# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LINDA CRUZ-PACKER** | ) | **C.A. No.:  07-1235** |
| | ) | **(RWR)** |
| | ) | |
| **Plaintiff,** | ) | **JURY DEMAND** |
| v. | ) | |
| | ) | |
| **MICHAEL CHERTOFF, Secretary** | ) | |
| **Department of Homeland Security** | ) | |
| **Defendant** | ) | |
| | ) | |

## PLAINTIFF'S  REPLY TO DEFENDANT'S ANSWERS TO AMENDED COMPLAINT BASED ON UNLAWFUL EMPLOYMENT PRACTICES, ON THE BASIS OF SEX (FEMALE, RACE (AFRICAN AMERICAN, AND RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1966.

COMES NOW, Plaintiff Linda Cruz-Packer, Pro Se litigant hereby answers as follows:

**Parties**

1)      Plaintiff is an adult and a resident of the State of Maryland.  At all times herein

mentioned Plaintiff was employed by the Department of Homeland Security, and at the time of the

discrimination it was under the Department of Transportation (DOT) and later it became specifically the

Department of Transportation Security Administration, Hereinafter referred to as "TSA", as a SV-1811-J

Band, Special Agent. Plaintiff was assigned to work in the Office of Internal Affairs and Program

Review.  (Defendant admits)

**Plaintiff disagrees** with there being a stipulation/condition that specifically indicated that Plaintiff

position was predicated upon a successful completion of the Office of Personnel Management (OPM)

background investigation. (See offer letter Exhibit **/** )

2.) Defendant and his Agency TSA removed  Plaintiff from her SV-1811-J Special Agent

(Criminal Investigator) position based on a charge of "Unsuitability for Federal Service" The Agency

TSA alleged that the appellant had been terminated by a prior employer for misconduct and had failed to

**RECEIVED**

**APR 2 2 2008**

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

disclose that termination to their satisfaction on her Standard Form 86, Questionnaire for National

Security Positions. (Defendant Admits)

**Plaintiff** contends that Defendant's answer is untrue and the reason for my removal was based on a

discriminatory, retaliatory, bias, and orchestrated efforts on the part of the Defendants to remove Plaintiff

and prevented OPM from conducting my background investigation to its conclusion which might have

found issues but at no time did they specifically state that I was unsuitable. TSA inserted their CPO Office

into the mix to make sure that my Top Secret Clearance was not granted. When TSA should have referred

all discrepancies to OPM to investigate where there could be no chance of bias that resulted in the

circumstances surrounding Plaintiff's case. Where the CPO office acted as Judge, Jury, and Executor. In

that the CPO office recommended Plaintiff's removal, investigated the areas of concern, and was the

deciding official at Plaintiff's removal hearing.

3.) Plaintiff appealed the removal to the Merit System Protection Board (MSPB) because she was a

preference-eligible employee in the excepted service who had completed at least one year of current

continuous service in the same position and also asserted that she was a veteran, who had served in the

United States Army.    (Defendant Admits)

**Plaintiff** contends that her treatment should have been less disparate and non discriminatory given her

veteran status and the fact that she had worked for TSA for over two years and should not have been

removed from her position, but given consideration to revert to her original position of an 1801, if a top

secret clearance could not be obtained.

4.) Because Plaintiff worked for TSA the Aviation and Transportation Security Act (ATSA) applies in

this case. Under ATSA, TSA employees are covered by the personnel management system that is

applicable to employees of the Federal Aviation Administration (FAA) under 49 U.S.C. & 40122, except

to the extent that the Under Secretary of Transportation for Security modifies that system as it applies to

TSA employees, as such she was allowed to appeal to MSPB as an "employee." (Defendant Admits)

**Plaintiff** contends that TSA deliberately led her to believe that she had no appeal rights in this wrongful

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)
termination and in their termination/removal letter failed to acknowledge such.

5.) Based on that determined "employee" status established by the Plaintiff so that she could be heard

before the MSPB, showed that she was a vested federal employee. Therefore, the issue Defendant and his

Agency, TSA, raised regarding suitability is **MOOT.** (Defendant Denies)

**Plaintiff contends** that the agency had more than two years to conclude Plaintiff's background

investigation and took over 8 months to even initiate a background investigation. However, once these

alleged issues surface in West VA, they should have been handled like other Homeland Security

employees who were also undergoing a security background check during this time,

The Department of Homeland Security Inspector General found many of them had a history of drunk

driving, domestic violence, sexual harassment or falsifying employment information, along with filing for

bankruptcy, been arrested or faced allegations of misconduct. It should be noted that Plaintiff's situation

involved allegations that reportedly came from prisoners, whose credibility, should have raised a flag with

investigators. Therefore, if these employees, most of them white males, were grandfathered in and

allowed to remain in their positions. The treatment of Plaintiff's background investigation should not have

been treated any differently. TSA showed favoritism and different hiring standards. Especially if you

happened to be a female, especially in Plaintiff's case when she also was an African American female.

(See AOL Mail exhibit 2)

6.) The reason for suitability issue being **MOOT** is that the Plaintiff was not a brand new employee with

the Federal Government, but instead was a former Federal employee who had previous government

experience with the Federal Bureau of Investigation as a Special Agent and served in the United States

Army and was vested.. (Defendant Denies)

 **Plaintiff contends** that based on her prior government services and veteran status, removal, was too

severe a penalty.

7.) The Plaintiff should have received the same consideration that was used and brought about or retained

and used when Background Investigations were being handled while TSA was under the jurisdiction of

3

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

Department of Transportation that were on going at the exact time frame as the Plaintiff's background was being handled. (Defendant Admits)

8.) Comparative analysis can be made that Background Investigations that were underway that involved Federal Air Marshall, Custom Agents, and Former Federal Aviation employees, where actual criminal charges, domestic violence charges, and other serious matter were discovered relating to these Department of Homeland Security Employees (DHS), these (DHS) employee were grandfathered in and absorbed into the (DHS) and DOT/TSA workforce. (Defendant Denies)

**Plaintiff contends** Homeland Security Department Inspector-General's report cited by the Wall Street Journal, August 31, 2004, revealed such findings.

9.) Application of the same standards used in adjudicating these (DHS) employees' employment background if applied to the Plaintiff's Background Investigation would have resulted in the same outcome for the Plaintiff and she should have been grandfathered in as other prior Federal Employee's had been. Instead the Agency (TSA) took it upon itself to do what the Plaintiff's former employee failed to do, which was conduct an investigation into the allegations reported by inmates who had their own hidden agenda for making false statements. (Defendant Denies) (**Plaintiff Contends** that the Defendants went out on a witch like hunt and aggressively gathered damaging information to make a case to remove the plaintiff with distorted and unsubstantiated information that they concocted and interpreted in a negative way without any investigator asking Plaintiff what she meant or wrote on my (SF) 86. Other HLS/government employees would have been contacted and asked or allowed to explain or provide individuals who might be able to shed some light onto these issues. However TSA CPO office undertook a crusade to carry out very lengthy and unnecessary investigations without consulting with the plaintiff or allowing OPM to interview the plaintiff to find out what or why certain information had been written on the (SF) 86. It wasn't until after plaintiff filed a complaint of an unfair, prejudicial and biased *(see exhibit* investigation conducted by OPM that anyone asked the plaintiff about the issues uncovered in West *3* Virginia. In other word TSA did what West Virginia had failed to do and that was to determine the

4

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)
validity of the allegations.

10.) It was never a pre employment condition that the Plaintiff's position be predicated and based on the successful condition of an OPM Background Investigation. If that was true, the Agency would have put that condition in writing when the offer of employment was made to Plaintiff. (Defendant Denies) **Plaintiff contends** that a Top Secret Clearance was never discussed or required prior to Plaintiff accepting a position with TSA. (See Job Offer letter exhibit *J*)

11.) Conversely, the treatment and actions undertaken by the Defendant and his Agency (TSA) treated the Defendant as if she was a new employee. Their actions opened up unsubstantiated allegations that resulted in a lengthy background investigation check that was used in a discriminatory and harmful way against the Plaintiff that resulted in a wrongful termination. (Defendant Denies) **Plaintiff contends** that TSA overstep it's authority in their rush to remove her and did not allow OPM to do their job. The agency did not prove by a preponderant of evidence that the plaintiff knowingly supplied incorrect information with the intention of defrauding this agency. Nakel v. Department of Transportation, 782 F.2d 975,977 fed Cir, 1986. The circumstances surrounding OPM's background check where usurped by the Agency and to prevent OPM from clearing up these discrepancies like they did with another job where the plaintiff was fired they simply took over the investigations and slanted it to make sure the removal was allowed to remain. Under whose authority did TSA use to usurp OPM's and complete the Plaintiff's background check. The fair thing to do would have been to allow OPM to handle the investigation in West Virginia.

12.) Defendant, Michael Chertoff, is the Secretary of (DHS), (Defendant Admits) and consented to and or participated in the decision to terminate the Plaintiff from her employment with (DHS). (Defendant Denies) **Plaintiff Contends** Secretary Chertoff was not in his position at that time but the prior Secretary participated.

13.) Defendant, Michael Chertoff, at all relevant times herein mentioned had actual as well as constructive knowledge of all of the acts the plaintiff complained about. (Defendant Denies) **Plaintiff Contends** that prior Secretary participated.

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

14.) At all relevant times herein mentioned, Defendant, Michael Chertnoff was the agent of the

Defendant, (DHS) and was acting within the scope of his employment  (Defendant Denies) **Plaintiff**

**Contends** that prior Secretary participated.


### Jurisdiction

This court has jurisdiction of this matter as a result of the Office of Federal Operations final EEOC

decision GIVEN THE Plaintiff right to file a civil action.

### Statement of Facts Common to All Counts.

The Plaintiff, who is forty years and older, was hired on June 4, 2002, in the position of Transportation

Security Specialist.

15.) The Plaintiff never received anything in writing stipulating that her position was predicated on the

completion of an OPM background check. (Defendant Denies) **Plaintiff Contends** that her job offer letter

contained neither such stipulation nor Standard Form 50. ( See Exhibit  Now comes TSA on November

15th, 2007  with a declaration from Sheran Callahan, stating that there is a requirement for a top secret

security clearance, when in actuality the Plaintiff worked in her position for over a year and a half without

A top secret clearance. (see exhibit **|** )

16.) The Plaintiff wasn't even asked to complete an SF-86 form to initiate a Background Investigation

until March of 2003, some eights months after her arrival on duty date (AOD) and employment at TSA

started. (Defendant Denies) **Plaintiff Contends** that her hire date was June 17, 2002 and the request for

completion of her SF-86 for a background Investigation to commence did not happen until March of

2003.

17.) On June 30, 2002, Plaintiff was reassigned to a Criminal Investigator Position. (Defendant  Admits)

18.) The Plaintiff submitted her Sf-86 in March 2003, and did not learn of the specifics of allegations that

had been learned by the Agency (TSA) until after they proposed her dismissal in October, 24, 2003.

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)
(Defendant Denies) **Plaintiff Contends** that TSA was extremely secretive and even when asked refused

to inform the Plaintiff of the specifics of the allegations surrounding her background check  It wasn't until

Plaintiff requested her records from West Virginia on October 31, 2003, that she became aware of the

magnitude of the issues surrounding her former position in West Virginia. (see exhibit 4)

19.) The Plaintiff was never question about the allegations by any investigator prior to the proposal for

removal being presented. (Defendant Denies)

## Plaintiff contends

 Letter from Holland indicated rumored concerns by inmates of the correctional facility, it never

indicated they took the charges serious enough to investigate therefore, nothing was ever

substantiated nor was there ever any final report completed or any thorough investigation

warranting a dismissal.  TSA interpreted this dismissal to suit their needs, and under took a very

calculated and·sophisticated method in evoking the suitability reason, as a tool of retaliation and

reprisal, instead of affording me a fair and impartial hearing, as one should to a veteran and wife of

decease disable veteran.  I feel I should have been given the benefit of doubt particular since TSA is

unable to produce anything to substantiate any of these allegations except for hearsay from

prisoners.

Note: the letter form Holland listed four areas of concern; TSA added two additional charges to

buttress an extremely weak case for my removal.  Plaintiff admits that the second week I was

employed with, Corrections, Plaintiff had her driver stop at her daughter's school and they picked

her up and brought her back to work. Plaintiff was counseled and told by the Administrator Mr. Ervin

that was not allowed, and it never occurred again. The other three charges have no merits and

are frivolous. TSA added two additional charges of directing an inmate who was incarcerated for 3rd

offense DUI and driving on a suspended license to dive my personal vehicle, and theft of Facility

food, to show the mean spirtness, retiality and discriminatory actions harness against the Plaintiff .

(See Holland's letter dated May 21, 1998 investigation.)

This is plain piling on and relying on hearsay, where is the final report, sworn affidavit or anything

that substantiates any of these ridiculous allegations. Why was Plaintiff not asked **one question**

7

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

concerning these allegation or discrepancies when Plaintiff was called over ten times with questions about another termination from Volunteers of America where one of the questions ask included is their anyone who can shed any light on this situation to clarify it. It goes without saying that TSA wanted to literally lynch Plaintiff by not affording her any opportunity to clarify or provide any supporting documentation or information to resolve these multiple allegations in West Virginia. Other white or male employees were afforded an opportunity to clarify serious issues such as these before putting the cart before the horse and immediately recommending the Plaintiff's removal.

20.) The Agency moved forward with an investigation into the alleged allegation and Plaintiff was on Paid administrative leave during that period. (Defendant Admits)

21.) On April, 15, 2004, The Agency (TSA) proposed Plaintiff's indefinite suspension. (Defendant Admits)

22.) On June 1, 2004, The Agency (TSA) issues a Decision indefinitely suspending Plaintiff. Effective June 3, 2004. (Defendant Admits)

23.) The Plaintiff was removed from the Agency (TSA) on November 18, 2004, based on a charge of unsuitability. (Defendant Admits)

24.) The Plaintiff filed a petition with the MSPB and a hearing was held by an Administration Judge (AJ) Who upheld the Agency decision to remove the Plaintiff. (Defendant Admits)

25.) The Plaintiff next filed an appeal for the full MSPB to review the decision made by the MSPB (AJ), and the Board issued a final order on January 31, 2007, denying Plaintiff's petition for review. (Defendant Admits)

26. On March 7, 2007, the Plaintiff filed a timely petition with the Equal Employment Opportunity Commission (EEOC) asking for review of a final order issued by the Merit System Protection Board, and alleged that she was discriminated against based on her race (African-American, sex (female) and reprisal for prior protective EEO activity. (Defendant Admits)

Michael Chertoff, Secretary, Department of Homeland Security, TSA

C.A. 07-1235 (RWR)

27. On April 13, 2007. EEOC. Office of Federal Operations concurred with the Final decision of the

MSPB finding no discrimination. (Defendant Admits)

This case was a mixed case and the AJ did not allow any discrimination matters into the MSPB hearing.

. (Defendant Denies)

## Count 1

### Defendants Have Engaged In an Unlawful employment Practice in Violation of the Civil Right Act of 1966, As Amended, On the Basis of My Sex (female).

28.)    That the Defendant has engaged in an unlawful employment proactive in violation

Of the Civil Rights Act of 1966, as amended, on the basis of my sex (female). (Defendant Denies)

29.)    That as a result of said violation the Plaintiff has been injured. (Defendant Denies)

30.)    That as a result of that injury the Plaintiff has suffered damages. (Defendant Denies)

**Plaintiff** will response at a later date with the assistance of an attorney.

## Count II

### Defendants Have Engaged In An Unlawful Employment Practice In Violation of the Civil Rights Act of 1966, As Amended, on the Basis of Plaintiff's Sex (Sexual Harassment.

31.)    The Defendant have engaged in an unlawful employment practice in violation of

the Civil Rights Act of 1966 as amended, on the basis of the Plaintiff's sex, (sexual

harassment). (Defendant Denies)

32.)    That as a result of the Defendants behavior the Plaintiff has been injured. (Defendant Denies)

33.)    That as a result of the injury the plaintiff has suffered damages. (Defendant Denies)

**Plaintiff** will response at a later date with the assistance of an attorney

## Count III

### Defendants Have Engaged In an Unlawful Employment Practice In Violation Of the Civil Rights Act of 1966, As Amended, On the Basis of Retaliation.

9

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

34.)    That the Defendants have engaged in an unlawful employment practice in

violation of the Civil Rights Act of 1966, as amended on the basis of retaliation, for filing a complaint and

EEOC action against her immediate supervisor. (Defendant Denies) **Plaintiff disagrees**

35.)    That as a result of said conduct the plaintiff has been injured. (Defendant Denies) **Plaintiff disagress**

36.)    That as a result of said injury, the plaintiff has suffered damages. (Defendant Denies) **Plaintiff disagrees**

**Plaintiff contends**

On October 24, 2003, when TSA proposed my removal, not one person from TSA or OPM, bothers to

ask me any question about the allegation that West Virginia Alleged.  As a veteran, I should have

been given an opportunity to produce someone who could shed some light onto these charges or

give my explanation to this allegation, but they didn't.  I was so shocked at the way OPM conducted

my background investigation that I filed a complaint against them.  They conducted additional

interviews but TSA, left that interview out of the official record.  Instead they accused me of having

an improper relationship with the Cabinet Secretary Otis Cox, who provided insight into these

allegations.  TSA, behaved extremely retaliatory and in a reprisal mode in that they concealed

information and did not afford me the proper forum to defend myself at the hearing regarding my

indefinite suspension, when they knew the CPO's investigation had discovered new information that

they would use to suspend me but they fail to notify me of these matters until after the suspension

took place which is in violation of prohibited personnel practices. The grounds for the suspension

were predicated on the information obtained in the background investigation therefore, I have aright

to appeal this to the MSPB, because my indefinite suspension was for a period over 14days, the

Board has jurisdiction and must decide this appeal pursuant to 5 USC $ 7701. As such the Board has

jurisdiction over this case because 49 USC $ 40122/g (2) applies 5 USC $$ 7701 through 7703 to

the FAA and now TSA. moreover subsection g (3) of this same provision also restored FAA

employees right to submit an appeal to the board. section 7701 describes the appellate procedures

applicable in appeals to the board. section 7522 defines employee to include veteran preference

10

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

employee with over one year of current continuous service. under 7512, a suspension of more than

14 days in appeal bale to the board. Because the appellant meets the definition of "employee" and

because TSA indefinite suspension was for more than 14 days, the Board has jurisdiction over this

case.   I contend that the information contained in the aforementioned section shows that harmful

error in the application of the Agency's procedure in arriving at such decision, which was

compounded by my later removal. see Corbett V.DHS.

**Count IV**

**Defamation**

37.) That the Defendants posted at the front entranceway entering the building and at the gate entering the

garage for any and all DHS (TSA )employees to see,  the name and picture of the Plaintiff and barred her

from returning to DHS to retrieved her personal property. (Defendant Denies) **Plaintiff Contends** that the

TSA officials placed her pictures in the aforementioned areas to embarrassed and humiliate her and when

Supervisor (Hector Santana) responsible for said action was questioned he stated it was a practice at

Secret Service. Plaintiff also spoke with the Special Agent in the Office of Internal Affairs and Program

Reviews who was director to secure the pictures that were placed in the Main Lobby and Garage area.

This type of treatment was extreme and would never had been conducted on a non-minority or white male

Employee.

38.). The Plaintiff's supervisor told individual that employee was terminated and had her name removed

from her cubicle desk work area before the removal was final. (Defendant Denies) **Plaintiff disagrees.**

Responses to Affirmative Defenses:

**First  Affirmative Defense**

The court lacks subject matter jurisdiction because Plaintiff's claim in this case are inextricably

interwined with the Executive Branch's stewardship over national security. See Bennett V. Ridge

11

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)
**Plaintiff Contends** that this case differs greatly from the Bennett case in that she knew and had

knowledge of her termination, in this case Plaintiff had no knowledge of a termination until after she

submitted her (SF 86). **Plaintiff disagrees**

This court has jurisdiction of this matter as a result of the Office of Federal Operations final EEOC

decision GIVEN THE Plaintiff right to file a civil action.

If an adverse action results from a decision to deny a security clearance, an employee is entitled in the

procedural protections set forth in 5 U.S.C. $7513, and (b)

TSA change specifications to suit them as this case unfolded. Originally the Plaintiff's removal

was based on falsification of my Sf-86, when they thought that I failed to declare the West

Virginia job. That was their specification, plain and simple. Absent that charge, there would be no

suspension and subsequent termination. Unjustly, when I was able to show that I did include it

however, it was in the wrong place, and then they came at me with the unsuitability issue, so it

couldn't possibly be heard by the MSPB. Now since a law suit has been filed they are attempted

to use the issue of National Security when this case is one of wrong doings, misrepresenting the

facts of what happened in West Virginia and blatant discrimination, retaliation, and unlawful

employment practices from the beginning. In addition, I believe the plaintiff's due process was

violated by TSA keeping the reasons for her removal a secret and not supplying the Plaintiff

sufficient information to formulate an accurate response to charges level at the time of the

hearing for the recommendation of an indefinite suspension.

An employee who is removed for "cause" under $7513 when his/her required clearance is denied,

or in this case not allowed to be completed, is entitled to the several procedural protections

specified in that statue. The AJ at MSPB hearing may determine whether such cause existed,

whether in fact the clearance was denied, whether it was required, and whether transfer to a

nonsenstive position was feasible. In this case the AJ failed to undertake any of these options

and instead concentrated on the falsification charge.

12

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

## Second Affirmative Defense

The complaint fails to state a claim upon which relief can be granted.

**Plaintiff contends**

a)    that this court enjoin the Defendant, (DHS) their agents, servants and or employees,

acting within the scope of their employment  from continuing to engaged in

the unlawful acts of discrimination against the Plaintiff, and from defaming the plaintiff;

b)    that this court award the plaintiff judgment in her favor and against the

Defendant jointly and severally;

c)    that this court award the plaintiff compensatory damages in the amount of

$3,000,000.00, against the Defendant jointly and severally;

d)    that this court award the Plaintiff punitive damages against the Defendant

jointly and severally in the amount of 1,000,000.00;

e)    Economic damages $800,000 non economic $1,500,000

f)    Race discrimination $300,000

g)    Retaliation –as the court deems necessary against the defendant

h)    Harassment discrimination- as the court deems necessary against the defendant

i)    and that this court award the Plaintiff such other and further relief as it deems

necessary, to make the Plaintiff, an aggrieved individual, whole again.


## Third Affirmative Defense

Any adverse employment action(s) or decisions by Defendant relating to Plaintiff were based upon

legitimate, non-discriminatory reasons. Defendant did not intentionally or otherwise unlawfully

discriminate against Plaintiff. **Plaintiff disagrees**    (see exh b, t  19)  Re 5 day suspension

## Fourth Affirmative Defense

Plaintiff cannot establish that employee(s) who were not Africian American received more favorable

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)
treatment by TSA in circumstances nearly identical to Plaintiff's. **Plaintiff disagrees**

- The Homeland's Security Department's Inspector General found that a TSA oversight board that reviews and approves potential hires that where undergoing background security clearances during the same period my background clearance was ongoing, failed to flag the questionable background of 161 of the 504 applicants' to the Air Marshall's program as too lenient and some of them with actual criminal crimes in their background where grandfather in and actually hired by TSA and they where granted top secret clearances and all I had was allegations of misconducted and my clearance was derailed and improperly handled by both opm and tsa

- When Plaintiff was first hired at TSA she (and other African Amercian agents) was only given a five percent bonus where my white male peers where awarded up to 15% bonus.

- There where cases involving Homeland Security employees where issues uncovered in their backgrounds where over looked, like the case of the DHS employee where DHS had information of him engaging in pedophile but he was granted his clearance anyway.

## Fifth Affirmative Defense

Plaintiff cannot establish that employee(s) who were not female received more favorable treatment by TSA in circumstances nearly identical to Plaintiff's. **Plaintiff disagrees**

(See # **5**) formal EEOC complaint (exhibit *6*) and IG report (exhibit   )

## Sixth Affirmative Defense

Plaintiff cannot establish that employee(s) who had not engaged in prior protected EEO activity received favorable treatment by TSA in circumstances nearly identical to Plaintiff's. **Plaintiff disagrees**

See IG report (exhibit   ).

## Seventh Affirmative Defense

Plaintiff cannot establish a prima facie case of race discrimination. **Plaintiff disagrees**

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

Many of Plaintiff's supervisors were former Secret Service employees and TSA CPO office had a large

concentration of former Secret Service employees. Specifically Plaintiff's immediate supervisor Hector

Santana, and Mr. Robert Scanlon from CPO office had a connection. The Secret Service connection was

lethal to Plaintiff. in that Scanlon  proposed the Plaintiff's removal instead of allowing the appropriate

Official from the Plaintiff's Office of Internal Affairs and Program Review to initiate the action as it did

with the Proposed Indefinite Suspension. The Plaintiff's work team "red" were almost exclusively all

former Secret Service agents,  Hector Santana and John Rooney Plaintiff's Supervisor's at the time of this

discriminatory action were both former Secret Service Agents. The pattern of race discrimination is alive

within TSA as outlined in Narcosphere, written by Bill Conroy on October 26th, 2004. Where he outlined

alleged racial discrimination problems within the Secret Service-formerly part of Treasury Department

and now some of these same individuals are now part of Department of Homeland Security/TSA and

appear to be part of a widespread pattern of racism with major federal law enforcement agencies.

It showed a pattern like the ones the plaintiff was subjected to that they argue represents a threat not only

to civil rights, but to the national security of this country. The lawsuit contends that the Secret Service has

"discriminated against African American Special Agents, from at least January 1974 forward, in its

personnel policies, practices, and procedures. A lot of the Agents involved in that case retired or received

waivers to come work for DHS/TSA and subsequently brought their Good Ole boy mentality with them

and continue to fail to ensure a fair and level field for African American Agents as noted in the case of the

Plaintiff. (see exhibit 6 )  *(exibit 7)*

## Eight Affirmative Defense

Plaintiff cannot establish a prima facie case of sex discrimination. **Plaintiff disagrees**

## Ninth Affirmative Defense

Plaintiff cannot establish a prima facie case of sexual harassment discrimination. **Plaintiff disagrees**

## Tenth Affirmative Defense

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

Plaintiff cannot establish a prima facie case of retaliation discrimination. **Plaintiff disagrees**

**Plaintiff contends** As a result of my retaliation discriminatory treatment and proposed dismissal,

Plaintiff sought the assistant of the National Organization of Black Law Enforcement Executive

(NOBLE), which Plaintiff was a member of at that time. Since TSA inception NOBLE has met with all

three Administrator's to voice their concerns about the frequency with which African American

Employees of TSA were the target of investigations, management reviews and adverse actions

(where like in my case terminations were being proposed.) The representative from NOBLE elicited

minimal concern by the questions and problems raised concerning the arbitrary and discriminatory

action on the part of TSA as an agency. The Plaintiff will provide testimony and names of African

Americans who like the Plaintiff suffered highly questionable circumstances and prompted members

of NOBLE and other minority organizations to view employment with TSA risky. (see Exhibit #18)

### Eleventh Affirmative Defense

Plaintiff cannot show that TSA's proffered reason for terminating Plaintiff' actually was pretext for

Discrimination. **Plaintiff disagrees**

### Twelfth Affirmative Defense

The Court lacks subject matter jurisdiction over the defamation count because defamation claims are

Specifically exempted under FTCA, see 28 USC 2680 (h), and so, the federal government has not waives

Sovereign immunity against defamation claims. As a result, Plaintiff cannot proceed against the
Defendant

On such a claim. Ingalshe v. Chertoff. 2006 WI 908678 at 12 (N.D. GA 2006.

### Thirteenth Affirmative Defense

Defendant United States reserves the right to plead all other affirmatives defenses or any applicable state

and federal statue which through discovery it learns may be applicable.

39.) **Plaintiff responses** to the aforementioned Defenses can be summed up by the appeal put forth by my

Michael Chertoff, Secretary, Department of Homeland Security, TSA

C.A. 07-1235 (RWR)

former attorney through e-filing to the board of MSPB as such the attachments are presently unavailable

but will be submitted at a later date:

## LINDA Y. CRUZ-PACKER v. PETITION FOR REVIEW

**COMES NOW** Appellant Linda Y. Cruz-Packer, by undersigned counsel, and petitions

this Honorable Board for review of the Initial Decision of September 6, 2006, which affirmed the

indefinite suspension and removal actions taken against by the Agency Department of Homeland Security

(hereinafter "Agency") during the course of her employment. As set forth more fully below, Appellant

Cruz-Packer asserts that there were errors of law and fact stated in said Decision. Moreover, Appellant

Cruz-Packer contends that the penalty taken her was unreasonable and unduly severe, and an abuse of the

Agency's discretion. Accordingly, Appellant Cruz-Packer requests that the Initial Decision be

REVERSED in its entirety, and that the removal and indefinite suspension actions be NOT SUSTAINED.

### STATEMENT OF FACTS

On or about June 4, 2002, Appellant Linda Y. Cruz-Packer (hereinafter "Appellant") was

offered and accepted employment at the Transportation Security Administration (hereinafter )

*"Agency") in the excepted service for the position of Transportation Security Specialist, SV–1801-J.

*Employment Offer Letter, Agency File, Tab 6.* Later that same month, Appellant was transferred to the

position of Criminal Investigator, based upon her previous employment experience in law enforcement.

*Reassignment Memorandum, Agency File, Tab 7.* Appellant was and is veteran-preference eligible, in that

she served in the Gulf War and is the widow of a veteran.

In or about March 2003, Appellant completed and submitted a SF-86 form and

Declaration of Federal Employment, which initiated a background investigation of Appellant by the

Office of Personnel Management ("OPM") in order for Appellant to receive a security clearance. In or

about April 2003, Appellant was interviewed by an OPM investigator, when she was questioned about her

responses on the two forms. OPM performed this investigation until June 11, 2003, when the Agency

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

requested that OPM close its investigation. *Appellant's Exhibit A, OPM Case Closing Transmittal, dated*

*6/11/03.* Thereafter, Appellant's background investigation was conducted by the Agency's own

Credentialing Program Office. At no time was Appellant advised nor informed as the authority by which

the Agency was conducting said investigation.

Subsequently, on or about October 24, 2003 Appellant was served with a Notice of

Proposed Removal based upon information disclosed during the course of Appellant's

background investigation. *Notice of Proposed Removal, Agency File, Tab 8.* According to said Notice, the

Agency alleged that Appellant was unsuitable for federal employment due to the alleged termination of

her employment with the State of West Virginia, Department of Military Affairs & Public Safety,

Division of Corrections in May 1998 for a litany of wrongdoings and inmate abused. Id. The Notice

further accused Appellant of failing to fully disclose information regarding her employment history on the

SF-86 form, in that she did not list such termination in response to Question# 22 on the form. Id.

Appellant averred that she had not been questioned about said employment, nor

her reasons for separation from said position, until the Notice of Proposed Removal was issued.

Accordingly, Appellant responded to the Notice, stating that she was not terminated from said

employment, but instead verbally resigned from that position due to terminal illness of her husband (who

was still residing in New York) and difficulty she was experiencing with her supervisors at said job.

Appellant vehemently denied that she had ever received any notice of termination concerning that job.

Moreover, Appellant submitted an affidavit from Otis Cox, the former Secretary of Public Safety for the

State of West Virginia, who had personally hired Appellant to the position in the Department of

Corrections. In the affidavit, Mr. Cox stated that,

While serving as Secretary, he had not been advised of Appellant's dismissal, and further, had Appellant

been terminated from her position in 1998, his office would have been notified and received the internal

documentation related to such adverse action. *Declaration of Otis Cox, Agency File, Tab 9.*

The Agency then persisted in its investigation of Appellant and presented her with several documents

18

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

from the State of West Virginia related to the falsification allegations, including a copy of preliminary

investigation by Appellant's former supervisor, a termination letter purportedly sent to Appellant in May

1998, and affidavits from her former supervisor and other West Virginia employees related to the

supervisor's ability to fire Appellant. Appellant raised issues with several aspects of said documentation;

specifically, she noted that (1) there was no conclusory evidence nor final report regarding the charges

which had been lodged against her in West Virginia; (2) the allegations had been made, in most part, by

inmates, yet there was no

corroborating statements nor recordings evidencing any testimony by said inmates; (3) the record from

West Virginia was devoid of any reference to the meeting held between Appellant and her supervisor,

during which she verbally announced her resignation from her position at the Department of Corrections;

(4) the alleged termination letter was issued days after her verbal resignation and it failed to state that any

of the accusations lodged against Appellant had been sustained; and (5) the internal personnel form

evidencing Appellant's purported dismissal lacked the requisite signatures for full completion, including

acknowledgment from Otis Cox's office.

*Exhibit B, Letter re: Reply to Proposed Removal– Supplemental Investigation to Gary*

*Krizanovic, Personnel Security & Credentialing Program Office, dated June 1, 2004; Exhibit C Letter re:*

*Ms. Linda Cruz-Packer to Joy Fairtile, Credentialing Program Office, dated September21, 2004; Exhibit*

*D, Letter re: Ms. Linda Cruz-Packer to Joy Fairtile, Credentialing ProgramOffice, dated October 4,*

*2004.* Appellant contended that, on the preponderance of the evidence, the record not only failed to

establish that Appellant was dismissed from her employment with the Department of Corrections but also

did not demonstrate that she was ever advised of such

action. Nevertheless, on or about November 18, 2004, the Agency issued its Decision on

Proposed Removal, finding that Appellant was unsuitable for federal employment.

Consequently, Appellant filed an appeal to the Agency's determination of suitability as

well as the removal action. On or about July 18, 2006, a hearing was held on the matter, as well as

Michael Chertoff, Secretary, Department of Homeland Security, TSA

C.A. 07-1235 (RWR)

Appellant's challenge of the indefinite suspension, and presided over by Administrative Judge (AJ)

Michelle Hudson. On September 9, 2006, AJ Hudson issued the Initial Decision, currently on appeal

herein.

## ARGUMENT

Appellant Cruz-Packer now asserts that errors of both fact and law were made in the

Initial Decision, such that the Decision must be REVERSED and the removal action be NOT

SUSTAINED. As set forth more fully below, Appellant contends that (1) the Agency did not meet its

burden to justify the removal action taken against Appellant and (2) the penalty imposed by the Agency

was unreasonable and failed to acknowledge Appellant's mitigating factors. Insofar as the indefinite

suspension action, Appellants contends that said action was unnecessary and inappropriate, because the

Agency had completed its investigation of her background and was preparing for her removal.

## A. THE AGENCY DID NOT MEET ITS BURDEN TO JUSTIFY THE

## REMOVAL ACTION TAKEN AGAINST APPELLANT.

It is well-settled that an agency has the burden to prove the merits of its actions by a

preponderance of the evidence. To sustain a falsification charge, the agency must prove by preponderant

evidence that the employee knowingly supplied incorrect information with the intention of defrauding the

agency. Naekel v. Dep't of Transportation, 782 F.2d 975, 977 (Fed Cir. 1986). Intent may be shown by

circumstantial evidence and may be inferred when the misrepresentation is made with reckless disregard

of the truth. McClain v. Office of Personnel Management, DE-0731-96-0542-I-1 (August 18, 1997)

(citing Devitto v. Office of Personnel Management, 61 M.S.P.R. 297, 302 (1994).

With respect to the removal action in the present matter, the presiding Administrative

Judge found that agency had met its burden and its charge. According to the Initial Decision, Appellant

was unsuitable for federal employment in accordance with the two (2) specifications set forth in the

Agency's notices related to the removal action: (1) that she had been terminated from her prior

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

employment for numerous acts of misconduct and (2) that she falsified the SF-86 form by failing to

provide information regarding the West Virginia termination in response to question #22 of the form.

*Initial Decision at 14-15, 18.* However, Appellant Cruz-Packer contends that there was insufficient

evidence presented by the Agency to support either specification by the preponderance of the evidence.*1.*

*The Agency did not Present Credible Evidence that Appellant was Terminated from Employment by the*

*West Virginia Department of Corrections.*

In reviewing the entire record here, the Agency did not prove that Appellant was

terminated from her employment from the West Virginia Department of Corrections

("WVDOC"). In the Initial Decision, the Administrative Judge (AJ) notes that the issue in dispute is a

"falsification" of employment application case, despite the Agency's finding concerning the merits of the

alleged misconduct of Appellant during her WVDOC employment. *Initial Decision at 8 n. 6.* As such, the

AJ did not require the Agency to prove the reasons given by the WVDOC for its decision to dismiss in

May 1998. Appellant contends this is procedural error in the Initial Decision. In the Decision on Proposed

Removal, the deciding official expressly stated that "the conduct referenced in this Specification is of a

serious nature and it renders you unsuitable for employment with [the Agency]." *Agency File, Tab 5, at 5.*

Given that the conduct alleged against Appellant was considered in the decision to remove her, the

Agency must be required that such conduct was committed.

Accordingly, the evidence presented in support of Appellant's purported misconduct at

the WVDOC failed to meet the requisite burden here. The Agency relied upon a "preliminary

investigation" conducted by Donald Ervin in May 1998, which, assumedly recorded the wrongful

behavior of Appellant during her mere sixty (60) days of employment with that institution. This

investigation, while replete with wild accusations from various inmates of extreme misconduct by

Appellant, failed to include any sworn statements or affidavits by the accusers, nor any other document,

tape or other tangible item to substantiate the allegations set forth therein. Indeed,

even the dismissal letter signed Manfred Holland did not indicate that Appellant had, in fact, been found

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

to have committed any acts of misconduct. *Agency File, Tab 12*. As such, the Agency presented no

concrete evidence that the allegations lodged against Appellant were ever found to be true. Insofar as the

termination of Apellant's WVDOC employment itself, the evidence is again lacking. Appellant has

repeatedly and consistently testified that (1) she verbally resigned from employment during a private

meeting with Manfred Holland and (2) that the documentation provided by the WVDOC concerning the

dismissal is inconsistent and flawed.

First, Appellant testified that on or about May 14, 1997, she was presented with the

preliminary investigation and advised of her suspension. On or about May 18, 1998, she

responded in writing to the investigation and then met with Holland. During said meeting, Appellant

tendered her resignation verbally to Holland. Thereafter, she immediately packed up her family and

moved back to New York, where her terminally ill husband was awaiting her. In opposition, the Agency

offered a letter by Holland which purportedly terminated Appellant's employment. *Agency File, Tab 12*.

The Agency, nor the WVDOC, provided any proof that the letter had been issued, delivered or received

by Appellant. In the Initial Decision, the AJ found it "unlikely" that the letter had not been delivered to

Appellant due to a missing apartment number (*Initial Decision at 15)*; however, it seems just as

"implausible" that a state agency would not utilize some means of confirmation or verification that a

correspondence announcing an employee's termination was, in fact, received by the intended recipient.

Additionally, the other document related to Appellant's purported termination, the WV-11 form– the

official personnel form– was completed, but had several significant irregularities: a change in the dates,

missing signatures from requisite approving officials (specifically, the omission of approval by the

Secretary's office) and a signature by Holland himself, in place of The discrepancies in the WV-11 form

should have raised questions as to the veracity of the document. Moreover, it should be noted that the

form itself was presented during the course of the Agency's investigation, after OPM had been asked to

conclude its investigation.

Finally, with respect to the termination, the Initial Decision cites two (2) statements in the

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

record by Otis Cox, who served as the Secretary of Public Safety during the time period of Appellant's

employment with the WVDOC. In these statements, Cox asserted that: (1) as the Secretary of Public

Safety, he oversaw the WVDOC; (2) he was involved in the hiring and firing of employees; (3) his office

received the WV-11 forms of WVDOC employees in order to approve the requested personnel action; (4)

that, with respect to Appellant, he nor his office received any such WV-11 at or around the time of

Appellant's alleged dismissal. Cox further stated that, since he did not ever receive notice of Appellant's

termination, "something must have fallen through the cracks."

As such, the AJ's findings as to Specification #1 were not supported by the evidence in

the record. Specifically, there was nothing in the record which demonstrated, by a

preponderance, that Appellant was dismissed and did not resign, nor that she was notified of the

dismissal. Indeed, even Otis Cox, who remained in position in West Virginia until 2001, was not made

aware of Appellant's alleged dismissal until he was questioned in regard to Appellant's background

investigation.

*2. The Agency Did not Show By Preponderant Evidence that Appellant Falsified the*

*SF-86 Form.*

Next, the AJ found that the Agency had met its burden in proving that Appellant had

falsified her SF-86 form when she failed to disclose the WVDOC termination. Falsification entails the

specific intent of defrauding, deceiving or misleading the agency. Naekel, 782 F.2d at 975. Appellant

consistently testified that she completed the SF-86 and OF306 forms as a single security "package" and

believed that she could continue her answers from the SF-86 form on the other document. Accordingly,

when she described her resignation from the WVDOC on the OF306 form, she was utterly unaware that

the information would be considered as "omitted" on the SF-86 form. Indeed, testimony from the Agency

official John Rooney confirmed that the Agency's usual and customary practice to present the two

documents simultaneously and without

a directive that each document will be "stand alone" at time of its review. As such, there was no evidence

23

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)
of any intent of Appellant to mislead the Agency, since she reasonably assumed that the two documents

would read together.

Furthermore, the testimony of Appellant and Otis Cox are consistent with Appellant's

(exhibit #8)

statement on the OF306 form. Cox stated in his affidavit that he did not discuss with Appellant any

circumstances of Appellant's separation from WVDOC employment in May 1998 Accordingly, when

Appellant testified about the "mutual agreement" with Cox regarding her employment, she explained that,

at the relevant time, she and Cox discussed, as friends, the severity of her husband's medical condition

and her desire to return to New York to care for him While she and Cox agreed that she should return to

New York and her husband, they did not discuss the ramifications of taking such leave upon her WVDOC

employment, nor whether she should, or would, resign from her position. Cox's statement, then, that he

did not discuss termination or resignation with Appellant is entirely consistent with Appellant's

testimony. Moreover, had Appellant been provided the opportunity to clarify her response on the OF306

form prior to the Agency's proposal of the removal action (as she had been provided with other items on

the SF-86 and OF306 forms when OPM conducted its investigation), the matter in dispute currently

probably would not have arisen.

Accordingly, the AJ's finding concerning Appellant's statement on the OF306 form was

erroneous. There was not sufficient evidence in the record to prove, or even reasonably infer, that

Appellant knowingly and intentionally made a false statement in order to defraud, deceive or otherwise

mislead the Agency.

## B. THE PENALTY TAKEN BY THE AGENCY WAS UNREASONABLE IN

## LIGHT OF THE DOUGLAS FACTORS.

This Honorable Board can review an agency-imposed penalty to determine if the agency

considered all the relevant factors and exercised management discretion within the tolerable limits of

reasonableness. Tom v. Dep't of the Interior, 97 M.S.P.R. 395 ¶50 (2004) (citing Wentz v. U.S. Postal

Service, 91 M.S.P.R. 176 ¶ 13 (2002); Luciano v. Dep't of the Treasury, 88 M.S.P.R. 335 ¶ 13 (2001)).

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

The Board will modify a penalty only when it finds that the agency failed to weigh the relevant factors of

that it clearly exceeded the bounds of reasonableness in determining the penalty. Id.

In the present matter, Appellant contends that the Agency's imposition of its penalty was

unduly severe for several reasons. First, in the Initial Decision, the AJ remarked that the deciding

official, Joy Fairtile, "noted that appellant had expressed no remorse, and that she had not taken any

responsibility for her action." *Initial Decision at 23.* It is inappropriate to consider an appellant's denial of

misconduct as an aggravating factor in determining the maximum reasonable penalty. Smith v. Dep't of

Navy, 62 M.S.P.R. 616 (1994). Additionally, neither the Agency nor AJ acknowledged Appellant's status

as a veteran in the determination of the penalty. See Skates v. Dep't of Army, 69 M.S.P.R. 366 (1996);

Willis v. Dept of Army, 12 M.S.P.R. 82 (1982).

Lastly, Fairtile testified that she considered a prior five-day suspension of Appellant, for a "violation of

travel card policy." *Initial Decision at 23.* However, Appellant testified and presented evidence that the

alleged violations were later found to be fraudulent activity, by no fault of her own, on the government

travel card.

As such, the Agency failed to consider the relevant Douglas factors in its imposition of

penalty in this matter. Therefore, the removal action is unreasonable in light of the circumstances of this

matter and should not be sustained.

C. **THE INDEFINITE SUSPENSION OF APPELLANT WAS UNNECESSARY,**

**AS THE AGENCY HAD COMPLETED ITS INVESTIGATION.**

Finally, Appellant contends that the Indefinite Suspension action taken by the Agency was not necessary,

in that the Agency had completed its investigation prior to said action. Shortly after Appellant was

presented with the Notice of Proposed Indefinite Suspension on or about April 15, 2004, she was

provided a copy of the Agency's Supplemental Investigation related to the proposed removal action, on or

about May 21, 2004. There is no evidence in the record, nor any testimony from Agency officials, that

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

any further investigation was conducted after June 1, 2004– the effective date of the indefinite suspension

action. Accordingly, Appellant asserts that the indefinite suspension action itself was moot at the time it

was effected, and therefore, improperly imposed upon her.

## CONCLUSION

For the foregoing reasons, Appellant Cruz-Packer respectfully requests the following

relief from the Board, namely:

a. That the Initial Decision dated September 6, 2006 be REVERSED in its

entirety; b. That the removal action taken by the Agency be NOT SUSTAINED;

c. That the indefinite suspension action taken by the Agency be NOT

SUSTAINED; d. That Appellant be restored to her employment in the Federal Service, with full backpay

and benefits; and

e. That the Board grant such other and further relief as deemed necessary and

proper.


Respectfully submitted,
LINDA Y. CRUZ-PACKER, Appellant
By Counsel
BY: **CAROLYN C. EAGLIN & ASSOCIATES**
_____/s/_____
Crystal A.G. Fisher, Esquire
431 N. Lee Street
Alexandria, Virginia 22314
703-549-9041
703-549-9043 (fax)


**Points from the Plaintiff:**

40) In addition to the aforementioned petition for review submitted by

Plaintiff's former attorney, it is the Plaintiff view that the AJ and TSA relied on selected information from

Mr. Otis Cox and chose to ignore or omit other information that was most helpful to Plaintiff. Case in

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

point was information provided by COX that he never had a conversation with Holland the West Virginia

Official that reportedly terminated the Plaintiff but never signed off on the WV-11 paperwork indicating

the Plaintiff's termination. Yet Holland gave a signed sworn statement indicating that he had a

conversation with Cox dealing specifically with Plaintiff's termination/firing. So, which is it? Is Cox only

believable when he says something to support TSA's view of this case. (See Exhibit 8 Holland also stated

that Cox told him to do what he had to do, which Cox also denied. That statement had nothing to do with

the termination, but instead had to do with the video tape of the Plaintiff allegedly stealing food from the

refrigerator

41.) TSA went to unusually circumstances to disprove that a WV-11 was needed to terminate the

Plaintiff. several interviews where conducted by the CPO. It should be noted that during OPM's

investigation this document could not be found or produced by West Virginia Officials. But later after

TSA's CPO investigator's involvement this most damaging document appeared without any West

Virginia DOC official signature affixed on it and several flaws, typos and suspicious alternations that

TSA readily accepted as proof of a termination. This document and a letter that Holland reportedly stated

he mailed to the Plaintiff's former West Virginia address, were the only tangible documentation that TSA

CPO office was able to produce. ( See Exhibits 9 and 10 )

42).Another point that removes suitability from their argument is that in the letter from TSA offering

Plaintiff her  position, (see letter of offering dated June 4, 2002 found in August 6, 2004 tab 4i submitted

by TSA)  nowhere did it stipulate that her job was dependent on the successful completion of a

background investigation, therefore, after more than two years of employment how can they take their

time initiating the background investigation, it was March of 2003, before they even asked her to

complete her background papers, which was some 8 months after her start date. and then summarily

remove her because of some unproven allegations made primarily by prisoners. More over Plaintiff was

able to perform all my job duties with no limitations without a top secret clearance. Even given the fact

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

that a top secret clearance was mandatory( which was never conveyed to her either in writing or orally,

Plaintiff was originally hired as an 1801 Transportation security specialist and should have been allowed

to revert back to that position since I was a vested employee with over two years of employment with

TSA and a veteran of the United States army.

43.)The Homeland's Security Department's Inspector General found that a TSA oversight board that

reviews and approves potential hires that where undergoing background security clearances during the

same period my background clearance was ongoing, failed to flag the questionable background of 161 of

the 504 applicants' to the Air Marshall's program as too lenient and some of them with actual criminal

crimes in their background where grandfather in and actually hired by TSA and they where granted top

secret clearances and all Plaintiff had was allegations of misconduct and her clearance was derailed and

improperly handled by both OPM and TSA   See attached letter exhibit **I** )

44.). Although TSA could prove no falsification, if we considered their argument of suitability, of note,

there was no issuance of a termination notice from the State of West Virginia. it was a dismissal notice

with no reason's listed for the dismissal.(see WV-11 exhibited 14 of TSA CPO investigation)

Additionally, the letter of dismissal written by Holland was never received by Plaintiff, nor was it sent up

the chain of command for review. During the time span when this alleged letter was sent to her former

address she had left the state of West Virginia and returned home (Queens, New York) to take care of her

severely ill husband). More importantly the letter that was sent to her former address did not have an

apartment number on it and I lived in a large apartment complex. In addition, the Plaintiff had relocated to

West Virginia and did not put in a change of address until several months later, therefore Plaintiff

contends she never received the letter.  Given the Plaintiff's history of responding to adverse actions in

writing, if she had received the letter from Holland detailing the dismissal, Plaintiff would have responded
*see exhibit 11*

in writing, and taken other appropriate steps.  However none of this was undertaken by the Plaintiff

because she never received the letter of dismissal from Holland. Therefore, how could she report

something she had no knowledge of. The only other evidence of " my alleged dismissal was a WV-11

28

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

equivalent to a sf-50, that was not in the records when OPM, conducted my background, but somehow

materialized when TSA CPO office investigated, and was faxed to TSA in May of 2005, from a budget

office, that contained several notations and entries that appeared altered, and no one from the Department

of Corrections signature was affixed to the document. The only signature was someone authorized

respectively for the Commissioner's Office, who had the authority to sign in his absence. The only

thing suspect with her signing for the Commissioner was he never was notified of the dismissal so she had

no reason to sign off on the document back in 1998. In other words the letter was never sent up the chain

of command, and Holland if he sent the letter should have been the official to sign off on the dismissal

letter. It appears to have been authored in 2005. (See exhibited

8

45. Letter from Holland indicated rumored concerns by inmates of the correctional facility, it never

indicated they took the charges serious enough to investigate therefore, nothing was ever substantiated nor

was there ever any **final report** completed or any thorough investigation warranting a dismissal. (Neither

OPM nor TSA ever asked for the tapes that Ervin stated he made of the prisoners) and when Plaintiff

FOIA and requested these tapes DOC refused (see exhibit 2) TSA interpreted this dismissal to suit their

needs, and under took a very harmful and sophisticated method in evoking the suitability reason, as a tool

of retaliation and reprisal, instead of affording me a fair and impartial hearing, as one should to a veteran

and wife of decease disable veteran. I feel I should have been given the benefit of doubt particular since

TSA is unable to produce anything to substantiate any of these allegations except for hearsay from

prisoners.

Note: the letter form Holland listed four areas of concern; TSA added two additional charges to buttress

an extremely weak case for my removal. I admit that the second week I was employed with, Corrections,

I had my driver stop at my daughter's school and I picked her up and brought her back to work with me. I

was counseled and told by the Administrator Mr. Ervin that was not allowed, and it never occurred again.

The other three charges have no merits and are frivolous. TSA added two additional charges of directing

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

an inmate who was incarcerated for 3rd offense DUI and driving on a suspended license to dive my

personal vehicle, and theft of Facility food, to show the mean spirtness harness against me. (See Holland's

letter dated May 21, 1998 exhibit 9 form CPO investigation.) $(\text{See } exhibit \ \underline{M})$

This is plain piling on and relying on hearsay, where is the final report, sworn affidavit or anything

that substantiates any of these ridiculous allegations. Why was I not asked one question concerning these

allegation or discrepancies when I was called over ten times with questions about another termination

from Volunteers of America where one of the questions ask included is their anyone who can shed any

light on this situation to clarify it. It goes without saying that TSA wanted to literally lynch me by not

affording me any opportunity to clarify or provide any supporting documentation or information to

resolve these multiple allegations in West Virginia.


46.). CPO investigation lacks credibility to show suitability as the reason for my removal, what evidence

did the CPO uncover, hearsay evidence, in many of the memorandum secured by TSA West Virginia

individuals, refer to video tapes, letters that my client wrote, tape conversation with inmates, improper

purchases made by my client, misuse of inmates free time, where is the paper trail, not one document or

sworn statement was obtain that contained any of these alleged evidence. When my client FOIA the State

of West Virginia for these documents she was denied access of these documents, because they don't exist.

Believe you me if my client had broken any laws, the animosity was so strong against her she would have

been arrested. TSA over stepped it's authority when they determined my suitability instead of referring it

back to OPM for a fair and impartial investigation.

If you review the investigation conducted by CPO they led every interview off with " - was interviewed

regarding an allegation developed during a background investigation that LINDA CRUZ-Packer, Special

Agent, internal Affairs Division, DHS,TSA, Arlington, VA may have made false written statements on

OPM (OF) form 306, Declaration for Federal Employment. Specifically, Cruz-Packer did not list her

termination from the West Virginia Division of Correction on her SF-86. That was what was on the table

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

from Day one. Once TSA saw that they could not prove these they then fell back on the suitability issue

which they should not even had been allowed to get into. They acted as jury and judge addressing

allegation that happened over seven years ago that had not been substantiated. I feel that this court

should hear my case because suitability was never an issue with TSA originally it was falsification, when

it became evident that falsification was weak given that I put the termination From West Virginia down in

the wrong section while completed my background forms in a section identified as the Declaration of

Federal employment question #12. What TSA did was to deny me an opportunity to clarify what I wrote

in that section and instead question Mr. Otis Cox as to "what I meant and if we had agreed to a "mutual

agreement. It is important to note. That TSA

At this point had become so zealous in getting me that they took over without having the authority to do

so OPM's role and conducted my background investigation.

TSA and any other federal agency has OPM do their background investigation of their employees, after

TSA realized that OPM might actual conduct a fair and impartial investigation in West Virginia that

might clear me and there was a possibility of my getting my Top Secret Clearance they CPO office

interjected and performed OPM's job and conducted my background investigation. Like my suspension,

my removal proposal should have come from my office of internal affairs, Instead CPO office which is

primarily composed of former secret service employees had a bias and allegiance to my immediate

supervisor who I had filed an EEOC complaint against, and retaliated by proposing my removal,

conducting my background check, and serving as hearing officer in my removal. It should be noted when

discrepancies come up in a background check it is up to OPM to resolve it. Why was my case treated so

differently and TSA could not refer questionable matters to OPM for them to resolve them.


47. Credibility of West Virginia Officials interviewed. These were career correction employees who had

worked together for over twenty years, had a comfortable niche and pattern of work that I interrupted by

being assigned to their facility. In addition they hated the fact that the prisoners liked me and gave up

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

their furloughs and passes to work voluntarily on my community work projects. (See posting of job

opportunities that required the prisoners to sign up for  exhibit  ). It should be noted that the prison

population was 99.1% white. And they had no aversion from filing complaints if I violated or cancelled

anyone's furlough or home visits.  In addition I would have had to put a written cancellation into effect to

cancel anything, which was never produced in my FOIA requests to West Virginia.  More importantly, no

one seems to question how one prisoner came into Ervin's office and reported over 20 incidents of alleged

misconduct conducted by myself in less than 90 days. What administrator would not call an employee in

and censor or counsel them.  In my case the reason for the voluminous amount of charges brought against

me was the result of a rumor that I was being considered for a warden of the new prison that was opening.

These career correction people who themselves envisioned themselves being considered Ervin, Swatch

and Holland, had to smeared my reputation and  integrity and they confirmed and decided to smear my

good name with a litany of ridiculous allegations.  When the showing of the video of my supossingly

removing food from the centers refrigerator didn't work they concocted something so damaging, that I

would have to be removed.  However, I resigned due to my late husband's grave illness and returned to

New York, not knowing that after my departure they entered a termination/dismissal into the books.  It

should be noted that West Virginia could not and did not produce any evidence that I ever receive any

letter from Holland. No fed-ex receipt or return receipt requested was ever produced. More importantly

during OPM involvement with my background check no WV-11, or dismissal form was found. It wasn't

until TSA's CPO office got involved that this flawed, altered and unsigned by any DOC official's

document mysterious surfaced. If indeed Mr. Holland had sent me a dismissal letter on May 21, 1998, his

signature would have been on the form. It should be noted that Mr. Holland left DOC, shortly after I

requested my personnel file and complained about this whole questionable and messy situation.


48. During July 1, 2004, I file an appeal with the MSPB relating to my indefinite suspension, TSA did not

indicate then that as an exempt employee I had no right to appeal to the MSPB, therefore presence had

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)
been set, why appeal the removal being heard by MSPB.

49. Secret Service connection- my client believes that collusion not only took place in West Virginia but also right within TSA with the Secret Service connection, ranging from the proposing official to the CPO investigators, to the security personnel etc.(see attached article) *13*

50. On October 24, 2003, when TSA proposed my removal, not one person from TSA or OPM, bothers to ask me any question about the allegation that West Virginia Alleged. As a veteran, I should have been given an opportunity to produce someone who could shed some light onto these charges or give my explanation to this allegation, but they didn't. I was so shocked at the way OPM conducted my background investigation that I filed a complaint against them. They conducted additional interviews but TSA, left that interview out of the official record. Instead they accused me of having an improper relationship with the Cabinet Secretary Otis Cox, who provided insight into these allegations. TSA, behaved extremely retaliatory and in a reprisal mode in that they concealed information and did not afford me the proper forum to defend myself at the hearing regarding my indefinite suspension, when they knew the CPO's investigation had discovered new information that they would use to suspend me but they fail to notify me of these matters until after the suspension took place which is in violation of prohibited personnel practices. The grounds for the suspension were predicated on the information obtained in the background investigation therefore, I have aright to appeal this to the MSPB, because my indefinite suspension was for a period over 14days, the Board has jurisdiction and must decide this appeal pursuant to 5 USC $ 7701. As such the Board has jurisdiction over this case because 49 USC $ 40122/g (2) applies 5 USC $$ 7701 through 7703 to the FAA and now TSA. moreover subsection g (3) of this same provision also restored FAA employee's right to submit an appeal to the board. section 7701 describes the appellate procedures applicable in appeals to the board. section 7522 defines employee to include veteran preference employee with over one year of current continuous service. under 7512, a suspension of more

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

than 14 days in appeal bale to the board. Because the appellant meets the definition of "employee" and because TSA indefinite suspension was for more than 14 days, the Board has jurisdiction over this case. I contend that the information contained in the aforementioned section shows that harmful error in the application of the Agency's procedure in arriving at such decision, which was compounded by my later removal. see Corbett V.DHS.

51. OPM conducted their background investigation from April 29, 2003 until May 15, 2003, and forwarded their investigation to TSA. During June 2003, Plaintiff was suspended for allegiely misuse of government credit card for five days. After learning that fraud had occurred on my account and an individual employed as a nanny for my two children had stolen and misused my credit card without my authority. I immediately notified TSA, and they stated that a personal problem. And refused to adjust or conduct any further investigation that resulted in my receiving a five day suspension. (See exhibit    )

52. As a result of Plaintiff's discriminatory treatment and proposed dismissal by TSA, she sought the assistant of the National Organization of Black Law Enforcement Executive (NOBLE), which she was a member of at that time. Since TSA inception NOBLE has met with all three Administrator's to voice their concerns about the frequency with which African American Employees of TSA were the target of investigations, management reviews and adverse actions (where like in my case terminations were being proposed.) DHS/TSA has a very negative image in dealing fairing with African American employees especially females. (See exhibit /4)

53.) TSA/CPO office deliberately failed to enclosed the Declaration for Federal Employment, (See Exhibit 5 where she thought it was a continuation sheet, and she specifically listed her brief reasons from leaving her job, Page 4 of Your employment activities where Plaintiff listed West Virginia Job (See exhibit/6 and Declaration for Federal Employment question #12 where she answered yes to the

34

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

questioned During the last 5 years have you been fired from any job for any reason. Did you quit after

being told that you would be fired, id you leave any job by mutual agreement because of specific

problems, or where you debarred from Federal employment by the Office of Personnel management or

any other Federal Agency. Plaintiff clearly marked **yes,** but the Agency down played that response and

failed to ask or allow OPM to clarify the Plaintiff's response until after CPO office proposed her removal.

This blatant discriminatory and unlawful employment practice would never have occurred or tried with a

white employee. ( See Exhibit *17*

Respectfully submitted

*Linda Cruz-Packer*

Linda Cruz-Packer, pro se
48000 Megan Drive
Clinton, Maryland 20735
(240) -602-4579

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing PLAINTIFF'S REPLY TO DEFENDANT'S

ANSWERS TO AMENDED COMPLAINT BASED ON UNLAWFUL EMPLOYMENT PRACTICES,

ON THE BASIS OF SEX (FEMALE), RACE (AFRICAN AMERICAN), AND RETALIATION IN

VIOLATION OF THE CIVIL RIGHTS ACT OF 1966.   This reply, was mailed regular mail this 22nd day

of April 2008.

_Linda Cruz-Packer_

Linda Cruz-Packer

**Counsel for Defendant**
WYNEVA JOHNSON
Assistant United States Attorney
555 4th Street, NW. E-4106
Washington, DC 20530

Bryan Bonner
**Senior Counselor, Administrative Litigation**
Dept. of Homeland Security
TSA
 West Tower, 2nd Fl. So.
601 S. 12th St. #TSA-6
Arlington, VA. 22202-4220

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

**Plaintiff's Exhibit**

**#**

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

#

1



June 04, 2002

Ms. Linda Cruz-Packer
4800 Megan Drive
Clinton, MD 20735

Dear Ms. Cruz-Packer:

This confirms our offer of employment in the excepted service for the position of **Transportation Security Specialist, SV-1801-J**, in the Transportation Security Administration effective **Sunday, June 16, 2002**. Your annual salary will be **$74,200.00**.

On **Monday, June 17, 2002**, please report to the **Southwest entrance** of the Nassif Building, 400 Seventh Street, SW, Washington, DC. Once you enter the lobby, please have the security guard dial extension 64075 to notify us of your arrival. A member of the TASC Human Resource Services staff will be down at 8:20 a.m. to escort you to Room 2225 where the orientation session will begin at **8:30 a.m.**

We will brief you on issues concerning your employment, benefits and completion of the necessary forms to effect your appointment. In order to verify your identity please bring a current drivers license and social security card or passport.

We look forward to having you as a member of our transportation team. If you have any questions or concerns, please do not hesitate to contact me at (202) 366-9414.

Sincerely,

*Joan B. Simpson*

Joan B. Simpson
Human Resources Specialist

**TASC** *Service / Value / Success*

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

#
2

 

---

Subj:   **FW: TSA Issues**
Date:   8/31/2004 10:44:50 PM Eastern Daylight Time
From:   "lin das" <stl4011@hotmail.com>
To:     Llycpacker@aol.com
*Sent from the Internet (Details)*


Reply


Forward


Reply All


Add
Address



>From: "Linda.J.Pinnix@usdoj.gov" <Linda.J.Pinnix@usdoj.gov>
>To: "'stl4011@hotmail.com'" <stl4011@hotmail.com>
>Date: Tue, 31 Aug 2004 14:17:25 -0400 (EDT)
>
>The Wall Street Journal, August 31, 2004
>
>WASHINGTON -- The government, ramping up to improve air security, failed to
>thoroughly review background checks of dozens
>of air marshals, which could have led to the hiring of candidates with a
>history of drunk driving, domestic violence, sexual
>harassment or falsifying employment information.
>
>The Homeland Security Department's inspector-general found that a
>Transportation Security Administration oversight board that
>reviews and approves potential hires failed to flag the questionable
>background of 161 of 504 applicants to the air-marshal
>program. The department's inspector-general said TSA's hiring standards for
>air marshals have been too lenient.
>
>According to a report released yesterday, about 30% of applicants had filed
>for bankruptcy in the past seven years, and 62
>applicants have either been arrested or face allegations of misconduct,

>including drunken driving, domestic violence or sexual
>harassment.
>
>Homeland security officials said that none of the questionable applicants
>was hired and that background checks and standards --
>no longer the responsibility of TSA -- have been raised for the air-marshal
>program.
>
>Nevertheless, the report suggests that TSA continues to have internal
>challenges in ensuring hiring standards. In June 2003, TSA
>said it had fired 1,200 airport screeners, or 2% or the work force, after
>finding they provided false information on job applications,

As a direct result of the aforementioned concerns, Executive Director Jessie Lee requested a meeting with TSA'S Acting Administrator David M. Stone. Acting Director Stone agreed to a NOBLE/TSA meeting and this meeting took place at TSA headquarters on March 17, 2004. Department of Homeland Security (DHS) Undersecretary Asa Hutchison, TSA Acting Director Stone and TSA Deputy Director Steve McHale were DHS/TSA'S principal representatives at this meeting.

President Scott, Executive Director Lee, Bernard E. Thompson, Esq., and I represented NOBLE at this meeting. NOBLE representatives focused on the following concerns: · The low number of African Americans within TSA in senior and mid-level positions; · TSA'S failure to contact NOBLE applicants applying for positions with that agency; · The widely held perception that African Americans within TSA have been subjected to disparate disciplinary actions, involuntary transfers and terminations; · That less qualified persons have received promotions over more qualified African Americans; and · The dismissal of James B. Golden, Jr.

In summary, NOBLE'S representatives strongly emphasized that TSA'S image among many senior and mid-level African American law enforcement practitioners is poor. We stressed our belief that the dismissal of James B. Golden, Jr. was disproportionate to his alleged violation. We also questioned the frequency with which African American employees of TSA were the target of investigations, management reviews and adverse actions (where terminations were being proposed).

TSA'S representatives indicated their desire to improve their agency image among African Americans in law enforcement. We responded that NOBLE expected specific corrective actions and not mere words. We identified the absence of a recruitment plan with outreach initiatives targeting minorities as a glaring example of a TSA shortcoming. We also advised the TSA officials of our strong belief that the handling of Director Golden's personnel matter remains linked to our ability to, in good conscience, recommend our members and friends to that agency as vacancies become available. TSA officials strongly defended their decisions; however, they are now keenly aware of NOBLE'S concerns and that we remain resolute in our position in these matters. We are determined that African Americans working for TSA - or seeking employment with that agency - will be treated fairly. A letter is being drafted to Acting Director Stone thanking him for granting this meeting, reiterating our concerns and detailing NOBLE'S recommendations to remedy this situation. We will keep the membership apprised of any new developments regarding this matter.

Sincerely,

Clarence Edwards (cedwards7788@comcast.net)
National Vice President

email: jakers@noblenatl.org
voice: 703-658-1529
web: http://www.noblenational.org

NOBLE · 4609-F Pinecrest Office Park Drive · Alexandria · VA · 22312-1442

Powered by

>failed drug tests or had criminal records.
>
>Disciplinary problems in the air-marshal program last year led officials at
>the Department of Homeland Security to review the
>oversight board's hiring decisions. After examining 504 candidates,
>Homeland Security officials determined 161 of them had
>questionable backgrounds that should prevent their hiring. But the TSA
>board maintained its approval of all but two applicants,
>even after Homeland Security officials raised concerns.
>
>It is unclear how many armed, undercover federal air marshals now fly on
>select international and domestic flights to protect
>against potential terrorist attacks. The government considers that number
>classified, but the program was moved under the
>control of the U.S. Immigration and Customs Enforcement division last
>November so its roughly 5,000 agents could help.
>
>Air marshals are required to be U.S. citizens with no convictions in the
>past 10 years and must pass psychological, medical and
>firearms qualifications.
>
>In the report, Homeland Security Inspector General Clark Kent Ervin also
>found discrepancies in air-marshal pistol-testing
>practices and a requirement that marshals complete quarterly training.

---

On the road to retirement? Check out MSN Life Events for advice on how to
get there! http://lifeevents.msn.com/category.aspx?cid=Retirement

 

Move messages to.. ▼    ◄ Prev   5 of 71   Next ►

☐ Include original text in reply.

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

#
3



**United States**
## Office of
# Personnel Management

Investigations Service
Federal Investigations Processing Center
Boyers, Pennsylvania 16018-0618

In Reply Refer To:                    Your Reference:

December 9, 2003

Ms. Linda Cruz-Packer
4800 Megan Drive
Clinton, MD    20735

Dear Ms. Cruz-Packer,

This is to acknowledge that we have received your concern regarding your investigation conducted by Investigator David Ralph Smith.

Thank you for bringing this matter to our attention.  Please rest assured that all efforts will be made to resolve your concerns.

If you have any questions, please contact me at 724-794-5612, Ext. 190.

Sincerely,

Pamela C. Cannavan
Chief
Contract Management Services

*Sga03*

CON 132-48-9
July 1995

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

\#
4

Standard Form 52
Rev. 7/9
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

## PART A - Requesting Office (Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39)

**1. Actions Requested**

New Hire - Excepted Appointment - Permanent

**2. Request Number**

**3. For Additional Information Call (Name and Telephone Number)**

Angela Freeman, (202) 493-1623  385-1441

**4. Proposed Effective Date**
6/16/02

**5. Action Requested By (Typed Name, Title, Signature, and Request Date)**

K. David Holmes, AUS for Inspection

**6. Action Authorized by (Typed Name, Title, Signature, and Concurrence Date)**

K. David Holmes, AUS for Inspection

## PART B - For Preparation of SF 50 (Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)

**1. Name (Last, First, Middle)**

CRUZ-PACKER Linda

**2. Social Security Number**  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

**3. Date of Birth**  5/20/51

**4. Effective Date**  06/16/02

### FIRST ACTION

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 170 | Exc App |

| 5-C. Code | 5-D. Legal Authority |
|---|---|
| ZVC | P.L. 107-71 |

| 5-E. Code | 5-F. Legal Authority |
|---|---|

### SECOND ACTION

| 6-A. Code | 6-B. Nature of Action |
|---|---|

| 6-C. Code | 6-D. Legal Authority |
|---|---|

| 6-E. Code | 6-F. Legal Authority |
|---|---|

**7. FROM: Position Title and Number**

**15. TO: Position Title and Number**

Transportation Security Specialist
P.D. # 02-801-008

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| SV | 1801 | J | | $74,200.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| | | | |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $66,559.00 | $7,641 | $74,200.00 | $0.00 |

**14. Name and Location of Position's Organization**

**22. Name and Location of Position's Organization**

US Department of Transportation
Transportation Security Administration
Office of the Associate Under Secretary
for Inspection

## EMPLOYEE DATA

**23. Veterans Preference**

1 - None      3 - 10-Point/Disability      5 - 10-Point/Other
2 - 5-Point   4 - 10-Point/Compensable     6 - 10-Point/Compensable/30%

1

**24. Tenure**

0 - None      2 - Conditional
1 - Permanent 3 - Indefinite

1

**25. Agency Use**

**26. Veterans Pref for RIF**

YES  ☑ NO

**27. FEGLI**

C0

**28. Annuitant Indicator**

9

**29. Pay Rate Determinant**

0

**30. Retirement Plan**

K

**31. Service Comp. Date (Leave)**

06-16-02

**32. Work Schedule**

F

**33. Part-Time Hours Per Biweekly Pay Period**

## POSITION DATA

**34. Position Occupied**

1 - Competitive Service    3 - SES General
2 - Excepted Service       4 - SES Career

2

**35. FLSA Category**

E - Exempt
N - Nonexempt

E

**36. Appropriation Code**

**37. Bargaining Unit Status**

8888

**38. Duty Station Code**

11-0010-001

**39. Duty Station (City - County - State or Overseas Location)**

WASH, D.C.

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 - USA  8 - Other  N | | |

## PART C - Review and Approvals (Not to be used by requesting office.)

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | | | D. | | |
| B. | | | E. | | |
| C. Keyed | | 6/21/0 | F. | | |

**2. Approval:** I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature

Approval Date

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | |
|---|---|---|
| CRUZ-PACKER, LINDA    6753 | 2. Social Security Number 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 | 3. Date of Birth 05-20-51 | 4. Effective Date 06-30-02 |

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action | | **SECOND ACTION** |
|---|---|---|---|
| 721 | REASSIGNMENT | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| ZVC | P.L. 107-71 | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| TRANSPORTATION SECURITY SPECIALIST<br>PD NO=02-801-008    BU NO=810001<br>ORG=SA801         CST CNTR=8010 | CRIMINAL INVESTIGATOR<br>PD NO=02-801-005    BU NO=810001<br>ORG=SA801        CST CNTR=801000 |

| 8. Pay Plan | 9.Occ. Code | 10.Grade or Level | 11.Step or Rate | 12. Total Salary | 13.Pay Basis | 16. Pay Plan | 17. Occ. Code | 18.Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SV | 1801 | J | 00 | $92,750 | PA | SV | 1811 | J | 00 | $92,750 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $66,559 | $7,641 | $74,200 | $18,550 | $66,559 | $7,641 | $74,200 | $18,550 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| O/ASSOC. UNDERSEC FOR INSPECTION<br>WASHINGTON, DC | O/ASSOC. UNDERSEC FOR INSPECTION<br>WASHINGTON, DC |

**EMPLOYEE DATA**

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|---|
| 1  1 - None  3 - 10-Point/Disability<br>2 - 5-Point  4 - 10-Point/Compensable<br>5 - 10-Point/Other<br>6 - 10-Point/Compensable/30% | | 1  0 - None  2 - Conditional<br>1 - Permanent  3 - Indefinite | | YES [X] NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| R5  BASIC+OPT B(3X)+OPT A+OPT C(5X) | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K  FERS & FICA | 06-16-02 | F | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2  1 - Competitive Service  3 - SES General<br>2 - Excepted Service  4 - SES Career | E  E - Exempt<br>N - Nonexempt | SEE REMARKS BELOW | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| SP PROG=00 | SUPV CSC=8 | POS TYPE=1 | | POSITION SENSITIVITY = 3 |

45. Remarks

APPROP = 06X2.801/000/810001/801000/1111
SALARY IN BLOCK 12A IS BASED ON PAY BAND J, TECHNICAL JOB CATEGORY, LEVEL 4.
SALARY IN BLOCK 12C INCLUDES A LOCALITY-BASED PAYMENT OF 11.48%. SALARY IN
BLOCK 12 INCLUDES AVAILABILITY PAY OF $18,550. SALARY IN BLOCK 20A IS BASED ON
PAY BAND J, TECHNICAL JOB CATEGORY, LEVEL 4. SALARY IN BLOCK 20C INCLUDES A
LOCALITY-BASED PAYMENT OF 11.48%. SALARY IN BLOCK 20 INCLUDES AVAILABILITY PAY
OF $18,550. PAY ASSOCIATED WITH THIS PREMIUM INCREASES RETIREMENT SYSTEM,
FEGLI AND TSP ENTITLEMENTS AND DEDUCTIONS.

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF TRANSPORTATION/TSA | *Nancy A. Mowry* |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | Nancy A. Mowry |
| TD-19 | 1598 | 07-10-02 | APPROVING OFFICIAL |

Part 2 - OPF Copy - Long-Term Record -- DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After
6/30/93
NSN 7540-01-333-6236

000023

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

\#

*5*

# FORMAL EEO COMPLAINT OF LINDA CRUZ-PACKER

Ms. Cruz-Packer asserts that the following actions were discriminatory and retaliatory, and created a hostile work environment for her based on her race (African American) and her sex (female), her prior participation in the EEO administrative complaints process against Volunteers of America, her former employer, and her current EEO activity against TSA (beginning October 13, 2003). Some of the following are also actionable independent of a hostile work environment.

**1.)   Unwarranted 5 Day Suspension:** On May 2, 2003, Ms. Cruz-Packer was called to a meeting with her supervisor, Mr. Santana, and Deputy Director Widawski, and given a memorandum instructing her to explain in writing charges on her government-issued credit card for three cash advances and several car rentals. She was not allowed to respond verbally to the charges at that time or any other time.  On May 5, 2003, she timely delivered her written response to her Director, John Rooney, explaining that she had not misused her government credit card. Five weeks later, she was suspended for 5 days without pay, beginning on June 16, 2003.  Her suspension was unwarranted, and was disproportionately severe relative to the discipline administered to similarly situated white male agents. **( or other TSA employee's)** The suspension was motivated by discrimination on the basis of Ms. Cruz-Packer's race and sex and her prior participation in the EEO administrative complaints process.

On October 8, 2003, Ms. Cruz-Packer reported to SA Robert Boswell, that she had filed a police report with Prince George's Police Department, and notified Citibank that someone had fraudulently misused her credit card as well as several other credit cards that belonged to her. She was later informed by Mr. Widawski that he would not investigate the matter because it was "personal" in nature. **(since that time Citibank has conducted an investigation and resored $500 due to fraudulent misuse) I will fax the bill to you so you can use as an attachment.**

**2.)   Unwarranted Placement on Administrative Leave:**   From June 23, 2003 through the present, Ms. Cruz-Packer was placed on Administrative Leave with pay supposedly because unspecified "issues" had surfaced during her background investigation. TSA refused to provide Ms. Cruz-Packer with any further information about the reasons she was placed on administrative leave.  The period of forced administrative leave was imposed shortly after she confronted Mr. Santana about his disparity in treatment between herself and white male agents when he inappropriately brought agents to her house, posted her picture, and refused to meet with her about the alleged misuse of her government card.

**3.)   Work assignment:**  On December 29, 2002, Ms. Cruz-Packer was assigned to TSA's Office of Program Reviews and Special Operation and Hector Santana became her immediate supervisor. As the only minority member of the team except for one other black female, she was treated as an outsider by Mr. Santana.  Mr. Santana rarely spoke to her, and when he did, he always had the Deputy Director, Lou Widawski in the room./ In contrast with the treatment given to white male agents, she was not given her choice of work assignments (cities) to work. She picked at least six cities besides Chicago, which is the assignment that she was eventually given.

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

#
6

AOL.COM | Message View    Page 1 of 2

 


Reply


Forward


Reply All


Add Address



Subj: **FW: TSA issues**
Date: 8/31/2004 10:44:50 PM Eastern Daylight Time
From: "lin das" <stl4011@hotmail.com>
To: Llyopacker@aol.com
*Sent from the Internet (Details)*

>From: "Linda.J.Pinnix@usdoj.gov" <Linda.J.Pinnix@usdoj.gov>
>To: "'stl4011@hotmail.com'" <stl4011@hotmail.com>
>Date: Tue, 31 Aug 2004 14:17:25 -0400 (EDT)
>
>The Wall Street Journal, August 31, 2004
>
>WASHINGTON -- The government, ramping up to improve air security,
failed to
>thoroughly review background checks of dozens
>of air marshals, which could have led to the hiring of candidates with
a
>history of drunk driving, domestic violence, sexual
>harassment or falsifying employment information.
>
>The Homeland Security Department's inspector-general found that a
>Transportation Security Administration oversight board that
>reviews and approves potential hires failed to flag the questionable
>background of 161 of 504 applicants to the air-marshal
>program. The department's inspector-general said TSA's hiring standards
for
>air marshals have been too lenient.
>
>According to a report released yesterday, about 30% of applicants had
filed
>for bankruptcy in the past seven years, and 62
>applicants have either been arrested or face allegations of misconduct,

>including drunken driving, domestic violence or sexual
>harassment.
>
>Homeland security officials said that none of the questionable
applicants
>was hired and that background checks and standards --
>no longer the responsibility of TSA -- have been raised for the air-
marshal
>program.
>
>Nevertheless, the report suggests that TSA continues to have internal
>challenges in ensuring hiring standards. In June 2003, TSA
>said it had fired 1,200 airport screeners, or 2% of the work force,
after
>finding they provided false information on job applications,



>failed drug tests or had criminal records.
>
>Disciplinary problems in the air-marshal program last year led officials at
>the Department of Homeland Security to review the
>oversight board's hiring decisions. After examining 504 candidates,
>Homeland Security officials determined 161 of them had
>questionable backgrounds that should prevent their hiring. But the TSA
>board maintained its approval of all but two applicants,
>even after Homeland Security officials raised concerns.
>
>It is unclear how many armed, undercover federal air marshals now fly on
>select international and domestic flights to protect
>against potential terrorist attacks. The government considers that number
>classified, but the program was moved under the
>control of the U.S. Immigration and Customs Enforcement division last
>November so its roughly 5,000 agents could help.
>
>Air marshals are required to be U.S. citizens with no convictions in the
>past 10 years and must pass psychological, medical and
>firearms qualifications.
>
>In the report, Homeland Security Inspector General Clark Kent Ervin also
>found discrepancies in air-marshal pistol-testing
>practices and a requirement that marshals complete quarterly training.

---

On the road to retirement? Check out MSN Life Events for advice on how to
get there! http://lifeevents.msn.com/category.aspx?cid=Retirement

  Move messages to.. ▾     Prev  5 of 71  Next ▶

☐ Include original text in reply.

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

\#
7



**NATIONAL SECURITY NEWS ALERT**

PRESIDENT IS WARNED RACE BIAS "THREATENS NATIONAL SECURITY"

*This is the text of a*  *News Release sent to news organizations nationwide. The full text of the letter to the President and other government officials is included at the end of the release.*

For Immediate Release

# President is Warned Race Bias "Threatens National Security"

**Redstone Arsenal minorities cite "Tar Baby" incidents, urge caution in creation of Homeland Security Department**

Warning that deteriorating race relations present "a grave threat to our national security," minority employees at the sensitive Redstone Arsenal in Huntsville, Alabama have called upon President Bush and his top military and national security executives to "directly and forcefully address this matter *before* the U.S. Congress acts to create a new Department of Homeland Security."

In a June 13th letter obtained by The Black Commentator, an Internet publication (http://www.blackcommentator.com), the head of the Redstone Area Minority Employees Association said that military and civilian supervisors had used the racial slur "Tar Baby" on three occasions since the events of September 11. Matthew Fogg described the incidents as examples of "an epidemic of official corruption, systemic racial discrimination and vile epithets that undermines our country's War on Terror."

Fogg's organization represents 200 minority employees at Redstone Arsenal, which is home to many of the U.S. Army's precision "smart" weapons systems as well as NASA's Marshall Space Flight Center. "The alarming resurrection of 'Tar Baby' as a term of racial abuse at Redstone," Fogg wrote, "is only one, dramatic manifestation of a deep and escalating breakdown in military standards."

Fogg said Redstone race relations "are even worse than those that prevailed at Goddard Space Flight Center," in suburban Washington, DC, where 120 Black scientists recently settled a discrimination suit against NASA for $3.75 million.

The "security and intelligence agencies of the U.S. are rife with race discrimination," said Fogg, a chief deputy U.S. Marshal.

Fogg called for caution in creating the Homeland Security Department. "Unless discrimination is immediately treated as a national security priority, this new department will find itself hopelessly infested with all of the bias practices of its 22 component organizations," he said.

The letter was addressed to the President, National Security Advisor Condoleezza Rice, Director of Homeland Security Tom Ridge, Defense Secretary Donald Rumsfeld, Secretary of the Army Thomas White and Senator Patrick Leahy.

The Black Commentator is an Internet publication of commentary, analysis and investigation

If someone pass
to you make sure
Free Sign Up pa;

Don't miss anyth

**Other Comment
issue 4 - June 7**

**Tar Baby Outra;
and Corruption
Redstone Arser**

**Condoleezza's (
Paratroopers in
Basement: Con
and the Venezu**

**Did the Green P
Black America:
Jonathan David
Guest Commen**

**A Law That Giv
Something to F
Deputy U.S. Mal
Matthew Fogg, (
Commentator**

on issues affecting African Americans.

Contact: mailto.publisher@blackcommentator.com  Tel 202.318.4032

Contact:Chief Deputy U.S. Marshal Matthew Fogg
mailto:u.s.marshal@writeme.com  Tel 301.423.8161

*The full text of Marshall Fogg's letter follows.*

June 13, 2002

Honorable George W. Bush
President of the United States
1600 Pennsylvania Ave NW
Washington, D.C. 20001

Honorable Condolezza Rice
National Security Advisor
1600 Pennsylvania Ave, NW
Washington, D.C., 20504

Governor Tom Ridge
Director of Homeland Security
1600 Pennsylvania Ave
Washington, D.C. 20502

Honorable Patrick Leahy
Chairman, Senate Judiciary Committee
224 Dirksen Senate Office Building
Washington, D.C. 20510

Honorable Donald Rumsfeld
Secretary of Defense
1000 Defense Pentagon
Washington, D.C. 20301-1000

Honorable Thomas E. White
Secretary of the Army
101 Army Pentagon
Washington, D.C. 20310-0101

Dear Mr. President and Distinguished Gentlemen and Lady:

It is my responsibility to alert you to a grave threat to our national security, an epidemic of official corruption, systemic racial discrimination and vile epithets that undermines our country's War on Terror. Race relations at Huntsville, Alabama's Redstone Arsenal, one of the nation's most sensitive military installations, have deteriorated to such a degree that military preparedness has been seriously eroded.

I fear that this dangerous situation is spiraling out of control, degrading Redstone's mission and destroying the productive lives of valuable personnel.

As Executive Director of the Redstone Area Minority Employees Association (RAMEA), I have authenticated three separate incidents of flagrant, public use of the slur "Tar Baby" by civilian and military supervisors at the base, popularly known as the "rocket capital of the world." The targets of these horrific insults are dedicated African American scientists and specialists in precision weapons, men and women on whom our citizens depend at this time of national crisis.

A disturbing number of superbly trained weapons systems experts have been sidelined for

Commentaries i
issues :

Condoleezza &
Fine Pair : The R
Burden

Hard Right Cas
in Black City - T
Ultra-Conservat
Cory Booker Lo
Newark, New Je

Newark: The Fir
- The Hard Righ
National Black {

Fruit of the Poi:
The Hard Right'

Capture Newark
5, 2002

A Letter from H
"How to spot a '
Trojan Horse." I
Kilson, Guest C

Reparations Pa:
True Value of S<
and an Animal

The Living Wag
Movement: A N<
Beginning - Bre
and Civil Rights
Languages

Rep. Cynthia M<
Statement on th
September 11 : 7
an investigation
events surroun<
September11 is
as is the need f<
investigation of
debacle.

Make The Amer
to Get the U.S. (
Out of the Intern
Drug Trade

Psychologically
U.S. Can't Hand
Penalty

Linguistic Profil
Patrice D. John:

years on end, forced to perform menial duties, solely because of the color of their skin. This pervasive pattern of under-utilization of minority expertise is cruel, wasteful and profoundly unpatriotic. Racial reprisals for complaints against such injustices are routine at Redstone. As one of our members, who also serves as head of the Huntsville NAACP, puts it, "Any time they can get us off of a critical mission, they'll do it."

commentator

You will recall that 120 Black scientists at Goddard Space Flight Center recently settled their discrimination suit against NASA for $3.75 million. They had been shamefully under-utilized and held back from promotions. Conditions at Redstone are even worse than those that prevailed at Goddard. The cost to the nation's military readiness is incalculable.

Is this the way the United States of America unites its citizens in our War on Terror? I cannot believe that our leaders would knowingly countenance such a cancer at the core of our national defense structure.

The alarming resurrection of "Tar Baby" as a term of racial abuse at Redstone is only one, dramatic manifestation of a deep and escalating breakdown in military standards. RAM has thoroughly documented a litany of abuses and illegalities throughout the installation, home of the Aviation and Missile Command (AMCOM), Space and Missile Defense Command (SMDC), Army Corps of Engineers, Program Executive Offices (PEO), Department of Defense Commissary and NASA's Marshall Space Flight Center.

Our grievances include discrimination, unfair labor practices, blacklisting, unfounded criminal prosecutions, false statements, unwarranted revocation of security clearances, falsification of official documents, obstruction of justice, witness intimidation, physical assaults, slashing of vehicle tires, misappropriation of government funds, illegal contract activity, and other improprieties.

The NAACP joined with us in calling for a congressional investigation. We have submitted substantial evidence directly to the office of the Secretary of Defense, the Secretary of the Army, NASA's administrator and more recently to Senator Carl Levin, chairman of the Armed Services Committee. Clearly, RAM has made the Redstone situation known in every official forum available to our membership.

We now appeal to you to intervene directly at Redstone. If this nation is truly being placed on a war footing, the Redstone problem cannot be permitted to fester through years of grinding EEO and Class Action litigation. The talents of many hundreds of patriotic African Americans are being wasted. Their rights and all of our freedoms are at risk.

To paraphrase the slogan of yesteryear's opponents of Jim Crow in the U.S. Armed Forces: America cannot fight a War on Terror with one hand tied behind its back.

The cancer eating away at Redstone Arsenal is acute, but not unique. As a chief deputy U.S. Marshal and Executive Director of the Congress Against Racism & Corruption In Law Enforcement (CARCLE), I am inundated with complaints of racial discrimination at virtually every law enforcement, national security and intelligence agency of the U.S. government.

All of you, Mr. President, Gentlemen and Lady, are aware of the great services rendered to our country by whistleblowers during this period of crisis. Supervisory Special Agent, Coleen Rowley, of the Minneapolis FBI office, has properly been granted a full hearing on her charges concerning the now infamous search warrant on terrorist Zacarias Mousaoui's computer prior to 9/11.

Yet, you may not be aware that the Special Agent In-charge (SAC) of that same office has been formally charged with egregious Equal Employment Opportunity (EEO) racial discrimination claims since 1996, resulting in vast harm to the bureau's national security mission. Had the bureau followed its own EEO policies and guidelines with respect to that SAC, history might have been written, differently.

Patriots of color are blowing whistles all across this nation. Do you hear them?

I am very familiar with racism within the U.S. Marshal Service (USMS), having won a

landmark discrimination case in the US District Court for the District of Columbia, Fogg v. Reno 94-2814, in 1998. A federal jury found the entire USMS nationwide to be a Racial Hostile Environment. The USMS now faces a class action suit by many African American Marshals who have been subjected to this same hostile environment and curtailed career opportunities.

Mr. President, your own Secret Service is the subject of legal action by African American agents. National security is clearly at stake in this issue.

The US Customs, US Capital police, Immigration & Naturalization, Border Patrol and the CIA, all have some form of race discrimination complaints pending. Black FBI agents recently announced a settlement in their race discrimination Class Action complaint, but many of them have since told me that a racially hostile environment still exists in their offices.

The bottom line is that security and intelligence agencies of the U.S. are rife with race discrimination. Whistleblowers, who are truly America's unsung heroes and seek only to strengthen the effectiveness of these agencies, are being abused or ignored. For this reason, it is imperative that racial bias be treated as a serious threat to national security, and that your offices directly and forcefully address this matter *before* the U.S. Congress acts to create a new Department of Homeland Security.

Unless discrimination is immediately treated as a national security priority, this new department will find itself hopelessly infested with all of the bias practices of its 22 component organizations. I fear the problem will be compounded beyond all possible solution, further damaging our national security.

Do not allow the prevailing patterns of racial bias at these agencies to be stacked on top of one another and commingled into an impenetrable mass, thereby bequeathing the nation a $37.5 billion, 170,000-member edifice of discrimination. I implore you to act now to solve these problems before they disappear into a giant, bureaucratic jumble, only to resurface later in even more dangerous form.

Mr. President, on June 6, you promised that the Department of Homeland Security would "bring together our best scientists to develop technologies that detect biological, chemical and nuclear weapons."

But current employment practices at Redstone Arsenal and elsewhere tell us that African American scientists will not be full participants in this effort.

In the same speech, the President asked all Americans to, "Add your eyes and ears to the protection of our homeland. In protecting our country we depend on the skill of our people."

Yet we know that at Redstone and other federal workplace facilities, Black skills are marginalized and rejected. African Americans are derided as Tar Baby.

We ignore this crisis at our nation's peril.


Respectfully,


Matthew F. Fogg
Executive Director
Redstone Area Minority Employees Association
P.O. Box 22214
Huntsville, AL 35814-2214

cc: Kweisi Mfume, Executive Director NAACP
Gerald Reed, National President of Blacks In Government (BIG)
Maurice Foster, Executive Director - National Organization of Black Law Enforcement
Executives (NOBLE)

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

#
8

# TRANSPORTATION SECURITY ADMINISTRATION

## Credentialing Program Office

### Affidavit

State of:  Washington, DC  )

                            ss:

County of:  _____  )

I, ____Otis G. Cox_____, being duly sworn, hereby make the following statement to ____Steve Geary_____, who has identified himself/herself to me as a special agent with TSA Credentialing Program Office. I am making this statement of my own free will, without any duress or coercion.

My name is Otis G. Cox, Jr., and I currently serve as the Deputy Administrator, National Highway Traffic Safety Administration, U.S. Department of Transportation, and have served in this position since June 15, 2003.

I served as the Cabinet Secretary for Public Safety and Military Affairs, for the State of West Virginia, from February 1997 until February 2001. As the Cabinet Secretary, I had ultimate responsibility over a number of departments of the State of West Virginia, which included the Department of Corrections, the West Virginia State Police, the West Virginia National Guard, the Regional Jails Authority and the State Capital Security Agency.

This affidavit is concerning my role with the Department of Corrections and the knowledge I had with the resignation of Linda Cruz Packer.

In 1998, I recommended to William (Bill) Davis, Commissioner of the Department of Corrections that he take look at Linda's resume for a possible position in Corrections. About two months after bringing her on board, Bill came to me with a film and advised me that Linda's supervisor was complaining of Linda taking food from the dining room refrigerator. I reviewed the film and noted Linda removing food from the refrigerator. After I reviewed the entire film and the film from the remainder of the week, I advised Bill we could not use this information because it appeared that all of the staff were going in and out of the refrigerator. Bill advised me that there were some other issues and he would get back to me. Bill and I never discussed Linda again. However, when Bill was leaving my office I advised him to do whatever was necessary to correct the situation.

*Otis G. Cox Jr.*

*April 27, 2004*

Page 2 of 2

I reviewed Manfred Holland's letter to Linda today where he advised Linda she was being dismissed from Corrections. Mr. Holland had not sent me a copy of this letter and this was the first time I reviewed the letter. If Mr. Holland had discussed the letter with me, I would have agreed on the dismissal. All of this time I have assumed that she resigned because I never saw Deputy Commissioner Holland's letter and never saw or signed the WV-11 personnel action form indicating a termination. My department had a procedure in place that on any special hire or dismissal the WV-11 would come through the Secretary's office. Without seeing the WV-11 indicating a dismissal, I will have to assume that Linda resigned from Corrections.

Mr. Holland was given the signature authority to hire and to terminate by letter. However, to close out the personnel action, a WV-11 would have been needed to notify the Division of Personnel and to have taken Linda off payroll. It appears to me that something fell through the cracks. The letter to Linda from Mr. Holland was official and will stand as a letter of termination. There must be a WV-11 some place in the Division of Personnel which brought closure to Linda's termination.

I never discussed with Linda how she exited the organization and I had no mutual agreement with her regarding the issue of her leaving.

Initials: _____

I have read the above statement consisting of _2_ page(s) and I have been given an opportunity to make corrections. All of the facts contained herein are true and correct to the best of my knowledge.

_____
(Affiant Signature)

_____
(Witness Signature)

Signed and sworn before me
This _27th_ day of _April_ , 2004

_____
Name, Title, Transportation Security Administration

(Authority to administer
oaths: Title 5, Sec: 303)

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

\#
9



**STATE OF WEST VIRGINIA**
**DEPARTMENT OF MILITARY AFFAIRS & PUBLIC SAFETY**
**DIVISION OF CORRECTIONS**

CECIL H. UNDERWOOD
GOVERNOR

WILLIAM K. DAVIS
COMMISSIONER

OTIS G. COX, JR.
SECRETARY

OFFICE OF THE COMMISSIONER
112 CALIFORNIA AVENUE-STATE CAPITOL COMPLEX
BUILDING 4, ROOM 300
CHARLESTON, WV 25305-0280
(304) 558-2036 Telephone - (304) 558-5834 Fax

May 21, 1998

Ms. Linda Cruz-Packer
306 Grandview Pointe
Dunbar, West Virginia 25064

Dear Ms. Cruz-Packer:

This letter is to inform you of my decision to dismiss you from your limited term/temporary position as Corrections Program Specialist with the West Virginia Division of Corrections, Charleston Work Release Center. The dismissal shall be effective immediately.

As you are aware, you were hired as a limited term/ temporary employee on March 16, 1998 at noon. On March 3, 1998, you were advised that acceptance of a limited term/ temporary position did not provide you any rights under the Civil Service System (Division of Personnel). Therefore, you may be released from employment without cause. Nevertheless, I wish to share with you that the reason for this action is my loss of confidence in your ability to effectively discharge the duties and responsibilities of your position. The following is submitted to reiterate my concerns:

* Misuse of inmates free time

* Misuse of inmate privileges, i.e. Visits/Furloughs

* Utilizing the services of correctional staff and inmates to provide transportation and baby sitting services contrary to law and policy.

* Making improper purchases

Ms. Linda Cruz-Packer
May 21, 1998
Page 2

You have the opportunity to either meet with me in person or to present me with a written explanation of the reason why you may think the facts and grounds contained in this letter are in error and why you may think this action is inappropriate, providing that you do so within fifteen (15) calendar days of receipt of this letter.

Sincerely,

Manfred G. Holland
Deputy Commissioner

MGH:HLW

cc: Don Ervin, Administrator
    Division of Personnel
    Personnel File

# TRANSPORTATION SECURITY ADMINISTRATION

## Credentialing Program Office

## **Affidavit**

State of:  West Virginia  )

                            ss:

County of: _Kanawha_  )

I, _Manfred G. Holland_ , being duly sworn, hereby make the
following statement to Spec. Agent Steve Geary, who has identified himself/herself
to me as a special agent with TSA Credentialing Program Office. I am making this
statement of my own free will, without any duress or coercion.

In March of 1998, I was Deputy Commissioner for the Division of Corrections.
While in this position, I had occasion to speak with Otis Cox, Cabinet Secretary
for the Department of Military Affairs and Public Safety regarding Ms. Linda
Cruz-Packer and Mr. Cox's wishes for us to employ her as a Program Specialist
at the Charleston Work Release Center. Ms. Cruz-Packer was hired as a 160
day temporary employee.

While she was in this position, Don Ervin, Administrator of the Charleston
Work Release Center, advised me that Ms. Cruz-Packer may possibly be involved
in rule violations in the performance of her duties.

I instructed Mr. Ervin to investigate those allegations. The outcome of that
investigation prompted me to author a letter dated, May 21, 1998, dismissing
Ms. Cruz-Packer for reasons outlined in that correspondence.

Prior to issuing that correspondence, I spoke with the Cabinet Secretary of
Military Affairs and Public Safety, Otis Cox, advising him of the problem with
Ms. Cruz-Packer and my believing that she should no longer be employed at the
Charleston Work Release Center or with the division. Mr. Cox advised me to
do what I had to do.

Subsequent to that conversation, Mr. Cox and I did not speak again in reference
to Ms. Cruz-Packer. I have no knowledge of Ms. Cruz-Packer resigning or
requesting resignation in lieu of termination.

4/22/06

Initials: _____

I have read the above statement consisting of **2** page(s) and I have been given an opportunity to make corrections. All of the facts contained herein are true and correct to the best of my knowledge.

_____
(Affiant Signature)

_____
(Witness Signature)

Signed and sworn before me
This 22ⁿᵈ day of _APRIL_ , 200**4**

_____
STEVE CLEARY, S/A, TSA - CPO
Name, Title, Transportation Security Administration

(Authority to administer
oaths: Title 5, Sec: 303)

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

#
*10*

## PERSONNEL ACTION FORM

EMPLOYEE NAME: __Cruz-Packer, Linda__          REFERENCE NUMBER __M---27/CWR__

SOC. SEC. NO.: __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__  
    (LAST)  (FIRST)  (MIDDLE)

DEPARTMENT OF: __MAPS__  
Corrections

ADDRESS: _____

DIVISION NAME: __Chas. Work Rel.__  
ORG NO.: __0608__

COUNTY: _____  DATE OF BIRTH: _____  EMPLOYMENT DATE: _____

SEX: _____  RACE: _____

TYPE OF CHANGE

- ☐ NEW EMPLOYMENT
- ☐ FILL VACANT POSITION
- ☐ DATE OF VACANCY
- ☐ NEW HIRE   ☐ OA
- ☐ PROBATIONARY-REQ.
- ☐ PROVISIONAL-REQ.
- ☐ REINSTATEMENT
- ☐ RETURN TO DUTY
- ☐ PERMANENT   ☐ FT   ☐ PT
- ☐ TEMPORARY   ☐ FT   ☐ PT
- ☐ INTERMITTENT-REQ.
- ☐ 6-MO. TEMP.-REQ.
- ☐ CLASSIFIED EXEMPT
- ☐ 30-DAY   ☐ 90-DAY   ☐ 160-DAY
- ☐ STUDENT EXEMPT
- ☐ PROFESSIONAL PT EXEMPT

- ☐ SEPARATION CODE
- ☐ TRANS. TO
- ☐ TRANS. FROM
- ☐ RESIGNATION
- ☐ TERMINATION
- ☐ RETIREMENT
- ☐ LEAVE OF ABSENCE
- FROM _____ TO _____
- ☐ MEDICAL
- ☐ MILITARY
- ☐ PARENTAL
- ☒ LAST WORKING DAY __5-15-98__
- ☒ LAST DAY ON PAYROLL __5-15-98__
- ☒ LEAVE PAID
- ☒ LEAVE BALANCE(S)
  - AL __0__   SL __0__

- ☒ DISMISSAL
- ☐ LAYOFF
- ☐ DEATH
- ☐ SUSPENSION
- ☐ PERSONAL
- ☐ WC   ☐ ED
- ☐ UL

- ☐ OTHER
- ☐ REQUEST NEW POSITION
- ☒ POSITION UPGRADE
- ☒ FUNDING SOURCE   ☐ UNIT CODE ONLY
- ☐ CERTIFIED PERMANENT
- ☐ SALARY ADJ   ☐ LONG. INC.
- ☐ SALARY ADVANCE/MERIT _____%
- ☐ PROMOTION   ☐ DEMOTION
- ☐ RECLASSIFICATION   ☐ REALLOCATION
- ☐ TEMPORARY UPGRADE
- ☐ LATERAL CLASS CHANGE
- ☐ NAME CHANGE-FORMER _____
- ☐ ADDRESS-FORMER _____

- ☐ PT TO FT   ☐ FT TO PT   ☐ PT TO PT

### CURRENT BUDGET INFORMATION

POS. #: __10T__   PAYROLL TITLE: __CORPRSP__

NO. PAY PERIODS: __24__   WAGE/HR STATUS: __c__   EFFECTIVE DATE: _____

DOP COVERED/EXEMPT: __c__   HOURLY: Y __N x__ RATE: __13.52__   BASE MONTHLY RATE: __2,344.00__

EEO-4 CODE: _____   CLASS NO.: __8923__   PAY GRADE: __11__   STEP: _____

| FUND | ACCOUNT NO. | | | UNIT CODE | FTE | ANNUAL BASE | INCRE. |
| | FY | ORG | ACT | | | | |
|------|----|-----|-----|-----------|------|-------------|--------|
| 0450 | 98 | 0608 | 001 | 002-000 | 1.00 | 28,128.00 | 0 |

### PROPOSED BUDGET INFORMATION

POS. #: _____   PAYROLL TITLE: _____

NO. PAY PERIODS: _____   WAGE/HR STATUS: _____   EFFECTIVE DATE: __5-16N-98__

DOP COVERED/EXEMPT: _____   HOURLY: Y __N__ RATE: _____   BASE MONTHLY RATE: _____

EEO-4 CODE: _____   CLASS NO.: _____   PAY GRADE: _____   STEP: _____

| FUND | ACCOUNT NO. | | | UNIT CODE | FTE | ANNUAL BASE | INCRE. |
| | FY | ORG | ACT | | | | |
|------|----|-----|-----|-----------|------|-------------|--------|
| | | | | | | | |

DEPARTMENT OF ADMINISTRATION USE ONLY  
☐ PENDING   DATE/BY __5-27 MB__  
☐ APPROVED   DATE/BY __6-18 OC__

JUSTIFICATION

DIVISION OF PERSONNEL USE ONLY  
☐ APPROVED   ☐ DISAPPROVED   ☐ NOTED  
SIGNATURE: _____  
DATE: _____

AGENCY SIGNATURE - AREA OFFICE

APPROVALS

DIVISION _____ (DATE)

DIVISION SIGNATURE  __Nancy Reason Swecker__  __5/26/98__  
(DATE)

DEPT. SECRETARY/GOVERNOR

DATE _____

DEPARTMENT OF ADMINISTRATION

DATE __6/22/98__

1. WHITE - ADMINISTRATION/BUDGET PLANNING
2. GREEN - AGENCY PAYROLL OFFICE
3. CANARY - DIVISION OF PERSONNEL
4. PINK - AGENCY ORIGINATOR (PENDING)
5. GOLDENROD

WV-11 (Rev. 2-96)

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

**#**

*//*

TO:        Mr. Donald C. Ervin
           Administrator

FROM:      Ms. Linda Cruz-Packer  *LCP*
           Program Specialist (Acting)

SUBJECT:   **Suspension**

DATE:      May 18, 1998

---

This letter is written to discuss with you several issues related to my employment at CWRC as a temporary Employment Programs Specialist. Those issues will include my recent suspension; the letter of suspension stamped with your signature dated May 14, 1998; request for an independent review of CWRC based on this investigation conducted by Mr. Ray Swach; acts of discrimination and unprofessionalism attributed to the staff at CWRC, a blind rebuttal of alleged allegations responsible for my suspension; (which were omitted from the letter) relating to the suspension; dated May 14, 1998, a formal grievance filed as a result of this investigation; and areas of concern will be addressed as stipulated and outlined in the letter received May 14, 1998.

It indeed saddens me that I have to respond in writing to something I've been kept in the dark about deliberately which I will sum up as all a lot of baloney. To be specific though, let me begin by attempting to respond in the blind to wrongdoings that I can guess might have led up to your letter stipulated "an investigation regarding several issues of alleged Gross Misconduct involving unprofessional conduct contrary to laws and policy"

**1. Allegation # 1.**. I reportively have **stolen food** from the kitchen to feed my children.
**Response..** My son and daughter only want to eat junk food, or hot dogs and hamburgers. My daughter hardly eats anything and my son Keith is such a poor eater he is on Insure because he's so thin.  There have been several occasions due to time constraints and running out of the center to attend to numerous projects relating to the CWRC, that food has been wrapped for me to eat on the go.

On days whenever hot-dogs or hamburgers or corndogs have been served I have asked inmates to make sure I get two of each and shared them with my children after I have picked them up from their respected day care centers. This was done on rare occasions when I had no time to stop for dinner with them due to the fact I had to return to the center on Center business.

On May 2, 1998, a Friday, I was going to a surprise birthday party after work, and had gone to Kroger's during the day and brought fruit and cheese to be made into platters. In specific I brought strawberries, grapes, kiwi, watermelon and cantaloupe, hotpepper cheese, sharp cheese, and muenster cheese, that was made into cheese platters. In addition, I requested the assistance of Inmates Tammy Johnson, Joanie Price, and Tim Dotson, to help wash and cut up the items. I believe Marty Ramirez was present in the kitchen at that time also. I had also bought some items to make a fruit punch that included pineapple juice, fruit punch, and orange juice. All items were in waxed paper carton containers. It should be noted CWRC's juices are canned items. Tim Dotson placed the trays in my personal vehicle that day and perception might have been I was pilfering the kitchen. Upon rushing from work that evening, I mistakenly left the items in the centers refrigerator and returned to secure them. I personally carried them to my girlfriends car that evening.

There was a time on May 12, 1998, where Officers Walters checked a bag being taken out of the center for me by Inmate Tim Dotson. The bag contained two plates, one plate contained my dinner and another a dessert. It should be noted that this was a holiday I had run two successful special details that day, one for the YMCA and one for Juvenile Services and due to limited staff coverage I personally had to do a lot of ripping and running and had eaten nothing at all that day, until around 6:00 PM.

There were other occasions when we had large details outside of the facility where food was packed in my personal container, to prevent us from having to stop and come back to the center, and the inmates ate on site. I categorically deny stealing any food from the center.

**2. Allegation #2..** I have **threaten, intimidated or coerced** inmates to work on special projects or other center related work assignments including community service to the point of denying them a furlough.

**Response..** This is totally untrue. I had no authority, nor did I ever sign for anyone to go on any furloughs. It should be noted that my philosophy was to treat inmates with respect, and to attempt to get them to put their best foot forward. That would include volunteering for work assignments. All special projects that I handled were published by an announcement describing the event and what the job entailed. The inmates voluntarily signed up to work the detail.

I never solicited anyone to work unless I didn't have enough names, which to my knowledge never happened except for one occasion when Doris Bean had volunteered for Ladiley Field, and I specifically needed a female on Friday and she was the only female in the building and I inquired if she wanted to work. Later I encountered an incident with her daughter, who was concerned about how she was going to get home.

To the best of my knowledge only two inmates were every placed on any work detail against their wishes, and they were inmates Lee Simon and Thomas Calloway.

**3. Allegation #3..** I signed inmates **out** of the center on a **pass over two hours**.

**Response..** This is true. I believe I signed either Joanie Price or Tammy Johnson out of the center on a special shopping pass for six hours. This was done as a reward for service beyond expectations for special projects they had volunteered for and worked without so much as one complaint. In addition they had indicated they wanted to go to Kanawha City to Gabriels which is not easily accessible by bus on Sundays and I thought they needed the additional time. This matter was brought to my attention By Mr. Swach as something that should not be done, and it never happened again. In fact Mr. Swach stressed that no passes should exceed two hours. Yet, that same weekend he granted Inmate William Hedrick a pass or furlough, for twelve hours even though he had been placed on thirty days of restriction.

3

4. **Allegation #4..** I have endangered or caused inmates to be injured while being transported by me in a state vehicle.

**Response..** I deny this. However, I admit that I drive fast and aggressive, but I do not exceed the speed limit.

5. **Allegation #5..** I have reportively hit another vehicle while operating a state vehicle and left the scene and not reported it.

**Response..** This is so preposterous I can't even respond.

6. **Allegation #6.. I have taken inmates to unauthorized places while they have been signed out with me.**

**Response..**This is true.

On April 18, 1998, at the end of the day after painting all day on a community service project located at a church, I took all inmates that I was transporting out to dinner at Bob Evans, located at Corridor G and treated them to dinner at my expense and paid this bill on my visa card. I advised control of my actions and whereabouts prior to going. I also reported this incident to Mr. Swach, and at no time was I advised this was an improper actions or against policy and procedure of the CWRC.

On April 25, 1988, after again ending the work day that included painting the same church all day, and being covered from head to toe in paint, I along with several inmates went to my home located in Dunbar to get a change of clothes, towels, and swimming gear for all those who wished, so we could shower and sit in a Jacuzzi to relieve our aching muscles from the work we had done that day. We went to the South Charleston Gym I frequent. However, the Jacuzzi was shut down that day and we were unable to use the facility due to renovations. This was not reported to Control, because my radio transmission frequency was down, and the Gym was not available for use.

4

On another occasion, while picking up my children from their daycare centers inroute to my baby sitter, I was beeped by a prospective client who I was supposed to meet later that evening to inspect their home located at 1320 Moore Street, Dunbar. Since I was in the area I took my children to a park located near by and Inmates Dotson and Jones watched them so they wouldn't interfere or get in the way while I inspected a house that was unsafe and needed complete regutting. My Landlord was also present at this park and watched the inmates and my children while I was gone.

On a Wednesday prior to attending church inmates accompanied me while I measured windows that needed closing up with plywood at a Church on 26th Street. We stopped in a K-Mart located in the area to buy a measuring tape and to return some work shoes that inmate Tabbath Cummings had brought to work on a road crew. She later decided she no longer wanted to pursue the job and had no further need for the shoes.

On another Wednesday after attending church with several inmates we stopped at Taco Bell to buy ice cream before returning to the center.

On another occasion on Tuesday May 12, 1998, inmates Jones and Dotson accompanied me to the YMCA, on Hillcrest Drive. After completing the inspection of a project we had worked on all day, we worked out at the YMCA. Prior to completing my workout I was beeped by a friend who was keeping my children who resides at 118 Oak Drive, in Dunbar, WV., who advised me an emergency had come up and she needed me to pick up the children right away. I proceeded to do so and upon arrival I called control to report my new location and a number I could be reached at since I had to dress the children prior to departing.

On several other occasions various inmates have been signed out by me to assist with purchasing and carrying supplies and other items needed to complete work jobs. Those places were Lowes, Sherwin Williams, Mountaineer hardware, K-Mart, Moores etc.

I would like to enter on the record at this time that I have only recently moved here and have no support system except for friends who reside at 118 Oak Drive in Dunbar, and a baby-sitter who lives on the West side at 1533 3rd Ave. My baby-sitter doesn't have a phone, or drive, therefore she is my last resort. I have worked long hours averaging 60-72 hours a week. I have had only **one Saturday** off, up until last week when I worked Saturday, Sunday, and Tuesday finishing off Juvenile Services offices, and took Wednesday off to recuperate after working all those hours.

7. **Allegation # 7..** Lack of coverage of inmates on a work site, in specific Juvenile Services, 1200 Quarrier Street.

**Response..** True and not true. Initially, Officer Hudson was assigned to this project by Mr. Swach. However, I did not know until 1:00 PM that same day that he was scheduled to work the 2:00 PM to 10:00 PM shift. Therefore, I released him at 1:50 PM, and covered the detail myself at 2:10 PM.

Mr. Ervin I believe that my treatment in this matter was discriminatory because of my race and sex. If the circumstances had been reversed and these allegations were attributed to Mr. Swach or Mr. Marshall, both white males, I assure you this matter would not have been handled in the manner it has been. For example first of all I'm appalled that none of the above outlined alleged wrongdoings were ever discussed or brought to my attention by you or Mr. Swach. Granted I'm an outsider and only been employed a short period of time but I am part of the administrative staff and that courtesy should have been extended.

If, as you were receiving all these complaints of wrongdoing from inmates concerning me, why wasn't it brought to my attention whenever an inmate brought it to management's attention like I've done with alleged wrongdoings concerning staff that inmates have reported to me. Why is it that whenever I brought allegations about Mr. Marshall or Mr. Swach to either one of your attention, your response was, inmates are lying, or I didn't or never said any of that. Why is a **double standard** being applied to me? The inmates all of a sudden telling the truth and they are credible when it comes to allegations concerning this writer.

To address a few specifics let me first address a few **Incidents related to Lonnie Marshall.**

Upon my arrival Mr. Marshall and I clashed due to my usage of his kitchen and maintenance staff without his approval and while they are assigned to the kitchen. He did not want me to touch or use his people at all until they finished their 30 or more days in the kitchen. I disagreed with that request. I was told it was the policy not to use the kitchen staff. Due to Ms. Spurlock going on leave immediately and Mr. Swach taking employment from her jurisdiction, I was not apprised of this prior policy until Mr. Marshall expressed his displeasure with my actions. Then shortly thereafter Mr. Marshall became sick and the issue was not resolved until we had an administrative meeting on May 6, 1998. After which we reached an agreement that I wouldn't use anyone without his approval/and or it interfering with Center's duties.

There came a time when a dishwasher was observed by Mr. Swach and Mr. Marshall as looking tired. They conspired and decided that regardless of the job request that might come in this particular inmate (Dotson) couldn't work any assignments because it took away from his alertness to details of his kitchen job and he might injure himself. As far as safety goes what was he going to do cut his hand off loading the dishwasher. I vehemently disagreed with their decisions and brought it to your attention with my concerns. Mr. Ervin you advised me that you preferred that I not touch the kitchen staff, but you were open to my concerns and saw my points when it came to selective useage as well. You instructed me and Mr. Marshall to work it out. It was quite obvious Mr. Marshall was displeased with your decision and voice his harsh opposition to several inmates.

As you know there came a time when in house maintenace and kitchen inmate staff no longe had to look for jobs, but had jobs waiting for them the day they were release from their work assignments. This seem to bother Mr. Marshall as well. And let me add these were not field jobs, like DOIH or Parks and recreation. They were found jobs tailored to their unique skills, unless they specifically asked for field jobs. This should have been considered a positive contributions by me.

Instead it was viewed as coddling and pampering the inmates which I couldn't understand. Since many inmates reported to me, prior to my arrival they had to wait weeks before they were able to find jobs and inmates had been sent back because they were unable to find jobs in a timely manner.

There was a time after that when I used members of his staff and did not interfere with the kitchen duties and the two dishwashers switched shifts to allow one to work for prison industries, and to do a detail at Ladiley Field. Mr. Marshall threw a plum fit he started screaming and hollering, abusing the staff with extra work, cursing and swearing at them, and I overheard him say "you'll work in the kitchen or I'll take your furlough, I don't care what Ms. Packer said, I run this fucking place she doesn't, If you work another job you will do 30 more days" I immediately reported this to Mr. Swach. I consider this intimidation, coercion and threatening inmates. Why in this case was an investigation not pursued and why was no action taken against Mr. Marshall? War was declared when it comes to me.

Another incident involved my taking the cook out of the kitchen and not returning her on a weekend when only four inmates were in the center. Therfore, I requested that cold cuts be served. Again Mr. Marshall threw a fit and mistreated the inmates in the kitchen verbally. I was chastised by Mr. Swach and told a grievance could be filed by not offering a hot meal to the inmates. No action To my knowledge were taken against Mr. Marshall.

There was a time when Mr. Marshall spoke negatively against me to an inmate I had written up for refusing to work. Not only did he speak against me but he advised the inmate not to worry the charges will never stick. Not only did he advised this inmate (Lee Simons) but he repeated it to others. When I reported this to Mr. Swach he took no further action to my knowledge. I felt Mr. Marshall's action were prejudicial and highly unprofessional, particularly discussing an ongoing disciplinary action with an inmate in an advisory capacity.

There were numerous other interactions between Mr. Marshall and my self that were so distressing that I relayed my fears of Mr. Marshall's treatment of me to another administrator outside of CWRC.

8

They advised me that I was probably mistaken he was just being territorial, but it was a lot more than that as this suspension shows.

On July 12, 1998, in my opinion, Mr. Marshall worked on a holiday just to be disruptive and to prevent me from using his staff which I had successfully done over the weekend without interfering with the kitchen.
He even refused to allow us to take glasses for the inmates to drink water out of knowing they were going to be out in the hot sun cutting down trees all day.

### Incidents relating to Mr. Swach

Numerous inmates have come to me with allegations of improprieties relating to Mr. Swach. Being a professional, I would immediately leave from my office and walk across the hallway and discuss them with him. I'm appalled and sickened by his actions and systematic sabotage of my character, integrity and good name. Afterwards we would walk into Mr. Ervin's office and tell him about them, and that would be the end of it. Why is there a different set of standards for me.

While Mr. Ervin was away from the center an inmate approached me and stated that they were afraid to speak with Mr. Swach because of his relationship with inmate Lemley, who they don't get along with. They felt Mr. Swach would be bias in granting their request.

Several inmate approached me about Mr. Swach's alleged fraternization with inmate Lemley which I advised him about and reported to Mr. Ervin, because of their long standing relationship and being former roommates I feel appropriate actions were not taken. And if they were they certainly were different than the actions taken against me in this matter. I can assure you no inmates have been interviewed pertaining to allegations of alleged misconduct reported by inmates. Things like he's given her his credit card to buy things with, where do they go when he transports her to work instead of one of his CO's. I repeat there is a double standard of handling allegations made by inmates when it comes to male staffers as opposed to me.

Upon my arrival Mr. Swach informed me that I was to report directly to him, he would be responsible for my training. I received little training from Mr. Swach except the phonetic (CWRC) names of the individual facilities, and manuals I never had time to read. All my training came from Magistrate Ladika relating to disciplinary hearings and rule 607. I was allowed to observed the runnings and operations at CWRC and then I was thrown to the wolves to sink or swim. I was never told about any policy or procedure regarding inmates except for the two hour pass limit. I find it extremely suspicious that Mr. Swach is conducting an investigation about misconduct when he caused the investigation by failing to instruct me about situations I was handling incorrectly especially, when he was receiving first hand knowledge. Normally an employee is given a period of time to improve their work before they are suspended.

I brought several complaints regarding his correctional officers reluctance and resistance towards me as a new administrator to Mr. Swach's attention. He initially, advised me "to wait and let them get adjusted to you." When it continued Mr. Swach put out a memo instructing them of my new duties and responsibilities. After a period of time the tide of resistance relaxed a little, but there was still overt bigotry and resistance in the center. I think it escalated when Officer fox literally wrote me up. When I asked him to copy some memo's I had written late one night. In addition, he provided me a copy of his job responsibilities. When I advised Mr. Swach of this matter he took no action on the issue, which I considered insubordination. Since the CO's job description stated "and other duties as assigned". Over a week later after this issue had still not been address, I brought it up at a staff meeting and Mr. Swach answered to Mr. Ervin's inquiry of why the issue hadn't been addressed was, I hadn't given him anything in writing. I was attempting to fit in and felt if I wrote the officer up it would only make matters worse. Coupled with the fact CO issues were Mr. Swach's responsibility.

When I later talked to Mr. Ervin about what I felt the resistance of the o0fficers was caused by. I related, I would like to think it's because I'm a woman, not due to me being black, and not because I was both a woman and black. In addition, CO's do not want to do any work. They were angry with me because they felt I was coddling the inmates and being too nice to them because I requested that they CO's tranport them to and from work.

On April 27, 1998, I was called by Mr. Ray Swecker, from Central Office, and he requested that I fax to him a copy of my preliminary report concerning the background check of applicant's conducted at St. Mary's Correctional Facility. When I reported this to Mr. Swach he became irrate and stated "don't you send that little prick anything without my authorizing it" Mr. Ervin's in charge of the background investigation and nothing goes out of this center without his okaying it. Once again this is an illustration of Mr. Swach's need to exert his position in a show of power. When Mr. Swecker called on another occassion for additional information I advised him I had been instructed By Mr. Swach not to accomadate his request.

When I first came aboard he took employment away from Ms. Spurlock in such a quick action and then told her to keep her hands off it. His action were so abrupt and unnecessary that she took a week off and left me in the cold as to what to do. And Mr. Swach gave me no help or assistance so I learned through trail and error. After Ms. Spurlock return he continue to try to cause dissension between us until we put our heads together and worked out our differences and developed an extremely good working relationship.

There came a time when I asked Mr. Swach why the CO's couldn't take the inmates to Bible study on Wednesday Nights. His response was "they are goddam inmates, they don't need religion. It wasn't until Mr. Ervin interceded and told him that as chaplain I could take them to church. But you could tell he was unhappy with Mr. Ervin's decision.

On May 6, 1998, after being at the Center for over two months and no staff meeting, I suggested that we have weekly meetings to address inmate problems and to insure all staff was on the same plate. Mr. Ervin directed that meeting will be held every Monday at 10:00 PM, no matter if certain staff was missing including him. However, On Monday May 11, 1998, no meeting was held, because Mr. Swach wanted to show who really was in power at the center. I can go on indefinitely about Mr. Swach's power trip but time and energy don't permit. It's enough for you to get a picture of what was going on.

My work and job satisfaction is important to me, and I truly enjoyed working at the CWRC until this matter surfaced and it totally turned me off. A review of your in house records will reflect how may hours a day I devoted to the CWRC.   I find it extremely interesting that Mr. Swach's name is omitted from the dailey journal frequently when it comes to his arrival and depature time from the CWRC.

I approached my work like a track team 4 X 4 relay. I'm only concerned about my leg of the race, I'm going to give my all, when it comes to my job I let it all hang out, I put forth everything I've got to make sure I go all out. I'm not concerned or going to worry about my team mates because they have their own way of running their leg of the race and as long as I've done my part to the best of my ability I feel good about myself. God has truly blessed me in my life time. That's why I chose public service arena to work in. With my background I could make much more money in the private sector but I chose government so I can give something back for all that I've accomplished.

I'm a workaholic. I didn't come to CWRC to take anyone's job, I made that abunduntly clear. I can't sit around and take a pay check for doing nothing. That's not the way I was brought up. Others can take smoke breaks with inmates on the front steps and cause other inmates to talk about them, or sit in their office an read a race program all day, or have female inmates continuously in their office all day, or sit around and gather information on their co-workers in an attempt to destroy them, or curse and belittle staff in front of inmates in the dining hall, or sit out in the garage for extend periods of time, or bang in sick once a week, or come and leave work anytime they choose and continue to fight against progress and change. That onuses is on them, they have to live with themselves.

But **real power** is to do what you need to do in spite of opposition, impediments, bigotry, sexism, simple minded individuals, people talking about you, being envious, displaying jealousy, or overcoming other obstacles put in your way.  And that is what I've done since I've been at the CWRC.

All inmates are employed, making money, and were beginning to have some self esteem and feel good about themselves.

12

It's something that Steven Covey with all his various books and Dale Carnegie with all his various classes couldn't deliver. This is what this whole matter is all about. Inmates were too content, many worked with me tirelessly and eagerly as I attempted to bring a breathe of fresh air to the center. Mr. Swach and Mr. Marshall in this writer's opinion, felt their status at the CWRC was deminishing and their perceived power base eroding.

The Mission of this program is to ease the inmate's transition from correctional institution back into the community and at the same time provide financial support for the inmate and his family. In addition my own personal goals were to reach out to the inmates spiritually and uplift them. I accomplished the mission of this program and my own personal goals and I did it without meanness. A little kindness goes a long way. Mr. Swach and Mr. Marshall can not resist being mean to the inmates. And I realize you have a long relationship with Mr. Swach and feel you have to back him up no matter what. While that may be a good general rule, there are times when exceptions are called for. Blind allegiance can be very costly. Too many lawsuits come about because a supervisor has been totally unreasonable and higher management has failed to act. Firing people who have a right to complain about the way their supervisor has treated them is a sure way to end up in court.

Here is a little scenario of the work situation at CWRC. Linda, the employee, is doing a wonderful job, so wonderful that everyone in the CWRC and the Division of Correction respects her and calls on her for help and advice concerning her area of expertise and other areas outside. They do not or call on her supervisor, Ray, or congregate frequently in his office, much less than they use to, or like they once did prior to my arrival on the job, including you, Mr. Ervin. Ray feels jealous and left out.

He therefore begins to pry and interrogate inmates. He informs his loyal snitches, Inmates Hedricks and Lemley, to report anything they here relating to Linda to him. As Linda reports her ongoing activities that involve inmates to Ray, he documents them to use at a later date, knowing that Linda being new to Correction's doesn't know Policy and Procedure, and he fails to

inform her that certain actions are unacceptable or against policy. Ray, had a mind set and conscious intent to find "**something**" because you were fair and receptive to her suggestions, you were beginning to rely on her instead of him, the center was running smoothly, inmates respected and admired her because of her treatment of them as human beings .

Due to the fact they couldn't caused me to fail when it came to job performance, even though I had no previous insight into Corrections, Mr. Swach engaged in outrageous behavior along with Mr. Marshall by conducting a witchhunt/and smear campaign, by engaging in snide and derogatory comments to inmates in particular, and by engaging in overt if not collusionary means, in an attempt to discredit, humiliate, and concoct a series of events based on erroneous and unsubstaniate allegations that I believe Mr. Swach orchestrated into my ultimate suspension. His serious aspersions and claims/allegations of "gross misconduct are not precisely accurate or portrayed as downright false.

Mr. Swach's transgressions towards me and numerous inmates were and still are extremely boorish, unprofessional, downright coercive, stressful, mean spirited and caused, me to work in an extreme hostile environment. I therefore request that an independent investigation be conducted regarding the alleged wrongdoings attributed to me, as well as looking into the overall operations of the CWRC facility.  In addition, this letter also serves as a formal grievance as well.  An addendum to this letter will be submitted outlining the decencies of the CWRC observed by this writer at a later date. This addendum will cover work evaluations, treatment plans, inmate and building security, staff deficiencies, record keeping, employment issues, passes, needed equipment, particularly outside perimeter camera monitors(after the recent Nike sneaker theft).

On Wednesday, May 13th, after taking the day off after successfully completing spackling and painting 42 offices for Juvenile Services, I receive a telephone call from you at 6:06 PM.  I was expecting a call from you, Mr. Ervin, that would be congratulating me on a job well done at the YMCA or Juvenile Services.  Instead you inform me that I was suspended only after you and

14

Mr. Swach had gather all the inmates up in the yard and informed them about my suspension before you even bothered to call me. A blatant invasion of my privacy was created by management when an inmate meeting was held. I suffered the ignominy/embarrassment and humiliation of a public announcement of management gloating and informing the inmates (which had absolutely no right to know that I had been suspended. It serve the same purpose like they used to do in slavery days, when they whipped the slave in public to show who the master was. Your actions were highly unethical, unprofessional, misguided, and blatantly racial.

After learning about this atrocious deed, I felt like a common criminal with my poster hanging up in the local post office wall. This action alone gives me grounds to sue for defamation of character, invasion of privacy, and intentional infliction of emotional distress. I'd be willing to bet that Mr. Swach rubbed even more more salt into my wounds by publicly posting something in writing about my suspension.   But threats of a law suit is not what this letter is about. This letter is to make management aware  of the serious underlying problems in the Division of Corrections that not only is prevalent in the CWRC but throughout the entire organization, that must be address, when it comes to problems and issues unique to women and **especially** minority employees which are few and far between.
The **GOOD OLD BOYS NETWORK IS ALIVE AND DOING WELL IN THE DIVISION OF CORRECTION.**

In conclusion, I respectfully ask that the Office of Personnel or the appropriate outside agency other than Mr. Swach continue to review this matter and interview the inmates at CWRC to see who actually has been intimidating, threatening, and coercing inmates, paying particular focus to the violations of my civil rights, where my employer has engaged in such a blatant pattern of employment discrimination. I believe I was wrongly suspended and my civil rights violated because of my race, color and gender.

I believe that the white male staff at CWRC felt so threaten and intimated by my work ethics, intelligence and presence, that there was a systematic sabotage undertaken along with a rush to judgment to **get something** on me that administrators used the flimsy excuse that the allegations were coming from the inmates, when in actuality they had some input in the matter.

As you can tell by the length of this letter I have a magnitude of concerns, too many to outlined in this memo, however, I will have no reservations about articulating them if and when the opportunity presents itself.

Finally, their actions were a very sophisticated and highly successful way of eliminating an aggressive, knowledgeable, go getter, articulate, well respected, educated black female from a position of high visibility and responsibility which threaten the white administrators at CWRC who had been in total control of the inmates and ran the facility without anyone questions their actions prior to my arrival. I also attribute to a certain Director of Security of being so power hunger and consumed with jealousy and bias that he coerced inmates and CO's to spy on me and used information relayed to him to distort the truth which led to this investigation.

The above articulated complaint made by this writer is a micro of how Afro American employees are treated within the Division of Corrections at the present time and you wonder why you can't attract minorities. I have not requested the disciplinary records through Freeedom of information act relevant to disciplinary matters yet, but I can almost be assured that minorities within Correction are dealt with more frequently and harshly when it comes to disciplinary matters within the Division of Corrections.

In closing, I want to personally thank you for the opportunity to work at your center. In addition, I appriciated your openess to most of my suggestions for improvements at the CWRC. You were extremely supportive and helpful with my acclamation to your Center and West Virginia. However, there is something extremely **FOUL** going on at your center.

I would hope this action has no correlation to the action taken by CWRC staff against Warden's Trent daughter, since I was the Administrator on Duty that night, and instructed the officers to address the issue appropriately by bringing her into the center and gathering the neccesary information.

I believe that there is a radical difference between the righteous and the wicked; that those who are justified by faith in the Lord Jesus Christ are righteous, while all those who remain in unbelief are in God's sight as wicked and under the curse, and this distinction holds true both in your work and personal life. One cannot sin or err without consequences.

As somone said that I greatly admire "Cream rises to the top". There is a lot of buttermilk at CWRC and it is truly curdling as this matter is being investigated.

LCP/lcp
atttachment

cc: Mr. Holland
    Mr. Davis

17

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

#

*12*



**Corrections**

**BOB WISE**
**GOVERNOR**

**JIM RUBENSTEIN**
**COMMISSIONER**

**JOE MARTIN**
**SECRETARY**

OFFICE OF THE COMMISSIONER
112 CALIFORNIA AVENUE STATE CAPITOL COMPLEX
BUILDING 4, ROOM 300
CHARLESTON, WV 25305-0280
(304) 558-2036 Telephone - (304) 558-5934 Fax

September 16, 2004

Ms. Linda Cruz Packer
4900 Megan Dr.
Clinton, MD 20735

Re: Request for Information

Dear Ms. Packer:

This office previously provided you a response to your requests for information and that position remains unchanged to the extent that you have tendered a "narrowed" request.

More specifically, your requests in items 1, 2, 3 and 4 seek information that is privileged and not subject to FOIA by virtue of W.Va. Code § 29B-1-4(2). Moreover, the period of time for which you seek records and potential volume render redaction impracticable. Further, the costs associated with such undertaking would be substantial.

Item number 5 of your request is not subject to FOIA as FOIA does not require that an agency create a document.

With respect to the remaining items, except Nos. 9, and 10 please be advised that you were provide with a copy of all paper documentation believed to be in the possession of Corrections that pertained to you. To the extent you desire to inspect inmate records or radio logs of the Charleston Work Release, in conformity with W.Va. Code § 29B-1-3(4)(b) you may make arrangements to inspect such records during normal work hours 8:00 a.m. to 4:00 p.m. at the Charleston Work Release Center by contacting the director of said facility.

You will be expected to tender payment for costs of retrieving said records at the time of your inspection.

Sincerely,

Jim Rubenstein, Commissioner

cc: Nancy Swecker
Jeff Stinnett, CWRC

*We are an Equal Opportunity Employer*

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

## #
## 13

Case 1:07-cv-01235-RWR     Document 24-2     Filed 04/22/2008     Page 54 of 82



narcosphere.narconews.com

*a project of the narco news bulletin*

## Secret Service agents claim White House turning blind eye to racism

By Bill Conroy,
Posted on Tue Oct 26th, 2004 at 10:21:46 PM EST

African American agents with the U.S. Secret Service, which is charged with safeguarding the life of the president and other national leaders, contend the Bush Administration has worked to undermine their class-action discrimination lawsuit against the agency.

Officials with the nonprofit Black Agents of the Secret Service (BASS) allege that for the past four years -- the lawsuit was filed in 2000 -- "the Bush Administration and the Secret Service have used the judicial process to prevent a discussion of this case on its merits." BASS representatives say not a "single witness" has been called "nor has a single document been produced" in the case to date.

"The refusal to address the merits of the Black Agents' case is shameful," said Special Agent Reginald G. Moore, BASS president, in a prepared statement. "It is particularly disappointing that nothing was done after (former U.S.) Rep. J.C. Watts arranged a meeting with White House Associate Counsel Stuart Bowen and the class representatives to discuss the case. This is not a situation where the White House is unaware of the issues, nor could they be after the appearance of several front-page stories on the gross mismanagement and racial discrimination in the Secret Service."

The alleged racial discrimination problems within the Secret Service -- formerly part of the Treasury Department and now part of the Department of Homeland Security (DHS) -- appear to be part of a widespread pattern of racism within major federal law enforcement agencies.

It is a pattern that numerous government whistleblowers contend has not been addressed by the current administration, and it is a pattern they argue represents a threat not only to civil rights, but to the national security of this country.

Past stories on Narco News have detailed the class-action discrimination lawsuit filed by current and former Hispanic U.S. Customs agents against DHS. That case also has been pending in federal court for years.

More recently, special agents within DHS' Immigration and Customs Enforcement (ICE) were informed that they would not be receiving foreign-language pay due to "budget" constraints.

In addition, a resolution adopted by a national organization representing Hispanic law-enforcement officers charged that former DEA administrator Asa Hutchinson (who is now one of the top guns at DHS) has a track record of "perpetuating an

### Menu

- Home
- English | Español
- Search
- About the NarcoSphere
- Reporters' Notebooks
- Request a Co-publisher's Account
- The Narco News Bulletin

### Enter the NarcoSphere

Request Account
Copublisher
Agreement

Username:
Password:

Login

Mail Password

**Read Introductions by Our Copublishers**

### Reporters' Notebooks

- Reber Boult
- Julia Steinberger
- Al Giordano
- Bill Conroy
- Franz J.T. Lee
- Nancy Davies
- Cynthia McKinney
- Benjamin Melancon
- David Keating
- Fabio Mesquita
- Dan Feder
- Claudia Espinoza
- Yasmin Khan
- Jules Siegel
- Gissel Gonzales
- Daniel Fleming

atmosphere of distrust, reprisal and retaliation against minority employees...."

The delays in the African American Secret Service agents' discrimination case led their attorneys last week to resort to the extreme measure of filing special pleadings (a Writ of Mandamus) with the U.S. Court of Appeals for the District of Columbia. As part of the pleadings, they asked the federal appeals court to intercede and force the federal district court to take action in the case.

"We take this unusual step today because we cannot take four more years of denial and delay," said Secret Service agent Moore, who is a named plaintiff in the discrimination litigation. "Every day that passes, we lose witnesses and evidence.

"The Secret Service 'accidentally' fails to retain relevant documents. For the future of the Secret Service, we must have a hearing on the merits of more than 20 years of racial discrimination and a remedy that dissolves the 'Good Ol' Boy' network, which has worked so often to disadvantage black agents."

The class-action case was filed in the U.S. District Court for the District of Columbia on behalf of some 250 African American special agents of the United States Secret Service. The lawsuit contends that the Secret Service has "discriminated against African-American Special Agents, from at least January 1974 forward, in its personnel policies, practices, and procedures."

More from the Writ of Mandamus pleadings:

*Over four years have passed since the government filed its motion to dismiss and the Petitioners filed their motion for class certification. Petitioners have waited patiently, but they are suffering prejudice. They have not been allowed to depose any fact witnesses, analyze any personnel databases, or conduct any discovery whatsoever. In the meanwhile, the Secret Service admits that it has not in the past and will not in the future preserve electronic mail evidence relevant to the present action. Petitioners have no way to determine if the Secret Service is complying with its responsibility to preserve other documents relevant to the case.*

*Evidence is slipping away and Petitioners are beginning to lose the cohesiveness and cooperation of the class needed to prosecute this action. Without a sufficient number of participating class members, Plaintiffs will not be able to locate sufficient witnesses, documents and other information needed for the case.*

**Judge Reacts**

The filing of the writ on Oct. 22 did prompt quick action on the part of the judge, who, after years of issuing no rulings in the case, appears to have worked all weekend to prepare a ruling on the pending motions in the lawsuit.

In that ruling, issued Oct. 24, Judge Richard Roberts determined that "despite the (agents') compelling allegations of discrimination within the Secret Service" the class-action claims should be dismissed on technical grounds.

The claims on behalf of the class -- a group of some 250 African American agents – were thrown out because they had not been completely exhausted through federal administrative channels before being brought into federal court, the judge

- Pablo Francischelli
- Andrew Grice
- Baylen Linnekin
- Alex Satanovsky
- Irene Roca Ortiz
- Sean Donahue
- Erik Siegrist
- Charlie Hardy
- Ron Smith
- Christopher Fee
- Diego Mantilla
- Natalia Viana
- Amber Howard
- Teo Ballve
- Vladimir F-Garcia
- Justin Delacour
- Linda Langness
- Steve Young
- Kevin Okabe
- Jeff Simpson
- Christopher Whalen
- Sarah de Haro
- Ricardo Sala
- Charles Faris
- Nora Callahan
- Luis Gomez



NARCO NEWS
The Fund for
Authentic Journalism

**Narco News:
Top Stories**

Emergency Music for a
New Bolivia by
Parafonista

Brazil's Lula to Sign Drug
Decriminalization
Decree by Al Giordano
4 Comments

Walking: We Ask
Questions by the Notes
From Nowhere
Collective
12 Comments

Cynthia McKinney: We
Need Narco News, and
It Needs Us by Cynthia
McKinney

ruled. Lawyers for the agents stress, though, that the class claims can be filed again with the court after they wind their way through the 180-day administrative-review process.

However, Judge Roberts did not dismiss the individual discrimination claims of five Secret Service agents who are party to the case.

On another front, the judge's ruling failed to address a potential conflict-of-interest issue raised by the writ. In a footnote included in those pleadings, lawyers for the agents raise questions about Judge Roberts relationship with a potential witness.

The footnote:

*In a July 13, 2000 Order, Judge Richard Roberts disclosed to the parties that he was personal friends with then Treasury Undersecretary James Johnson, who had supervised the United States Secret Service for the Department of Treasury during much of the relevant time period. Judge Roberts disclosed that he and Johnson had discussed the case as it had been reported by the Washington Post one morning over breakfast.*

*In addition, Judge Roberts disclosed that as a Department of Justice attorney he served on the "Church Arson Task Force," co-chaired by Undersecretary Johnson. As a result, he was exposed to the "Good Ol'Boy Roundup" investigation which had documented organized racism by Agents in the Justice and Treasury law enforcement bureaus, including the Secret Service.*

*At that time, Judge Roberts deemed recusal (stepping down from the case) inappropriate because there was no indication that he would be required to assess then Undersecretary Johnson's credibility and that the Roundup allegations were a small part of Petitioners' complaint. Four years later, the facts have changed substantially.*

*Through Freedom of Information Requests, witness interviews and other investigative techniques, Petitioners have learned more about the Roundups and Undersecretary Johnson's role in the subsequent investigation. Petitioners believe that Treasury Undersecretary James Johnson will be a key witness and that the "Good Ol' Boy Roundups" will be a significant part of this case. Thus, Judge Roberts will be required to assess Undersecretary Johnson's credibility and to rule on matters concerning the Roundup investigation.*

**Direct Appeals**

Beyond the effort to address the discrimination problem through the courts, the African American Secret Service agents also have attempted to resolve the case through agency channels as well.

In a January 2003 letter, Moore wrote the following to Secret Service Director Ralph Basham:

*We are writing to see if you are interested in discussing a potential resolution of the race discrimination class action that was filed almost three years ago in federal court. Throughout this difficult period while this case has been pending, the Black Agents have remained loyal and dedicated to the Secret Service. It was*

1 Comment

Eduardo Galeano: The War on Drugs is a Great Imperial Hypocrisy by Alex Contreras Baspineiro
View Comments

Power: Building it Without Taking it by the Notes From Nowhere collective
12 Comments

Now What? First, We Kill the Media by Al Giordano
4 Comments

Election Loss of pro-Harm Reduction Mayor in São Paulo by Fabio Mesquita
View Comments

A New Beginning for Uruguay by Alex Contreras Baspineiro
View Comments

Clandestinity: Resisting State Repression by the Notes From Nowhere Collective
12 Comments

Carnival: Resistance Is the Secret of Joy by the Notes From Nowhere Collective
12 Comments

Uruguay Election Coverage: Tabaré Vázquez, Presidente by Narco News Copublishers
12 Comments

The Coca Leaf: Tradition and Struggle by the Narco News J-School Radio Team

Last Chance for Gas in Bolivia by Amber Howard and Natalia Viana

Autonomy: Creating Spaces for Freedom by the Notes From Nowhere collective
12 Comments

Mexico's New Power Before the United States by Al Giordano
View Comments

Networks: The Ecology of the Movements by the Notes From Nowhere Collective
12 Comments

*always our desire to resolve these matters informally outside of court, but we had little choice when former Director Stafford refused to engage in any dialogue with us.*

*The Black Agents want to achieve two objectives 1) basic personnel reforms that would ensure a level playing field for all Agents; and 2) reasonable compensation for those Black Agents who have been damaged by unfair personnel practices and policies. We are committed to a flexible approach and it is our desire to resolve this issue to the mutual benefit of all concerned.*

*I hope that you will give serious consideration to opening up a dialogue with us and taking the first step towards healing this painful rift in the Secret Service family.*

Basham responded to Moore in February 2003, as follows:

*... The Secret Service must maintain its acknowledged expertise in protecting our nation's leaders, visiting world leaders and our nation's financial infrastructure, while actively seeking out new ideas, skills and viewpoints. The continued success of the Secret Service and the security of our homeland depend on all of us working together and maximizing the skills, contributions, and potential of every single member of this organization.*

*In regard to the portion of your letter which concerns ongoing litigation, your letter has been referred to the Department of Justice which represents the Secret Service in that matter.*

According to the African America special agents involved in the case, the stakes are too high for the Secret Service, the court, or the White House, to continue stonewalling on this issue.

"This is an important case involving the civil rights ... of African-American Special Agents of the Secret Service," the Writ of Mandamus pleadings assert. "Many of the Agents have risked their lives through the years protecting the lives of the President and his family. They deserve a trial on the merits and the chance to purge their workplace of an alleged history of over twenty plus years of racial discrimination."

Former Secret Service agent Cheryl Tyler, who is a plaintiff in the case, sums it up this way:

"We have been waiting patiently for years. Justice delayed is justice denied."

---

Secret Service agents claim White House turning blind eye to racism | **0** comments (0 topical, 0 hidden)

Display: nested 🔲 Oldest First 🔲 🔲

---

**Return to The Narcosphere Homepage**

The United States Opposes New Agreement Between Government and Coca Growers by Alex Contreras Baspineiro

The Free Trade Area of the Americas (FTAA) and Drugs: A Perverse Omission? by José Mirtenbaum Kniebel
View Comments

Homeland Security Stiffing Agents on Foreign-Language Pay by Bill Conroy
View Comments

## Search the NarcoSphere



 RSS 1.0



Server, bandwidth & technical assistance for the Narcosphere is donated by:

**voxel dot net**
best of breed linux solutions

# FORMAL EEO COMPLAINT OF LINDA CRUZ-PACKER

Ms. Cruz-Packer asserts that the following actions were discriminatory and retaliatory, and created a hostile work environment for her based on her race (African American) and her sex (female), her prior participation in the EEO administrative complaints process against Volunteers of America, her former employer, and her current EEO activity against TSA (beginning October 13, 2003). Some of the following are also actionable independent of a hostile work environment.

**1.)    Unwarranted 5 Day Suspension:** On May 2, 2003, Ms. Cruz-Packer was called to a meeting with her supervisor, Mr. Santana, and Deputy Director Widawski, and given a memorandum instructing her to explain in writing charges on her government-issued credit card for three cash advances and several car rentals. She was not allowed to respond verbally to the charges at that time or any other time.  On May 5, 2003, she timely delivered her written response to her Director, John Rooney, explaining that she had not misused her government credit card. Five weeks later, she was suspended for 5 days without pay, beginning on June 16, 2003. Her suspension was unwarranted, and was disproportionately severe relative to the discipline administered to similarly situated white male agents. **( or other TSA employee's)** The suspension was motivated by discrimination on the basis of Ms. Cruz-Packer's race and sex and her prior participation in the EEO administrative complaints process.

On October 8, 2003, Ms. Cruz-Packer reported to SA Robert Boswell, that she had filed a police report with Prince George's Police Department, and notified Citibank that someone had fraudulently misused her credit card as well as several other credit cards that belonged to her. She was later informed by Mr. Widawski that he would not investigate the matter because it was "personal" in nature. (**since that time Citibank has conducted an investigation and resored $500 due to fraudulent misuse) I will fax the bill to you so you can use as an attachment.**

**2.)    Unwarranted Placement on Administrative Leave:**   From June 23, 2003 through the present, Ms. Cruz-Packer was placed on Administrative Leave with pay supposedly because unspecified "issues" had surfaced during her background investigation. TSA refused to provide Ms. Cruz-Packer with any further information about the reasons she was placed on administrative leave.  The period of forced administrative leave was imposed shortly after she confronted Mr. Santana about his disparity in treatment between herself and white male agents when he inappropriately brought agents to her house, posted her picture, and refused to meet with her about the alleged misuse of her government card.

**3.)    Work assignment:**  On December 29, 2002, Ms. Cruz-Packer was assigned to TSA's Office of Program Reviews and Special Operation and Hector Santana became her immediate supervisor.  As the only minority member of the team except for one other black female, she was treated as an outsider by Mr. Santana.   Mr. Santana rarely spoke to her, and when he did, he always had the Deputy Director, Lou Widawski in the room./ In contrast with the treatment given to white male agents, she was not given her choice of work assignments (cities) to work. She picked at least six cities besides Chicago, which is the assignment that she was eventually given.

**4.)   Firearms Requalification:**   On January 28 and 29, 2003, Ms. Cruz-Packer attended firearms training and qualified with a score of 240, the qualifying score was 210. Three months later, on April 18, 2003, Mr. Santana required Ms. Cruz-Packer to requalify, supposedly for "safety reasons."   According to Mr. Santana, her requalification was requested by the firearms instructors who had been present when she originally qualified.   When she was at firearms training, however, those instructors did not mention to Ms. Cruz-Packer any problems regarding her performance, nor did they relay any concerns to the acting firearms agent in charge of our office, Special Agent Robert Boswell.  At the time of her original qualification, she had never fired a Sigarm Automatic weapon, which was the weapon used for the training. No white male agents, even those who displayed the same unfamiliarity with the weapon, were required to requalify. The firearm requalification requirement was a pretext for Mr. Santana to discriminate and retaliate against Ms. Cruz-Packer on the basis of her race, sex, and her prior participation in protected EEO activity.

**5.)   Accusing Ms. Cruz-Packer of "Stealing Time":**   Mr. Santana repeatedly accused Ms. Cruz-Packer of falsifying her work hours because he supposedly observed her not being at her desk on a few oc_cocasions.  Eventually, on April 16, 2003, she changed her core hours from 8:30- 4:30 to 9:30 to 5:30 to stop Mr. Santana's constant harassment and accusations against her. No white male agents were accused of falsifying their hours by Mr. Santana.

**6.)   Forcing Ms. Cruz-Packer To Work on Mother's Day:** On May 10, 2003, Mr. Santana required Ms. Cruz-Packer to work on Mother's Day against her protest that this would be the first time since her husband died that she wouldn't be home with her children. There was no emergency or other reason for her to work that day, and she was not normally required to work on weekends. Mr. Santana did not schedule the team, which was primarily white males, to work on Father's Day.

**7.)   Humiliating Ms. Cruz-Packer In Front of Co-Workers:**  In June of 2003, Mr. Santana humiliated Ms. Cruz-Packer when he unnecessarily informed agents in her office that he had taken Ms. Cruz-Packer off of a work assignment because of her suspension. He also brought agents who had no reason to know of her suspension to her home on June 16, 2003 on the pretext of picking up TSA property, in order to further insult and embarrass her.

**8.)   Posting Her Picture:**   From June 16 through June 17, during her 5 day suspension, Mr. Santana directed that Ms. Cruz-Packer's picture be posted at the entrance to the TSA building and parking lot.  The implication was that she was a "wanted fugitive".  The incident was humiliating to Ms. Cruz-Packer.  To her knowledge, no other agent has been subjected to such degrading treatment – the only time people have had their pictures similarly posted is when they have been fired, or when they are perceived as a threat to the agency.

**9.)   Removal of Items from Desk:** On October 28, 2003, Ms. Cruz-Packer received permission to obtain personal belonging from her work area.  After reviewing her work area, she discovered certain items missing from her desk and file cabinet area, including her copy of her SF-86 and duplicate copies that she had used as working drafts to complete the final submitted

SF-86 that was used in connection with her background investigation. She attempted to file a theft report with both TSA security and she also reported it to the Director of Investigation, Steve Iannucci. Mr. Iannucci reported the matter back to Mr. Santana who took no action. Mr. Widawski was present at the time, and she reported the theft to him. On October 30, 2003, Mr. Widawski told Ms. Cruz-Packer that he would arrange for her to make a report and he provided her a telephone number for her to call, but she never received a response to her messages. Accordingly, she was never able to place a theft report for the papers taken from her desk.

**10.)    Unwarranted Proposed Removal:** [1] On October 24, 2003, TSA issued a Notice of Proposed Removal to terminate Ms. Cruz-Packer from the federal service. The sole support for the issuance of this Notice was the allegedly unfavorable results of OPM's background investigation of Ms. Cruz-Packer, which supposedly revealed that Ms. Cruz-Packer was unsuitable for federal employment because she had been terminated from a previous job, and failed to fully disclose that information on her SF-86. Neither of those allegations is true. Ms. Cruz-Packer was not terminated from her job with the West Virginia Department of Corrections, and she disclosed the circumstances of her departure from that position on her Declaration of Federal Employment, which was submitted to the agency along with her SF-86 in March of 2003 (Att. D).

Ms. Cruz-Packer responded thoroughly to the proposal to remove in two submissions to Mr. Gary Krizanovic, copies of which are attached here as Att. B-C. In short, Ms. Cruz-Packer's removal was proposed as a result of an OPM background investigation, which supposedly showed that Ms. Cruz-Packer concealed her termination from a previous position. The charges against Ms. Cruz-Packer were utterly false, as the former Secretary for Public Safety for the state of West Virginia attested that she was not terminated (Att. E). moreover, TSA proposed to remove Ms. Cruz-Packer despite the fact that OPM's background investigation was unfinished and obviously inadequate. The proposed removal merely a pretext to discriminate against Ms. Cruz-Packer on the basis of her sex and race and retaliate against her for participating in the EEO administrative complaints process.

**11.)    Failure to Restore Ms. Cruz-Packer to Active Duty and Restore Annual Leave Used to Prepare Her Reply:** On October 31, 2003 Ms. Cruz-Packer requested documents from TSA that were necessary for her to prepare her Reply to the Notice of Proposal to Remove. TSA needed over two months, until January 8, 2004, before the agency provided its partial response to Ms. Cruz-Packer's request. On January 13, she requested a brief extension of time to submit her Reply. After it had delayed in providing the documents for two and a half months, TSA granted her a one week extension, but refused to carry her in administrative leave during that time. Instead, she was required (**removed her**) to use 4 (**5**) days of annual leave. On January 27, 2004 Ms. Cruz-Packer timely submitted her Reply to TSA's proposal to remove, and provided evidence disproving the charges raised by TSA in it's Notice of Proposal to Remove.

---

[1]    Ms. Cruz-Packer raised TSA's proposed removal in her November 5 2003 letter to the EEO Counselor, Janet White, as an adverse personnel action that she wanted to include in her EEO complaint (Att. A at 3).

**STATE OF WEST VIRGINIA**
**DEPARTMENT OF MILITARY AFFAIRS & PUBLIC SAFETY**
**DIVISION OF CORRECTIONS**

West Virginia
Division of
Corrections

CECIL H. UNDERWOOD
GOVERNOR

WILLIAM K. DAVIS
COMMISSIONER

OTIS G. COX, JR.
SECRETARY

OFFICE OF THE COMMISSIONER
112 CALIFORNIA AVENUE-STATE CAPITOL COMPLEX
BUILDING 4, ROOM 300
CHARLESTON, WV 25305-0280
(304) 558-2036 Telephone - (304) 558-5834 Fax

May 21, 1998

Ms. Linda Cruz-Packer
306 Grandview Pointe
Dunbar, West Virginia 25064

Dear Ms. Cruz-Packer:

This letter is to inform you of my decision to dismiss you from your limited term/temporary position as Corrections Program Specialist with the West Virginia Division of Corrections, Charleston Work Release Center. The dismissal shall be effective immediately.

As you are aware, you were hired as a limited term/ temporary employee on March 16, 1998 at noon. On March 3, 1998, you were advised that acceptance of a limited term/ temporary position did not provide you any rights under the Civil Service System (Division of Personnel). Therefore, you may be released from employment without cause. Nevertheless, I wish to share with you that the reason for this action is my loss of confidence in your ability to effectively discharge the duties and responsibilities of your position. The following is submitted to reiterate my concerns:

*   Misuse of inmates free time

*   Misuse of inmate privileges, i.e. Visits/Furloughs

*   Utilizing the services of correctional staff and inmates to provide transportation and baby sitting services contrary to law and policy.

*   Making improper purchases

Ms. Linda Cruz-Packer
May 21, 1998
Page 2


You have the opportunity to either meet with me in person or to present me with a written explanation of the reason why you may think the facts and grounds contained in this letter are in error and why you may think this action is inappropriate, providing that you do so within fifteen (15) calendar days of receipt of this letter.


Sincerely,

Manfred G. Holland
Deputy Commissioner


MGH:HLW

cc: Don Ervin, Administrator
    Division of Personnel
    Personnel File

# Black Agents Sue Secret Service

By Bill Miller
Washington Post Staff Writer
Wednesday, May 3, 2000; Page A21

For more than 26 years, black Secret Service agents have complained internally about the agency's hiring and promotional practices. Today they intend to strike back with a federal class action lawsuit seeking millions of dollars in damages and a court order that would require the Secret Service to initiate employment reforms.

The suit is a follow-up to a complaint filed in February with the Equal Employment Opportunity Commission. Attorneys for the agents said they have come up with new evidence since then, and that they believe they will get quicker results by moving to U.S. District Court.

David J. Shaffer, one of the plaintiffs' attorneys, said he and co-counsel John P. Relman have assembled a trail of correspondence documenting complaints from black agents through the 1970s, 1980s and 1990s. "It runs the gamut," Shaffer said, contending that the Secret Service failed to correct the problem. "They had a lot of responses, none meaningful."

Ten current and former agents are joining in the federal suit, including three agents who were part of the earlier EEOC complaint. They charge they were denied promotions, given dead-end assignments, unfairly disciplined, and subjected to repeated racial slurs in what they called a long-standing hostile work environment.

The Secret Service, responsible for protecting the president and vice president, among other duties, has more than 2,500 agents, including roughly 220 African Americans. Shaffer said he hopes to get court approval to cover all black agents who have worked for the Secret Service since 1974. He said that would include nearly every black agent who ever worked there.

The Secret Service is the latest major federal law enforcement agency to face a racial discrimination claim in the courts. The FBI and the Bureau of Alcohol, Tobacco and Firearms settled similar class action discrimination cases during the 1990s.

Jim Mackin, a Secret Service spokesman, said he would not comment on pending litigation. But he defended the agency's record, saying two of seven assistant directors are black, along with the heads of four of the agency's 11 largest field offices.

"The Secret Service in the past has taken matters of discrimination and equity very seriously, and we continue to do so," Mackin said. He said officials are determined to ensure that the hiring and promotions process is conducted fairly.

According to the lawsuit, job-related difficulties date back at least to 1974, when 35 black agents sent a memorandum to then-director H.S. Knight. The memorandum complained about recruitment, assignment and promotions, and said that black agents felt they were "not included in the mainstream" of the Secret Service.

Similar concerns were repeated to other top officials over the years, Shaffer said, sometimes generating promises that changes would be forthcoming. But black agents continue to hit a wall when they reach the GS-13 pay rank, the notch just below the supervisory jobs, he said. For example, nearly 11 percent

of the GS-13 jobs are held by African Americans, but they have only 4.2 percent of the GS-14 jobs, he said.

Shaffer attributed the problem to employment practices that are too subjective and foster a "good-old-boy network." The lawsuit will ask the court to strike down the agency's system of awarding promotions and making performance evaluations.

According to Shaffer, the Secret Service missed a deadline in responding to the EEOC complaint, clearing the way for him to shift the case into federal court. He said the plaintiffs include men and women with a wide variety of experience, including agents who served on presidential and vice presidential details. But even after getting those choice assignments, he said, they got transferred laterally instead of being moved up.

John E. Turner, an agent with the Washington field office, said he ran into that problem after working on Vice President Gore's detail. He hoped the duties would be a gateway to advancement. Instead, he said, white agents with less experience got the promotions he sought. Turner said he had a score of 98.1 out of a possible 100 points in the Secret Service's promotional system, but the rules permitted officials to promote candidates with lower scores.

"Our frustration level is so high we have to do something," Turner said yesterday.

Jennell Walker Clark, one of the new plaintiffs in the case, left the Secret Service in 1996 after six years. Clark said she routinely missed out on assignments that would permit her to compete for promotions and she endured occasional racial slurs. Now she's an agent with the inspector general's office for the Small Business Administration.

"The Secret Service cannot just say it was one office or a personality thing," Clark said. "We were in different offices with different supervisors. It's pretty pervasive."

© 2000 The Washington Post Company

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

#
/4

Subj: **Exciting News about NOBLE**
Date: 3/20/2004 3:19:02 PM Eastern Standard Time
From: jakers@noblenatl.org
To: llycpacker@aol.com



# A Message From The National Vice President

**Justice by Action**

**March 20, 2004**

**My Fellow NOBLE Member**

For the past several weeks, I have been a part of a team comprised of National President Anthony R. Scott, Executive Director Jessie Lee and Bernard E. Thompson, Esq. that developed NOBLE'S response to member allegations that the work environment was less than welcoming for African Americans at the Transportation Security Administration (TSA).

At TSA'S inception in 2002, officials from that agency approached NOBLE and requested that we assist in their recruitment of senior level and mid-level managers. NOBLE immediately responded to this request. Members already in such positions with other law enforcement agencies and recent retirees at the federal, state and local level were contacted and encouraged to apply for vacancies at TSA. Notification to NOBLE'S general membership was provided via our publications. A significant number of well qualified NOBLE members expressed interest in supporting TSA'S efforts to enhance security at the nation's airports and subsequently submitted applications for vacancies they believed they were qualified for. The vast majority of these applicants never heard anything from TSA on the status of their applications

Jimmy Wilson, national president during this period, initiated several meetings with TSA officials in an effort to determine why that agency had failed to at least acknowledge receipt of applications submitted by NOBLE members. These meetings were unproductive.

NOBLE members inside and outside of TSA began to express concerns about the following issues to members of the Executive Board: · The sincerity of TSA'S minority outreach recruitment efforts; · The low number of African Americans within TSA in senior and mid-level management positions; · The number of African American senior and mid-level officials within TSA who have been the target of internal affairs investigations, management reviews or other adverse actions; and · The dismissal of Philadelphia Airport Federal Security Director James B. Golden, Jr., and the proposed dismissal of several other NOBLE members.

As a direct result of the aforementioned concerns, Executive Director Jessie Lee requested a meeting with TSA'S Acting Administrator David M. Stone. Acting Director Stone agreed to a NOBLE/TSA meeting and this meeting took place at TSA headquarters on March 17, 2004. Department of Homeland Security (DHS) Undersecretary Asa Hutchison, TSA Acting Director Stone and TSA Deputy Director Steve McHale were DHS/TSA'S principal representatives at this meeting.

President Scott, Executive Director Lee, Bernard E. Thompson, Esq., and I represented NOBLE at this meeting. NOBLE representatives focused on the following concerns: · The low number of African Americans within TSA in senior and mid-level positions; · TSA'S failure to contact NOBLE applicants applying for positions with that agency; · The widely held perception that African Americans within TSA have been subjected to disparate disciplinary actions, involuntary transfers and terminations; · That less qualified persons have received promotions over more qualified African Americans; and · The dismissal of James B. Golden, Jr.

In summary, NOBLE'S representatives strongly emphasized that TSA'S image among many senior and mid-level African American law enforcement practitioners is poor. We stressed our belief that the dismissal of James B. Golden, Jr. was disproportionate to his alleged violation. We also questioned the frequency with which African American employees of TSA were the target of investigations, management reviews and adverse actions (where terminations were being proposed).

TSA'S representatives indicated their desire to improve their agency image among African Americans in law enforcement. We responded that NOBLE expected specific corrective actions and not mere words. We identified the absence of a recruitment plan with outreach initiatives targeting minorities as a glaring example of a TSA shortcoming. We also advised the TSA officials of our strong belief that the handling of Director Golden's personnel matter remains linked to our ability to, in good conscience, recommend our members and friends to that agency as vacancies become available. TSA officials strongly defended their decisions; however, they are now keenly aware of NOBLE'S concerns and that we remain resolute in our position in these matters. We are determined that African Americans working for TSA - or seeking employment with that agency - will be treated fairly. A letter is being drafted to Acting Director Stone thanking him for granting this meeting, reiterating our concerns and detailing NOBLE'S recommendations to remedy this situation. We will keep the membership apprised of any new developments regarding this matter.

Sincerely,

Clarence Edwards (cedwards7788@comcast.net)
National Vice President

email: jakers@noblenatl.org
voice: 703-658-1529
web: http://www.noblenational.org

NOBLE · 4609-F Pinecrest Office Park Drive · Alexandria · VA · 22312-1442

Powered by

As a direct result of the aforementioned concerns, Executive Director Jessie Lee requested a meeting with TSA'S Acting Administrator David M. Stone. Acting Director Stone agreed to a NOBLE/TSA meeting and this meeting took place at TSA headquarters on March 17, 2004. Department of Homeland Security (DHS) Undersecretary Asa Hutchison, TSA Acting Director Stone and TSA Deputy Director Steve McHale were DHS/TSA'S principal representatives at this meeting.

President Scott, Executive Director Lee, Bernard E. Thompson, Esq., and I represented NOBLE at this meeting. NOBLE representatives focused on the following concerns: · The low number of African Americans within TSA in senior and mid-level positions; · TSA'S failure to contact NOBLE applicants applying for positions with that agency; · The widely held perception that African Americans within TSA have been subjected to disparate disciplinary actions, involuntary transfers and terminations; · That less qualified persons have received promotions over more qualified African Americans; and · The dismissal of James B. Golden, Jr.

In summary, NOBLE'S representatives strongly emphasized that TSA'S image among many senior and mid-level African American law enforcement practitioners is poor. We stressed our belief that the dismissal of James B. Golden, Jr. was disproportionate to his alleged violation. We also questioned the frequency with which African American employees of TSA were the target of investigations, management reviews and adverse actions (where terminations were being proposed).

TSA'S representatives indicated their desire to improve their agency image among African Americans in law enforcement. We responded that NOBLE expected specific corrective actions and not mere words. We identified the absence of a recruitment plan with outreach initiatives targeting minorities as a glaring example of a TSA shortcoming. We also advised the TSA officials of our strong belief that the handling of Director Golden's personnel matter remains linked to our ability to, in good conscience, recommend our members and friends to that agency as vacancies become available. TSA officials strongly defended their decisions; however, they are now keenly aware of NOBLE'S concerns and that we remain resolute in our position in these matters. We are determined that African Americans working for TSA - or seeking employment with that agency - will be treated fairly. A letter is being drafted to Acting Director Stone thanking him for granting this meeting, reiterating our concerns and detailing NOBLE'S recommendations to remedy this situation. We will keep the membership apprised of any new developments regarding this matter.

Sincerely,

Clarence Edwards (cedwards7788@comcast.net)
National Vice President

email: jakers@noblenatl.org
voice: 703-658-1529
web: http://www.noblenational.org

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

\#
*15*

# Declaration for Federal Employment

Form Approved
OMB No. 3206-0182

## GENERAL INFORMATION

1. **FULL NAME** *(First, middle, last)*
   • Linda Yuetta Cruz-Packer

2. **SOCIAL SECURITY NUMBER**
   • 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

3. **PLACE OF BIRTH** *(Include city and state or country)*
   • Clarksville, Tenn

4. **DATE OF BIRTH** *(MM/DD/YYYY)*
   • 05-20-1951

5. **OTHER NAMES EVER USED** *(For example, maiden name, nickname, etc)*
   • Wakefield (maiden)
   • Pippen (married

6. **PHONE NUMBERS** *(Include area codes)*
   Day • (571) 227-1681
   Night • (301) 234-0097

## Selective Service Registration

If you are a male born after December 31, 1959, and are at least 18 years of age, civil service employment law (5 U.S.C. 3328) requires that you must register with the Selective Service System, unless you meet certain exemptions.

7a. Are you a male born after December 31, 1959? ☐ YES ☑ NO *If "NO" skip 7b and 7c. If "YES" go to 7b.*
7b. Have you registered with the Selective Service System? ☐ YES ☑ NO *If "NO" go to 7c.*
7c. If "NO," describe your reason(s) in item #16.

## Military Service

8. Have you ever served in the United States military? ☑ YES *Provide information below* ☐ NO
   If you answered "YES," list the branch, dates, and type of discharge for all active duty.
   If your only active duty was training in the Reserves or National Guard, answer "NO."

| Branch | From | To | Type of Discharge |
|--------|------|-----|-------------------|
| Army | 1/3/72 | 7/3/73 | Honorable |
| | | | |
| | | | |

## Background Information

**For all questions, provide all additional requested information under item 16 or on attached sheets.** The circumstances of each event you list will be considered. However, in most cases you can still be considered for Federal jobs.

For questions 9, 10, and 11, your answers should include convictions resulting from a plea of *nolo contendere* (no contest), but omit (1) traffic fines of $300 or less, (2) any violation of law committed before your 16th birthday, (3) any violation of law committed before your 18th birthday if finally decided in juvenile court or under a Youth Offender law, (4) any conviction set aside under the Federal Youth Corrections Act or similar state law, and (5) any conviction for which the record was expunged under Federal or state law.

| | | YES | NO |
|---|---|-----|-----|
| 9. | During the last 10 years, have you been convicted, been imprisoned, been on probation, or been on parole? (Includes felonies, firearms or explosives violations, misdemeanors, and all other offenses.) *If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the police department or court involved.* | ☐ | ☒ |
| 10. | Have you been convicted by a military court-martial in the past 10 years? *(If no military service, answer "NO.")* If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the military authority or court involved. | ☐ | ☒ |
| 11. | Are you now under charges for any violation of law? *If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the police department or court involved.* | ☐ | ☒ |
| 12. | During the last 5 years, have you been fired from any job for any reason, did you quit after being told that you would be fired, did you leave any job by mutual agreement because of specific problems, or were you debarred from Federal employment by the Office of Personnel Management or any other Federal agency? *If "YES," use item 16 to provide the date, an explanation of the problem, reason for leaving, and the employer's name and address.* | ☒ | ☐ |
| 13. | Are you delinquent on any Federal debt? (Includes delinquencies arising from Federal taxes, loans, overpayment of benefits, and other debts to the U.S. Government, plus defaults of Federally guaranteed or insured loans such as student and home mortgage loans.) *If "YES," use item 16 to provide the type, length, and amount of the delinquency or default, and steps that you are taking to correct the error or repay the debt.* | ☒ | ☐ |

Optional Form 306
Revised January 2001
Previous editions obsolete and unusable

5 U.S.C. 1302, 3301, 3304, 3328 & 8716

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

#

*16*

**#4** 6/98 To 10/98 | Code 9 | Employer/Verifier Name/Military Duty Location: Collective Capital Inc | Your Position Title/Military Rank: Supervisor

Employer's/Verifier's Street Address: UNKNOWN | City (Country): Dunbar | State: WV | ZIP Code: 25064 | Telephone Number: ( UNKNOWN )

Street Address of Job Location (if different from Employer's Address) | City (Country) | State | ZIP Code | Telephone Number: ( )

Supervisor's Name & Street Address (if different from Job Location) | City (Country) | State | ZIP Code | Telephone Number: ( )

**PREVIOUS PERIODS OF ACTIVITY (Block#4)**

| Month/Year To Month/Year | Position Title | Supervisor |
|---|---|---|
| | Part-time Supervisor | unknown |
| | | |
| | | |

**#3** 3/98 To 6/98 | Code 5 | Employer/Verifier Name/Military Duty Location: WV Division of Correction | Your Position Title/Military Rank: Program Manager

Employer's/Verifier's Street Address: 112 California Ave, Bldg 4, Rm 30 | City (Country): Charleston | State: WV | ZIP Code: 25301 | Telephone Number: (304) 558-2036

Street Address of Job Location (if different from Employer's Address) | City (Country) | State | ZIP Code | Telephone Number: ( )

Supervisor's Name & Street Address (if different from Job Location): OTIS COX (Director of Public Safety) | City (Country) | State | ZIP Code | Telephone Number: (304) 293-6967 X 3380

**PREVIOUS PERIODS OF ACTIVITY (Block#5)**

| Month/Year To Month/Year | Position Title | Supervisor |
|---|---|---|
| 3/98 To 6/98 | Program Manager | OTIS COX (304) 594-3133 |
| | | |

**#3** 3/96 To 8/97 | Code 9 | Employer/Verifier Name/Military Duty Location: Volunteers of America | Your Position Title/Military Rank: Director of Security

Employer's/Verifier's Street Address: The Regent Family Residence | City (Country) | State | ZIP Code | Telephone Number: (212) 865-7000

Street Address of Job Location (if different from Employer's Address): 104 + Broadway | City (Country): Manhattan | State: NY | ZIP Code: 10035 | Telephone Number: ( )

Supervisor's Name & Street Address (if different from Job Location): Ms Pyrek (Regional Director) | City (Country) | State | ZIP Code | Telephone Number: (212) 865-7000

**PREVIOUS PERIODS OF ACTIVITY (Block#6)**

| Month/Year To Month/Year | Position Title | Supervisor |
|---|---|---|
| 3/96 To 8/97 | Volunteers of America Director of Security | Donna Kennedy (Director) (212) 865-7000 |
| | | |

---

**12 PEOPLE WHO KNOW YOU WELL**

List **three people** who know you well and live in the United States. They should be good friends, peers, colleagues, college roommates, etc., whose combined association with you covers as well as possible the last 7 years. Do not list your spouse, former spouses, or other relatives, and try not to list anyone who is listed elsewhere on this form.

**#1** Name: Emmett Dashiell | Dates Known: 2/80 To Present | Telephone Number: ( ) Day (202) 564-2480 ( ) Night (703) 930-5773

Home or Work Address: Ariela Rios South Rm 211 (EPA) 200 Pennsylvania Ave, NW - MC 2231A | City (Country): Washington | State: DC | ZIP Code: 20004

**#2** Name: James Younger | Dates Known: 1/80 To Present | Telephone Number: ( ) Day 703 228-4322 ( ) Night (703) 920-2888

Home or Work Address: 1425 North Courthouse Road (Arlington Police) | City (Country): Arlington | State: VA | ZIP Code: 22201

**#3** Name: Francine Plummer | Dates Known: 1/90 To Present | Telephone Number: ( ) Day 202 646-2613 ( ) Night (301) 868-3782

Home or Work Address: 500 D St, SW (Fema) | City (Country): Washington | State: DC | ZIP Code: 20407

Enter your Social Security Number before going to the next page → 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

**Page 4**

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

#
/7

# Declaration for Federal Employment

Form Approved
OMB No. 3206-0182

## Additional Questions

14. Do any of your relatives work for the agency or government organization to which you are submitting this form? (Include: father, mother, husband, wife, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother, and half sister.) If "YES," use item 16 to provide the relative's name, relationship, and the department, agency, or branch of the Armed Forces for which your relative works.

YES ☐   NO ☒

15. Do you receive, or have you ever applied for, retirement pay, pension, or other retired pay based on military, Federal civilian, or District of Columbia Government service?

YES ☐   NO ☒

## Continuation Space / Agency Optional Questions

16. Provide details requested in items 7 through 15 and 18c in the space below or on attached sheets. Be sure to identify attached sheets with your name, Social Security Number, and item number, and to include ZIP Codes in all addresses. If any questions are printed below, please answer as instructed (these questions are specific to your position and your agency is authorized to ask them).

DIVISION OF CORRECTION   (6|98)   This job is on the border line of
112 California Ave, Bldg 4 RM 30   being 5 years -
Charleston, WV 25301
Job promised could not be granted. Due to start up cost. Couple with Family
stress, Relocation, mutual agreement between Director of Public Safety (Otis Cox)
+ myself to leave

## Certifications / Additional Questions

APPLICANT: If you are applying for a position and have not yet been selected, carefully review your answers on this form and any attached sheets. When this form and all attached materials are accurate, read item 17, and complete 17a.

APPOINTEE: If you are being appointed, carefully review your answers on this form and any attached sheets, including any other application materials that your agency has attached to this form. If any information requires correction to be accurate as of the date you are signing, make changes on this form or the attachments and/or provide updated information on additional sheets, initialing and dating all changes and additions. When this form and all attached materials are accurate, read item 17, complete 17b, read 18, and answer 18a, 18b, and 18c as appropriate.

17. I certify that, to the best of my knowledge and belief, all of the information on and attached to this Declaration for Federal Employment, including any attached application materials, is true, correct, complete, and made in good faith. I understand that a false or fraudulent answer to any question or item on any part of this declaration or its attachments may be grounds for not hiring me, or for firing me after I begin work, and may be punishable by fine or imprisonment. I understand that any information I give may be investigated for purposes of determining eligibility for Federal employment as allowed by law or Presidential order. I consent to the release of information about my ability and fitness for Federal employment by employers, schools, law enforcement agencies, and other individuals and organizations to investigators, personnel specialists, and other authorized employees or representatives of the Federal Government. I understand that for financial or lending institutions, medical institutions, hospitals, health care professionals, and some other sources of information, a separate specific release may be needed, and I may be contacted for such a release at a later date.

17a. Applicant's Signature: *Linda Cruz-Packer*   Date 3/24/03
(Sign in ink)

**Appointing Officer:**
Enter Date of Appointment or Conversion
MM / DD / YYYY

17b. Appointee's Signature: _____   Date _____
(Sign in ink)

18. Appointee (Only respond if you have been employed by the Federal Government before): Your elections of life insurance during previous Federal employment may affect your eligibility for life insurance during your new appointment. These questions are asked to help your personnel office make a correct determination.

18a. When did you leave your last Federal job?   DATE:   MM / DD / YYYY

| | YES | NO | Do Not Know |
|---|---|---|---|
| 18b. When you worked for the Federal Government the last time, did you waive Basic Life Insurance or any type of optional life insurance? | ☐ | ☐ | ☐ |
| 18c. If you answered "YES" to item 18b, did you later cancel the waiver(s)? If your answer to item 18c is "NO," use item 16 to identify the type(s) of insurance for which waivers were not canceled. | ☐ | ☐ | ☐ |

U.S. Office of Personnel Management          NSN 7540-01-368-7775

Optional Form 306
Revised January 2001
Previous editions obsolete and unusable

5 U.S.C. 1302, 3301, 3304, 3328 & 8716

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

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

## #
## *18*

*Peace and blessings brothers and sisters, it is struggle continues in Iraq... our many voices is important... partisipate it is in the context of empowering hiliarns of the nation that brings communities. Please circulate this article to your friends, colleagues, and associates.*

*Power concedes nothing without a fight... remember that.*

### National Organization of Black Law Enforcement Executives Asserts that TSA's Discriminatory Practices Impairs Transportation Security

**10/25/2004 6:18:00 PM**

To: National Desk

ALEXANDRIA, Va., Oct. 25 /U.S. Newswire/ -- NOBLE President Clarence Edwards today announced that major concerns with TSA'S Minority Hiring and Disciplinary Practices still exist.

Specifically:

1. Qualified minorities who apply for job vacancies with TSA are seldom considered for senior level positions;

2. Imminently qualified minorities interviewed by TSA for senior level positions are not offered jobs, e.g., a former U.S. Army Brigadier General with 30 years of extensive experience directing facility and base security operations for major military bases and a retired Bureau of Alcohol, Tobacco and Firearms (ATF) Special Agent In Charge were both overlooked for senior level positions as under qualified; and, of most concern;

3. That significant numbers of the African Americans who are hired by TSA for senior level positions are subjected to arbitrary and discriminatory actions inevitably leading to termination in many cases.

Edwards stated that a meeting with Department of Homeland Security Undersecretary (DHS) Asa Hutchison and TSA Administrator David M. Stone on March 17, 2004, elicited minimal concern by these officials with the questions and problems raised by NOBLE. Both of these top officials seemed unconcerned that only 4 of 151 or 3 percent of TSA'S senior executive service equivalent level employees were African American. This abysmal figure has diminished even more since March 17th. Today TSA has only 1 African American in charge of a major airport.

NOBLE questions why a government agency in today's multi- cultural society would fail to monitor the number of its senior level minority hires and not take corrective action if any one racial group was significantly underrepresented. TSA failed to even acknowledge receipt of job applications filed by 55 qualified applicants with extensive senior level law enforcement experience after soliciting help in recruiting qualified applicants from several minority organizations.

An ongoing pattern and practice of harsh disciplinary actions directed toward African Americans under highly questionable circumstances has prompted members of NOBLE and other minority organizations to view employment with TSA as very risky.

A number of TSA'S more senior African American employees have been subjected to harassment and termination. The paucity of such employees in senior positions with this agency seems to matter little to its most senior leaders. They are insensitive to the appearance of impropriety that harassment, forced resignations and actual terminations of such employees generates within their work force and general

'public.

It is difficult to envision a more hostile and unwelcoming federal government work environment for African American Federal Security Directors and other high level members of this group than the one they are now experiencing at TSA. The good reputations that these individuals enjoyed before employment with TSA are being destroyed by management's callous disregard for their skills at a time when the threat of terrorism has never been more real.

NOBLE joins all law enforcement in the very specific concern of preserving and protecting America's national security; however, Edwards said that the best way to accomplish this is by hiring the most qualified and experienced law enforcement and security personnel, irrespective of race, gender, ethnicity, religion or sexual orientation in positions of responsibility. TSA should recognize this obligation. These perilous times are not the time to allow such discriminatory or retaliatory practices undermine this nation's transportation security.

Given the failure of negotiations with TSA, NOBLE will now seek to join future federal lawsuits against the agency as Amicus Curiae.


**Pierre D. Dickson**

*office: (301) 867-0154*
*cell:  (240) 882-1903*

Michael Chertoff, Secretary, Department of Homeland Security, TSA
C.A. 07-1235 (RWR)

# Plaintiff's Exhibit

\#
*19*

   

7556802900016650000000000000156

| 5568-0290-0018-4285 | 03/11/2004 | Total Amount Due<br>$0.00 | Amount Amount Paid |
|---|---|---|---|

LINDA Y CRUZ-PACKER
TRANSPORTATION
4800 MEGAN DR
CLINTON MD 20735-2429

N14916

Address Correspondence to:
CITIBANK
GOVERNMENT COMMERCE SERVICES
P.O. BOX 6575
THE LAKES, NV 88901-6575

For telephone or address change on travel cards, please place an X in the parentheses and make the desired changes on the reverse side.(     )

Payment coupon: Please tear along perforation and return this portion with your payment. Make check or money order payable in U.S. dollars on a U.S. bank to Citibank. Include account number on check or money order. No cash please. Do not staple or tape your check to this coupon.

# CITIBANK GOVERNMENT COMMERCE SERVICES
## CARD STATEMENT

Invoice Date
02/15/2004
Due Date
03/11/2004

| | | | |
|---|---|---|---|
| $0.00 | $506.52 | $0.00 | $506.52cr |

FOR CUSTOMER SERVICE CALL 1-800-790-7206 OR WRITE P.O. BOX 45134, JACKSONVILLE, FL 32232-5134
OUTSIDE THE U.S. AND CANADA CALL COLLECT 904-954-7850
SEND PAYMENTS TO: CITIBANK GOVERNMENT COMMERCE SERVICES, P.O.BOX 6575, THE LAKES, NV 88901-6575

Agency Name: **TRANSPORTATION**
Accounting Code:
Billing Office Id:
Discretionary Code:
Single Purchase Limit:              $0.00

Account Number:        **5568-0290-0018-4285**

Agency/Org Id:
Tax Exempt #:
Cycle Purchase Limit:     $0.00

| Sale Date | Post Date | MCC Code | Reference Number | | Description | | | Total Amount |
|---|---|---|---|---|---|---|---|---|
| 03/22 | 02/10 | 6011 | 1000000007269 | 1 | SECURITY CREDIT | CLINTON, | MD | 501.50 cr |
| 03/22 | 02/10 | 0000 | 1000000007269 | 2 | CASH ADVANCE FEE CREDIT | | | 5.02 cr |

*****TOTAL AMOUNT DUE: $0.00

GSA Global Supply: Safe. Simple. Flexible. Global. Now with thousands of new product choices. 800-525-8027

Your credit balance reflected on this statement will be forwarded to you upon receipt of request and current address.

| ACCOUNT SUMMARY CURRENT PERIOD | | Previous Balance | Payments | Credits | Purchases and Advances | Taxes and Fees | New Balance |
|---|---|---|---|---|---|---|---|
| | Purchases | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | Advances | $0.00 | $0.00 | $506.52 | $0.00 | $0.00 | $506.52 cr |
| | TOTALS | $0.00 | $0.00 | $506.52 | $0.00 | $0.00 | $506.52 cr |

Memo Section

| | |
|---|---|
| Amount Over Credit Limit: | |
| Amount Past Due: | $0.00 |
| Net Total Charges: | $506.52cr |
| Total Cash Advances: | $0.00 |
| Current Period Total: | $506.52cr |

Approval Section

_____
CARDHOLDER SIGNATURE

_____
APPROVING OFFICIAL SIGNATURE (Except Travel)

PAGE 1 of 1

A member of citigroup

**citibank**®

**Citibank, N.A.**
Risk Control & Loss Prevention

One Court Square
Long Island City, NY 11120

October 1, 2003

Linda Cruz-Packer
4800 Megan Drive
Clinton, MD 20735

RE: Account 73989462

Dear Ms Packer,

On August 27, 2003 you submitted a claim to Citibank alleging forged checks were drawn on your account #73989462 totaling $975.00. Based upon the information provided to us and a review of the items involved we conclude that Citibank is liable for the amount of $625.00.

According to your affidavit and statement regarding check nos. 182 & 183, the checks were signed by you and were made out by the payee who stole the checks. Given this information we are denying your claim for reimbursement of these items totaling $350.00.

It is required that you close this account on which the forgery occurred. Please visit the Financial Center to close this account and open a new account. Reimbursement in the amount of $625.00 will be credited to the new account.

If you have any questions please call Robin Thompson at our Capitol Hill Office tel. 202-548-5907.

Very truly yours,

Rose-Marie Gomes
Loss Control Officer

718-248-

l & Loss Prevention performs risk management functions for Citibank, N.A., Citibank, F.S.B., Citibank (West), FSB, vestment Services and Smith Barney. Smith Barney is a division and service mark of Citigroup Global Markets Inc.

**CUNA MUTUAL GROUP**

*CUMIS Insurance Society, Inc.*

P.O. Box 1221 • 5910 Mineral Point Road
Madison, WI 53701-1221
Phone: 800/437-2676 • Fax: 608/231-7900
www.cunamutual.com

| CLAIM NO. |
|---|
| STATE & CONTRACT NO. |

Important: The person alleging forgery
**must** complete this form in longhand.

## AFFIDAVIT OF FORGERY

1. I am first duly sworn and state I am:

   Name _Linda Cruz - Packer_

   Mailing Address _4800 Megan Drive_

   City, State, Zip _Clinton, Md         20735_

   Phone Number   Home ( _202_ ) _385-1064_         Work ( _301_ ) _234-0097_

2. The instrument(s) forged is/are a: (Check the appropriate box)
   - ☐ Check
   - ☐ Cash Withdrawal Voucher
   - ☐ Share Draft
   - ☐ Loan Note (including Co-maker forgery)
   - ☑ Other (specify) _ATM CARD FRAUD_
     <span style="font-size:smaller">Name of Credit Union or Bank</span>

3. The instrument(s) is/are drawn on _____

4. On the instrument(s) I am named as the: (Check the appropriate box)
   - ☐ Payee/Endorser (on back of check/share draft or bottom of withdrawal voucher)
   - ☐ Maker (on note or face of share draft/check)
   - ☐ Co-maker (on a loan)
   - ☐ Other (specify) _ATM Credit CARD OWNER_

5. This signature for each instrument(s) listed below and attached to this affidavit is not written nor authorized by me and is a forgery:

   | Date | Instrument Number | Dollar Amount |
   |---|---|---|
   | a) | | |
   | b) | | |
   | c) | | |

   (If more space is required, use a separate sheet)

6. I did not receive any part of the proceeds of the instrument(s) listed above. This affidavit is made voluntarily for the purpose of establishing the fact that my signature is a forgery.

7. Do you know who forged your signatures? ☑ Yes   ☐ No   If yes, provide details on a separate page or the back of this page.

8. I understand this forgery is subject to investigation by local, state and/or federal law enforcement agencies. I may be required to comply with a court order or subpoena to give testimony.

9. I understand making a false sworn statement is subject to federal and/or state statutes and may be punishable by fines and/or by imprisonment.

_Subject Randy Bernard Green stole my ATM CARD & Removed Funds w/out my knowledge totalling $904.92._

Sign your name five times:   _Linda Cruz-Packer_
_Linda Cruz-Packer_
_Linda Cruz-Packer_
_Linda Cruz-Packer_
_Linda Cruz-Packer_

Linda Cruz-Packer
4800 Megan Drive
Clinton, MD 20735

Dear Government Accounts Citibank:

Re: 5568 0200 0110 8480

Through a careful review of all my banking records, I have discovered that suspect, Randy B. Green, has fraudulently used my ATM, Banking, and Credit cards to withdraw money from three separate Citibank accounts. He also fraudulent withdrew money from my DOT Credit Union account. In addition he forged 6 personal checks as of this date, that he found, by rambling through personal items, while he was employed as my children's caretaker.

Green very cleverly opened my mail, and gained access to other banking information by searching through my papers to gain pin# information and hid my bank statements so that I had no idea what had happen until I needed a large sum of money and found my accounts had been tampered with.

Green admitted to me that he had used my cards without my authorization, and swore he was going to pay me back. However, he had misused used funds from my credit union account in December 2002, and had justified it with the excuse that his mother was dying of cancer, and he wanted to give his mother the best of everything before her death. Since my own mother and grandmother had died from cancer as well, I was extremely sympatric and warned him if it occurred again, I would press charges.

Subsequently, upon further review I believe Green misused my government account, I never received my pin number to that account until mid year. On 3/22/03 there was a $500 withdrawal which I initially believe I had done accidentally because my Citibank banking card was yellow in color, similar to the government issued one. However, on recollect I only used my account at a Citibank where I have to sign for money or at an airport, where I would get a cash advance for tickets to do testing for my team. The transaction on 3/22/03 to place at a 7-11 store in Clinton near Green's residence.

I believe Green also fraudulently misused my government card as well on 3/22/03.

Thank you in advance.

Linda Cruz-Packer
301 234-0097