**RECEIVED**

JUL 2 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LINDA CRUZ-PACKER** | ) | **C.A. No.:    07-1235 (RWR)** |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **JURY DEMAND** |
| **v.** | ) | |
| | ) | |

**MICHAEL CHERTOFF, Secretary**
**Department of Homeland Security**

**Defendant**


## MEMORANDUM OF POINTS AND AUTHORITIES DENYING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

### INTRODUCTION

This complaint is before the United States District Court of the District of Columbia on the grounds of wrongful termination.  The Plaintiff contends that her termination was motivated by discrimination on the basis of the Plaintiff's race, age, sex, retaliatory based on her participation in the administrative EEOC complaint process investigation. identifying discrepancies discrimination, and retaliatory measures constantly requesting investigations into matters of concerns at TSA which required management to actually work in violation of her First Amendment Rights, the 1994 Fair Employment practices, the

National Labor Relations Act of 1935, anti retaliation laws, civil service laws.

Wherefore, the Plaintiff demands judgment against Defendant(s) in the sum of **three** million dollars and reinstatement of a career service status position within the agency for which she is qualified.

The Plaintiff contends the termination to be a wrongful termination and that the defendants' actions were adversarial, malicious, and retaliate, resulting in discrimination, actionable retaliation to activity that affected the terms and conditions of the Plaintiff's employment, intentional infliction of emotional stress, negligent infliction of emotional stress, retaliatory discharge, and defamation of the Plaintiff's character.

The termination decision as well as the inauspicious actions of the defendants has caused personal injury to the Plaintiff, causing emotional stress, economic losses, and other punitive damages, and for the reasons expressed below, the Plaintiff concludes that the Department of Homeland Security be charge upon which the termination decision was based is a wrongful termination.

Wrongful discharge actions for violating public policy can be premised on one of three grounds:

a) Explicit legislative statements prohibiting discharge, discrimination or adverse treatment of employees who act in accordance with the statutory right or duty;

b) "Legislative expression of policy" - for example, discharging an employee for refusing to violate the law during employment; or,

c) Retaliatory discharge.

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin." Pub. L. 88-352, §704, 78 Stat.257, as amended, 42 U.S.C. §2000e-2(a). A separate action of the Act – its anti-retaliation provision – forbids an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding of investigation. §2000e-3(a).


In Philip's v Butterball Farms Co, 448 Mich 239 (1995), the Michigan Supreme Court resolved a conflict in the Court of Appeals and held that a claim of retaliatory discharge sounds in tort and not in contract. Consequently, the full tort remedies are available for a retaliatory discharge in violation of public policy.

Title VII of the Civil Rights Act of 1964, 42 USC 2000e, makes it unlawful for an employer to hire or discharge any individual, or otherwise to discriminate

3

against any individual with respect to his/her compensation, terms, conditions or privileges of employment, because of an individual's race, color, religion, sex or national origin. This covers hiring, firing, promotions and all workplace conduct.

It was never a pre employment condition that the Plaintiff's position be predicated and based on the successful condition of an OPM Background Investigation. If that was true, the Agency would have put that condition in writing when the offer of employment was made to Plaintiff. TSA was a start up Agency without any written policy and reference FAA policies for the most part. Initially, TSA only hired former or retired special agents so they could hit the ground running.and didn't require extensive training TSA is quick to say that the appellant's hiring was conditional but failed to produce any documentation supporting said condition. Please review letter of job offer and standard form 50 where such a condition would be indicated which clearly show no such condition existed. See Exhibits A, B & C Conversely, the treatment and actions undertaken by the Defendant and his Agency (TSA) treated the Defendant as if she was a new employee. Their actions opened up unsubstantiated allegations that resulted in a lengthy background investigation check that was used in a discriminatory and harmful way against the Plaintiff that resulted in a wrongful termination.

**Plaintiff contends** that the agency had more than two years to

4

conclude Plaintiff's background investigation and took over 8 months to even initiate a background investigation. However, once these alleged issues surface in West VA, they should have been handled like other Homeland Security employees who were also undergoing a security background check during this time,

The Department of Homeland Security Inspector General found many of them had a history of drunk driving, domestic violence, sexual harassment or falsifying employment information, along with filing for bankruptcy, been arrested or faced allegations of misconduct. It should be noted that Plaintiff's situation involved allegations that reportedly came from prisoners, whose credibility, should have raised a flag with investigators. Therefore, if these employees, most of them white males, were grandfathered in and allowed to remain in their positions. The treatment of Plaintiff's background investigation should not have been treated any differently. TSA showed favoritism and different hiring standards. Especially if you happened to be a female, especially in Plaintiff's case when she also was an African American female. (See AOL Mail exhibit D )

The Plaintiff was not a brand new employee with the Federal Government, but instead was a former Federal employee who had previous government experience with the Federal Bureau of Investigation as a Special Agent and served in the United States Army

and was vested.. TSA should have allowed her to revert to a less
sensitive position given her status as a career employee and veterans
status.

**Plaintiff contends** that based on her prior government services and
veteran status, removal, was too severe a penalty.

The Plaintiff should have received the same consideration that was
used and brought about or retained and used when Background
Investigations were being handled while TSA was under the jurisdiction
of Department of Transportation that were on going at the exact time
frame as the Plaintiff's background was being handled.

Comparative analysis can be made that Background Investigations
that were underway that involved Federal Air Marshall, Custom
Agents, and Former Federal Aviation employees, where actual criminal
charges, domestic violence charges, and other serious matter were
discovered relating to these Department of Homeland Security
Employees (DHS), these (DHS) employee were grandfathered in and
absorbed into the (DHS) and DOT/TSA workforce.

**Plaintiff contends** Homeland Security Department Inspector-
General's report cited by the Wall Street Journal, August 31, 2004,
revealed such findings.

Application of the same standards used in adjudicating these (DHS)
employees' employment background if applied to the Plaintiff's

6

Background Investigation would have resulted in the same outcome for the Plaintiff and she should have been grandfathered in as other prior Federal Employee's had been. Instead the Agency (TSA) took it upon itself to do what the Plaintiff's former employee failed to do, which was conduct an investigation into the allegations reported by inmates who had their own hidden agenda for making false statements.  (**Plaintiff Contends** that the Defendants went out on a witch like hunt and aggressively gathered damaging information to make a case to remove the plaintiff with distorted and unsubstantiated information that they concocted and interpreted in a negative way without any investigator asking Plaintiff what she meant or wrote on her(SF) 86. Other HLS/government employees would have been contacted and asked or allowed to explain or provide individuals who might be able to shed some light onto these issues. However TSA Transportation Vetting and Credentialing Office (TVCO) office undertook a crusade to carry out very lengthy and unnecessary investigations without consulting with the plaintiff or allowing OPM to interview the plaintiff to find out what or why certain information had been written on the (SF) 86. It wasn't until after plaintiff filed a complaint of an unfair, prejudicial and biased investigation conducted by OPM that anyone asked the plaintiff about the issues uncovered in West Virginia. In other word TSA did what West Virginia had failed to

do and that was to determine the validity of the allegations. (See Exhibit E)

It was never a pre employment condition that the Plaintiff's position be predicated and based on the successful condition of an OPM Background Investigation.  If that was true, the Agency would have put that condition in writing when the offer of employment was made to Plaintiff.

**Plaintiff contends** that a Top Secret Clearance was never discussed or required prior to Plaintiff accepting a position with TSA. (See Job Offer letter Exhibit A )

Conversely, the treatment and actions undertaken by the Defendant and his Agency (TSA) treated the Defendant as if she was a new employee. Their actions opened up unsubstantiated allegations that resulted in a lengthy background investigation check that was used in a discriminatory and harmful way against the Plaintiff that resulted in a wrongful termination.   **Plaintiff contends** that TSA overstep it's authority in their rush to remove her and did not allow OPM to do their job.

### Statement of Facts Common to All Counts.

The Plaintiff, who is forty years and older, was hired on June 4, 2002, in the position of Transportation Security Specialist.

The Plaintiff never received anything in writing stipulating that her

position was predicated on the completion of an OPM background
check.

 The Plaintiff wasn't even asked to complete an SF-86 form to initiate a
Background Investigation until March of 2003, some eights months
after her arrival on duty date (AOD) and employment at TSA started.

 On June 30, 2002, Plaintiff was reassigned to a Criminal Investigator
Position.

 The Plaintiff submitted her Sf-86 in March 2003, and did not learn of
the specifics of allegations that had been learned by the Agency (TSA)
until after they proposed her dismissal in October, 24, 2003.

The Plaintiff was never question about the allegations by any
investigator prior to the proposal for removal being presented.

The Agency moved forward with an investigation into the alleged
allegation and Plaintiff was on Paid administrative leave during that
period.

 On April, 15, 2004, The Agency (TSA) proposed Plaintiff's indefinite
suspension.

 On June 1, 2004, The Agency (TSA) issues a Decision indefinitely
suspending Plaintiff. Effective June 3, 2004.

 The Plaintiff was removed from the Agency (TSA) on November 18,
2004, based on a charge of unsuitability.

 The Plaintiff filed a petition with the MSPB and a hearing was held by

an Administration Judge (AJ) Michelle M. Hudson who upheld the
Agency indefinite suspension and decision to remove the Plaintiff. (See
Exhibit G)

The Plaintiff next filed an appeal for the full MSPB to review the
decision made by the MSPB (AJ), and the Board issued a final order on
January 31, 2007, denying Plaintiff's petition for review.

 On March 7, 2007, the Plaintiff filed a timely petition with the Equal
Employment Opportunity Commission (EEOC) asking for review of a
final order issued by the Merit System Protection Board, and alleged
that she was discriminated against based on her race (African-
American, sex (female) and reprisal for prior protective EEO activity.
(See Exhibit H)

.On April 13, 2007. EEOC. Office of Federal Operations concurred with
the Final decision of the MSPB finding no discrimination.

This case was a mixed case and the AJ did not allow any discrimination
matters into the MSPB  hearing.

## BACKGROUND

On or about June 4, 2002, Appellant Linda Y. Cruz-Packer (hereinafter
"Appellant") was Offered and accepted employment at the
Transportation Security Administration  in the excepted service for the
position of Transportation Security Specialist, SV–1801-J. *Employment*

10

*Offer Letter, ( Exhibit A)* Later that same month, Appellant was transferred to the position of Criminal Investigator, based upon her previous employment experience in law enforcement.  Appellant was and is veteran-preference eligible, in that she served in the Gulf War and is the widow of a purple heart veteran. (See Exhibit I)

In or about March 2003, some eight months after her start date, Appellant completed and submitted a SF-86 form and Declaration of Federal Employment, which initiated a background investigation of Appellant by the Office of Personnel Management ("OPM") in order for Appellant to receive a security clearance. In or about April 2003, Appellant was interviewed by an OPM investigator, where she was questioned about her responses on the two forms very briefly. OPM performed this investigation until June 11, 2003, when the Agency requested that OPM close its investigation.  Thereafter, Appellant's background investigation was conducted by the Agency's own Transportation Vetting & Credentialing Program Office. At no time was Appellant advised nor informed as the authority by which the Agency was conducting said investigation.

Subsequently, on or about October 24, 2003 Appellant was served with a Notice of

Proposed Removal based upon information disclosed during the course of Appellant's background investigation. According to said Notice, the Agency alleged that Appellant was unsuitable for federal employment due to the alleged termination of her employment with the State of West Virginia, Department of Military Affairs & Public Safety, Division of Corrections in May 1998 for a litany of wrongdoings and inmate abused. Id. The Notice further accused Appellant of failing to fully disclose information regarding her employment history on the SF-86 form, in that she did not list such termination in response to Question# 22 on the form. Id.

Appellant averred that she had not been questioned about said employment, nor her reasons for separation from said position, until the Notice of Proposed Removal was issued. Accordingly, Appellant responded to the Notice, stating that she was not terminated from said employment, but instead verbally resigned from that position due to terminal illness of her husband (who was still residing in New York) and difficulty she was experiencing with her supervisors at said job. Appellant vehemently denied that she had ever received any notice of termination concerning that job.

(That is the biggest difference between my case and the Patsy Bennett case and the main reason our cases our not **identical.** Patsy Bennett

was aware she had been terminated, the appellant only found out she was terminated as a result of her background investigation which TSA had commenced.) The appellant contends you can not write something on your SF-86 if you were not aware at the time that a termination had occurred.

Moreover, Appellant submitted an affidavit from Otis Cox, the former Secretary of Public Safety for the State of West Virginia, who had personally hired Appellant to the position in the Department of Corrections. In the affidavit, Mr. Cox stated that,
while serving as Secretary, he **had not been advised** of Appellant's dismissal, and further, had Appellant been terminated from her position in 1998, his office would have been notified and received the internal documentation related to such adverse action. See Exhibit J *Declaration of Otis Cox,)*

The Agency then persisted in its investigation of Appellant and presented her with several documents from the State of West Virginia related to the falsification allegations, including a copy of preliminary investigation by Appellant's former supervisor, a termination letter purportedly sent to Appellant in May 1998, and affidavits from her

former supervisor and other West Virginia employees related to the supervisor's ability to fire Appellant.

Appellant raised issues with several aspects of said documentation; specifically, she noted that (1) there was no conclusory evidence nor final report regarding the charges which had been lodged against her in West Virginia; (2) the allegations had been made, in most part, by inmates, yet there was no corroborating statements nor recordings evidencing any testimony by said inmates; (3) the record

from West Virginia was devoid of any reference to the meeting held between Appellant and her supervisor, during which she verbally announced her resignation from her position at the Department of Corrections; (4) the alleged termination letter was issued days after her verbal resignation and it failed to state that any of the accusations lodged against Appellant had been sustained; and (5) the internal personnel form evidencing Appellant's purported dismissal lacked the requisite signatures for full completion, including acknowledgment from Otis Cox's office. Attached for your review is a WV11 that was used to bring her on board with WVDOC that contains the proper correction officials signature and contains no alterations or write overs, (See Exhibit K)

Appellant contended that, on the preponderance of the evidence, the record not only failed to establish that Appellant was dismissed from her employment with The Department of Corrections but also did not demonstrate that she was ever advised of such action. Nevertheless, on or about November 18, 2004, the Agency issued its Decision on Proposed Removal, finding that Appellant was unsuitable for federal employment. Consequently, Appellant filed an appeal to the Agency's determination of suitability as well as the removal action. On or about July 18, 2006, a hearing was held on the matter, as well as Appellant's challenge of the indefinite suspension, and presided over by Administrative Judge (AJ) Michelle Hudson. On September 9, 2006, AJ Hudson issued the Initial Decision, which was later appealed.

## JURISDICTION

This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 552a (g)(1),

702 and 28 U.S.C. $ 2401(A), 42 U.S.C.. $20002-16(c) and violation of 1st and 5 th amendments of the constitution.

This court has jurisdiction of this matter as a result of the Office of Federal Operations final EEOC decision GIVEN THE Plaintiff right to file a civil action.

## ARGUMENT

Appellant Cruz-Packer now asserts that errors of both fact and law were made in the Initial Decision, such that the Decision must be

REVERSED and the removal action be NOT SUSTAINED. As set forth more fully below, Appellant contends that (1) the Agency did not meet its burden to justify the removal action taken against Appellant and (2) the penalty imposed by the Agency was unreasonable and failed to acknowledge Appellant's mitigating factors. Insofar as the indefinite suspension action, Appellants contends that said action was unnecessary and inappropriate, because the Agency had completed its investigation of her background and was preparing for her removal.

## A. THE AGENCY DID NOT MEET ITS BURDEN TO JUSTIFY THE REMOVAL ACTION TAKEN AGAINST APPELLANT.

It is well-settled that an agency has the burden to prove the merits of its actions by a Preponderance of the evidence. To sustain a falsification charge, the agency must prove by preponderant evidence that the employee knowingly supplied incorrect information with the intention of defrauding the agency. Naekel v. Dep't of Transportation, 782 F.2d 975, 977 (Fed. Cir. 1986). Intent may be shown by circumstantial evidence and may be inferred when the misrepresentation is made with reckless disregard of the truth. McClain v. Office of Personnel Management, DE-0731-96-0542-I-1 (August 18,

1997) (citing Devitto v. Office of Personnel Management, 61 M.S.P.R.
297, 302 (1994).

With respect to the removal action in the present matter, the presiding
Administrative Judge found that agency had met its burden and its
charge. According to the Initial Decision, Appellant was unsuitable for
federal employment in accordance with the two (2) specifications set
forth in the Agency's notices related to the removal action: (1) that
she had been terminated from her prior employment for numerous
acts of misconduct and (2) that she falsified the SF-86 form by failing
to provide information regarding the West Virginia termination in
response to question #22 of the form. . However, Appellant Cruz-
Packer contends that there was insufficient evidence presented by the
Agency to support either specification by the preponderance of the
evidence.

At no time did the Agency mention Nation Security as a reason for
appellant's removal prior to the case being heard before the MSPB.
Only, now since the Appellant filed suit in your court do they now fall
back on National Security in an effort to avoid this case being heard by
a fair and impartial jury, where accountability can be determined.

17

**1. The Agency did not Present Credible Evidence that Appellant was Terminated from Employment by the West Virginia Department of Corrections.**

In reviewing the entire record here, the Agency did not prove that Appellant was terminated from her employment from the West Virginia Department of Corrections.

("WVDOC"). In the Initial Decision, the Administrative Judge (AJ) notes that the issue in dispute is a "falsification" of employment application case, despite the Agency's finding concerning the merits of the alleged misconduct of Appellant during her WVDOC employment.

As such, the AJ did not require the Agency to prove the reasons given by the WVDOC for its decision to dismiss in May 1998. Appellant contends this is procedural error in the Initial Decision. In the Decision on Proposed Removal, the deciding official expressly stated that "the conduct referenced in this Specification is of a serious nature and it renders you unsuitable for employment with [the Agency]." . Given that the conduct alleged against Appellant was considered in the decision to remove her, the Agency must be required that such conduct was committed.

Accordingly, the evidence presented in support of Appellant's purported misconduct at the WVDOC failed to meet the requisite burden here. The Agency relied upon a "preliminary investigation" conducted by Donald Ervin in May 1998, which, assumedly recorded the wrongful behavior of Appellant during her mere sixty (60) days of employment with that institution. This investigation, while replete with wild accusations from various inmates of extreme misconduct by Appellant, failed to include any sworn statements or affidavits by the accusers, nor any other document, tape or other tangible item to substantiate the allegations set forth therein. Indeed, even the dismissal letter signed Manfred Holland did not indicate that Appellant had, in fact, been found to have committed any acts of misconduct. The AJ erred in that even though she determined the case was a falsification case she did not make the agency prove the allegations alleged by WVDOC, but the Agency used the false allegations as the reasons to support the unsuitability charge even though they had no substantiated proof.

 As such, the Agency presented no concrete evidence that the allegations lodged against Appellant were ever found to be true. Insofar as the termination of Appellant's WVDOC employment itself, the evidence is again lacking. Appellant has repeatedly and

19

consistently testified that (1) she verbally resigned from employment
during a private meeting with Manfred Holland and (2) that the
documentation provided by the WVDOC concerning the dismissal is
inconsistent and flawed. Yet, during the background investigation
conducted by OPM the WV-11, which purporteively shows the dismissal
could not be found, however, mysteriously during the subsequential
investigations conducted by Ms. Fartiles's office Transportation Vetting
and Credentialing (TVCO) this document materializes from an office
not connected with WVDOC and the document contained no signatures
of any official from WVDOC as well.  More importantly, the document
did not contain Manfred Holland's signature, which if he is to be
believed sent me a letter of dismissal. (See Exhibit L)

First, Appellant testified that on or about May 14, 1997, she was
presented with the Preliminary investigation and advised of her
suspension. On or about May 18, 1997, she responded in writing to
the investigation and then met with Holland. During said meeting,
Appellant tendered her resignation verbally to Holland. Thereafter, she
immediately packed up her family and moved back to New York, where
her terminally ill husband was awaiting her.

In opposition, the Agency offered a letter by Holland which purportedly terminated Appellant's employment. . The Agency, nor the WVDOC, provided any proof that the letter had been issued, delivered or received by Appellant. The appellant contends that she finds it harder to believe that WVDOC sent out an unregistered letter that could not be tracked to an address without an apartment number and expected it to be received. Note Mr. Holland was very careful in stating that he authored the letter of dismissal at no time did he state it was mailed out by him or upon his instructions. (See Exhibit M)

In the Initial Decision, the AJ found it "unlikely" that the letter had not been delivered to Appellant due to a missing apartment number; however, it seems just as "implausible" that a state agency would not utilize some means of confirmation or verification that a correspondence announcing an employee's termination was, in fact, received by the intended recipient.

Additionally, the other document related to Appellant's purported termination, the WV-11 form– the official personnel form– was completed, but had several significant irregularities: a change in the dates, missing signatures from requisite approving officials (specifically, the omission of approval by the Secretary's office) and a

signature by Holland himself, in place of The discrepancies in the WV-11 form should have raised questions as to the veracity of the document. Moreover, it should be noted that the form itself was presented during the course of the Agency's investigation, after OPM had been asked to conclude its investigation. The document did not exist during OPM's investigation. Indeed TVCO accused Mr. Cox of removing said document. (See Exhibit N)

Finally, with respect to the termination, the Initial Decision cites two (2) statements in the record by Otis Cox, who served as the Secretary of Public Safety during the time period of Appellant's employment with the WVDOC. In these statements, Cox asserted that: (1) as the Secretary of Public Safety, he oversaw the WVDOC; (2) he was involved in the hiring and firing of employees; (3) his office received the WV-11 forms of WVDOC employees in order to approve the requested personnel action; (4) that, with respect to Appellant, he nor his office received any such WV-11 at or around the time of Appellant's alleged dismissal. Cox further stated that, since he did not ever receive notice of Appellant's termination, "something must have fallen through the cracks."
More importantly Mr. Cox  emphatically denied that he and Holland ever had a conversation regarding the appellant's dismissal. Instead

Joy Fartile's office (VCO) misrepresented what he said at the MSPB hearing, when they sated that Cox reportively told Holland to take what ever steps necessary when he was talking about a tape of the Appellant removing food from a refrigerator. Not a termination.

As such, the AJ's findings as to Specification #1 were not supported by the evidence in the record. Specifically, there was nothing in the record which demonstrated, by a preponderance, that Appellant was dismissed and did not resign, nor that she was notified of the dismissal. Indeed, even Otis Cox, who remained in position in West Virginia until 2001, was not made aware of Appellant's alleged dismissal until he was questioned in regard to Appellant's background investigation. The OPM investigator when fact finding and talking to the Administrator  Mr. Irving failed to secure tapes that he stated he made nor did WVDOC provide those tapes upon appellant's FOIA request. (See exhibit O)

## 2. The Agency Did not Show By Preponderant Evidence that Appellant Falsified the SF-86 Form.

Next, the AJ found that the Agency had met its burden in proving that Appellant had Falsified her SF-86 form when she failed to disclose the

WVDOC termination. Falsification entails the specific intent of defrauding, deceiving or misleading the agency. Naekel, 782 F.2d at 975. Appellant consistently testified that she completed the SF-86 and OF306 forms as a single security "package" and believed that she could continue her answers from the SF-86 form on the other document. Accordingly, when she described her resignation from the WVDOC on the OF306 form, she was utterly unaware that the information would be considered as "omitted" on the SF-86 form. Indeed, testimony from the Agency official John Rooney confirmed that the Agency's usual and customary practice to present the two documents simultaneously and without a directive that each document will be "stand alone" at time of its review. As such, there was no evidence of any intent of Appellant to mislead the Agency, since she reasonably assumed that the two documents would read together.

Joy Fartile's (TVCO) went to elaborate and extraordinary means to make it appear that the appellant never indicated or put down the job in WVDOC, when it was clearly indicated in question 18, on the Declaration of Federal Employment. (See Exhibit P), and listed as a job held on the SF 306 itself, and her resume. The appellant could just as easily have omitted the job since it was a mere 90 days and prior to that period she was unemployed for a brief period of time. Where was

the intent or deliberate action to misrepresent this job since by its omission if the appellant knew she had been terminated simply by putting the job down during an investigation it would be uncovered.

Furthermore, the testimony of Appellant and Otis Cox are consistent with Appellant's statement on the OF306 form. Cox stated in his affidavit that he did not discuss with Appellant any circumstances of Appellant's separation from WVDOC employment in May 1998 Accordingly, when Appellant testified about the "mutual agreement" with Cox regarding her employment, she explained that, at the relevant time, she and Cox discussed, as friends, the severity of her husband's medical condition and her desire to return to New York to care for him. Once again Joy Fartile's (TVCO) made sure that OPM never allowed me to explain what I meant by "mutual agreement", instead  they set about a witch hunt and smear campaign to justified Mr. Scalan's a TVCO official proposal for removal.

While she and Cox agreed that she should return to New York and her husband, they did not discuss the ramifications of taking such leave upon her WVDOC employment, nor whether she should, or would, resign from her position. Cox's statement, then, that he did not discuss termination or resignation with Appellant is entirely consistent

25

with Appellant's testimony.In addition, it showed that Holland's affidavit was false when he stated he discussed the dismissal of the appellant  Apellant learned later that Holland had been allowed to resigned early due to his questionable handling of the appellant's removal.

 Moreover, had Appellant been provided the opportunity to clarify her response on the OF306 form prior to the Agency's proposal of the removal action (as she had been provided with other items on the SF-86 and OF306 forms when OPM conducted its investigation), the matter in dispute currently probably would not have arisen  proposal for removal

Accordingly, the AJ's finding concerning Appellant's statement on the OF306 form was erroneous. There was not sufficient evidence in the record to prove, or even reasonably infer, that Appellant knowingly and intentionally made a false statement in order to defraud, deceive or otherwise mislead the Agency. When in actuality Joy Fartile's (TVCO) impeded OPM's investigation and  took over the background investigation so that they could slanted their own investigation in a discriminatory manner,  in retaliation for appellant  filing an EEOC complaint against one of their former Secret Service peers. Appellant contends that Joy Fartile's office committed many questionable acts of

wrongdoing and outright discrimination against the Plaintiff. They would have never allowed a background check to be conducted on a non minority individual and upon discovering the amount of discrepancies associated with this case and not question the individual about who might they contact to shed some light or might possibly explain these allegations. Instead Joy Fartile's office of investigation (TVCO) recommended her removal (that should have come from the appellant's office just as the proposal for indefinite suspension did by her director or administrator David Holmes),The investigation should have been allowed to be completed by OPM, but after OPM cleared appellant from the termination at Volunteers of America, which MS. Fartile testified under oath at the MSPB hearing that she felt it should have made appellant unsuitable for governmental employment, they made sure that the discrepancies in VVDOC, would be damaging to the appellant securing a clearance, therefore all information was tainted by TVCO handling and misinterputation of it's findings. It was so bad that TVCO/ or OPM allowed racial comments to be entered into the appellant's background such as "the plaintiff had children out of wedlock" when her  children are adoptive and she has never been pregnant, " she runs around saying she is the biggest  baddest black nigger"

When she is a Christian woman and the former wife of a minister,

"she is coveting inmates". Which was a blantant lie. WVDOC was satuated with "rednecks"  the work environment was premated with hatred and hostility because the appellant was an outsider, and more importantly an African American woman who was perceived as a threat. Later when it was leaked that she was being considered for a position as a warden of a prison to be opened soon, was when all of a sudden some 27 allegations mysterious came to light, that occurred in less than 90 days but only one was ever addressed with the appellant by her supervisor  during her first week on the job and nothing was committed to paper except for a preliminary report that was filled with salacious lies from primarily prisoners.

 Joy Fartile acted as the deciding official, She had a vested interest in making sure that her Deputy Scalon recommendation for removal was upheld, and now she enters an Declaration in this case, which at best is suspect, and a way of covering up for all the misdeeds of her office, and the failure of  (TVCO) conducting a fair and impartial background investigation. Why wasn't the declaration submitted by officials in the appellant's Office of Internal Affairs and Program Review. Joy Fartile dosen't know anything about the appellant's work ethics, habits or performance, she was not her supervisor and should have not been the official recommending the Appellant's removal. At best her

declaration submission should be inadmissible based on the inference of a possible cover up and conflict of interest.

More importantly, the TVCO should not have been allowed to conduct the supplemental background investigation. Under who's authority did TSA get permission to summarily dismiss OPM from conducting the background. This action in itself was discriminatory in that other agents or TSA applicants going through a background investigation were handled by OPM, not the office of (TVCO) Joy Fartile's declaration should not be allowed to stand given the cloud of suspicion and misdeeds that accompany it. More importantly, it is just a litlle too self serving to cover up the mishandling and improper actions committed by her office TVCO.

Additionally, Joy Fartile and TSA denied they had knowledge of prior EEOC activity by the appellant, when in actuality John J. Rooney referred to it in his decision to place appellant on indefinite decision right before he elaborated on the Douglas Factors. (See Exhibit Q) The AJ erred in determining that no nexus existed between her defense of retaliation and the removal. Additional, it was articulated that Hector Santana wad the management official who was responsible for retaliation actions being taken against the appellant due to his Secret Service connection and peers who worked in the TVCO office, in

specific Mr. Scanlon who was the official who recommended my removal, had a Secret Service connection to Santana. See Exhibit  R)

The appellant's does not dispute the legal principle that the authority to issue a security clearance is a discretionary function of the Executive Branch and involves the complex area of foreign relations and national security, employment actions based on denial of security clearance are not subject to judicial review, including under Title VII. However in this case it not simply a matter of National Security, The Agency in specific Joy Fartile's office of Transportation Vetting and credentialing, have conspired, manipulated, slanted, and omitted questionable evidence, and denied the appellant due process.

## B. THE PENALTY TAKEN BY THE AGENCY WAS UNREASONABLE IN LIGHT OF THE DOUGLAS FACTORS.

This court can review an agency-imposed penalty to determine if the agency considered all the relevant factors and exercised management discretion within the tolerable limits of reasonableness. Tom v. Dep't of the Interior, 97 M.S.P.R. 395 ¶50 (2004) (citing Wentz v. U.S. Postal Service, 91 M.S.P.R. 176 ¶ 13 (2002); Luciano v. Dep't of the Treasury, 88 M.S.P.R. 335 ¶ 13 (2001)). The court will modify a penalty only when it finds that the agency failed to weigh the relevant

factors of that it clearly exceeded the bounds of reasonableness in determining the penalty. Id.

In the present matter, Appellant contends that the Agency's imposition of its penalty was unduly severe for several reasons. First, in the Initial Decision, the AJ remarked that the deciding official, Joy Fairtile, "noted that appellant had expressed no remorse, and that she had not taken any responsibility for her action."

It is inappropriate to consider an appellant's denial of misconduct as an aggravating factor in determining the maximum reasonable penalty. Smith v. Dep't of Navy, 62 M.S.P.R. 616 (1994). Additionally, neither the Agency nor AJ acknowledged Appellant's status as a veteran in the determination of the penalty. See Skates v. Dep't of Army, 69 M.S.P.R. 366 (1996); Willis v. Dept of Army, 12 M.S.P.R. 82 (1982).

Lastly, Fairtile testified that she considered a prior five-day suspension of Appellant, for a "violation of travel card policy." . However, Appellant testified and  presented evidence that the alleged violations were later found to be fraudulent activity, by not fault of her own, on the government travel card. Both the appellants office and TVCO refused to consider the new information that showed that the

31

appellant's government credit card had been subjected to fraud and
the individual identified. When the appellant brought it to the attention
of TSA official's she was told that's a personal problem not one we
should be concerned about.

As such, the Agency failed to consider the relevant Douglas factors in
its imposition of penalty in this matter. Therefore, the removal action
is unreasonable in light of the circumstances of this matter and should
not be sustained.

## C. **THE INDEFINITE SUSPENSION OF APPELLANT WAS UNNECESSARY,**

## **AS THE AGENCY HAD COMPLETED ITS INVESTIGATION.**

Finally, Appellant contends that the Indefinite Suspension action taken
by the Agency was not necessary, in that the Agency had completed
its investigation prior to said action. Shortly after Appellant was
presented with the Notice of Proposed Indefinite Suspension on or
about April 15, 2004, she was provided a copy of the Agency's
Supplemental Investigation related to the proposed removal action, on
or about May 21, 2004. There is no evidence in the record, nor any
testimony from Agency officials, that any further investigation was
conducted after June 1, 2004– the effective date of the indefinite

suspension action. Accordingly, Appellant asserts that the indefinite suspension action itself was moot at the time it was effected, and therefore, improperly imposed upon her.  (See Declaration of Cruz-Packer Exhibit  S)

A. **The Discretionary Power of the Executive Branch to Issue Security Clearance For Access To National Security Information is Not Subject to Judicial Review.**

The Plaintiff concurs with the above but in the appellant's case heard before the MSPB the issues pertained to a negative suitability, specifically, ***falsification,*** not a denial of a security clearance or national security as the agency contends in their request for dismissal. There was not sufficient evidence in the record to substantiate any of the numerous allegations for the alleged suitability determination arrived at by TVCO.  There can be judicial review when it can be shown the first and fifth amendments were violated.

**The Right to Due Process**

The TSA (TVCO) deprived the Plaintiff of liberty without due process when they publicized the Plaintiff's termination and refused to allow

OPM to complete her background investigation or ask her questions to clear up discrepancies or provide witness/information to shed light on the numerous allegations before the officials at (TVCO) rushed to judgment to remove the appellant.   The *Fifth Amendment* prohibits the government for depriving an individual of liberty or property without due process.  In the employment situation, discipline or discharge, can in some circumstances, constitute a deprivation of the employee's liberty or property interest.  In such case the government must provide due process before firing or disciplining.  Government employees' liberty interests in their job are involved if:

1. **the way employees are disciplined or dismissed impugns their character as the result of a false characterization; and**

2. **The stain on employees' character is made public.**
   TSA place a picture of the Plaintiff in the front lobby of TSA and drive in parking garage for all TSA employees's to know that she had been barred during a five day suspension for misuse of the government credit card. Subsequently, humiliating and embarrassing appellant.

34

TSA should establish "consistent standards" for all individuals who require access to classified national security information or who are applying for a sensitive government position.  Like in the appellant's case the security requirements where far higher than other non minority or female applicants..

"An agency may not establish additional investigative or adjudicative requirements ... that exceed the requirements for suitability, contractor employee fitness, eligibility for logical or physical access, eligibility to hold a sensitive position, or eligibility for access to classified information," should not be addressed by TVCO when it is OPM's responsibility.  Both OPM's and TVCO investigation were conducted so badly that a formal complaint was formed with Investigations Services, Federal Investigations Processing Center, Boyers, Pennsyvlvania. (See Exhibit  E) .

   TSA change specifications to suit them as this case unfolded. Originally the Plaintiff's  removal was based on falsification of her Sf-86, when they thought that she failed to declare the West Virginia job. That was their specification, plain and simple. Absent that charge, there would be no suspension and subsequent termination. Unjustly, when she was able to show that she did include it however, it was in the wrong place, and then they came

35

at her with the unsuitability issue, so it couldn't possibly be heard by the MSPB. Now since a law suit has been filed they are attempted to use the issue of National Security when this case is one of wrong doings, misrepresenting the facts of what happened in West Virginia and blatant discrimination, retaliation, and unlawful employment practices from the beginning. In addition, I believe the plaintiff's due process was violated by TSA keeping the reasons for her removal a secret and not supplying the Plaintiff sufficient information to formulate an accurate response to charges level at the time of the hearing for the recommendation of an indefinite suspension.

TSA should not be allow now in 2008, to hide behind the pretext of the "The Discretionary Power of the Executive Branch to Issue Security Clearance For Access To National Security Information is Not Subject to judicial review", to hide the harm and discriminatory treatment that the appellant and other African American TSA employee's have been subjected to since the inception of TSA in 2002. When the appellant's first began to suffer disparate treatment, retaliation and discriminatory actions at the hand of TSA officials, she exercise her first amendment rights and reported this illegal and harmful action to the National

Organization Blacks Law Enforcement Executives (NOBLE)

President and its board of Directors. Appellant's rights were

violated based on the exercise of his First Amendment rights.

As a result of the actions of one or more of the defendants, Cruz-

Packer suffered mental anguish, emotional pain and suffering and loss of enjoyment of
life.
NOBLE Executives had meetings with the Acting Director Stone and

Director Hawley to discuss among several other topics the widely

held perception that African Americans within TSA have been

subjected to disparate disciplinary actions, involuntary transfers

and terminations. In addition they questioned the frequency with

which African American employees of TSA were the target of

investigations, management reviews and adverse actions Such as

the termination/removal of Cruz-Packer. (See exhibit T)

With TSA being allowed to hide behind the curtain and evoke

National Security whenever an employee speaks out about

discriminatory and wrongful termination actions this pattern will

continue and the check and balance protection provided in the

constitution between the Executive Branch and the Judiciary

Branch will be wasted.

B. **This Circuit Has Previously Dismissed Title VII Claims**

**Where Litigations Would Bring Into Questions Issues Concerning The Grant or Denial of a Security Clearance.**

Linda Cruz-Packer, former Special Agent, TSA experienced retaliation by the TSA TVCO's officials when they inappropriately and intentionally sabotaged her being issued her security clearance based on exaggerated, distorted and clearly false allegations. During a 2004 security examination/background investigation that they handled instead of allowing OPM to complete the background initially started by their office.

The TSA's treatment of Linda Cruz-Packer, a former employee, Army veteran, wife/widower of a minister who dared speak out about a pattern of discrimination which is substantiated by numerous reports which will be attached as (exhibits U & V) , is indicative of a pattern and practice by the TSA's of unlawful and disgraceful retaliation through the abuse of the security clearance process.

As an employee working in a Federal Government agency it applies because you are to be protected from harassment, disparate treatment, staff threatening you, etc. The defendants failed to protect the plaintiff from those things and many more. In addition, there were no notifications/postings anywhere informing the plaintiff and other

TSA employees how to contact authorities if we needed assistant (i.e., EEOC posters, workman's comp info).

Employers are required to post <u>notices</u> to all employees advising them of their rights under the laws EEOC enforces and their right to be free from retaliation. Such notices must be accessible, as needed, to persons with visual or other disabilities that affect reading. The plaintiff contends that TSA facility has no notices posted advising him/her how, where, when or who to file an EEOC complaint against which is a violation of the federal laws relating to EEOC. In a recent discrimination case brought by another Female employee (Linda Gaston VS. Homeland Security)  it was ordered that EEOC posters be placed so that employee would be aware of how to report work place violation of their civil rights and discrimination.

According to D.C. Code § 1- 616.04(b), "Any individual or class of individuals may commence a civil action on his or her or their own behalf against any employee or employees in any agency for breach of a fiduciary duty upon showing that said employee or employees by his or her  or their acts or omissions has or have exposed said individual or class of individuals to an injury or harm, or risk of injury or harm, from which they are to be protected by the employee or employees".

39

Civil Rights Act 11. 371 "While supervisory employee may be joined as party defendant in Title VII action that employer must be viewed as being sued in his capacity as agent of employer, who is alone liable for violation of Title VII. Civil Right Act of 1964, $ 701 et seq. as amended, 42 U.S.C.A. $ 2000e et seq.

In this case OPM had compiled Investigative material on the appellant. Upon review of the partial report obtained by the appellant certain interviews that had been conducted were missing, in particular a follow up interview with Mr. Otis Cox, by a female investigator from OPM. There were potentially actionable issue(s) which, standing alone should be investigated further by OPM under suitability/security considerations. Joy Fartile stated that she made the proposal for the appellant's removal. This case needs to be heard before this court to determine how the agency, in particular (TVCO) got the authority from OPM to take action against the appellant under part 315 without first providing notice to the parties of her concerns on the issues and an opportunity to respond to established jurisdiction.

OPM retains jurisdiction over all cases involving evidence of material, false statement or deception or fraud in examination of

appointment,  Agencies must refer these cases to OPM for

adjudication or contact OPM for prior approval id the agency

wants to take action under its own authority. % C.F.R. $ 731.103

(a), see Saunders V. Department of Justice, 95 M.S.R.P. 38, 6-7

(2003). The appellant asserts that the AJ erred in not requiring

the agency to show that it obtained approval to take action under

5 C.R.F., part 315, Tab 6.

This case was a mixed case and the AJ did not allow any

discrimination matters into the MSPB  hearing. (See Formal EEO

Complaint Exhibit W)

In addition, Joy Fartile proposed my removal she was not my direct

supervisor, yet instill the Aj disallowed , similar situated comparator

employee Ed Gomez, who was vetted through TVCO office like the

appellant which this writer believes was an error and unfair. The

other applicant Janice Pavlick did not experience any problem

completing her  SF-86, however when she ran into a problem

concerning some medical issues, her investigator came to the office

and interviewed her and allowed her to explain the discrepancies.

Appellant was never afforded such an opportunity when all her

allegation surfaced which questions the fairness of Joy Faritle's

office and its investigators. Point to make that further illustrates the

41

unfairness the appellant suffered at the hands of TVCO is the way the supplement investigator report was written. In that each statement started off with a predispose assumption that the appellant made a false statement and stated she left due to a mutual agreement between herself and Otis Cox, which the appellant was never ask to clarify or even given an opportunity to explain but instead it was distorted and twisted by officials at TCVO to be used against the appellant in a derogatory manner. (See Exhibit X) These and numerous other suspect if not illegal actions by TCVO officials cry out for a judicial review.  The Plaintiff respectfully request that the court deny the Defendant's motion to Dismiss this case for lack of subject matter jurisdiction, and allow this case to be heard by a jury.

## CONCLUSION

For the a foregoing reasons, Appellant Cruz-Packer respectfully requests the following relief from the court, namely:

a. That the Initial Decision dated September 6, 2006 be REVERSED in its entirety;

b. That the removal action taken by the Agency be NOT SUSTAINED;

c. That the indefinite suspension action taken by the Agency be NOT SUSTAINED;

d. That Appellant be restored to her employment in the Federal
Service, with full backpay and benefits; and

(e) Declare and find that the defendants violated the Administrative
Procedure Act, its internal regulations and/or statutes governing its
conduct involving Cruz-Packer and her government credit card , and
award any damages that are deserved there from;

(f) Declare and find that the defendants violated the Privacy Act by
failing to collect information directly from Cruz-Packer, failed to
maintain accurate, relevant, timely or complete records pertaining to
Cruz-Packer and/or failed to make reasonable efforts to assure that
such records regarding Cruz-Packer are accurate, complete, timely and
relevant, and award any damages that are deserved there from;

(f) Declare and find that the defendants violated Cruz-Packer's liberty
interest under the Fifth Amendment to the Constitution, and award
any damages that are deserved there from;

(g) Declare and find that the defendants violated Cruz-Packer's
interests under the First Amendment to the Constitution, and award
any damages that are deserved there from;

(h) Declare and find that the TSA/TVCO intentionally misuses the
security clearance process as a retaliatory tool;

(i) Award any damages caused by the TSA's failure to timely process
Cruz-Packer's Background investigation and allow OPM to complete it.

(j) Award any damages caused by TSA's retaliatory behavior in initially denying/preventing her a security clearance and/or continually maintaining and disseminating false information.

(k) Invoke its equitable powers to expunge all records or information that is inaccurate, derogatory or infringes upon Cruz-Packer's express or implied constitutional or statutory rights;

(l) Refer those TSA officials responsible for violating the Privacy Act for prosecution under 5 U.S.C. § 552a(i)(1);

(m) Award Cruz-Packer the costs of the action and reasonable attorney fees under the Equal Access to Justice Act or any other applicable law; and

(n) grant such other relief as the Court may deem just and proper.

(o). That the Board grant such other and further relief as deemed necessary and proper.

Respectfully,

Linda Cruz-Packer

Linda Cruz-Packer

Pro Se

7/25/08

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing   Plaintiff's

MEMORANDUM OF POINTS AND AUTHORITIES DENYING

DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

was mailed regular mail this 25th day of July, 2008.


*Linda Cruz-Packer*

Linda Cruz-Packer

**Counsel for Defendant**
WYNEVA JOHNSON
Assistant United States Attorney
555 4th Street, NW. E-4106
Washington, DC 20530

Bryan Bonner
**Senior Counselor, Administrative Litigation**
Dept. of Homeland Security
TSA
West Tower, 2nd Fl. So.
601 S. 12th St. #TSA-6
Arlington, VA. 22202-4220



June 04, 2002

Ms. Linda Cruz-Packer
4800 Megan Drive
Clinton, MD 20735

Dear Ms. Cruz-Packer:

This confirms our offer of employment in the excepted service for the position of **Transportation Security Specialist, SV-1801-J**, in the Transportation Security Administration effective Sunday, June 16, 2002. Your annual salary will be **$74,200.00**.

On **Monday, June 17, 2002**, please report to the **Southwest entrance** of the Nassif Building, 400 Seventh Street, SW, Washington, DC. Once you enter the lobby, please have the security guard dial extension 64075 to notify us of your arrival. A member of the TASC Human Resource Services staff will be down at 8:20 a.m. to escort you to Room 2225 where the orientation session will begin at 8:30 a.m.

We will brief you on issues concerning your employment, benefits and completion of the necessary forms to effect your appointment. In order to verify your identity please bring a current drivers license and social security card or passport.

We look forward to having you as a member of our transportation team. If you have any questions or concerns, please do not hesitate to contact me at (202) 366-9414.

Sincerely,

*Joan B. Simpson*

Joan B. Simpson
Human Resources Specialist

**TASC** *Service / Value / Success*

Standard Form 52
Rev. 7/...
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

## PART A - Requesting Office (Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39)

**1. Actions Requested**

New Hire - Excepted Appointment - Permanent

**3. For Additional Information Call** (Name and Telephone Number)
Angela Freeman, (202) 493-1623   385-1441

**5. Action Requested By** (Typed Name, Title, Signature, and Request Date)
K. David Holmes, AUS for Inspection

**2. Request Number**

**4. Proposed Effective Date**
6/16/02

**6. Action Authorized by** (Typed Name, Title, Signature, and Concurrence Date)
K. David Holmes, AUS for Inspection

## PART B - For Preparation of SF 50 (Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order)

**1. Name** (Last, First, Middle)
CRUZ-PACKER, Linda

**2. Social Security Number**
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

**3. Date of Birth**
5/20/51

**4. Effective Date**
06/16/02

### FIRST ACTION

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 170 | Exc Appt |

| 5-C. Code | 5-D. Legal Authority |
|---|---|
| ZUC | P.L. 107-71 |

| 5-E. Code | 5-F. Legal Authority |
|---|---|

### SECOND ACTION

| 6-A. Code | 6-B. Nature of Action |
|---|---|

| 6-C. Code | 6-D. Legal Authority |
|---|---|

| 6-E. Code | 6-F. Legal Authority |
|---|---|

**7. FROM: Position Title and Number**

| 8. Pay Plan | 9.Occ. Code | 10.Grade or Level | 11.Step or Rate | 12. Total Salary | 13.Pay Basis |
|---|---|---|---|---|---|

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|

**14. Name and Location of Position's Organization**

**15. TO: Position Title and Number**
Transportation Security Specialist
P.D. #02-801-008

| 16. Pay Plan | 17. Occ. Code | 18.Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| SV | 1801 | J | | $74,200.00 | PA |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $66,559.00 | $7,641 | $74,200.00 | $0.00 |

**22. Name and Location of Position's Organization**
US Department of Transportation
Transportation Security Administration
Office of the Associate Under Secretary
for Inspection

## EMPLOYEE DATA

**23. Veterans Preference**

| 1 - None | 3 - 10-Point/Disability |
|---|---|
| 2 - 5-Point | 4 - 10-Point/Compensable |
| | 5 - 10-Point/Other |
| | 6 - 10-Point/Compensable/30% |

**27. FEGLI**
0 S

**30. Retirement Plan**

**24. Tenure**
1

| 0 - None | 2 - Conditional |
|---|---|
| 1 - Permanent | 3 - Indefinite |

**28. Annuitant Indicator**
9

**25. Agency Use**

**26. Veterans Pref for RIF**
YES    ☒ NO

## POSITION DATA

**34. Position Occupied**
2

| 1 - Competitive Service | 3 - SES General |
|---|---|
| 2 - Excepted Service | 4 - SES Career |

**38. Duty Station Code**
11-0010-001

**40. Agency Data**

**31. Service Comp. Date (Leave)**
06-16-02

**35. FLSA Category**
E

| E - Exempt |
|---|
| N - Nonexempt |

**39. Duty Station** (City - County - State or Overseas Location)
WASH, DC

**32. Work Schedule**
F

**36. Appropriation Code**

**29. Pay Rate Determinant**
0

**33. Part-Time Hours Per Biweekly Pay Period**

**37. Bargaining Unit Status**
8888

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 44. |
|---|---|---|---|---|

**49. Citizenship**
1 - USA   8 - Other

**50. Veterans Status**

**51. Supervisory Status**

## PART C - Reviews and Approvals (Not to be used by requesting office)

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| | | | D. | | |
| Keyed | | 6/21/02 | E. | | |
| | | | F. | | |

**Approval:** I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

CONTINUED ON REVERSE SIDE
18

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

**NOTIFICATION OF PERSONNEL ACTION**

| 1. Name (Last, First, Middle) | | | |
|---|---|---|---|
| CRUZ-PACKER, LINDA | | | |

| 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|
| 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 | 05-20-51 | 06-30-02 |

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 721 | REASSIGNMENT |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |

| 5-C. Code | 5-D. Legal Authority |
|---|---|
| ZVC | P.L. 107-71 |

| 6-C. Code | 6-D. Legal Authority |
|---|---|
| | |

| 5-E. Code | 5-F. Legal Authority |
|---|---|
| | |

| 6-E. Code | 6-F. Legal Authority |
|---|---|
| | |

| 7. FROM: Position Title and Number |
|---|
| TRANSPORTATION SECURITY SPECIALIST |
| PD NO=02-801-008    BU NO=810001 |
| ORG=SA801    CST CNTR=8010 |

| 15. TO: Position Title and Number |
|---|
| CRIMINAL INVESTIGATOR |
| PD NO=02-801-005    BU NO=810001 |
| ORG=SA801    CST CNTR=801000 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| SV | 1801 | J | 00 | $92,750 | PA |

| 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| SV | 1811 | J | 00 | $92,750 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| $66,559 | $7,641 | $74,200 | $18,550 |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $66,559 | $7,641 | $74,200 | $18,550 |

| 14. Name and Location of Position's Organization |
|---|
| O/ASSOC. UNDERSEC FOR INSPECTION |
| WASHINGTON, DC |

| 22. Name and Location of Position's Organization |
|---|
| O/ASSOC. UNDERSEC FOR INSPECTION |
| WASHINGTON, DC |

**EMPLOYEE DATA**

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|---|
| 1 | 1 - None    3 - 10-Point/Disability    5 - 10-Point/Other<br>2 - 5-Point    4 - 10-Point/Compensable    6 - 10-Point/Compensable/30% | 1 | | YES  X NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| R5    BASIC+OPT B(3X)+OPT A+OPT C(5X) | 9  NOT APPLICABLE | 0 |

| 24. Tenure |
|---|
| 0 - None    2 - Conditional<br>1 - Permanent    3 - Indefinite |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K    FERS & FICA | 06-16-02 | F | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2    1 - Competitive Service    3 - SES General<br>2 - Excepted Service    4 - SES Career | E    E - Exempt<br>N - Nonexempt | SEE REMARKS BELOW | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| SP PROG=00 | SUPV CSC=8 | POS TYPE=1 | | POSITION SENSITIVITY = 3 |

| 45. Remarks |
|---|
| APPROP = 06X2.801/000/810001/801000/1111 |

SALARY IN BLOCK 12A IS BASED ON PAY BAND J, TECHNICAL JOB CATEGORY, LEVEL 4.
SALARY IN BLOCK 12C INCLUDES A LOCALITY-BASED PAYMENT OF 11.48%. SALARY IN
BLOCK 12 INCLUDES AVAILABILITY PAY OF $18,550. SALARY IN
PAY BAND J, TECHNICAL JOB CATEGORY, LEVEL 4. SALARY IN BLOCK 20A IS BASED ON
LOCALITY-BASED PAYMENT OF 11.48%. SALARY IN BLOCK 20C INCLUDES A
OF $18,550. PAY ASSOCIATED WITH THIS PREMIUM INCREASES RETIREMENT SYSTEM,
FEGLI AND TSP ENTITLEMENTS AND DEDUCTIONS.

| 46. Employing Department or Agency |
|---|
| DEPARTMENT OF TRANSPORTATION/TSA |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| TD-19 | 1598 | 07-10-02 |

| 50. Signature/Authentication and Title of Approving Official |
|---|
| *Nancy A. Motley* |
| Nancy A. Motley |
| APPROVING OFFICIAL |

5-Part

Editions Prior to 7/91 Are Not Usable After
6/30/93
NSN 7540-01-333-6236

 **AOL.**Mail


Reply


Forward


Reply All


Add
Address



Subj: **FW: TSA Issues**
Date: 8/31/2004 10:44:50 PM Eastern Daylight Time
From: "lin das" <stl4011@hotmail.com>
To: Llycpacker@aol.com
*Sent from the Internet (Details)*

>From: "Linda.J.Pinnix@usdoj.gov" <Linda.J.Pinnix@usdoj.gov>
>To: "'stl4011@hotmail.com'" <stl4011@hotmail.com>
>Date: Tue, 31 Aug 2004 14:17:25 -0400 (EDT)
>
>The Wall Street Journal, August 31, 2004
>
>WASHINGTON -- The government, ramping up to improve air security, failed to
>thoroughly review background checks of dozens
>of air marshals, which could have led to the hiring of candidates with a
>history of drunk driving, domestic violence, sexual
>harassment or falsifying employment information.
>
>The Homeland Security Department's inspector-general found that a
>Transportation Security Administration oversight board that
>reviews and approves potential hires failed to flag the questionable
>background of 161 of 504 applicants to the air-marshal
>program. The department's inspector-general said TSA's hiring standards for
>air marshals have been too lenient.
>
>According to a report released yesterday, about 30% of applicants had filed
>for bankruptcy in the past seven years, and 62
>applicants have either been arrested or face allegations of misconduct,
>including drunken driving, domestic violence or sexual
>harassment.
>
>Homeland security officials said that none of the questionable applicants
>was hired and that background checks and standards --
>no longer the responsibility of TSA -- have been raised for the air-marshal
>program.
>
>Nevertheless, the report suggests that TSA continues to have internal
>challenges in ensuring hiring standards. In June 2003, TSA
>said it had fired 1,200 airport screeners, or 2% of the work force, after
>finding they provided false information on job applications,

>failed drug tests or had criminal records.
>
>Disciplinary problems in the air-marshal program last year led officials at
>the Department of Homeland Security to review the
>oversight board's hiring decisions. After examining 504 candidates,
>Homeland Security officials determined 161 of them had
>questionable backgrounds that should prevent their hiring. But the TSA
>board maintained its approval of all but two applicants,
>even after Homeland Security officials raised concerns.
>
>It is unclear how many armed, undercover federal air marshals now fly on
>select international and domestic flights to protect
>against potential terrorist attacks. The government considers that number
>classified, but the program was moved under the
>control of the U.S. Immigration and Customs Enforcement division last
>November so its roughly 5,000 agents could help.
>
>Air marshals are required to be U.S. citizens with no convictions in the
>past 10 years and must pass psychological, medical and
>firearms qualifications.
>
>In the report, Homeland Security Inspector General Clark Kent Ervin also
>found discrepancies in air-marshal pistol-testing
>practices and a requirement that marshals complete quarterly training.

---

On the road to retirement? Check out MSN Life Events for advice on how to
get there! http://lifeevents.msn.com/category.aspx?cid=Retirement

☐ Include original text in reply.

Exhibit D



**United States Office of Personnel Management**

Investigations Service
Federal Investigations Processing Center
Boyers, Pennsylvania 16018-0618

In Reply Refer To:

Your Reference:

December 9, 2003

Ms. Linda Cruz-Packer
4800 Megan Drive
Clinton, MD    20735

Dear Ms. Cruz-Packer,

This is to acknowledge that we have received your concern regarding your investigation conducted by Investigator David Ralph Smith.

Thank you for bringing this matter to our attention. Please rest assured that all efforts will be made to resolve your concerns.

If you have any questions, please contact me at 724-794-5612, Ext. 190.

Sincerely,

Pamela C. Cannavan
Chief
Contract Management Services

Sga03

(j) Award any damages caused by TSA's retaliatory behavior in initially denying/preventing her a security clearance and/or continually maintaining and disseminating false information.

(k) Invoke its equitable powers to expunge all records or information that is inaccurate, derogatory or infringes upon Cruz-Packer's express or implied constitutional or statutory rights;

(l) Refer those TSA officials responsible for violating the Privacy Act for prosecution under 5 U.S.C. § 552a(i)(1);

(m) Award Cruz-Packer the costs of the action and reasonable attorney fees under the Equal Access to Justice Act or any other applicable law; and

(n) grant such other relief as the Court may deem just and proper.

(o). That the Board grant such other and further relief as deemed necessary and proper.

Respectfully,


Linda Cruz-Packer

Pro Se

7/25/08

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing   Plaintiff's

MEMORANDUM OF POINTS AND AUTHORITIES DENYING

DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

was mailed regular mail this 25th day of July, 2008.

*Linda Cruz-Packer*

Linda Cruz-Packer

**Counsel for Defendant**
WYNEVA JOHNSON
Assistant United States Attorney
555 4th Street, NW. E-4106
Washington, DC 20530

Bryan Bonner
**Senior Counselor, Administrative Litigation**
Dept. of Homeland Security
TSA
West Tower, 2nd Fl. So.
601 S. 12th St. #TSA-6
Arlington, VA. 22202-4220



June 04, 2002

Ms. Linda Cruz-Packer
4800 Megan Drive
Clinton, MD 20735

Dear Ms. Cruz-Packer:

This confirms our offer of employment in the excepted service for the position of **Transportation Security Specialist, SV-1801-J**, in the Transportation Security Administration effective Sunday, June 16, 2002. Your annual salary will be **$74,200.00**.

On Monday, June 17, 2002, please report to the Southwest entrance of the Nassif Building, 400 Seventh Street, SW, Washington, DC. Once you enter the lobby, please have the security guard dial extension 64075 to notify us of your arrival. A member of the TASC Human Resource Services staff will be down at 8:20 a.m. to escort you to Room 2225 where the orientation session will begin at 8:30 a.m.

We will brief you on issues concerning your employment, benefits and completion of the necessary forms to effect your appointment. In order to verify your identity please bring a current drivers license and social security card or passport.

We look forward to having you as a member of our transportation team. If you have any questions or concerns, please do not hesitate to contact me at (202) 366-9414.

Sincerely,

*Joan B. Simpson*

Joan B. Simpson
Human Resources Specialist

**TASC** *Service / Value / Success*

Stand- Form 52
Rev. 7...
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office (Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39.)**

**1. Actions Requested**

New Hire - Excepted Appointment - Permanent

**3. For Additional Information Call (Name and Telephone Number)**
Angela Freeman, (202) 493-1623  385-1441

**5. Action Requested By (Typed Name, Title, Signature, and Request Date)**
K. David Holmes, AUS for Inspection

**2. Request Number**

**4. Proposed Effective Date**
6/16/02

**6. Action Authorized by (Typed Name, Title, Signature, and Concurrence Date)**
K. David Holmes, AUS for Inspection

**PART B - For Preparation of SF 50 (Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)**

**1. Name (Last, First, Middle)**
CRUZ-PACKER-Linda

**2. Social Security Number**
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

**3. Date of Birth**
5/20/51

**4. Effective Date**
06/16/02

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 170 | Exc Appi |
| 5-C. Code | 5-D. Legal Authority |
| ZLR | P.L. 107-71 |
| 5-E. Code | 5-F. Legal Authority |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| 6-C. Code | 6-D. Legal Authority |
| 6-E. Code | 6-F. Legal Authority |

**7. FROM: Position Title and Number**

| 8. Pay Plan | 9.Occ. Code | 10.Grade or Level | 11.Step or Rate | 12. Total Salary | | 13.Pay Basis |
|---|---|---|---|---|---|---|
| 12A. Basic Pay | | 12B. Locality Adj. | | 12C. Adj. Basic Pay | 12D. Other Pay | |

**14. Name and Location of Position's Organization**

**15. TO: Position Title and Number**
Transportation Security Specialist
P.D. # 02-801-008

| 16. Pay Plan | 17. Occ. Code | 18.Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| TV | 1801 | J | | $74,200.00 | PA |
| 20A. Basic Pay | 20B. Locality Adj. | | 20C. Adj. Basic Pay | 20D. Other Pay | |
| $66,559.00 | $7,641 | | $74,200.00 | $0.00 | |

**22. Name and Location of Position's Organization**
US Department of Transportation
Transportation Security Administration
Office of the Associate Under Secretary
for Inspection

**EMPLOYEE DATA**

**23. Veterans Preference**
1 - None
2 - 5-Point
3 - 10-Point/Disability
4 - 10-Point/Compensable
5 - 10-Point/Other
6 - 10-Point/Compensable/30%

**27. FEGLI**
0

**30. Retirement Plan**

**24. Tenure**
0 - None    2 - Conditional
1 - Permanent    3 - Indefinite
1

**25. Agency Use**

**28. Annuitant Indicator**
9

**26. Veterans Pref for RIF**
YES  ☒ NO

**29. Pay Rate Determinant**
0

**POSITION DATA**

**34. Position Occupied**
1 - Competitive Service    3 - SES General
2 - Excepted Service    4 - SES Career
2

**31. Service Comp. Date (Leave)**
06-16-02

**32. Work Schedule**
F

**33. Part-Time Hours Per Biweekly Pay Period**

**38. Duty Station Code**
11-0010-001

**35. FLSA Category**
E - Exempt
N - Nonexempt
E

**36. Appropriation Code**

**40. Agency Data**

**41.**

**42.**

**39. Duty Station (City - County - State or Overseas Location)**
WASH, DC

**43.**

**44.**

**37. Bargaining Unit Status**
8888

**45. Educational Level**

**46. Year Degree Attained**

**47. Academic Discipline**

**48. Functional Class**

**49. Citizenship**
1 - USA  8 - Other
M

**50. Veterans Status**

**51. Supervisory Status**

**PART C - Reviews and Approvals (Not to be used by requesting office.)**

**1. Office/Function**    Initials/Signature    Date    Office/Function    Initials/Signature    Date

A.

Keyed

D.

E.

F.

Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.    Signature    6/21/02

CONTINUED ON REVERSE SIDE
118

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

**NOTIFICATION OF PERSONNEL ACTION**

1. Name *(Last, First, Middle)*
CRUZ-PACKER, LINDA

| 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|
| 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 | 05-20-51 | 06-30-02 |

**FIRST ACTION** · 6753

**SECOND ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 721 | REASSIGNMENT | | |

| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
|---|---|---|---|
| ZVC | P.L. 107-71 | | |

| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
|---|---|---|---|
| | | | |

7. FROM: Position Title and Number
TRANSPORTATION SECURITY SPECIALIST
PD NO=02-801-008    BU NO=810001
ORG=SA801
CST CNTR=8010

15. TO: Position Title and Number
CRIMINAL INVESTIGATOR
PD NO=02-801-005    BU NO=810001
ORG=SA801    CST CNTR=801000

| 8. Pay Plan | 9.Occ. Code | 10.Grade or Level | 11.Step or Rate | 12. Total Salary | 13.Pay Basis |
|---|---|---|---|---|---|
| SV | 1801 | J | 00 | $92,750 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| $66,559 | $7,641 | $74,200 | $18,550 |

| 16. Pay Plan | 17. Occ. Code | 18.Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| SV | 1811 | J | 00 | $92,750 | PA |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $66,559 | $7,641 | $74,200 | $18,550 |

14. Name and Location of Position's Organization
O/ASSOC. UNDERSEC FOR INSPECTION
WASHINGTON, DC

22. Name and Location of Position's Organization
O/ASSOC. UNDERSEC FOR INSPECTION
WASHINGTON, DC

**EMPLOYEE DATA**

| 23. Veterans Preference | | | 24. Tenure | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|---|---|
| 1 | 1 - None   3 - 10-Point/Disability   5 - 10-Point/Other | | 1 | | YES  [X] NO |
| | 2 - 5-Point  4 - 10-Point/Compensable   6 - 10-Point/Compensable/30% | | 0 - None   2 - Conditional   1 - Permanent  3 - Indefinite | | |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| R5  BASIC+OPT B(3X)+OPT A+OPT C(5X) | 9    NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K  FERS & FICA | 06-16-02 | F | |

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2  1 - Competitive Service  3 - SES General   2 - Excepted Service  4 - SES Career | E  E - Exempt  N - Nonexempt | SEE REMARKS BELOW | 8888 |

| 38. Duty Station Code | 39. Duty Station *(City - County - State or Overseas Location)* |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| SP PROG=00 | SUPV CSC=8 | POS TYPE=1 | | POSITION SENSITIVITY = 3 |

45. Remarks
APPROP = 06X2.801/000/810001/801000/1111
SALARY IN BLOCK 12A IS BASED ON PAY BAND J, TECHNICAL JOB CATEGORY, LEVEL 4.
SALARY IN BLOCK 12C INCLUDES A LOCALITY-BASED PAYMENT OF 11.48%. SALARY IN
BLOCK 12 INCLUDES AVAILABILITY PAY OF $18,550. SALARY IN
PAY BAND J, TECHNICAL JOB CATEGORY, LEVEL 4. SALARY IN BLOCK 20A IS BASED ON
LOCALITY-BASED PAYMENT OF 11.48%. SALARY IN BLOCK 20C INCLUDES A
OF $18,550. SALARY IN BLOCK 20 INCLUDES AVAILABILITY PAY
FEGLI AND TSP ENTITLEMENTS AND DEDUCTIONS.    ASSOCIATED WITH THIS PREMIUM INCREASES RETIREMENT SYSTEM,

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF TRANSPORTATION/TSA | *Nancy A. Mowry* |
| 47. Agency Code  48. Personnel Office ID  49. Approval Date | Nancy A. Mowry |
| TD-19  1598  07-10-02 | APPROVING OFFICIAL |

5-Part

Editions Prior to 7/91 Are Not Usable After
6/30/93
NSN 7540-01-333-6236

AOL.COM | Message View




Reply


Forward


Reply All




Add Address



Subj: **FW: TSA Issues**
Date: 8/31/2004 10:44:50 PM Eastern Daylight Time
From: "lin das" <stl4011@hotmail.com>
To: Llycpacker@aol.com
*Sent from the Internet (Details)*

>From: "Linda.J.Pinnix@usdoj.gov" <Linda.J.Pinnix@usdoj.gov>
>To: "'stl4011@hotmail.com'" <stl4011@hotmail.com>
>Date: Tue, 31 Aug 2004 14:17:25 -0400 (EDT)
>
>The Wall Street Journal, August 31, 2004
>
>WASHINGTON -- The government, ramping up to improve air security, failed to
>thoroughly review background checks of dozens
>of air marshals, which could have led to the hiring of candidates with a
>history of drunk driving, domestic violence, sexual
>harassment or falsifying employment information.
>
>The Homeland Security Department's inspector-general found that a
>Transportation Security Administration oversight board that
>reviews and approves potential hires failed to flag the questionable
>background of 161 of 504 applicants to the air-marshal
>program. The department's inspector-general said TSA's hiring standards for
>air marshals have been too lenient.
>
>According to a report released yesterday, about 30% of applicants had filed
>for bankruptcy in the past seven years, and 62
>applicants have either been arrested or face allegations of misconduct,
>including drunken driving, domestic violence or sexual
>harassment.
>
>Homeland security officials said that none of the questionable applicants
>was hired and that background checks and standards --
>no longer the responsibility of TSA -- have been raised for the air-marshal
>program.
>
>Nevertheless, the report suggests that TSA continues to have internal
>challenges in ensuring hiring standards. In June 2003, TSA
>said it had fired 1,200 airport screeners, or 2% or the work force, after
>finding they provided false information on job applications,

AOL.COM | Message View

>failed drug tests or had criminal records.
>
>Disciplinary problems in the air-marshal program last year led officials at
>the Department of Homeland Security to review the
>oversight board's hiring decisions. After examining 504 candidates,
>Homeland Security officials determined 161 of them had
>questionable backgrounds that should prevent their hiring. But the TSA
>board maintained its approval of all but two applicants,
>even after Homeland Security officials raised concerns.
>
>It is unclear how many armed, undercover federal air marshals now fly on
>select international and domestic flights to protect
>against potential terrorist attacks. The government considers that number
>classified, but the program was moved under the
>control of the U.S. Immigration and Customs Enforcement division last
>November so its roughly 5,000 agents could help.
>
>Air marshals are required to be U.S. citizens with no convictions in the
>past 10 years and must pass psychological, medical and
>firearms qualifications.
>
>In the report, Homeland Security Inspector General Clark Kent Ervin also
>found discrepancies in air-marshal pistol-testing
>practices and a requirement that marshals complete quarterly training.

---

On the road to retirement? Check out MSN Life Events for advice on how to
get there! http://lifeevents.msn.com/category.aspx?cid=Retirement

---

☐ Include original text in reply.



Exhibit D



United States
**Office of**
**Personnel Management**

Investigations Service
Federal Investigations Processing Center
Boyers, Pennsylvania 16018-0618

In Reply Refer To:

Your Reference:

December 9, 2003

Ms. Linda Cruz-Packer
4800 Megan Drive
Clinton, MD    20735

Dear Ms. Cruz-Packer,

This is to acknowledge that we have received your concern regarding your investigation conducted by Investigator David Ralph Smith.

Thank you for bringing this matter to our attention. Please rest assured that all efforts will be made to resolve your concerns.

If you have any questions, please contact me at 724-794-5612, Ext. 190.

Sincerely,

Pamela C. Cannavan
Chief
Contract Management Services

*Sga03*

Ms. Linda Cruz-Packer
May 21, 1998
Page 2

You have the opportunity to either meet with me in person or to present me with a written explanation of the reason why you may think the facts and grounds contained in this letter are in error and why you may think this action is inappropriate, providing that you do so within fifteen (15) calendar days of receipt of this letter.

Sincerely,

Manfred G. Holland
Deputy Commissioner

MGH:HLW

cc: Don Ervin, Administrator
    Division of Personnel
    Personnel File

Exhibit L

# TRANSPORTATION SECURITY ADMINISTRATION

## Credentialing Program Office

## <u>Affidavit</u>

State of:  <u>West Virginia</u> )
                                             ss:
County of: <u>Kanawha</u> )


I, <u>Manfred G. Holland</u>, being duly sworn, hereby make the
following statement to <u>Spec. Agent Steve Geary</u> who has identified himself/herself
to me as a special agent with TSA Credentialing Program Office. I am making this
statement of my own free will, without any duress or coercion.


In March of 1998, I was Deputy Commissioner for the Division of Corrections.
While in this position, I had occasion to speak with Otis Cox, Cabinet Secretary
for the Department of Military Affairs and Public Safety regarding Ms. Linda
Cruz-Packer and Mr. Cox's wishes for us to employ her as a Program Specialist
at the Charleston Work Release Center. Ms. Cruz-Packer was hired as a 160
day temporary employee.

While she was in this position, Don Ervin, Administrator of the Charleston
Work Release Center, advised me that Ms. Cruz-Packer may possibly be involved
in rule violations in the performance of her duties.

I instructed Mr. Ervin to investigate those allegations. The outcome of that
investigation prompted me to author a letter dated, May 21, 1998, dismissing
Ms. Cruz-Packer for reasons outlined in that correspondence.

Prior to issuing that correspondence, I spoke with the Cabinet Secretary of
Military Affairs and Public Safety, Otis Cox, advising him of the problem with
Ms. Cruz-Packer and my believing that she should no longer be employed at the
Charleston Work Release Center or with the division. Mr. Cox advised me to
do what I had to do.

Subsequent to that conversation, Mr. Cox and I did not speak again in reference
to Ms. Cruz-Packer. I have no knowledge of Ms. Cruz-Packer resigning or
requesting resignation in lieu of termination.

Page 2 of 2 _nH_

I have read the above statement consisting of 2 page(s) and I have been given an opportunity to make corrections. All of the facts contained herein are true and correct to the best of my knowledge.

_____
(Affiant Signature)

_____
(Witness Signature)

Signed and sworn before me

This 22nd day of _APRIL_, 2004

_____
STEVE GEARY, S/A, TSA - CPO
Name, Title, Transportation Security Administration

(Authority to administer oaths: Title 5, Sec: 303)

Initials: _nH_

Exhibit N

MAY-06-2004 THU 11:00 AM S    BUDGET OFFICE       FAX NO. 130    8              P. 02

## PERSONNEL ACTION FORM

EMPLOYEE NAME: Cruz-Packer, Linda                    M---27/CWR
                (LAST)    (FIRST)    (MIDDLE)         REFERENCE NUMBER

SOC. SEC. NO.: 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           DEPARTMENT OF: MAPS
ADDRESS: _____     _____ Corrections
                                     DIVISION NAME: Chas. Work Rel.
_____    ORG NO.: 0608
COUNTY: _____              EMPLOYMENT DATE: _____
                      DATE OF BIRTH: _____   SEX: _____  RACE: _____

TYPE OF CHANGE

☐ NEW EMPLOYMENT              ☐ SEPARATION CODE          ☐ OTHER
  ☐ FILL VACANT POSITION      ☐ TRANS. TO _____    ☐ REQUEST NEW POSITION
  ☐ DATE OF VACANCY           ☐ TRANS. FROM _____    ☐ POSITION UPGRADE
  ☐ NEW HIRE   ☐ OA           ☐ RESIGNATION      (☒ DISMISSAL)   ☐ FUNDING SOURCE  ☐ UNIT CODE ONLY
  ☐ PROBATIONAL-REQ.          ☐ TERMINATION   ☐ LAYOFF   ☐ CERTIFIED PERMANENT
  ☐ PROVISIONAL-REQ.          ☐ RETIREMENT    ☐ DEATH    ☐ SALARY ADJ   ☐ LONG. INC.
  ☐ REINSTATEMENT             ☐ LEAVE OF ABSENCE  ☐ SUSPENSION  ☐ SALARY ADVANCE/MERIT ____%
  ☐ RETURN TO DUTY            FROM _____   TO _____  ☐ PROMOTION  ☐ DEMOTION
  ☐ PERMANENT ☐ FT  ☐ PT      ☐ MEDICAL      ☐ PERSONAL  ☐ RECLASSIFICATION  ☐ REALLOCATION
  ☐ TEMPORARY ☐ FT  ☐ PT      ☐ MILITARY     ☐ WC  ☐ ED  ☐ TEMPORARY UPGRADE
  ☐ INTERMITTENT-REQ.         ☐ PARENTAL     ☐ UL        ☐ LATERAL CLASS CHANGE
  ☐ 6-MO. TEMP.-REQ.          ☒ LAST WORKING DAY 5-15-98  ☐ NAME CHANGE-FORMER
  ☐ CLASSIFIED EXEMPT         ☒ LAST DAY ON PAYROLL 5-15-98  _____
  ☐ 30-DAY  ☐ 90-DAY  ☐ 160-DAY  ☐ LEAVE PAID _____
  ☐ STUDENT EXEMPT            ☒ LEAVE BALANCE(S)           ☐ ADDRESS-FORMER _____
  ☐ PROFESSIONAL PT EXEMPT    AL _____ 0    SL _____ 0
                                                          ☐ PT TO FT  ☐ FT TO PT  ☐ PT TO PT

### CURRENT BUDGET INFORMATION
POS. #: 10T    PAYROLL TITLE: CORPRSP
NO. PAY PERIODS: 24                WAGE/HR STATUS: C        EFFECTIVE DATE: _____
DOP COVERED/EXEMPT:  C         HOURLY: Y  N x  RATE: 13.52   BASE MONTHLY RATE: 2,344.00
                              EEO-4 CODE: ____  CLASS NO.: 8923   PAY GRADE: 11   STEP: ____

| FUND | FY | ORG | ACT | UNIT CODE | FTE | ANNUAL BASE | INCRE. |
|------|----|----|----|-----------|-----|-------------|--------|
| 0450 | 98 | 0608 | 001 | 002-000 | 1.00 | 28,128.00 | 0 |

### PROPOSED BUDGET INFORMATION
POS. #: ____    PAYROLL TITLE: _____
NO. PAY PERIODS: ____              WAGE/HR STATUS: ____     EFFECTIVE DATE: 5-16N-98
DOP COVERED/EXEMPT: ____       HOURLY: Y  N  RATE: ____     BASE MONTHLY RATE: ____
                              EEO-4 CODE: ____  CLASS NO.: ____   PAY GRADE: ____   STEP: ____

| FUND | FY | ORG | ACT | UNIT CODE | FTE | ANNUAL BASE | INCRE. |
|------|----|----|----|-----------|-----|-------------|--------|
|      |    |     |     |           |     |             |        |

DEPARTMENT OF ADMINISTRATION USE ONLY          JUSTIFICATION
☒ PENDING       DATE/BY 5-27 MB
☐ APPROVED      DATE/BY 6-18 QC

DIVISION OF PERSONNEL USE ONLY
☐ APPROVED   ☐ DISAPPROVED   ☐ NOTED
SIGNATURE: _____
DATE: _____

AGENCY SIGNATURE - AREA OFFICE        (DATE)      APPROVALS
                        DIVISION                  DEPT. SECRETARY/GOVERNOR
Nancy Leonard Swecker  5/26/98  DATE _____
DIVISION SIGNATURE          (DATE)
                                                  DEPARTMENT OF ADMINISTRATION

1. WHITE - ADMINISTRATION/BUDGET PLANNING    3. PINK - AGENCY ORIGINATOR (PENDING)
2. GREEN - AGENCY PAYROLL OFFICE

August 17, 2004

Linda Cruz-Packer
4800 Megan Drive
Clinton, MD  20735
301 234-0097

Sharon Dunbar
Dept. of Corrections
617 Leon Sullivan Way
Charleston, West Virginia
25301

**Re: FOIA Document Request**

Dear Ms. Dunbar:

I am a former CWRC employee, who is currently undergoing a background investigation with the federal government. West Virginia Department of Correction has provided information to the government that I vehemently disagree with, therefore I would like to exercise the Freedom of information Act and request the following documents for clarification purposes:

1. Any and all records pertaining to Linda Cruz-Packer, former Program Manager, CWRC, ssn# 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, employed from March 3, 1998 through May 21, 1998, to include those records maintain at Headquarter archives and CWRC 607 Brooks Street, Charlestown , West, Virginia 25301.

2. All Termination/dismissal letters regarding any and all limited term/temporary employee or regular appointed employees of the Dept. of Corrections authored by Manfred Holland, Deputy Commissioner for the years 1997, 1998, or 1999, to included the WV-11's that would relate to said termination.

3. Copies of all WV-11's issued to dismissed of terminated Dept of Correction employees for the years 1997,1998, or 1999 relating to limited term/temporary or regular appointed employees.

4. Copies of all WV-11's signed off on by Mary Swecker, Director of Administration, Budget Section, and Manfred Holland for the years of 1997, 1998, and 1999 relating to any and all Dept of Correction employees.

5. List of all inmates and staff assigned to CWRC, 607 Brooks Street, during the year 1998, this list should include the inmates ssn# and DOB, and last known address.

6. Copies of all taped conversation that Mr. Donald Ervin reported he made during his investigations into alleged improper and illegal activities relating to Linda Cruz-Packer.

7. Copies of all letters reportedly written to inmate Douglass Bircher by Linda Cruz-Packer, reported by Sharon Spurlock and Donald Ervin to the government.

*Exhibit P*
*1 of 2*

# Declaration for Federal Employment

Form Approved
OMB No. 3206-0182

---

## Additional Questions

|  |  | YES | NO |
|---|---|---|---|
| 14. | Do any of your relatives work for the agency or government organization to which you are submitting this form? (Include: father, mother, husband, wife, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother, and half sister.) If "YES," use item 16 to provide the relative's name, relationship, and the department, agency, or branch of the Armed Forces for which your relative works. | ☐ | ☒ |
| 15. | Do you receive, or have you ever applied for, retirement pay, pension, or other retired pay based on military, Federal civilian, or District of Columbia Government service? | ☐ | ☒ |

## Continuation Space / Agency Optional Questions

16.  Provide details requested in items 7 through 15 and 18c in the space below or on attached sheets. Be sure to identify attached sheets with your name, Social Security Number, and item number, and to include ZIP Codes in all addresses. If any questions are printed below, please answer as instructed (these questions are specific to your position and your agency is authorized to ask them).

Division of Correction   (6|98)     This job is on the border line of
112 California Ave, Bldg 4 RM30       being 5 years -
Charleston, WV 25301
Job promised could not be granted. Due to start up cost. Couple with family
stress, Relocation, mutual agreement between Director of Public Safety (Otis Cox)
& myself to leave

## Certifications / Additional Questions

APPLICANT: If you are applying for a position and have not yet been selected, carefully review your answers on this form and any attached sheets. When this form and all attached materials are accurate, read item 17, and complete 17a.

APPOINTEE: If you are being appointed, carefully review your answers on this form and any attached sheets, including any other application materials that your agency has attached to this form. If any information requires correction to be accurate as of the date you are signing, make changes on this form or the attachments and/or provide updated information on additional sheets, initialing and dating all changes and additions. When this form and all attached materials are accurate, read item 17, complete 17b, read 18, and answer 18a, 18b, and 18c as appropriate.

17.  I certify that, to the best of my knowledge and belief, all of the information on and attached to this Declaration for Federal Employment, including any attached application materials, is true, correct, complete, and made in good faith. I understand that a false or fraudulent answer to any question or item on any part of this declaration or its attachments may be grounds for not hiring me, or for firing me after I begin work, and may be punishable by fine or imprisonment. I understand that any information I give may be investigated for purposes of determining eligibility for Federal employment as allowed by law or Presidential order. I consent to the release of information about my ability and fitness for Federal employment by employers, schools, law enforcement agencies, and other individuals and organizations to investigators, personnel specialists, and other authorized employees or representatives of the Federal Government. I understand that for financial or lending institutions, medical institutions, hospitals, health care professionals, and some other sources of information, a separate specific release may be needed, and I may be contacted for such a release at a later date.

| 17a. | Applicant's Signature: *Linda Cruz-Packer*  (Sign in ink) | Date  3/24/03 | Appointing Officer: Enter Date of Appointment or Conversion  MM / DD / YYYY |
|---|---|---|---|

| 17b. | Appointee's Signature: _____ (Sign in ink) | Date _____ |  |

18.  Appointee (Only respond if you have been employed by the Federal Government before): Your elections of life insurance during previous Federal employment may affect your eligibility for life insurance during your new appointment. These questions are asked to help your personnel office make a correct determination.

| 18a. | When did you leave your last Federal job?   DATE: _____ MM / DD / YYYY |  |  |  |
|---|---|---|---|---|

|  |  | YES | NO | Do Not Know |
|---|---|---|---|---|
| 18b. | When you worked for the Federal Government the last time, did you waive Basic Life Insurance or any type of optional life insurance? | ☐ | ☐ | ☐ |
| 18c. | If you answered "YES" to item 18b, did you later cancel the waiver(s)? If your answer to item 18c is "NO," use item 16 to identify the type(s) of insurance for which waivers were not cancelled. | ☐ | ☐ | ☐ |

Optional Form 3

*Exhibit F*
*208 2*

# Declaration for Federal Employment

Form Approved
OMB No. 3206-0182

## GENERAL INFORMATION

**1. FULL NAME** *(First, middle, last)*
◆ Linda Yvetta Cruz-Packer

**2. SOCIAL SECURITY NUMBER**
◆ 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

**3. PLACE OF BIRTH** *(Include city and state or country)*
◆ Clarksville, Tenn

**4. DATE OF BIRTH (MM/DD/YYYY)**
◆ 05-20-1951

**5. OTHER NAMES EVER USED** *(For example, maiden name, nickname, etc)*
◆ Wakefield (maiden)
◆ Pippen (married

**6. PHONE NUMBERS** *(Include area codes)*
Day ◆ (571) 227-1681
Night ◆ (301) 234-0097

### Selective Service Registration

If you are a male born after December 31, 1959, and are at least 18 years of age, civil service employment law (5 U.S.C. 3328) requires that you must register with the Selective Service System, unless you meet certain exemptions.

| | | | |
|---|---|---|---|
| 7a. | Are you a male born after December 31, 1959? | ☐ YES ☑ NO | *If "NO" skip 7b and 7c. If "YES" go to 7b.* |
| 7b. | Have you registered with the Selective Service System? | ☐ YES ☑ NO | *If "NO" go to 7c.* |
| 7c. | If "NO," describe your reason(s) in item #16. | | |

### Military Service

**8. Have you ever served in the United States military?**      ☑ YES *Provide information below*      ☐ NO

*If you answered "YES," list the branch, dates, and type of discharge for all active duty.*

*If your only active duty was training in the Reserves or National Guard, answer "NO."*

| Branch | From (MM/DD/YY) | To (MM/DD/YY) | Type of Discharge |
|---|---|---|---|
| Army | 1/3/72 | 7/3/73 | Honorable |
| | | | |

### Background Information

For all questions, provide all additional requested information under item 16 or on attached sheets. The circumstances of each event you list will be considered. However, in most cases you can still be considered for Federal jobs.

For questions 9,10, and 11, your answers should include convictions resulting from a plea of *nolo contendere* (no contest), but omit (1) traffic fines of $300 or less, (2) any violation of law committed before your 16th birthday, (3) any violation of law committed before your 18th birthday if finally decided in juvenile court or under a Youth Offender law, (4) any conviction set aside under the Federal Youth Corrections Act or similar state law, and (5) any conviction for which the record was expunged under Federal or state law.

| | | YES | NO |
|---|---|---|---|
| 9. | During the last 10 years, have you been convicted, been imprisoned, been on probation, or been on parole? (Includes felonies, firearms or explosives violations, misdemeanors, and all other offenses.) *If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the police department or court involved.* | ☐ | ☒ |
| 10. | Have you been convicted by a military court-martial in the past 10 years? *(If no military service, answer "NO.")* If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the military authority or court involved. | ☐ | ☒ |
| 11. | Are you now under charges for any violation of law? *If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the police department or court involved.* | ☐ | ☒ |
| 12. | During the last 5 years, have you been fired from any job for any reason, did you quit after being told that you would be fired, did you leave any job by mutual agreement because of specific problems, or were you debarred from Federal employment by the Office of Personnel Management or any other Federal agency? *If "YES," use item 16 to provide the date, an explanation of the problem, reason for leaving, and the employer's name and address.* | ☒ | ☐ |
| 13. | Are you delinquent on any Federal debt? (Includes delinquencies arising from Federal taxes, loans, overpayment of benefits, and other debts to the U.S. Government, plus defaults of Federally guaranteed or insured loans such as student and home mortgage loans.) *If "YES," use item 16 to provide the type, length, and amount of the delinquency or default, and steps that you are taking to correct the error or repay the debt.* | ☒ | ☐ |

U.S. Office of Personnel Management

NSN 7540-01-368-7775

Optional Form 306
Revised January 2001

5 U.S.C. 1302, 3301, 3304, 3328 & 8716

U.S. Department of Homeland
Security
Arlington, VA 22202



**Transportation
Security
Administration**

June 1, 2004


TO:        Linda Cruz-Packer
           Special Agent
           Office of Internal Affairs and Program Review

FROM:      John J. Rooney
           Director, Office of Internal Affairs and Program Review

SUBJECT:   Decision on Proposed Indefinite Suspension

On April 15, 2004, the Transportation Security Administration (TSA) issued a notice proposing
your indefinite suspension from Federal service. I considered and evaluated all the available
information in this matter, including your April 30, 2004, written reply and your oral reply
presented on May 14, 2004, to the proposed action. Based on my review, I have decided to
indefinitely suspend you from your TSA position. This action is being taken to promote the
efficiency of the Federal service.

In your written and oral replies, you stated that the proposal to indefinitely suspend you violates
federal personnel law and TSA Management Directive (MD) 1100.75-1. You asserted that the
evidence you provided in response to the proposed removal was conclusive and discredited this
action. You stated that you were not terminated from the State of West Virginia, Division of
Corrections and you did not falsify the SF-86 you completed as part of your employment
requirements for the TSA. Thus, there was no need for further investigation. Lastly, you
asserted that the Agency's action smacks of retaliation for your pursuit of a complaint of
discrimination.

In accordance with the Aviation Transportation Security Act, Title 49, United States Code (USC)
4122, Subsection G, the TSA is excluded from the provisions of Title 5 USC 75. Accordingly,
your assertion that this action violates federal personnel law is not applicable. Contrary to your
assertion, the allegations against you have not been disproved. In fact, evidence in the
background investigation combined with the evidence you provided warranted additional
investigation into this matter. Pursuant to TSA MD 1100.75-1, indefinite suspensions may be
appropriate pending an investigation such as the one raised in this matter.

Further, the proposal to indefinitely suspend you is premised on the additional investigation and
not the proposal to remove. The TSA legitimately and reasonably believes that you have
engaged in misconduct and further investigation and adjudication of this matter is required. The

allegation of misconduct raised against you is very serious that, given the nature of your position as a law enforcement officer, your continued presence at the worksite would represent a threat to the effective operation of the workplace. The basis for this action is as stated and is not taken in retaliation due to your pursuit of a complaint of discrimination.

In assessing the reasonableness of the proposed action, I have considered a number of factors as set forth in Douglas v. Veterans Administration, 5 MSPB 313 (1981) which I find relevant to your case:

1. The nature and seriousness of the offense, and its relation to the employee's duties position, and responsibilities, including whether the offense was intentional or technical or inadvertent or was committed maliciously or for gain or was frequently repeated - Trustworthiness and integrity are required of all Federal employees. As a federal law enforcement officer, this responsibility and adherence to its standards are heightened. If determined that you have falsified a federal employment document and failed to disclose required information regarding your employment history, such actions are serious misconduct matters and would directly undermine the foundation of the employee-employer relationship and negatively affect your ability to continue in your position.

2. The employee's job level and type of employment, contacts with the public and prominence of the position - As a federal law enforcement officer, you occupy a position of public trust, substantial responsibility and authority. Given the nature of your position, if it is determined that you engaged in this misconduct, you would have failed to duly safeguard the TSA's and the public's trust, responsibility and integrity required of your position.

3. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties- As a law enforcement officer, if determined that you engaged in this misconduct, my confidence in your trustworthiness, truthfulness and ability to perform your assigned duties would be lost.

4. Past disciplinary record - On June 13, 2003, you were suspended from duty, without pay, for a period of five days beginning on June 16, 2003.

Therefore, I have decided to indefinitely suspend you, without pay, pending completion of the Agency's investigatory process and any administrative action that may follow. The indefinite suspension is effective on Thursday, June 3, 2004.

This notice constitutes a final decision. TSA is an excepted service agency and all of its employees are in the excepted service positions. Employees in excepted service positions have narrowly defined rights to appeal to the MSPB. Specifically, excepted service employees may file an appeal to the MSPB if they are: (1) veteran preference eligible individuals who have completed one year of current continuous service in the same or similar positions in an Executive agency, the United States Postal Service or Postal Rate Commission; or (2) non-veteran preference eligible individuals, who have completed two years of current or continuous service in the same or similar positions in an Executive agency under other than a temporary appointment

limited to two years or less. If you believe you meet this criterion you may file an appeal to the MSPB. Your appeal must be filed within 30 days of the effective date of this action or within 30 days of the date of this letter, whichever is later. If you decide to appeal, you may use the attached form. The MSPB's regulations are available on its website, www.MSPB.gov.

If you believe this action resulted from discrimination or harassment based on race, color, religion, sex, national origin, physical or mental disability, age (40 or over), sexual orientation, or reprisal, you may contact the Office of Civil Rights (OCR) at 1-877-336-4872. If you choose to contact OCR you must do so within 45 calendar days of the effective date of this action.

This correspondence is being forwarded by Federal Express Overnight Delivery.

If you have any questions regarding your rights or this process, you may contact Martina Griggs Johnson, Risk Management I, Office of Human Resources Management, at (571) 227-2865.


cc: Robert C. Seldon
    Robert C. Seldon & Associates, P.C.

The NarcoSphere || Secret Service agents claim White House turning blind eye to racism    Page 1 of 4



narcosphere.narconews.com

*a project of the narco news bulletin*

## Secret Service agents claim White House turning blind eye to racism

By Bill Conroy,
Posted on Tue Oct 26th, 2004 at 10:21:46 PM EST

African American agents with the U.S. Secret Service, which is charged with safeguarding the life of the president and other national leaders, contend the Bush Administration has worked to undermine their class-action discrimination lawsuit against the agency.

Officials with the nonprofit Black Agents of the Secret Service (BASS) allege that for the past four years -- the lawsuit was filed in 2000 -- "the Bush Administration and the Secret Service have used the judicial process to prevent a discussion of this case on its merits." BASS representatives say not a "single witness" has been called "nor has a single document been produced" in the case to date.

"The refusal to address the merits of the Black Agents' case is shameful," said Special Agent Reginald G. Moore, BASS president, in a prepared statement. "It is particularly disappointing that nothing was done after (former U.S.) Rep. J.C. Watts arranged a meeting with White House Associate Counsel Stuart Bowen and the class representatives to discuss the case. This is not a situation where the White House is unaware of the issues, nor could they be after the appearance of several front-page stories on the gross mismanagement and racial discrimination in the Secret Service."

The alleged racial discrimination problems within the Secret Service -- formerly part of the Treasury Department and now part of the Department of Homeland Security (DHS) -- appear to be part of a widespread pattern of racism within major federal law enforcement agencies.

It is a pattern that numerous government whistleblowers contend has not been addressed by the current administration, and it is a pattern they argue represents a threat not only to civil rights, but to the national security of this country.

Past stories on Narco News have detailed the class-action discrimination lawsuit filed by current and former Hispanic U.S. Customs agents against DHS. That case also has been pending in federal court for years.

More recently, special agents within DHS' Immigration and Customs Enforcement (ICE) were informed that they would not be receiving foreign-language pay due to "budget" constraints.

In addition, a resolution adopted by a national organization representing Hispanic law-enforcement officers charged that former DEA administrator Asa Hutchinson (who is now one of the top guns at DHS) has a track record of "perpetuating an

### Menu

- Home
- English | Español
- Search
- About the NarcoSphere
- Reporters' Notebooks
- Request a Co-publisher's Account
- The Narco News Bulletin

### Enter the NarcoSphere

**Request Account Copublisher Agreement**

Username: [        ]
Password: [        ]

[Login]
[Mail Password]

**Read Introductions by Our Copublishers**

### Reporters' Notebooks

- Reber Boult
- Julia Steinberger
- Al Giordano
- Bill Conroy
- Franz J.T. Lee
- Nancy Davies
- Cynthia McKinney
- Benjamin Melancon
- David Keating
- Fabio Mesquita
- Dan Feder
- Claudia Espinoza
- Yasmin Khan
- Jules Siegel
- Gissel Gonzales
- Daniel Fleming

The NarcoSphere || Secret Service agents claim White House turning blind eye to racism

atmosphere of distrust, reprisal and retaliation against minority employees...."

The delays in the African American Secret Service agents' discrimination case led their attorneys last week to resort to the extreme measure of filing special pleadings (a Writ of Mandamus) with the U.S. Court of Appeals for the District of Columbia. As part of the pleadings, they asked the federal appeals court to intercede and force the federal district court to take action in the case.

"We take this unusual step today because we cannot take four more years of denial and delay," said Secret Service agent Moore, who is a named plaintiff in the discrimination litigation. "Every day that passes, we lose witnesses and evidence.

"The Secret Service 'accidentally' fails to retain relevant documents. For the future of the Secret Service, we must have a hearing on the merits of more than 20 years of racial discrimination and a remedy that dissolves the 'Good Ol' Boy' network, which has worked so often to disadvantage black agents."

The class-action case was filed in the U.S. District Court for the District of Columbia on behalf of some 250 African American special agents of the United States Secret Service. The lawsuit contends that the Secret Service has "discriminated against African-American Special Agents, from at least January 1974 forward, in its personnel policies, practices, and procedures."

More from the Writ of Mandamus pleadings:

*Over four years have passed since the government filed its motion to dismiss and the Petitioners filed their motion for class certification. Petitioners have waited patiently, but they are suffering prejudice. They have not been allowed to depose any fact witnesses, analyze any personnel databases, or conduct any discovery whatsoever. In the meanwhile, the Secret Service admits that it has not in the past and will not in the future preserve electronic mail evidence relevant to the present action. Petitioners have no way to determine if the Secret Service is complying with its responsibility to preserve other documents relevant to the case.*

*Evidence is slipping away and Petitioners are beginning to lose the cohesiveness and cooperation of the class needed to prosecute this action. Without a sufficient number of participating class members, Plaintiffs will not be able to locate sufficient witnesses, documents and other information needed for the case.*

**Judge Reacts**

The filing of the writ on Oct. 22 did prompt quick action on the part of the judge, who, after years of issuing no rulings in the case, appears to have worked all weekend to prepare a ruling on the pending motions in the lawsuit.

In that ruling, issued Oct. 24, Judge Richard Roberts determined that "despite the (agents') compelling allegations of discrimination within the Secret Service" the class-action claims should be dismissed on technical grounds.

The claims on behalf of the class -- a group of some 250 African American agents – were thrown out because they had not been completely exhausted through federal administrative channels before being brought into federal court, the judge

- Pablo Francischelli
- Andrew Grice
- Baylen Linnekin
- Alex Satanovsky
- Irene Roca Ortiz
- Sean Donahue
- Erik Siegrist
- Charlie Hardy
- Ron Smith
- Christopher Fee
- Diego Mantilla
- Natalia Viana
- Amber Howard
- Teo Ballve
- Vladimir F-Garcia
- Justin Delacour
- Linda Langness
- Steve Young
- Kevin Okabe
- Jeff Simpson
- Christopher Whalen
- Sarah de Haro
- Ricardo Sala
- Charles Faris
- Nora Callahan
- Luis Gomez

NARCO NEWS
is supported by
The Fund for
Authentic Journalism
www.authenticjournalism.org

**Narco News:
Top Stories**

Emergency Music for a New Bolivia by Parafonista

Brazil's Lula to Sign Drug Decriminalization Decree by Al Giordano
4 Comments

Walking: We Ask Questions by the Notes From Nowhere Collective
12 Comments

Cynthia McKinney: We Need Narco News, and It Needs Us by Cynthia McKinney

The NarcoSphere || Secret Service agents claim White House turning blind eye to racism          Page 3 of 4

ruled. Lawyers for the agents stress, though, that the class claims can be filed again with the court after they wind their way through the 180-day administrative-review process.

However, Judge Roberts did not dismiss the individual discrimination claims of five Secret Service agents who are party to the case.

On another front, the judge's ruling failed to address a potential conflict-of-interest issue raised by the writ. In a footnote included in those pleadings, lawyers for the agents raise questions about Judge Roberts relationship with a potential witness.

The footnote:

*In a July 13, 2000 Order, Judge Richard Roberts disclosed to the parties that he was personal friends with then Treasury Undersecretary James Johnson, who had supervised the United States Secret Service for the Department of Treasury during much of the relevant time period. Judge Roberts disclosed that he and Johnson had discussed the case as it had been reported by the Washington Post one morning over breakfast.*

*In addition, Judge Roberts disclosed that as a Department of Justice attorney he served on the "Church Arson Task Force," co-chaired by Undersecretary Johnson. As a result, he was exposed to the "Good Ol'Boy Roundup" investigation which had documented organized racism by Agents in the Justice and Treasury law enforcement bureaus, including the Secret Service.*

*At that time, Judge Roberts deemed recusal (stepping down from the case) inappropriate because there was no indication that he would be required to assess a then Undersecretary Johnson's credibility and that the Roundup allegations were a small part of Petitioners' complaint. Four years later, the facts have changed substantially.*

*Through Freedom of Information Requests, witness interviews and other investigative techniques, Petitioners have learned more about the Roundups and Undersecretary Johnson's role in the subsequent investigation. Petitioners believe that Treasury Undersecretary James Johnson will be a key witness and that the "Good Ol' Boy Roundups" will be a significant part of this case. Thus, Judge Roberts will be required to assess Undersecretary Johnson's credibility and to rule on matters concerning the Roundup investigation.*

**Direct Appeals**

Beyond the effort to address the discrimination problem through the courts, the African American Secret Service agents also have attempted to resolve the case through agency channels as well.

In a January 2003 letter, Moore wrote the following to Secret Service Director Ralph Basham:

*We are writing to see if you are interested in discussing a potential resolution of the race discrimination class action that was filed almost three years ago in federal court. Throughout this difficult period while this case has been pending, the Black Agents have remained loyal and dedicated to the Secret Service. It was*

---

1 Comment

Eduardo Galeano: The War on Drugs is a Great Imperial Hypocrisy by Alex Contreras Baspineiro
View Comments

Power: Building it Without Taking it by the Notes From Nowhere collective
12 Comments

Now What? First, We Kill the Media by Al Giordano
4 Comments

Election Loss of pro-Harm Reduction Mayor in São Paulo by Fabio Mesquita
View Comments

A New Beginning for Uruguay by Alex Contreras Baspineiro
View Comments

Clandestinity: Resisting State Repression by the Notes From Nowhere Collective
12 Comments

Carnival: Resistance Is the Secret of Joy by the Notes From Nowhere Collective
12 Comments

Uruguay Election Coverage: Tabaré Vázquez, Presidente by Narco News Copublishers
12 Comments

The Coca Leaf: Tradition and Struggle by the Narco News J-School Radio Team

Last Chance for Gas in Bolivia by Amber Howard and Natalia Viana

Autonomy: Creating Spaces for Freedom by the Notes From Nowhere collective
12 Comments

Mexico's New Power Before the United States by Al Giordano
View Comments

Networks: The Ecology of the Movements by the Notes From Nowhere Collective
12 Comments

the "continuation space" provided under Question 16, I listed my 1998 departure from the Division of Corrections position in West Virginia, and provided contact information for that position. I further explained that the Director of Public Safety, Otis Cox, and I had come to a mutual agreement that I would leave that position.

17.)    Because the Declaration of Federal Employment was attached to the SF-86, I believed that listing the Division of Corrections position in the Declaration of Federal Employment would serve to complete my answer Question 22 on the SF-86. I did not intend to withhold or conceal that information on the SF-86 form. Rather, I listed the 1998 position in a continuation space on an attached form, submitted on the same date.

18.)    The Notice of Proposed Removal had the SF-86 form attached to it, but not the Declaration of Federal Employment. I obtained the Declaration of Federal Employment through a document request to TSA. The Declaration, dated March 24, 2003, is attached here as Attachment E, and clearly shows that I did disclose my departure from the Division of Corrections to TSA.

19.)    In response to my document request, I received two copies of the Declaration of Federal Employment; one had my response to Question 16 filled in and one was blank in that space. I do not understand where the blank form came from since I did not submit duplicate copies of the Declaration. The only copy I submitted was completed as described above.

Exhibit 5
4 of 5

I hereby declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

*Linda Cruz-Packer*

Linda Cruz-Packer
Executed on January 29th, 2004.

exhibit S

## DECLARATION OF OTIS COX

I, Otis G. Cox, being first duly sworn, do hereby depose and state as follows:

1.) My name is Otis G. Cox. I make this Declaration at the request of Linda Cruz-Packer to support her reply to the proposal to remove her from the Transportation Safety Administration ("TSA"). A copy of that proposal is attached here as Exhibit 1.

2.) Between 1997 and 2001, I served as the Secretary for Public Safety for the State of West Virginia. As Secretary, I was a Cabinet level official and reported directly to the Governor. I had ultimate responsibility over a number of departments of the State of West Virginia, including the Department of Corrections, the West Virginia State Police, the West Virginia National Guard, the Regional Jails, and the Capital Security.

3.) I currently serve as the Deputy Administrator, NHTSA, the U.S. Department of Transportation, where my duties and responsibilities includes providing executive direction and leadership to all organizational elements of National Highway Traffic Safety Administration (NHTSA) and evaluates their performance. Serve as the day-to-day first line supervisor of the Director of Civil Rights, Intergovernmental Affairs, Public and Consumer Affairs; the Associate Administrator for State and Community Services; and the Chief Counsel.

4.) As I noted above, one of the departments which reported to me as Secretary for Public Safety was the West Virginia Department of Corrections. This is the Department which employed Ms. Cruz-Packer in the period in question.

1

5.) TSA's notice of proposed removal is based on Ms. Cruz-Packer's supposed termination by the West Virginia Department of Corrections which she supposedly failed to disclose in applying for a position with TSA.

6.) As Secretary for Public Safety, I had supervisory authority over the Commissioner of Corrections. Had Ms. Cruz-Packer been terminated by the Department of Corrections, this is the official who would have had to have done so.

7.) The Commissioner of Corrections could only terminate Ms. Cruz-Packer with my approval and written concurrence.

8.) My approval to terminate Ms. Cruz-Packer was neither sought nor given. TSA's notice of proposed removal (Exh. 1) does not contain a copy of the supposed decision to terminate Ms. Cruz-Packer, nor does it refer to any approval which I would have had to have given before the Department of Corrections could have terminated her. For that reason, even if there were a document purporting to terminate Ms. Cruz-Packer, it would have no force or effect.

I hereby declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

_Otis Cox_

Executed on January ___16___, 2003.

2

_Exhibit F_

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### WASHINGTON REGIONAL OFFICE

LINDA Y. CRUZ-PACKER,

    Appellant,

        v.

DEPARTMENT OF HOMELAND
SECURITY,

    Agency.

DOCKET NUMBER
DC-0752-05-0636-B-1
DC-0752-04-0640-I-3

DATE: September 6, 2006

Crystal A. G. Fisher, Esquire, Carolyn C. Eaglin & Associates, Alexandria, Virginia, for the appellant.

Bryan A. Bonner, Esquire, and Remy Savin, Arlington, Virginia, for the agency.

**BEFORE**
Michelle M. Hudson
Administrative Judge

## INITIAL DECISION

In *Cruz-Packer v. Department of Homeland Security*, 102 M.S.P.R. 64 (2006), the Board remanded the appellant's appeal from an action taken by the agency's Transportation Security Administration (TSA) removing her from the position of Special Agent (Criminal Investigator), SV-1811-J, effective November 18, 2004, for adjudication of the merits of the removal action.[1] The appellant also refiled her appeal from the agency's action indefinitely suspending

---

[1] The docket number for the remand appeal of the removal action is MSPB Docket No. DC-0752-05-0636-B-1.

her effective June 3, 2004, and the Board has jurisdiction over that action.[2] *See* 5 U.S.C. §§ 7511(a), 7512, 7513, 7701; 5 C.F.R. Part 752, Subpart D.

For the reasons that follow, both the indefinite suspension and removal actions are AFFIRMED.

## BACKGROUND

On June 4, 2002, the appellant was offered the position of Transportation Security Specialist, SV-1801-J, with the TSA. The appellant received a waiver to begin working pending the outcome of a successful OPM background investigation, and she began working in the TSA's Office of Internal Affairs and Program Review. *See* Initial Removal Appeal File (DC-0731-05-0636-I-1) (IRAF), Tab 4, Agency's Response, tab 6. Shortly thereafter, on June 30, 2002, the appellant was reassigned to the position of Special Agent (Criminal Investigator), SV-1811-J, which is a Federal law enforcement position.

In furtherance of OPM's background investigation, the appellant submitted an SF-86, and a "Declaration of Federal Employment," Form 306, to the agency both dated March 24, 2003. Once OPM's background check on the appellant was completed, it was forwarded to the TSA's Credentialing Program Office (CPO) for a suitability determination. The CPO determined that the appellant was unsuitable for employment, after discovering the existence of evidence which indicated that in May of 1998, the appellant had been terminated from her former position with the West Virginia Department of Corrections (along with the reasons for the termination), and after determining that the appellant had not disclosed the termination on her SF-86.

---

[2] The docket number for the refiled indefinite suspension appeal is MSPB Docket No. DC-0752-04-0640-I-3. This appeal had been previously dismissed without prejudice on two occasions, in initial decisions that were issued on August 25, 2004 and January 14, 2005. The refiled indefinite suspension appeal has been joined with the removal appeal for adjudication, because joinder will not adversely affect the interest of the parties. *See* 5 C.F.R. § 1201.36(a)(2).

2

3

Thereafter, by notice dated April 15, 2004, Lou Widawski, (Deputy Director, MIIA, Management Inspections Division),[3] proposed the appellant's indefinite suspension, based on the charge of "Falsification of an Official Employment Document." *See* Initial Indefinite Suspension File (IISF) (DC-0752-04-0640-I-1), Tab 7, Agency's Response, tab 4(C). The appellant made both an oral and written reply to the proposed action, and by decision dated June 1, 2004, John J. Rooney (Director, Management Inspections Division, U.S. Customs and Border Protection),[4] decided to indefinitely suspend her, effective, June 3, 2004. *Id.*, Agency's Response, tab 4(A).

By notice dated October 24, 2003, Robert Scanlon, Assistant Director, Personnel Security & Credentialing Program Office, proposed to remove the appellant based on the charge of "Unsuitability for Federal Service," and the appellant replied to the proposed action. IRAF, Tab 4, Agency's Response, tab 8. Because of the appellant's denial that she had been terminated from the position with the Department of Corrections in West Virginia, and evidence that's she submitted in support of that claim, the CPO initiated a supplemental background investigation.

On July 1, 2004, the appellant filed an appeal from her indefinite suspension, and in an initial decision that was issued on August 25, 2004, the appeal was dismissed without prejudice because the appellant had amended a formal EEO complaint that she had previously filed, to include her indefinite suspension, prior to filing her appeal with this Board, and 120 days had not passed.

---

[3] Mr. Widawski was formerly the Deputy Director, Office of Internal Affairs and Program Review.

[4] Mr. Rooney was formerly the Director, Office of Internal Affairs and Program Review.

On October 20, 2004, the appellant refiled her indefinite suspension appeal (DC-0752-04-0640-I-2).

4

By notice dated November 18, 2004, Joy S. Fairtile, Deputy Director, Office of Transportation Vetting and Credentialing, decided to remove the appellant effective upon her receipt of the notice. IRAF, Tab 4, Agency's Response, tab 5.

In an initial decision that was issued on January 14, 2005, the indefinite suspension appeal was again dismissed without prejudice because the agency had taken action to remove the appellant. The appeal was dismissed in order to allow the indefinite suspension appeal to be joined with the removal appeal when it was filed.

On March 15, 2005, the appellant filed a formal EEO complaint concerning her removal action. IRAF-1, Tab 3. On July 14, 2005, the appellant filed her appeal to this Board from the removal action. IRAF, Tabs 1 and 3.

In an initial decision that was issued on October 6, 2005, the removal appeal was dismissed for lack of Board jurisdiction.

In *Cruz-Packer v. Department of Homeland Security*, 102 M.S.P.R. 64 (2006), the Board granted the appellant's petition for review, reversed the October 6, 2005 initial decision, and found that it has jurisdiction over the appellant's removal appeal under 5 U.S.C. § 7511(a)(1). Thus, the Board remanded the appeal for adjudication of the merits of the removal action.

The indefinite suspension appeal was reopened (DC-0752-04-0640-I-3), and the removal and indefinite suspension appeals were joined for adjudication. A hearing was held on both matters on July 18, 2006. The record remained open until July 24, 2006, for the receipt of additional evidence which the AJ ordered the agency to submit during the July 18, 2006 hearing.

<u>ANALYSIS AND FINDINGS</u>                    5

<u>Burdens of proof</u>

The agency has the burden to prove the merits of its case by a preponderance of the evidence, and the appellant has the burden to prove her affirmative defenses by a preponderance of the evidence. 5 C.F.R. § 1201.56(a). Preponderance of the evidence is defined by regulation as the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.56(c)(2). In addition, the agency must show that the penalty it selected was within the bounds of reasonableness. *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 302, 306 (1981).

<u>The Indefinite Suspension</u>
<u>The agency has established that the appellant was properly placed on indefinite suspension.</u>

Indefinite suspensions can be effected, pending criminal proceedings or inquiry, under certain circumstances in which an agency believes that the employee's retention on active duty could result in damage to Federal property, be detrimental to government interests, or be injurious to the employee, his fellow workers, or the public. 5 C.F.R. §§ 752.401(a)(2), 752.402(e); *Jones v. Department of the Navy*, 48 M.S.P.R. 680, 689 (1991), *Thomas v. General Services Administration*, 756 F.2d 86, 88, cert. denied, 474 U.S. 843, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985). The essential element of a valid indefinite suspension is that it have a condition subsequent that will bring the suspension to an end. *Jones*, 48 M.S.P.R. at 686. The Board has also held that an agency is not required to prove the misconduct at issue in an indefinite suspension, but only examination into that conduct. *Larson v. Department of the Navy*, 22 M.S.P.R. 260 (1984).

Here, the agency issued a notice of proposed indefinite suspension to the appellant pending an investigation into the appellant's allegation that she was not

6

terminated from the State of West Virginia, Division of Corrections, and that she did not falsify her SF-86 that she completed as a part of her employment requirements. IISF, Tab 7, Agency's Response, tab 4(C). The appellant responded to the proposed suspension, and by decision dated June 1, 2004, the agency decided to indefinitely suspend the appellant "pending completion of the Agency's investigatory process and any administrative action that may follow". Id., Agency's Response, tab 4(A).

The record shows that the agency was conducting an investigation into serious allegations concerning information that the appellant had provided on her SF-86 when it made the decision to indefinitely suspend her, and that it had not yet determined what, if any, administrative action would be taken. See Testimony of Lou Widawski and John J. Rooney. It is also undisputed that the appellant was provided with the required procedural safeguards prior to implementing the suspension.[5] I find that the indefinite suspension had an identifiable end, was for such cause as will promote the sufficiency of the service, and that the chosen penalty was reasonable under the circumstances. Accordingly, I find the agency has proven by preponderant evidence that the appellant was properly placed on indefinite suspension effective June 3, 2004.

The Removal Action

The agency has proven its charge by a preponderance of the evidence.

In the October 24, 2003 Notice of Proposed Removal, the agency charged the appellant as follows:

The Office of Personnel Management, on behalf of TSA, conducted a background investigation to determine your suitability for employment and eligibility for access to national security

---

[5] The appellant acknowledged during the telephonic prehearing conference that was held on July 10, 2006, that she is not alleging that there were any procedural errors regarding the indefinite suspension. RAF, Tab 9, Summary of Prehearing Conference.

7

information. The results of the investigation raise serious issues that render you unsuitable for employment.

Reason: Unsuitability for Federal Service

The results of your background investigation revealed the following:

Specification #1: The OPM Investigative Report reflects that you were terminated from employment with State of West Virginia, Department of Military Affairs & Public Safety, Division of Corrections on 05/21/98 for abuse of inmates free time, abuse of inmate privileges, i.e. visits/furloughs, no respect for staff assignments made by the Director of Security, theft of facility food, having inmates drive vehicles, which were not authorized to do so, directing an inmate who was incarcerated for 3rd offense DUI and Driving on a suspended license, to drive personal vehicle (a felony), taking inmates to your home without permission or notification of their whereabouts, taking inmates to the South Charleston Recreational facility without permission or notification of their whereabouts, making improper purchases, utilizing the services of correctional staff and inmates to provide transportation and baby sitting services contrary to law and policy.

Specification #2: On the SF-86 that you signed and completed on 03/24/03, Question #22, Your Employment Record asks, Has any of the following happened to you in the last 7 years? If "Yes," begin with the most recent occurrence and go backward, providing date fired, quit, or left, and other information requested. You responded in the affirmative; however, you listed 08/97 and selected reason #1 - Fired from job with Volunteer's of America, New York, but did not list being Fired from position with State of West Virginia, Department of Military Affairs & Public Safe Division of Corrections in 05/21/98. In your response to this question, you failed to fully disclose information regarding your employment history.

***

All TSA employees are required to demonstrate behavior, which meets federal government standards for trustworthiness, judgment, and reliability. As a federal law enforcement officer, this responsibility and standards are heightened. The above information reported in your background investigation reflects behavior that includes repeated and serious incidents of misconduct, **falsifying a federal document (SF-86)** and renders you unsuitable for employment with TSA.

8

*Emphasis Supplied.* See IRAF, Tab 4, Agency's Response, tab 8.

The agency's charge concerning the appellant's SF-86, is essentially a "falsification" charge.[6] To sustain a falsification charge, the agency must prove by preponderant evidence that appellant knowingly supplied incorrect information with the specific intent of defrauding, deceiving, or misleading the agency. The intent to defraud, deceive, or mislead, is a state of mind which generally is proven by circumstantial evidence. *Haack v. U.S. Postal Service*, 68 M.S.P.R. 275 (1995).

With regard to the first specification of the charge, the appellant argues that she was not terminated from her position with the Department of Corrections in West Virginia, and that she had verbally "resigned" from that position due to a

---

[6] The agency's representative argued in his closing remarks, in essence, that "Specification 1" of the agency's charge was that the OPM Investigative Report reflected that the appellant had been terminated from employment with State of West Virginia, Department of Military Affairs & Public Safety, Division of Corrections, on May 21, 1998, for numerous incidents of misconduct. He asserted that the agency was not charging the appellant with the actual incidents of the misconduct for which she was terminated, and that it is not required to prove that conduct. The appellant's representative argued in her closing remarks that the merits of the charges for which the West Virginia Department of Corrections allegedly terminated her should be adjudicated in this appeal.

The Board has held that an agency is required to state the reasons for a proposed adverse action in sufficient detail to allow the employee to make an informed reply, but that the charge must be viewed in light of the accompanying specifications and should not be technically construed. *Tom v. Department of the Interior*, 97 M.S.P.R. 395 (2004).

Having reviewed the agency's charge as cited in the October 24, 2003 proposal notice, in light of the accompanying specifications, I have determined that this is essentially a "falsification" of an employment application case, despite the fact that the agency's language in the November 18, 2004 decision letter indicated that the agency made findings concerning the merits of the appellant's alleged termination by the West Virginia Department of Corrections. Thus, the agency will not be required to prove the reasons given by the West Virginia Division of Corrections for its decision to "dismiss" the appellant from her position in 1998, and the actual incidents of misconduct charged in support of the dismissal will not be considered to support the removal action.

*i*

9

number of reasons, including, but not limited to, a perceived racially discriminatory and hostile work environment, the notification that her ailing husband (who was then living in New York State) had been diagnosed with a terminal illness and given a short duration of time to live, the announcement of biased and unfounded allegations of misconduct lodged against her (which she contends were concocted by two of her direct supervisors). *See* Remand Removal Appeal File (RRAF), Tab 6, Appellant's Prehearing Submissions. Additionally, the appellant argues that she had no knowledge that her resignation had been recorded as a dismissal by West Virginia Department of Corrections at the time that she completed the employment forms that are at issue in this appeal. *Id*

In response to the agency's proposed removal action, the appellant submitted a sworn Declaration from Otis Cox,[7] dated January 16, 2003. *See* IRAF, Tab 4, Agency's Response, tab 9. In this Declaration, Mr. Cox indicated that a Form WV-11 was required to complete a personnel action, that he was the only official authorized to execute such a document, and that he had not executed a Form WV-11, terminating the appellant.[8] *See id.*

During the hearing, the appellant testified essentially as follows. Her work environment at the West Virginia Department of Corrections was extremely hostile and racist. It was reported that she was going to be made the Warden of the correctional facility, and several individuals orchestrated a smear campaign against her. She was suspended by Mr. Ervin, the Administrator, based on allegations made by an inmate. She subsequently had a conversation with Mr.

*how could one inmate, when in actuality*

---

[7] Mr. Cox stated that between 1997 and 2001, he served as Secretary for Public Safety for the State of West Virginia (a Cabinet level position that reported directly to the Governor), and that he had ultimate responsibility over a number of departments for the State of West Virginia, including the Department of Corrections. IRAF, tab 4, Agency's Response, tab 9.

[8] I note that the record also contain a sworn affidavit from Mr. Cox dated April 27, 2004, the contents of which will be discussed later in this decision.

10

Cox, and although she does not know the exact word she used when speaking with him, it was her understanding that when she left (to take care of her husband), she would not return. She did not put her resignation in writing because she was in an "interim position." She never received a copy of the termination letter that informed her that she was being terminated from her position. The termination letter did not have her apartment number on it, and she was never told orally that she was terminated. She did not commit any of the misconduct charged in the termination letter, with the exception of the charge that she had her driver pick up her daughter from school at 7:00 p.m. one night. She did not carefully read the SF-86 and Declaration forms when she filled them out, as she was preoccupied with personal problems. She did not list her situation with the West Virginia Department of Corrections on the SF-86, because she thought that the "continuation page" on the Optional Form 306 (which she filled out at the same time) was the continuation page for both documents. *See also* the appellant's January 27, 2004 Declaration, RRAF, Tab 8, Appellant's Ex. C.

*I did not list it on the Job field & later on the Federal declaration*

In support of its charge, the agency submitted a copy of a May 21, 1998 letter from Mr. Manfred G. Holland, Deputy Commissioner, to the appellant, in which he dismissed her from her position "effective immediately." IRAF, tab 4, Agency's Response, tab 12. Mr. Holland noted that, on March 3, 1998, the appellant was advised that her acceptance of a limited term/temporary position did not provide her any rights under the Civil Service System. *Id.* Mr. Holland also noted that the appellant was hired as a limited term/temporary employee on March 16, 1998, and that she, therefore, could be released from employment without cause. Mr. Holland, stated, however, that the reason for the appellant's dismissal was his "loss of confidence in his ability to effectively discharge the duties and responsibilities of [her] position," and he reiterated his concerns of: (1) misuse of inmates free time; (2) misuse of inmates privileges, i.e. Visits/Furloughs; (3) utilizing the services of correctional staff and inmates to provide transportation and baby sitting services contrary to law and policy, and

*No way would she have [gotten] this letter and [not] respond just on the suspension - she [wrote?] a book!*

(4) making improper purchases. *Id.* The appellant was also advised that she could either meet with Mr. Holland in person, or present him with a written explanation of the reasons why she might think the action was inappropriate, within 15 days of receipt of the letter. *Id.*

The agency also submitted a copy of a sworn Declaration from Donald M. Ervin, Administrator for the Charleston Work Release Center (the appellant's former immediate supervisor), dated April 22, 2004. *See* IRAF, Tab 4, Agency's Response, tab 10. In his Declaration, Mr. Ervin stated that, during the appellant's employment she was involved in improprieties. *Id.* Mr. Ervin also stated that he suspended the appellant pending the outcome of his investigation, and that as a result of the improprieties, he recommended the appellant's dismissal to the then Deputy Commissioner for the Division of Corrections, Manfred G. Holland. Mr. Ervin additionally stated that Mr. Holland agreed with his recommendations, and that he (Mr. Holland) dismissed (fired) the appellant on May 21, 1998. *Id.*

The agency submitted a sworn affidavit from Manfred G. Holland, former Deputy Commissioner for the Division of Corrections, dated April 22, 2004. *Id.,* tab 11. In his sworn affidavit, Mr. Holland, stated, in pertinent, as follows. While the appellant was in the Program Specialist position at the Charleston Work Release Center, Mr. Ervin advised him that the appellant might possibly be involved in rule violations in the performance of her duties, and he instructed Ms. Ervin to investigate those allegations. *Id.* The outcome of that investigation prompted him to issue the May 21, 1998 letter dismissing the appellant for the reasons outlined in that letter. *Id.* Prior to issuing the termination letter, he spoke with Otis Cox, advising him of the problem with the appellant, and his belief that she should no longer be employed at the Charleston Work Release Center or within the Division. *Id.* Mr. Cox advised him to "do what I had to do." *Id.* He had no knowledge of the appellant resigning, or requesting a resignation in lieu of termination. *Id.*

*where is allegation + the result of the allegations?*

*Talk to Cox clearly states he never Holland re: my termination or alleged [improprieties?]*

In addition, the agency submitted a sworn affidavit from Otis G. Cox, dated

12

April 27, 2004.[9] IRAF, Tab 4, Agency's Response, tab 13. In that affidavit, Mr.
Cox stated, in pertinent part, as follows. He reviewed Mr. Holland's dismissal
letter to the appellant for the first time, because Mr. Holland had not sent him a
copy of the letter. *Id.* If Mr. Holland had discussed the letter with him, he would
have agreed on the dismissal. *Id.* He had assumed that the appellant resigned
because he had never seen Mr. Holland's termination letter, nor had he signed a
WV-11 personnel form indicating a termination. *Id.* His department had a
procedure in place that, on any special hire or dismissal, the Form WV-11 would
come through his office. *Id.* Mr. Holland had been given the signature authority
to hire and to terminate by letter, but in order to close out the personnel action, a
Form WV-11 would have been needed to notify the Division of Personnel, and to
take the appellant off the payroll. *Id.* It appears to him that something fell
through the cracks. *Id.* The letter to the appellant from Mr. Holland was official,
and it will stand as a letter of termination. *Id.* There must be a Form WV-11
some place in the Division of Personnel which brought closure to the appellant's
termination. *Id.* He never discussed with the appellant how she exited the
organization, and he had no mutual agreement with her regarding the issue of her
leaving. *Id.*

Robert J. Scanlon, Division Director, Operational Process & Performance
Metrics, TSA,[10] testified, in pertinent part, as follows. The "Declaration of
Employment," Optional Form 306, is not the document used to initiate
background investigations. *Id.* It is the SF-86 that goes to OPM to initiate
background investigations. *Id.* He believes that both the SF-86 and the Optional

---

[9]   As noted previously, the record also contains a sworn Declaration from Mr. Cox
dated January 16, 2003.

[10]  Mr. Scanlon was formerly the Assistant Director, Personnel Security and
Credentialing Program Office.

13

Form 306 are generally given to employees at the same time. *Id.* He does not know if employees are told that they are "stand alone" documents, but the forms are self instructive as to what information needs to be included on them. *Id.* Information that is not included on the SF-86 would be problematic, because OPM would not be aware of it when conducting its background investigation. *Id.*

Joy Fairtile was the Deputy Director, Office of Transportation Vetting and Credentialing, and she was responsible for the agency's credentialing program during the time period at issue. Ms. Fairtile testified, in pertinent part, concerning the agency's charge as follows. She learned during the appellant's suitability determination that the appellant had been terminated from the West Virginia Department of Corrections. *Id.* This information could have made the appellant unsuitable for employment, and it also may have been a problem for her concerning her eligibility for a security clearance. *Id.* In response to the matter concerning the appellant's employment with the West Virginia Department of Corrections, the appellant claimed that she ran out of room on the SF-86. *Id.* The appellant also claimed that she was not terminated from the position with the West Virginia Department of Corrections, but that she left by mutual decision with Mr. Cox. *Id.* Mr. Cox denied that he made any mutual agreement with the appellant concerning her leaving her employment with that agency. *Id.* The instructions on the SF-86 are in very clear and in plain language, and the form clearly tells you to use additional sheets for additional explanations. *Id.* She concluded that the information concerning the appellant that was provided to the agency as a result of OPM's background investigation was correct. *Id.* Although there was a signature missing from the Office of the Governor on the Form WV-11, that effected the appellant's dismissal from the West Virginia Department of Corrections, they received information that the authority for the personnel action had been delegated. *Id.* Sometimes personnel forms do not contain all signatures that the signature lines on the form provides for. *Id.* She does not recall receiving any evidence indicating that the appellant actually received the

*[handwritten annotations: "were is custody chain", "how could I when I never received letter", "14"]*

termination letter from the West Virginia Department of Corrections, but she does not believe that the appellant did not know that she had been terminated. *Id.*

The agency submitted copies of the "Suitability Worksheet" dated October 21, 2003, in which Personnel Security recommended that the appellant be found unsuitable for employment with the TSA as a Special Agent, because the investigation reflected that she had been terminated from her position with the West Virginia Division of Corrections on May 21, 1998, and because she failed to disclose the termination on her SF-86, dated March 24, 2003. IRAF, Tab 4, Agency's response, tab 8. The agency also submitted a copy of OPM's "Report of Investigation" dated June 11, 2003. *Id.*

*[handwritten annotation: "TSA handle INV not OPM"]*

The record also contains copies of the appellant's SF-86, and her "Optional Form 306," both dated March 24, 2003, that she submitted to the agency. RRAF, Tab 8, Appellant's Ex. C. In addition, the agency submitted a copy of the Form WV-11, effecting the appellant's dismissal from her position with the West Virginia Department of Corrections on May 15, 1998. IRAF, Tab 4, Agency's Response, tab 14. The WV-11 was signed by a "Nancy Swecker" on May 26, 1998, and it contains another signature by an official from the Department of Administration, that is illegible. *[handwritten annotation: "but not found when OPM was investigating - come up when TSA requested"]*

Having considered the record evidence in this appeal, I find that a reasonable person, considering the record as a whole, would accept as sufficient to find it more likely to be true than untrue that Mr. Holland had the authority to dismiss the appellant from her position with the West Virginia Department of Corrections, and that he in fact did so, effective May 15, 1998. In particular, the sworn affidavits and declarations from Messrs. Cox, Ervin and Holland, as well as copies of the May 21, 1998 termination letter and the Form WV-11, effecting the termination, support such a finding. I note that, while the record does not contain any evidence of the appellant's actual receipt of the May 21, 1998 termination letter from the West Virginia Department of Corrections, the record indicates that the appellant was aware that she had been terminated from that

15

position prior to filling out the Form SF-86 that is at issue. The termination letter was apparently sent to the correct address, although the appellant's apartment number may have been omitted.[11]  Nonetheless, I find it unlikely that the apartment number, if missing, would have rendered the termination letter undeliverable, even if it caused a delay.  Moreover, it is implausible that the incumbent of a position at such a high level as the appellant's at the West Virginia Department of Corrections, would not have submitted a resignation in writing, had she actually resigned her position as she contends, which further indicates that she had not resigned, and that she would have known that she had been terminated.

My assessment of the appellant's credibility concerning her contention that she did not have any knowledge that she had been terminated was also significantly affected and diminished by her statement on the "Declaration for Federal Employment," Optional Form 306, which she signed on March 24, 2003. See RRAF, Tab 8, Appellant's Ex. C. On that form, in the "Continuation Space" at Question 16, the appellant listed her position with the West Virginia Department of Corrections, and she stated, in pertinent part:

> Job promised could not be granted-Due to start up cost.  Couple with family stress, relocation, **mutual agreement between Director of Public Safety (Otis Cox) & myself to leave.**_____

See id.  Mr. Cox stated, unequivocally, in his April 27, 2004 affidavit that he never discussed with the appellant how she exited the organization, and he had had "no mutual agreement with her regarding the issue of her leaving." IRAF, Tab 4, Agency's Response, tab 13. I find Mr. Cox's sworn statement in this regard to be more credible than the appellant's statement on her March 24, 2003 Optional Form 306, to the contrary, since the record does not indicate any reason

_[handwritten marginalia: is where is transmittal I find it suspect that Holland sent me a memorandum letter + didn't do W.V.41 which was required]_

_[handwritten marginalia right side: He also stated he had no conversation with Holland at WV]_

---

[11]  The appellant testified that her apartment number was omitted from the address on the May 21, 1998 termination letter, and thus, it is possible that the apartment number was also omitted from the mailing address on the envelope.

*Do not now works for OPM/TSA doing background invest*

why Mr. Cox would have had to be untruthful concerning the matter. I note also in this regard that the appellant testified that she and Mr. Cox were "close personal friends," and the record indicates that Mr. Cox is no longer employed with the State of West Virginia in any capacity.[12] I note also that the appellant's credibility concerning her lack of any knowledge that she had been terminated by the West Virginia Department of Corrections was also significantly diminished by what I found to be her inconsistent and contradictory testimony at the hearing concerning her alleged "mutual agreement" with Mr. Cox to leave her position.

With regard to Specification 2 of its charge, I find the appellant's explanation that she did not put anything information about her position with the West Virginia Department of Corrections on the SF-86, at Question 22, because she was preoccupied with personal problems, because she did not carefully read the SF-86 and Optional Form 306 when she filled them out, because she ran out of space when filling out Question No. 22 on the SF-86, and because she believed that the SF-86 and the Optional Form 306 were a part of the same documents, and that she put the information on the "continuation sheet" on the Optional Form 306, to be unpersuasive. I have reviewed the directions on the SF-86, at Question 22, which the appellant signed on March 24, 2003, and I find that the directions clearly instructed her to disclose that any of the following that had happened to her in the last 7 years, including that she had been "fired from a job," that she "quit after being told that [she would] be fired," that she left a job by mutual agreement following allegations of misconduct," that she "left a job by mutual Agreement following allegations of unsatisfactory performance," or that she "left a job for reasons under unfavorable circumstances." RRAF, Tab 8, Appellant's Ex. C. The instructions on the SF-86 also clearly informed the appellant that she

---

[12]  Mr. Cox stated in his April 27, 2004 Affidavit that he has been employed as the Deputy Administrator, National Highway Traffic Safety Administration, U.S. Department of Transportation since June 15, 2003.

17

was to provide "additional answers" to "other items," which would have included a continuation of her answer to Question 22, on page 9, at the end of the form. It is unlikely, given the clear instructions on the form, that the appellant would have believed that the SF-86 and the Optional Form 306 were a part of the same documents, and that she correctly put the information concerning her employment with the West Virginia Department of Corrections on the "continuation sheet" of the Optional Form 306, and omitted the information from the SF-86. I agree with the agency that such an error by the appellant is even more implausible, in light of the nature of her position as Criminal Investigator, and the necessity that the incumbent of such a position be meticulous when filling out such forms. I note also that the appellant certified on the SF-86, that her statements that she provided on that form were true, complete and correct to the best of her knowledge and belief, and that she was aware that knowing and willful false statements are punishable by fines and/or imprisonment.

It is important to note that, even if I were to believe the appellant's arguments that she "resigned" (and was not terminated) from her position with the West Virginia Department of Corrections, that she ran out of space when filling out Question No. 22 on the SF-86, that because she believed that the SF-86 and the Optional Form 306 were a part of the same documents, and that consequently, she put the information on the "continuation sheet" of the Optional Form 306 instead of the SF-86, the record evidence indicates that the information that she provided on the Optional Form 306, was nonetheless untruthful. As discussed previously, the instructions on the SF-86, required that the appellant disclose any of the following that had happened to her in the last 7 years, including that she had been "fired from a job," that she "quit after being told that [she would] be fired," that she left a job by mutual agreement following allegations of misconduct," that she "left a job by mutual Agreement following allegations of unsatisfactory performance," or that she "left a job for reasons under unfavorable circumstances." The appellant admits that she had received

notice from the West Virginia Department of Corrections concerning the allegations of misconduct that ultimately resulted in her termination, and that she had been suspended during the investigation of those allegations. The appellant, however, failed to provide information on **both** the SF-86 and the Optional Form 306, concerning the misconduct allegations, when clearly such information was required by Question 22 on the SF-86, under code (3) left a job by mutual agreement following allegations of misconduct, code (4) left a job by mutual agreement following allegations of unsatisfactory performance, and code (5) left a job for other reasons under unfavorable circumstances. Moreover, as I previously found, the information concerning her employment with the West Virginia Department of Corrections that the appellant did provide on the Optional Form 306 was false, namely that there was "**mutual agreement between Director of Public Safety (Otis Cox) & myself to leave.**"

For all of the above reasons, I find that that appellant knowingly supplied incorrect information on her March 24, 2003 SF-86. See *Haack v. U.S. Postal Service,* 68 M.S.P.R. 275; *See Pappas v. Office of Personnel Management,* 76 M.S.P.R. 152, 158-59 (1997). I also find that the agency correctly determined that the appellant was unsuitable for the Criminal Investigator position based on her falsification of that document, and the charge is sustained.

<u>Nexus</u>

Appellant did not specifically raise an issue regarding nexus. In any event, I find that falsification of an SF-86, as here, has an inherently adverse affect on the efficiency of the service, as it raises serious doubts about an appellant's honesty and fitness for employment. *See, e.g., Scott v. Department of Justice,* 69 M.S.P.R. 211, 242 (1995), *aff'd,* 99 F.3d 1160 (Fed. Cir. 1996) (Table).

<u>Appellant failed to prove her affirmative defenses</u>

During the prehearing conference held on July 10, 2006, I informed the parties that I would adjudicate only those affirmative defenses that were

discussed, clarified and memorialized in the summary of that conference. See RRAF, Tab 9. The appellant clarified that she is alleging discrimination (disparate treatment) on the basis of race (African American), and sex (female), in connection with her removal. The appellant also claimed that the agency retaliated against her because of her prior EEO activities in October of 2003, and that she filed a formal EEO complaint at that time.

Race and Sex Discrimination

To establish a prima facie case of unlawful discrimination based on race and sex through circumstantial evidence, an appellant must show: (a) that she is a member of a protected group; (b) that she was similarly situated to an individual who was not a member of her protected group; and (c) that she was treated more harshly or disparately than the individual who was not a member of her protected group. See Buckler v. Federal Retirement Thrift Investment Board, 73 M.S.P.R. 476, 497 (1997).

Once the appellant has established a prima facie case, the burden of going forward shifts to the agency to produce evidence showing a legitimate nondiscriminatory reason for the different treatment. See Creer v. U.S. Postal Service, 62 M.S.P.R. 656, 661 (1994). It can do this by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for its action, regardless of whether the agency actually proves its case. Id. The appellant must then prove the agency's reason is merely a pretext for prohibited discrimination. Id. The appellant must show both that the stated reason was false, or not the real reason for the action, and that discrimination was the real reason for the action. See Buckler, 73 M.S.P.R. at 497 [citing St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)].

In order to be similarly situated, the comparator employee must be in the same work unit, must have the same supervisors, and the misconduct must be substantially similar. See Brown v. Defense Logistics Agency, 65 M.S.P.R. 436, 445 (1994), aff'd, 67 F.3d 319 (Fed. Cir. 1995) (Table); Thomas v. Department of

20

*Defense*, 66 M.S.P.R. 546, 551, *aff'd*, 64 F.3d 677 (Fed. Cir. 1995); *Archuleta v. Department of the Air Force*, 16 M.S.P.R. 404, 407 (1983).

When questioned concerning alleged similarly situated employees, the appellant named a coworker, Janice[13] Palvick (a white female), a Special Agent, who she claimed was employed in the same division as she. *See* RRAF, Tabs 7 and 9. After the prehearing telephone conference held on July 10, 2006, by submission of that same date, the appellant additionally alleged that Ed Gomez, a Director who she stated was employed in the San Francisco area, should be deemed an appropriate comparator as well. *See* RAF, Tab 7.

With regard to Mr. Gomez, however, it appeared that he did not work in the same work unit as the appellant, or that he had the same supervisor. Thus, the appellant has not shown that he was a comparator employee.

By submission dated July 17, 2006, the agency moved to exclude Janice Pavlick as an approved witness for the appellant, arguing that she was not similarly situated to the appellant. RRAF, Tab 10. The agency argued that, since July of 2002, Ms. Pavlick has been a supervisor, unlike the appellant who has never served as a supervisor. *Id.* The agency also argued that Ms. Pavlick has never been supervised by either the proposing or the deciding official who were involved in the appellants' removal. *Id.* Additionally, the agency argued that unlike the appellant, Ms. Pavlick never experienced any problems regarding the completion of her SF-86, nor was she ever terminated from a prior position for misconduct. *Id.*

While the appellant alleged that Ms. Pavlick was a comparative employee for her disparate treatment claim, she has not disputed the agency's proffer concerning the above matters, nor has she met her burden in this regard. In any

---

[13] The appellant named a "Janice Plavick" during the July 10, 2006 prehearing telephone conference, as a similarly situated employee, but subsequently informed me by submission dated July 10, 2006, that the employee's name is "Janice Plavick".

event, the agency has articulated a legitimate nondiscriminatory reason for its actions (the unsuitability charge which I have sustained), and the appellant has not established that the agency's charges constitutes a pretext for discrimination. Thus, the appellant's affirmative defenses of discrimination fail.

Reprisal for EEO Activity

To establish retaliation for EEO complaint activities, appellant must show that she engaged in protected activity; the accused official or officials knew of the activities; the agency action under review could have been retaliation under the circumstances; and after carefully weighing the motive to retaliate, that there is a genuine nexus between the alleged retaliation and the disputed agency action. *See Trammell v. Department of Veterans Affairs*, 60 M.S.P.R. 79, 88-89 (1993). In determining whether the appellant has established a nexus between the alleged retaliation and the adverse action, the Board must weigh the intensity of the motive to retaliate against the gravity of the misconduct. *Id.* The proper perspective for this determination is the gravity of the misconduct as it appeared to the deciding official at the time he took the action. *Jefferson*, 81 M.S.P.R. at 612.

The appellant argued that she filed a formal EEO complaint in October of 2003, and she clarified during the prehearing conference that a Hector Santana was the management official who she is claiming retaliated against her because of her EEO activities. *See* AF, Tab 9. The appellant, however, has failed to show that Hector Santana played any role in Ms. Fairtile's (the deciding official's) decision to remove her. Moreover, Ms. Fairtile testified that she did not know that the appellant had filed an EEO complaint when she made the decision to remove her, and the record does not indicate otherwise. Thus the appellant failed to meet her burden of showing that there was a genuine nexus between the alleged retaliation and her removal action, and her defense of retaliation thus fails.

22

<u>The penalty</u>

Penalty determinations are judgment calls within the discretion of the employing agency. *LaChance v. Devall*, 178 F.3d 1246, 1251 (Fed. Cir. 1999). The Board may not independently determine penalties. *Id.* at 1259. Rather, in a case in which all of the charges against an appellant are sustained, the Board reviews the penalty selection to determine whether it is so excessive as to be an abuse of discretion or is otherwise arbitrary, capricious, or unreasonable. *Douglas*, 5 M.S.P.R. at 302. In such cases, the Board will review an agency-imposed penalty to determine if the agency conscientiously considered all of the relevant mitigating factors and exercised management discretion within tolerable limits of reasonableness. *Id.* at 306.

In conducting its review, the Board will weigh these factors with the agency's discretionary authority to carry out its managerial functions in maintaining employee discipline and overall efficiency. *Id.* at 302. The Board's function in this regard is not to displace management's responsibility, but to assure that managerial judgment has been properly exercised. *Id.* Thus, the Board will modify a penalty only when it finds that the agency failed to weigh the relevant factors or that the agency's judgment clearly exceeded the bounds of reasonableness. *Hylick v. Department of the Air Force*, 85 M.S.P.R. 145, 153 (2000).

In evaluating a penalty determination, the Board will consider, first and foremost, the nature and seriousness of the misconduct and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or was frequently repeated. *Hylick*, 85 M.S.P.R. at 153.

There is no *per se* rule that removal is always warranted where an employee has falsified documents. *Perez v. U.S. Postal Service*, 75 M.S.P.R. 503, 506 (1997). However, the Board has held that law enforcement positions require a higher standard of conduct and degree of trust. *See, e.g., Padilla v.*

*Department of Justice*, 64 M.S.P.R. 416, 423 (1994), *aff'd*, 64 F.3d 676 (Fed. Cir. 1995) (Table).

In her November 18, 2004 decision letter, Ms. Fairtile stated that the appellant's conduct was serious, and that it called into question her judgment, integrity veracity and trustworthiness. IRAF, Tab 4, Agency's Response, tab 8. Ms. Fairtile also stated that, as a Federal law enforcement officer, the appellant should be held to the highest standards of conduct and performance. *Id.* Additionally, Ms. Fairtile noted that the appellant had expressed no remorse, and that she had not taken any responsibility for her actions. *Id.*

During her testimony, Ms. Fairtile stated that she does not believe that the appellant would have been offered her position, had the agency knew of her situation with the West Virginia Department of Corrections. Ms. Fairtile also stated that she considered the appellant's 5 years of service, but that her length of service was outweighed by her misconduct. She also testified that she considered that, in June of 2003, the appellant had been previously suspended for a five day period, for "violation of travel card policy." *See* RAF, Tab 13.

While I have also considered all of the appellant's defenses raised in connection with the agency's charge in my determination of the reasonableness of the penalty imposed in this case, I find that removal is reasonable under all of the circumstances. The appellant's falsification of an SF-86, a form which was required for her law enforcement position, unfortunately, directly implicates her honesty and fitness for employment. *Pappas*, 76 M.S.P.R. at 161; *Hanker v. Department of the Treasury*, 73 M.S.P.R. at 168; *Devitto v. Office of Personnel Management*, 61 M.S.P.R. 297, 302 (1994).

24

For all of these reasons, I find that the agency considered the relevant *Douglas* factors, and the penalty of removal is reasonable under the specific circumstances of this case.

## DECISION

Both the agency's indefinite suspension and removal actions are AFFIRMED.

FOR THE BOARD:

_____ /S/ _____
Michelle M. Hudson
Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **October 11, 2006**, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. You must establish the date on which you received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Equal Employment Opportunity Commission (EEOC) or with a federal court. The paragraphs that follow tell you how and when to file with the Board, the EEOC, or the federal courts. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

# BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file your petition with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.,
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. If you claim that you received this decision more than 5 days after its issuance, you have the burden to prove to the Board the date of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or e-mail is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. If the petition is filed by e-mail,

and the other party has elected e-Filing, including the party in the address portion of the e-mail constitutes a certificate of service.

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION REVIEW

If you disagree with the Board's final decision on discrimination, you may obtain further administrative review by filing a petition with the EEOC no later than 30 calendar days after the date this initial decision becomes final.  The address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 19848
Washington, D.C.  20036

## JUDICIAL REVIEW

If you do not want to file a petition  with the EEOC, you may ask for judicial review of both discrimination and nondiscrimination issues by filing a civil action.  If you are asserting a claim under the Civil Rights Act or under the Rehabilitation Act, you must file your appeal with the appropriate United States district court as provided in 42 U.S.C. § 2000e-5.  If you file a civil action with the court, you must name the head of the agency as the defendant.  *See* 42 U.S.C. § 2000e-16(c).   To be timely, your civil action under the Civil Rights Act, 42 U.S.C. § 2000e-16(c) must be filed no later than 30 calendar days after the date this initial decision becomes final.  If you are asserting a claim under the Age Discrimination in Employment Act, your claim must be filed with the appropriate United States district court as provided in 29 U.S.C. § 633a(c).  In some, but not all districts you may have up to 6 years to file such a civil action.  *See* 28 U.S.C. § 2401(a).

If you choose not to contest the Board's decision on discrimination, you may ask for judicial review of the nondiscrimination issues by filing a petition with:

The United States Court of Appeals
for the Federal Circuit
717 Madison Place, NW.
Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be <u>received</u> by the court no later than 60 calendar days after the date this initial decision becomes final.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our website, <u>http://www.mspb.gov.</u> Additional information is available at the court's website, <u>http://fedcir.gov/contents.html</u>. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's <u>Rules of Practice</u>, and Forms <u>5</u>, <u>6</u>, and <u>11</u>.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

### Appellant

Electronic Mail

Linda Y. Cruz-Packer
4800 Megan Drive
Clinton, MD 20735

### Appellant Representative

Electronic Mail

Crystal A. G. Fisher, Esq.
Carolyn Eaglin & Associates
431 North Lee Street
Alexandria, VA 22314

### Agency Representative

U.S. Mail

Bryan A. Bonner, Esq.
Remy Savin
Department of Homeland Security
Office of Chief Counsel
Transportation Security Administration
TSA Headquarters, East Tower
601 S. 12th Street, 12th Floor
Room 214S, TSA-2
Arlington, VA 22202-4220

September 6, 2006
(Date)

Sheila R. Stanton
Paralegal Specialist

# U.S. MERIT SYSTEMS PROTECTION BOARD

**Office of the Clerk of the Board**

1615 M Street, N.W.
Washington, D.C.  20419-0002
Phone: 202-653-7200; Fax: 202-653-7130; E-Mail: mspb@mspb.gov

April 4, 2007

Mr. Robert J. Barnhart, Director
Compliance and Control Division
Equal Employment Opportunity
Commission
PO Box 19848
Washington, DC 20036

EEOC Docket No:     0320070050
MSPB Docket No:     DC-0752-05-0636-B-1

RE: Linda Y. Cruz-Packer v. Department of Homeland Security

Dear Mr. Barnhart:

Because the appellant in the case shown above has filed an appeal with your office, we are enclosing a copy of the Board's administrative record of the appeal. We certify that the record is an accurate copy. This record is under my official custody and control on this date. If you have any questions regarding this record, please contact us.

The Board keeps the record in this appeal in a system of records subject to the Privacy Act, 5 U.S.C. 552a. The record is a part of a system of records entitled "Appeal and Case Records" announced by the Board in 61 FR 33946 dated July 1, 1996 as required by the Privacy Act. An MSPB case file does not constitute a public record because of its coverage under the Privacy Act. MSPB initial and final decisions in a case are public records. Only MSPB initial and final decisions in a case are public records. Access to MSPB case files is controlled in accordance with the law to protect the privacy interests of the subjects and the integrity of the files.

In your request for the record, you also asked the Board to inform you "if, and/or when a civil action or an action for review before the Federal Circuit Court in this case has been filed." We will inform you when we know that an appeal has been filed in the Federal Circuit. However, this office is not routinely informed when a civil action is filed and you may wish to contact the parties to obtain this information.

Sincerely,

Bentley M. Roberts, Jr.
Clerk of the Board

Enclosures: 8 volumes; 5 tapes

cc:     Linda Y. Cruz-Packer
        4800 Megan Drive
        Clinton, MD 20735

        Crystal A. G. Fisher, Esq.
        Carolyn Eaglin & Associates
        8502-B Lee Hwy.
        Fairfax, VA 22031

        Dept. of Homeland Security
        TSA
        OCR – West Tower, 2nd Fl. So.
        601 S 12th St. #TSA-6
        Arlington, VA 22202-4220

        Dept. of Homeland Security
        Office Civil Rights & Civil
        Liberties
        Daniel Sutherland, Director
        Washington, DC 20528

Exhibit 11

THIS IS AN IMPORTANT RECORD
SAFEGUARD IT.

| PERSONAL DATA | 1 LAST NAME FIRST NAME MIDDLE<br>CRUZ LINDA YVETTA | 2 SERVICE NUMBER<br>NA | 3 SOCIAL SECURITY NUMBER<br>411 86 649 |
|---|---|---|---|

| 4 DEPARTMENT, COMPONENT AND BRANCH OR CLASS<br>ARMY-RA-WC | 5a. GRADE, RATE OR RANK<br>PFC | b PAY<br>GRADE<br>E-3 | 6 DATE<br>OF<br>RANK<br>DAY 20 | MONTH MAY | YEAR 19 |
|---|---|---|---|---|---|

| 7 U S CITIZEN<br>☑ YES ☐ NO | 8 PLACE OF BIRTH (City and State or Country)<br>CLARKSVILLE TN | 9 DATE<br>OF<br>BIRTH<br>DAY 20 | MONTH MAY | YEAR 19 |
|---|---|---|---|---|

| SELECTIVE SERVICE DATA | 10a SELECTIVE SERVICE NUMBER<br>NA | b SELECTIVE SERVICE LOCAL BOARD NUMBER CITY, COUNTY STATE AND ZIP CODE<br>LB #NA | c DATE INDUCTED<br>DAY - MONTH - YEAR - NA |
|---|---|---|---|

| TRANSFER OR DISCHARGE DATA | 11a. TYPE OF TRANSFER OR DISCHARGE<br>DISCHARGED | b STATION OR INSTALLATION AT WHICH EFFECTED<br>FORT DIX NEW JERSEY |
|---|---|---|

| c REASON AND AUTHORITY<br>AR 635-200 SPN 220 | d<br>EFFECTIVE<br>DATE<br>DAY 3 | MONTH JUL | YEAR 197 |
|---|---|---|---|

| 12 LAST DUTY ASSIGNMENT AND MAJOR COMMAND<br>USATRESTA FT DIX NJ 1A | 13a CHARACTER OF SERVICE<br>HONORABLE | b TYPE OF CERTIFICATE ISS<br>DD FORM 256. |
|---|---|---|

| 14 DISTRICT, AREA COMMAND OR CORPS TO WHICH RESERVIST TRANSFERRED<br>NA | 15 REENLISTMENT CODE<br>RE-3 |
|---|---|

| SERVICE DATA | 16 TERMINAL DATE OF RESERVE<br>UMT&S OBLIGATION<br>MONTH / YEAR | 17. CURRENT ACTIVE SERVICE OTHER THAN BY INDUCTION<br>a SOURCE OF ENTRY<br>☑ ENLISTED (First Enlistment) ☐ ENLISTED (Prior Service) ☐ REENLISTED<br>☐ OTHER | b TERM OF<br>SERVICE<br>(Years)<br>3 | c DATE OF ENTRY<br>DAY 3 | MONTH JAN | YEAR 19 |
|---|---|---|---|---|---|---|

| 18 PRIOR REGULAR ENLISTMENTS<br>NONE | 19 GRADE RATE OR RANK AT TIME OF<br>ENTRY INTO CURRENT ACTIVE SVC<br>PV-1 | 20. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City and State)<br>NASHVILLE TN |
|---|---|---|

| 21 HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE<br>(Street RFD, City, County, State and ZIP Code)<br>104 CHARLEMAGNE BLVD<br>CLARKSVILLE(MONTGOMERY) TN 37046 | 22 | STATEMENT OF SERVICE | YEARS | MONTHS | D |
|---|---|---|---|---|---|
| | CREDITABLE<br>FOR BASIC PAY<br>PURPOSES | (1) NET SERVICE THIS PERIOD | 1 | 6 | |
| 23a SPECIALTY NUMBER & TITLE<br>75C20 15MAY73<br>SEE 30 | b RELATED CIVILIAN OCCUPATION AND<br>D O T NUMBER<br>166,268<br>EMP INT | (2) OTHER SERVICE | 0 | 0 | 0 |
| | | (3) TOTAL (Line (1) plus Line (2)) | 1 | 6 | |
| | | e TOTAL ACTIVE SERVICE | 1 | 6 | |
| | | f FOREIGN AND/OR SEA SERVICE | 0 | 0 | 0 |

| 24 DECORATIONS MEDALS BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED<br>NATIONAL DEFENSE SERVICE MEDAL |
|---|

| 25 EDUCATION AND TRAINING COMPLETED<br>PERS SPEC 71H20 8WKS 72<br>PERS MGT SPEC 71H30 3WKS 72 |
|---|

| VA AND EMP SERVICE DATA | 26a NET PAY PERIODS TIME LOST (Preceding<br>Two Years)<br>NA | b DAYS ACCRUED LEAVE PAID<br>NONE | 27a INSURANCE IN FORCE<br>(NSLI or USGLI)<br>☐ YES ☑ NO | b AMOUNT OF ALLOTMENT<br>NA | c MONTH ALLOTM<br>DISCONTINUED<br>NA |
|---|---|---|---|---|---|
| | | 28. VA CLAIM NUMBER<br>NA<br>c | 29 SERVICEMEN'S GROUP LIFE INSURANCE COVERAGE<br>☑ $15,000 ☐ $10,000 ☐ $5,000 ☐ NONE | | |

| REMARKS | 30 REMARKS<br>CIV ED: 116 SH      23A PERS MGT SPEC ES NONE<br>BLOOD GP: O POS      TABLE 2-5 AR 601-210 APPLIES |
|---|---|

| AUTHENTICATION | 31 PERMANENT ADDRESS FOR MAILING PURPOSES AFTER TRANSFER OR DISCHARGE<br>111 MELLINGTON HILL ST<br>BOSTON(SUFFOLK)MA 02126 | 32 SIGNATURE OF PERSON BEING TRANSFERRED OR DISCHARGED<br>Linda Cruz |
|---|---|---|
| | 33 TYPED NAME, GRADE AND TITLE OR AUTHORIZING OFFICER<br>G E CARTER CW3 USA<br>ASST CHIEF ENL BRANCH | 34 SIGNATURE OF OFFICER AUTHORIZED TO SIGN<br>G E Carter |

DD FORM
JUL 70 214      PREVIOUS EDITION OF THIS FORM IS TO BE USED

ARMED FORCES OF THE UNITED STATES
REPORT OF TRANSFER OR DISCHARGE

# TRANSPORTATION SECURITY ADMINISTRATION

## Credentialing Program Office

## <u>Affidavit</u>

State of:  <u>Washington, DC</u> )

                                           ss:

County of:  _____ )

I, <u>Otis G. Cox</u> , being duly sworn, hereby make the following statement to <u>Steve Geary</u> , who has identified himself/herself to me as a special agent with TSA Credentialing Program Office.  I am making this statement of my own free will, without any duress or coercion.

My name is Otis G. Cox, Jr., and I currently serve as the Deputy Administrator, National Highway Traffic Safety Administration, U.S. Department of Transportation, and have served in this position since June 15, 2003.

I served as the Cabinet Secretary for Public Safety and Military Affairs, for the State of West Virginia, from February 1997 until February 2001.  As the Cabinet Secretary, I had ultimate responsibility over a number of departments of the State of West Virginia, which included the Department of Corrections, the West Virginia State Police, the West Virginia National Guard, the Regional Jails Authority and the State Capital Security Agency.

This affidavit is concerning my role with the Department of Corrections and the knowledge I had with the resignation of Linda Cruz Packer.

In 1998, I recommended to William (Bill) Davis, Commissioner of the Department of Corrections that he take look at Linda's resume for a possible position in Corrections. About two months after bringing her on board, Bill came to me with a film and advised me that Linda's supervisor was complaining of Linda taking food from the dining room refrigerator.  I reviewed the film and noted Linda removing food from the refrigerator. After I reviewed the entire film and the film from the remainder of the week, I advised Bill we could not use this information because it appeared that all of the staff were going in and out of the refrigerator.  Bill advised me that there were some other issues and he would get back to me.  Bill and I never discussed Linda again.  However, when Bill was leaving my office I advised him to do whatever was necessary to correct the situation.

Page 2 of 2

OC

I reviewed Manfred Holland's letter to Linda today where he advised Linda she was being dismissed from Corrections. Mr. Holland had not sent me a copy of this letter and this was the first time I reviewed the letter. If Mr. Holland had discussed the letter with me, I would have agreed on the dismissal. All of this time I have assumed that she resigned because I never saw Deputy Commissioner Holland's letter and never saw or signed the WV-11 personnel action form indicating a termination. My department had a procedure in place that on any special hire or dismissal the WV-11 would come through the Secretary's office. Without seeing the WV-11 indicating a dismissal, I will have to assume that Linda resigned from Corrections.

Mr. Holland was given the signature authority to hire and to terminate by letter. However, to close out the personnel action, a WV-11 would have been needed to notify the Division of Personnel and to have taken Linda off payroll. It appears to me that something fell through the cracks. The letter to Linda from Mr. Holland was official and will stand as a letter of termination. There must be a WV-11 some place in the Division of Personnel which brought closure to Linda's termination.

I never discussed with Linda how she exited the organization and I had no mutual agreement with her regarding the issue of her leaving. *OC*

OC

Initials: _OC_

I have read the above statement consisting of 2 page(s) and I have been given an opportunity to make corrections. All of the facts contained herein are true and correct to the best of my knowledge.

_Otis G. Cuff_
(Affiant Signature)

_Bernadette W. Millinger_
(Witness Signature)

Signed and sworn before me
This 27th day of APRIL, 2004

_Steve Leary_ S/A, TSA CPO
Name, Title, Transportation Security Administration

(Authority to administer
oaths: Title 5, Sec: 303)

Exh. h. t. T

EXHIBIT K

# PERSONNEL ACTION FORM

M----2/CWR

REFERENCE NUMBER

EMPLOYEE NAME: Cruz-Packer, Linda

(LAST)    (FIRST)    (MIDDLE)

SOC. SEC. NO.: 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

ADDRESS: 306 Grandview Pointe

Dunbar, WV 25054

COUNTY: _____ DATE OF BIRTH: _____ SEX: _____ RACE: _____

DEPARTMENT OF: MAPS

Corrections

DIVISION NAME: Chas. Work Rel.

ORG NO.: 0308

EMPLOYMENT DATE: _____

## TYPE OF CHANGE

- ☐ NEW EMPLOYMENT
  - ☐ FILL VACANT POSITION
  - ☐ DATE OF VACANCY _____
  - ☐ NEW HIRE    ☐ OA
  - ☐ PROBATIONARY-REQ. _____
  - ☐ PROVISIONAL-REQ. _____
  - ☐ REINSTATEMENT
  - ☐ RETURN TO DUTY _____
  - ☐ PERMANENT ☐ FT   ☐ PT
  - ☒ TEMPORARY ☒ FT   ☐ PT
  - ☐ INTERMITTENT-REQ. _____
  - ☐ 6-MO. TEMP.-REQ. _____
  - ☐ CLASSIFIED EXEMPT
  - ☐ 30-DAY   ☐ 90-DAY   ☒ 60-DAY
  - ☐ STUDENT EXEMPT
  - ☐ PROFESSIONAL PT EXEMPT
- ☐ SEPARATION CODE
  - ☐ TRANS. TO _____
  - ☐ TRANS. FROM _____
  - ☐ RESIGNATION    ☐ DISMISSAL
  - ☐ TERMINATION    ☐ LAYOFF
  - ☐ RETIREMENT    ☐ DEATH
  - ☐ LEAVE OF ABSENCE ☐ SUSPENSION
  - FROM _____ TO _____
  - ☐ MEDICAL    ☐ PERSONAL
  - ☐ MILITARY    ☐ WC   ☐ ED
  - ☐ PARENTAL    ☐ UL
  - ☐ LAST WORKING DAY _____
  - ☐ LAST DAY ON PAYROLL _____
  - ☐ LEAVE PAID _____
  - ☐ LEAVE BALANCE(S)
  - AL _____ SL _____
- ☐ OTHER
  - ☐ REQUEST NEW POSITION
  - ☐ POSITION UPGRADE
  - ☐ FUNDING SOURCE   ☐ UNIT CODE ONLY
  - ☐ CERTIFIED PERMANENT
  - ☐ SALARY ADJ    ☐ LONG. INC.
  - ☐ SALARY ADVANCE/MERIT _____ %
  - ☐ PROMOTION   ☐ DEMOTION
  - ☐ RECLASSIFICATION ☐ REALLOCATION
  - ☐ TEMPORARY UPGRADE
  - ☐ LATERAL CLASS CHANGE
  - ☐ NAME CHANGE-FORMER _____
  - ☐ ADDRESS-FORMER _____
  - ☐ PT TO FT   ☐ FT TO PT   ☐ PT TO PT

## CURRENT BUDGET INFORMATION

Re: Shawn Denslow

POS. #: 151    PAYROLL TITLE: CO99999    WAGE/HR STATUS: C    EFFECTIVE DATE:

NO. PAY PERIODS: 24    HOURLY: Y    N X    RATE: 13.52    BASE MONTHLY RATE: 2,344.00

DOP COVERED/EXEMPT: E    EEO-4 CODE:    CLASS NO.: 3923    PAY GRADE: 11    STEP:

| ACCOUNT NO. | | | | | | | |
|------|-----|------|------|-----------|------|-------------|--------|
| FUND | FY | ORG | ACT | UNIT CODE | FTE | ANNUAL BASE | INCRE. |
| 1250 | 98 | 1608 | 001 | 302-000 | 1.00 | 28,131.00 | 0 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## PROPOSED BUDGET INFORMATION

POS. #:    PAYROLL TITLE:    WAGE/HR STATUS:    EFFECTIVE DATE: 7- -98

NO. PAY PERIODS:    HOURLY: Y    N    RATE:    BASE MONTHLY RATE:

DOP COVERED/EXEMPT:    EEO-4 CODE:    CLASS NO.:    PAY GRADE:    STEP:

| ACCOUNT NO. | | | | | | | |
|------|-----|------|------|-----------|------|-------------|--------|
| FUND | FY | ORG | ACT | UNIT CODE | FTE | ANNUAL BASE | INCRE. |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## DEPARTMENT OF ADMINISTRATION USE ONLY

☐ PENDING    DATE/BY 3-4-98

☐ APPROVED    DATE/BY 3-11-98

### DIVISION OF PERSONNEL USE ONLY

☐ APPROVED    ☐ DISAPPROVED    ☐ NOTED

SIGNATURE: _____

DATE: 3-10-98

## JUSTIFICATION

To primary employment    4-1

AGENCY SIGNATURE - AREA OFFICE    (DATE)

DIVISION

_William R. Davis_    3/5/98

DIVISION SIGNATURE    (DATE)

## APPROVALS

DEPT. SECRETARY/GOVERNOR

_Otis X. Cr Jr._    DATE 3/6/98

DEPARTMENT OF ADMINISTRATION

_____



**STATE OF WEST VIRGINIA**
**DEPARTMENT OF MILITARY AFFAIRS & PUBLIC SAFETY**
**DIVISION OF CORRECTIONS**

*CECIL H. UNDERWOOD*
*GOVERNOR*

*WILLIAM K. DAVIS*
*COMMISSIONER*

*OTIS G. COX, JR.*
*SECRETARY*

OFFICE OF THE COMMISSIONER
112 CALIFORNIA AVENUE-STATE CAPITOL COMPLEX
BUILDING 4, ROOM 300
CHARLESTON, WV 25305-0280
(304) 558-2036 Telephone - (304) 558-5834 Fax

May 21, 1998

Ms. Linda Cruz-Packer
306 Grandview Pointe
Dunbar, West Virginia 25064

Dear Ms. Cruz-Packer:

This letter is to inform you of my decision to dismiss you from your limited term/temporary position as Corrections Program Specialist with the West Virginia Division of Corrections, Charleston Work Release Center. The dismissal shall be effective immediately.

As you are aware, you were hired as a limited term/ temporary employee on March 16, 1998 at noon. On March 3, 1998, you were advised that acceptance of a limited term/ temporary position did not provide you any rights under the Civil Service System (Division of Personnel). Therefore, you may be released from employment without cause. Nevertheless, I wish to share with you that the reason for this action is my loss of confidence in your ability to effectively discharge the duties and responsibilities of your position. The following is submitted to reiterate my concerns:

* Misuse of inmates free time

* Misuse of inmate privileges, i.e. Visits/Furloughs

* Utilizing the services of correctional staff and inmates to provide transportation and baby sitting services contrary to law and policy.

* Making improper purchases

EXhibit L

U.S. Department of Homeland
Security
Arlington, VA 22202



**Transportation
Security
Administration**

June 1, 2004

TO:        Linda Cruz-Packer
           Special Agent
           Office of Internal Affairs and Program Review

FROM:      John J. Rooney
           Director, Office of Internal Affairs and Program Review

SUBJECT:   Decision on Proposed Indefinite Suspension

On April 15, 2004, the Transportation Security Administration (TSA) issued a notice proposing
your indefinite suspension from Federal service. I considered and evaluated all the available
information in this matter, including your April 30, 2004, written reply and your oral reply
presented on May 14, 2004, to the proposed action. Based on my review, I have decided to
indefinitely suspend you from your TSA position. This action is being taken to promote the
efficiency of the Federal service.

In your written and oral replies, you stated that the proposal to indefinitely suspend you violates
federal personnel law and TSA Management Directive (MD) 1100.75-1. You asserted that the
evidence you provided in response to the proposed removal was conclusive and discredited this
action. You stated that you were not terminated from the State of West Virginia, Division of
Corrections and you did not falsify the SF-86 you completed as part of your employment
requirements for the TSA. Thus, there was no need for further investigation. Lastly, you
asserted that the Agency's action smacks of retaliation for your pursuit of a complaint of
discrimination.

In accordance with the Aviation Transportation Security Act, Title 49, United States Code (USC)
4122, Subsection G, the TSA is excluded from the provisions of Title 5 USC 75. Accordingly,
your assertion that this action violates federal personnel law is not applicable. Contrary to your
assertion, the allegations against you have not been disproved. In fact, evidence in the
background investigation combined with the evidence you provided warranted additional
investigation into this matter. Pursuant to TSA MD 1100.75-1, indefinite suspensions may be
appropriate pending an investigation such as the one raised in this matter.

Further, the proposal to indefinitely suspend you is premised on the additional investigation and
not the proposal to remove. The TSA legitimately and reasonably believes that you have
engaged in misconduct and further investigation and adjudication of this matter is required. The

Exhibit 9

allegation of misconduct raised against you is very serious that, given the nature of your position as a law enforcement officer, your continued presence at the worksite would represent a threat to the effective operation of the workplace. The basis for this action is as stated and is not taken in retaliation due to your pursuit of a complaint of discrimination.

In assessing the reasonableness of the proposed action, I have considered a number of factors as set forth in Douglas v. Veterans Administration, 5 MSPB 313 (1981) which I find relevant to your case:

1. The nature and seriousness of the offense, and its relation to the employee's duties position, and responsibilities, including whether the offense was intentional or technical or inadvertent or was committed maliciously or for gain or was frequently repeated - Trustworthiness and integrity are required of all Federal employees. As a federal law enforcement officer, this responsibility and adherence to its standards are heightened. If determined that you have falsified a federal employment document and failed to disclose required information regarding your employment history, such actions are serious misconduct matters and would directly undermine the foundation of the employee-employer relationship and negatively affect your ability to continue in your position.

2. The employee's job level and type of employment, contacts with the public and prominence of the position - As a federal law enforcement officer, you occupy a position of public trust, substantial responsibility and authority. Given the nature of your position, if it is determined that you engaged in this misconduct, you would have failed to duly safeguard the TSA's and the public's trust, responsibility and integrity required of your position.

3. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties- As a law enforcement officer, if determined that you engaged in this misconduct, my confidence in your trustworthiness, truthfulness and ability to perform your assigned duties would be lost.

4. Past disciplinary record - On June 13, 2003, you were suspended from duty, without pay, for a period of five days beginning on June 16, 2003.

Therefore, I have decided to indefinitely suspend you, without pay, pending completion of the Agency's investigatory process and any administrative action that may follow. The indefinite suspension is effective on Thursday, June 3, 2004.

This notice constitutes a final decision. TSA is an excepted service agency and all of its employees are in the excepted service positions. Employees in excepted service positions have narrowly defined rights to appeal to the MSPB. Specifically, excepted service employees may file an appeal to the MSPB if they are: (1) veteran preference eligible individuals who have completed one year of current continuous service in the same or similar positions in an Executive agency, the United States Postal Service or Postal Rate Commission; or (2) non-veteran preference eligible individuals, who have completed two years of current or continuous service in the same or similar positions in an Executive agency under other than a temporary appointment

Exhibit 9
7 of 3

limited to two years or less. If you believe you meet this criterion you may file an appeal to the MSPB. Your appeal must be filed within 30 days of the effective date of this action or within 30 days of the date of this letter, whichever is later. If you decide to appeal, you may use the attached form. The MSPB's regulations are available on its website, www.MSPB.gov.

If you believe this action resulted from discrimination or harassment based on race, color, religion, sex, national origin, physical or mental disability, age (40 or over), sexual orientation, or reprisal, you may contact the Office of Civil Rights (OCR) at 1-877-336-4872. If you choose to contact OCR you must do so within 45 calendar days of the effective date of this action.

This correspondence is being forwarded by Federal Express Overnight Delivery.

If you have any questions regarding your rights or this process, you may contact Martina Griggs Johnson, Risk Management I, Office of Human Resources Management, at (571) 227-2865.


cc: Robert C. Seldon
    Robert C. Seldon & Associates, P.C.

Exhibit P
3 of 3



narcosphere.narconews.com

*a project of the narco news bulletin*

## Secret Service agents claim White House turning blind eye to racism

By Bill Conroy,
Posted on Tue Oct 26th, 2004 at 10:21:46 PM EST

African American agents with the U.S. Secret Service, which is charged with safeguarding the life of the president and other national leaders, contend the Bush Administration has worked to undermine their class-action discrimination lawsuit against the agency.

Officials with the nonprofit Black Agents of the Secret Service (BASS) allege that for the past four years -- the lawsuit was filed in 2000 -- "the Bush Administration and the Secret Service have used the judicial process to prevent a discussion of this case on its merits." BASS representatives say not a "single witness" has been called "nor has a single document been produced" in the case to date.

"The refusal to address the merits of the Black Agents' case is shameful," said Special Agent Reginald G. Moore, BASS president, in a prepared statement. "It is particularly disappointing that nothing was done after (former U.S.) Rep. J.C. Watts arranged a meeting with White House Associate Counsel Stuart Bowen and the class representatives to discuss the case. This is not a situation where the White House is unaware of the issues, nor could they be after the appearance of several front-page stories on the gross mismanagement and racial discrimination in the Secret Service."

The alleged racial discrimination problems within the Secret Service -- formerly part of the Treasury Department and now part of the Department of Homeland Security (DHS) -- appear to be part of a widespread pattern of racism within major federal law enforcement agencies.

It is a pattern that numerous government whistleblowers contend has not been addressed by the current administration, and it is a pattern they argue represents a threat not only to civil rights, but to the national security of this country.

Past stories on Narco News have detailed the class-action discrimination lawsuit filed by current and former Hispanic U.S. Customs agents against DHS. That case also has been pending in federal court for years.

More recently, special agents within DHS' Immigration and Customs Enforcement (ICE) were informed that they would not be receiving foreign-language pay due to "budget" constraints.

In addition, a resolution adopted by a national organization representing Hispanic law-enforcement officers charged that former DEA administrator Asa Hutchinson (who is now one of the top guns at DHS) has a track record of "perpetuating an

### Menu
- Home
- English | Español
- Search
- About the NarcoSphere
- Reporters' Notebooks
- Request a Co-publisher's Account
- The Narco News Bulletin

### Enter the NarcoSphere

**Request Account Copublisher Agreement**

Username: _____
Password: _____

Login
Mail Password

**Read Introductions by Our Copublishers**

### Reporters' Notebooks
- Reber Boult
- Julia Steinberger
- Al Giordano
- Bill Conroy
- Franz J.T. Lee
- Nancy Davies
- Cynthia McKinney
- Benjamin Melancon
- David Keating
- Fabio Mesquita
- Dan Feder
- Claudia Espinoza
- Yasmin Khan
- Jules Siegel
- Gissel Gonzales
- Daniel Fleming

Exhibit R

atmosphere of distrust, reprisal and retaliation against minority employees....."

The delays in the African American Secret Service agents' discrimination case led their attorneys last week to resort to the extreme measure of filing special pleadings (a Writ of Mandamus) with the U.S. Court of Appeals for the District of Columbia. As part of the pleadings, they asked the federal appeals court to intercede and force the federal district court to take action in the case.

"We take this unusual step today because we cannot take four more years of denial and delay," said Secret Service agent Moore, who is a named plaintiff in the discrimination litigation. "Every day that passes, we lose witnesses and evidence.

"The Secret Service 'accidentally' fails to retain relevant documents. For the future of the Secret Service, we must have a hearing on the merits of more than 20 years of racial discrimination and a remedy that dissolves the 'Good Ol' Boy' network, which has worked so often to disadvantage black agents."

The class-action case was filed in the U.S. District Court for the District of Columbia on behalf of some 250 African American special agents of the United States Secret Service. The lawsuit contends that the Secret Service has "discriminated against African-American Special Agents, from at least January 1974 forward, in its personnel policies, practices, and procedures."

More from the Writ of Mandamus pleadings:

*Over four years have passed since the government filed its motion to dismiss and the Petitioners filed their motion for class certification. Petitioners have waited patiently, but they are suffering prejudice. They have not been allowed to depose any fact witnesses, analyze any personnel databases, or conduct any discovery whatsoever. In the meanwhile, the Secret Service admits that it has not in the past and will not in the future preserve electronic mail evidence relevant to the present action. Petitioners have no way to determine if the Secret Service is complying with its responsibility to preserve other documents relevant to the case.*

*Evidence is slipping away and Petitioners are beginning to lose the cohesiveness and cooperation of the class needed to prosecute this action. Without a sufficient number of participating class members, Plaintiffs will not be able to locate sufficient witnesses, documents and other information needed for the case.*

**Judge Reacts**

The filing of the writ on Oct. 22 did prompt quick action on the part of the judge, who, after years of issuing no rulings in the case, appears to have worked all weekend to prepare a ruling on the pending motions in the lawsuit.

In that ruling, issued Oct. 24, Judge Richard Roberts determined that "despite the (agents') compelling allegations of discrimination within the Secret Service" the class-action claims should be dismissed on technical grounds.

The claims on behalf of the class -- a group of some 250 African American agents -- were thrown out because they had not been completely exhausted through federal administrative channels before being brought into federal court, the judge

- Pablo Francischelli
- Andrew Grice
- Baylen Linnekin
- Alex Satanovsky
- Irene Roca Ortiz
- Sean Donahue
- Erik Siegrist
- Charlie Hardy
- Ron Smith
- Christopher Fee
- Diego Mantilla
- Natalia Viana
- Amber Howard
- Teo Ballve
- Vladimir F-Garcia
- Justin Delacour
- Linda Langness
- Steve Young
- Kevin Okabe
- Jeff Simpson
- Christopher Whalen
- Sarah de Haro
- Ricardo Sala
- Charles Faris
- Nora Callahan
- Luis Gomez

NARCO NEWS
is supported by
The Fund for
Authentic Journalism
www.authenticjourna...m.org

**Narco News: Top Stories**

Emergency Music for a New Bolivia by Parafonista

Brazil's Lula to Sign Drug Decriminalization Decree by Al Giordano
4 Comments

Walking: We Ask Questions by the Notes From Nowhere Collective
12 Comments

Cynthia McKinney: We Need Narco News, and It Needs Us by Cynthia McKinney

11/18/2004

Exhibit R

ruled. Lawyers for the agents stress, though, that the class claims can be filed again with the court after they wind their way through the 180-day administrative-review process.

However, Judge Roberts did not dismiss the individual discrimination claims of five Secret Service agents who are party to the case.

On another front, the judge's ruling failed to address a potential conflict-of-interest issue raised by the writ. In a footnote included in those pleadings, lawyers for the agents raise questions about Judge Roberts relationship with a potential witness.

The footnote:

*In a July 13, 2000 Order, Judge Richard Roberts disclosed to the parties that he was personal friends with then Treasury Undersecretary James Johnson, who had supervised the United States Secret Service for the Department of Treasury during much of the relevant time period. Judge Roberts disclosed that he and Johnson had discussed the case as it had been reported by the Washington Post one morning over breakfast.*

*In addition, Judge Roberts disclosed that as a Department of Justice attorney he served on the "Church Arson Task Force," co-chaired by Undersecretary Johnson. As a result, he was exposed to the "Good Ol'Boy Roundup" investigation which had documented organized racism by Agents in the Justice and Treasury law enforcement bureaus, including the Secret Service.*

*At that time, Judge Roberts deemed recusal (stepping down from the case) inappropriate because there was no indication that he would be required to assess a then Undersecretary Johnson's credibility and that the Roundup allegations were a small part of Petitioners' complaint. Four years later, the facts have changed substantially.*

*Through Freedom of Information Requests, witness interviews and other investigative techniques, Petitioners have learned more about the Roundups and Undersecretary Johnson's role in the subsequent investigation. Petitioners believe that Treasury Undersecretary James Johnson will be a key witness and that the "Good Ol' Boy Roundups" will be a significant part of this case. Thus, Judge Roberts will be required to assess Undersecretary Johnson's credibility and to rule on matters concerning the Roundup investigation.*

**Direct Appeals**

Beyond the effort to address the discrimination problem through the courts, the African American Secret Service agents also have attempted to resolve the case through agency channels as well.

In a January 2003 letter, Moore wrote the following to Secret Service Director Ralph Basham:

*We are writing to see if you are interested in discussing a potential resolution of the race discrimination class action that was filed almost three years ago in federal court. Throughout this difficult period while this case has been pending, the Black Agents have remained loyal and dedicated to the Secret Service. It was*

1 Comment

Eduardo Galeano: The War on Drugs is a Great Imperial Hypocrisy by Alex Contreras Baspineiro
View Comments

Power: Building it Without Taking it by the Notes From Nowhere collective
12 Comments

Now What? First, We Kill the Media by Al Giordano
4 Comments

Election Loss of pro-Harm Reduction Mayor in São Paulo by Fabio Mesquita
View Comments

A New Beginning for Uruguay by Alex Contreras Baspineiro
View Comments

Clandestinity: Resisting State Repression by the Notes From Nowhere Collective
12 Comments

Carnival: Resistance Is the Secret of Joy by the Notes From Nowhere Collective
12 Comments

Uruguay Election Coverage: Tabaré Vázquez, Presidente by Narco News Copublishers
12 Comments

The Coca Leaf: Tradition and Struggle by the Narco News J-School Radio Team

Last Chance for Gas in Bolivia by Amber Howard and Natalia Viana

Autonomy: Creating Spaces for Freedom by the Notes From Nowhere collective
12 Comments

Mexico's New Power Before the United States by Al Giordano
View Comments

Networks: The Ecology of the Movements by the Notes From Nowhere Collective
12 Comments

11/18/2004

EXhibit R

the "continuation space" provided under Question 16, I listed my 1998 departure from the Division of Corrections position in West Virginia, and provided contact information for that position. I further explained that the Director of Public Safety, Otis Cox, and I had come to a mutual agreement that I would leave that position.

17.) Because the Declaration of Federal Employment was attached to the SF-86, I believed that listing the Division of Corrections position in the Declaration of Federal Employment would serve to complete my answer Question 22 on the SF-86. I did not intend to withhold or conceal that information on the SF-86 form. Rather, I listed the 1998 position in a continuation space on an attached form, submitted on the same date.

18.) The Notice of Proposed Removal had the SF-86 form attached to it, but not the Declaration of Federal Employment. I obtained the Declaration of Federal Employment through a document request to TSA. The Declaration, dated March 24, 2003, is attached here as Attachment E, and clearly shows that I did disclose my departure from the Division of Corrections to TSA.

19.) In response to my document request, I received two copies of the Declaration of Federal Employment; one had my response to Question 16 filled in and one was blank in that space. I do not understand where the blank form came from since I did not submit duplicate copies of the Declaration. The only copy I submitted was completed as described above.

Exhibit 5
4 of 5

I hereby declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

_Linda Cruz-Packer_
Linda Cruz-Packer
Executed on January 27th, 2004.

EXhibit 5
5 of 5

Subj:    **Exciting News about NOBLE**
Date:    3/20/2004 3:19:02 PM Eastern Standard Time
From:    jakers@noblenatl.org
To:    llycpacker@aol.com



# A Message From The National Vice President

**Justice by Action**                                     **March 20, 2004**

### My Fellow NOBLE Member

For the past several weeks, I have been a part of a team comprised of National President Anthony R. Scott, Executive Director Jessie Lee and Bernard E. Thompson, Esq. that developed NOBLE'S response to member allegations that the work environment was less than welcoming for African Americans at the Transportation Security Administration (TSA).

At TSA'S inception in 2002, officials from that agency approached NOBLE and requested that we assist in their recruitment of senior level and mid-level managers. NOBLE immediately responded to this request. Members already in such positions with other law enforcement agencies and recent retirees at the federal, state and local level were contacted and encouraged to apply for vacancies at TSA. Notification to NOBLE'S general membership was provided via our publications. A significant number of well qualified NOBLE members expressed interest in supporting TSA'S efforts to enhance security at the nation's airports and subsequently submitted applications for vacancies they believed they were qualified for. The vast majority of these applicants never heard anything from TSA on the status of their applications

Jimmy Wilson, national president during this period, initiated several meetings with TSA officials in an effort to determine why that agency had failed to at least acknowledge receipt of applications submitted by NOBLE members. These meetings were unproductive.

NOBLE members inside and outside of TSA began to express concerns about the following issues to members of the Executive Board: · The sincerity of TSA'S minority outreach recruitment efforts; · The low number of African Americans within TSA in senior and mid-level management positions; · The number of African American senior and mid-level officials within TSA who have been the target of internal affairs investigations, management reviews or other adverse actions; and · The dismissal of Philadelphia Airport Federal Security Director James B. Golden, Jr., and the proposed dismissal of several other NOBLE members.

Exhibit T
1 of 3

As a direct result of the aforementioned concerns, Executive Director Jessie Lee requested a meeting with TSA'S Acting Administrator David M. Stone. Acting Director Stone agreed to a NOBLE/TSA meeting and this meeting took place at TSA headquarters on March 17, 2004. Department of Homeland Security (DHS) Undersecretary Asa Hutchison, TSA Acting Director Stone and TSA Deputy Director Steve McHale were DHS/TSA'S principal representatives at this meeting.

President Scott, Executive Director Lee, Bernard E. Thompson, Esq., and I represented NOBLE at this meeting. NOBLE representatives focused on the following concerns: · The low number of African Americans within TSA in senior and mid-level positions; · TSA'S failure to contact NOBLE applicants applying for positions with that agency; · The widely held perception that African Americans within TSA have been subjected to disparate disciplinary actions, involuntary transfers and terminations; · That less qualified persons have received promotions over more qualified African Americans; and · The dismissal of James B. Golden, Jr.

In summary, NOBLE'S representatives strongly emphasized that TSA'S image among many senior and mid-level African American law enforcement practitioners is poor. We stressed our belief that the dismissal of James B. Golden, Jr. was disproportionate to his alleged violation. We also questioned the frequency with which African American employees of TSA were the target of investigations, management reviews and adverse actions (where terminations were being proposed).

TSA'S representatives indicated their desire to improve their agency image among African Americans in law enforcement. We responded that NOBLE expected specific corrective actions and not mere words. We identified the absence of a recruitment plan with outreach initiatives targeting minorities as a glaring example of a TSA shortcoming. We also advised the TSA officials of our strong belief that the handling of Director Golden's personnel matter remains linked to our ability to, in good conscience, recommend our members and friends to that agency as vacancies become available. TSA officials strongly defended their decisions; however, they are now keenly aware of NOBLE'S concerns and that we remain resolute in our position in these matters. We are determined that African Americans working for TSA - or seeking employment with that agency - will be treated fairly. A letter is being drafted to Acting Director Stone thanking him for granting this meeting, reiterating our concerns and detailing NOBLE'S recommendations to remedy this situation. We will keep the membership apprised of any new developments regarding this matter.

Sincerely,

Clarence Edwards (cedwards7788@comcast.net)
National Vice President

email: jakers@noblenatl.org
voice: 703-658-1529
web: http://www.noblenational.org

NOBLE · 4609-F Pinecrest Office Park Drive · Alexandria · VA · 22312-1442

Powered by

Exhibit T
2 of 3

Saturday, March 27, 2004 America Online: Llycpacker

As a direct result of the aforementioned concerns, Executive Director Jessie Lee requested a meeting with TSA'S Acting Administrator David M. Stone. Acting Director Stone agreed to a NOBLE/TSA meeting and this meeting took place at TSA headquarters on March 17, 2004. Department of Homeland Security (DHS) Undersecretary Asa Hutchison, TSA Acting Director Stone and TSA Deputy Director Steve McHale were DHS/TSA'S principal representatives at this meeting.

President Scott, Executive Director Lee, Bernard E. Thompson, Esq., and I represented NOBLE at this meeting. NOBLE representatives focused on the following concerns: · The low number of African Americans within TSA in senior and mid-level positions; · TSA'S failure to contact NOBLE applicants applying for positions with that agency; · The widely held perception that African Americans within TSA have been subjected to disparate disciplinary actions, involuntary transfers and terminations; · That less qualified persons have received promotions over more qualified African Americans; and · The dismissal of James B. Golden, Jr.

In summary, NOBLE'S representatives strongly emphasized that TSA'S image among many senior and mid-level African American law enforcement practitioners is poor. We stressed our belief that the dismissal of James B. Golden, Jr. was disproportionate to his alleged violation. We also questioned the frequency with which African American employees of TSA were the target of investigations, management reviews and adverse actions (where terminations were being proposed).

TSA'S representatives indicated their desire to improve their agency image among African Americans in law enforcement. We responded that NOBLE expected specific corrective actions and not mere words. We identified the absence of a recruitment plan with outreach initiatives targeting minorities as a glaring example of a TSA shortcoming. We also advised the TSA officials of our strong belief that the handling of Director Golden's personnel matter remains linked to our ability to, in good conscience, recommend our members and friends to that agency as vacancies become available. TSA officials strongly defended their decisions; however, they are now keenly aware of NOBLE'S concerns and that we remain resolute in our position in these matters. We are determined that African Americans working for TSA - or seeking employment with that agency - will be treated fairly. A letter is being drafted to Acting Director Stone thanking him for granting this meeting, reiterating our concerns and detailing NOBLE'S recommendations to remedy this situation. We will keep the membership apprised of any new developments regarding this matter.

Sincerely,

Clarence Edwards (cedwards7788@comcast.net)
National Vice President

---

email: jakers@noblenatl.org
voice: 703-658-1529
web: http://www.noblenational.org

Powered by

Exhibit 7
3 of 3

Saturday, March 27, 2004 America Online: Llycpacker



This is the text of a [bc] News Release sent to news organizations nationwide. The full text of the letter to the President and other goverment officials is included at the end of the release.

For Immediate Release

# President is Warned Race Bias "Threatens National Security"

**Redstone Arsenal minorities cite "Tar Baby" incidents, urge caution in creation of Homeland Security Department**

Warning that deteriorating race relations present "a grave threat to our national security," minority employees at the sensitive Redstone Arsenal in Huntsville, Alabama have called upon President Bush and his top military and national security executives to "directly and forcefully address this matter before the U.S. Congress acts to create a new Department of Homeland Security."

In a June 13th letter obtained by The Black Commentator, an Internet publication (http://www.blackcommentator.com), the head of the Redstone Area Minority Employees Association said that military and civilian supervisors had used the racial slur "Tar Baby" on three occasions since the events of September 11. Matthew Fogg described the incidents as examples of "an epidemic of official corruption, systemic racial discrimination and vile epithets that undermines our country's War on Terror."

Fogg's organization represents 200 minority employees at Redstone Arsenal, which is home to many of the U.S. Army's precision "smart" weapons systems as well as NASA's Marshall Space Flight Center. "The alarming resurrection of 'Tar Baby' as a term of racial abuse at Redstone," Fogg wrote, "is only one, dramatic manifestation of a deep and escalating breakdown in military standards."

Fogg said Redstone race relations "are even worse than those that prevailed at Goddard Space Flight Center," in suburban Washington, DC, where 120 Black scientists recently settled a discrimination suit against NASA for $3.75 million.

The "security and intelligence agencies of the U.S. are rife with race discrimination," said Fogg, a chief deputy U.S. Marshal.

Fogg called for caution in creating the Homeland Security Department. "Unless discrimination is immediately treated as a national security priority, this new department will find itself hopelessly infested with all of the bias practices of its 22 component organizations," he said.

The letter was addressed to the President, National Security Advisor Condoleezza Rice, Director of Homeland Security Tom Ridge, Defense Secretary Donald Rumsfeld, Secretary of the Army Thomas White and Senator Patrick Leahy.

The Black Commentator is an Internet publication of commentary, analysis and investigation.

http://www.blackcommentator.com/national_security_news_alert.html

Lir
Send this pa
Privacy
Ren

If someone pass
to you make sure
Free Sign Up pa

Don't miss anyth

Other Comment
issue 4 - June 7

Tar Baby Outra
and Corruption
Redstone Arser

Condoleezza's (
Paratroopers in
Basement: Con
and the Venezu

Did the Green P
Black America:
Jonathan David
Guest Commen

A Law That Giv
Something to Fi
Deputy U.S. Mar
Matthew Fogg, (
Commentator

on issues affecting African Americans.

Contact: mailto:publisher@blackcommentator.com Tel 202.318.4032

Contact:Chief Deputy U.S. Marshal Matthew Fogg
mailto:u.s.marshal@writeme.com Tel 301.423.8161

*The full text of Marshall Fogg's letter follows.*

June 13, 2002

Honorable George W. Bush
President of the United States
1600 Pennsylvania Ave NW
Washington, D.C. 20001

Honorable Condolezza Rice
National Security Advisor
1600 Pennsylvania Ave, NW
Washington, D.C., 20504

Governor Tom Ridge
Director of Homeland Security
1600 Pennsylvania Ave
Washington, D.C. 20502

Honorable Patrick Leahy
Chairman, Senate Judiciary Committee
224 Dirksen Senate Office Building
Washington, D.C. 20510

Honorable Donald Rumsfeld
Secretary of Defense
1000 Defense Pentagon
Washington, D.C. 20301-1000

Honorable Thomas E. White
Secretary of the Army
101 Army Pentagon
Washington, D.C. 20310-0101

Dear Mr. President and Distinguished Gentlemen and Lady:

It is my responsibility to alert you to a grave threat to our national security, an epidemic of official corruption, systemic racial discrimination and vile epithets that undermines our country's War on Terror. Race relations at Huntsville, Alabama's Redstone Arsenal, one of the nation's most sensitive military installations, have deteriorated to such a degree that military preparedness has been seriously eroded.

I fear that this dangerous situation is spiraling out of control, degrading Redstone's mission and destroying the productive lives of valuable personnel.

As Executive Director of the Redstone Area Minority Employees Association (RAMEA), I have authenticated three separate incidents of flagrant, public use of the slur "Tar Baby" by civilian and military supervisors at the base, popularly known as the "rocket capital of the world." The targets of these horrific insults are dedicated African American scientists and specialists in precision weapons, men and women on whom our citizens depend at this time of national crisis.

A disturbing number of superbly trained weapons systems experts have been sidelined for

Commentaries i
issues :

Condoleezza &
Fine Pair: The R
Burden

Hard Right Cas
in Black City - T
Ultra-Conservat
Cory Booker Lo
Newark, New Je

Newark: The Fir
- The Hard Righ
National Black §

Fruit of the Pois
The Hard Right'
Capture Newark
5, 2002

A Letter from H
"How to spot a '
Trojan Horse." I
Kilson, Guest C

Reparations Pa:
True Value of S(
and an Animal

The Living Wag
Movement: A N(
Beginning - Bre
and Civil Rights
Languages

Rep. Cynthia M(
Statement on th
September 11: 1
an investigation
events surroun
September11 is
as is the need f(
investigation of
debacle.

Make The Amer
to Get the U.S. (
Out of the Intern
Drug Trade

Psychologically
U.S. Can't Hand
Penalty

Linguistic Profil
Patrice D. Johns

10/10/2004

years on end, forced to perform menial duties, solely because of the color of their skin. This pervasive pattern of under-utilization of minority expertise is cruel, wasteful and profoundly unpatriotic. Racial reprisals for complaints against such injustices are routine at Redstone. As one of our members, who also serves as head of the Huntsville NAACP, puts it, "Any time they can get us off of a critical mission, they'll do it."

commentator

You will recall that 120 Black scientists at Goddard Space Flight Center recently settled their discrimination suit against NASA for $3.75 million. They had been shamefully under-utilized and held back from promotions. Conditions at Redstone are even worse than those that prevailed at Goddard. The cost to the nation's military readiness is incalculable.

Is this the way the United States of America unites its citizens in our War on Terror? I cannot believe that our leaders would knowingly countenance such a cancer at the core of our national defense structure.

The alarming resurrection of "Tar Baby" as a term of racial abuse at Redstone is only one, dramatic manifestation of a deep and escalating breakdown in military standards. RAM has thoroughly documented a litany of abuses and illegalities throughout the installation, home of the Aviation and Missile Command (AMCOM), Space and Missile Defense Command (SMDC), Army Corps of Engineers, Program Executive Offices (PEO), Department of Defense Commissary and NASA's Marshall Space Flight Center.

Our grievances include discrimination, unfair labor practices, blacklisting, unfounded criminal prosecutions, false statements, unwarranted revocation of security clearances, falsification of official documents, obstruction of justice, witness intimidation, physical assaults, slashing of vehicle tires, misappropriation of government funds, illegal contract activity, and other improprieties.

The NAACP joined with us in calling for a congressional investigation. We have submitted substantial evidence directly to the office of the Secretary of Defense, the Secretary of the Army, NASA's administrator and more recently to Senator Carl Levin, chairman of the Armed Services Committee. Clearly, RAM has made the Redstone situation known in every official forum available to our membership.

We now appeal to you to intervene directly at Redstone. If this nation is truly being placed on a war footing, the Redstone problem cannot be permitted to fester through years of grinding EEO and Class Action litigation. The talents of many hundreds of patriotic African Americans are being wasted. Their rights and all of our freedoms are at risk.

To paraphrase the slogan of yesteryear's opponents of Jim Crow in the U.S. Armed Forces: America cannot fight a War on Terror with one hand tied behind its back.

The cancer eating away at Redstone Arsenal is acute, but not unique. As a chief deputy U.S. Marshal and Executive Director of the Congress Against Racism & Corruption In Law Enforcement (CARCLE), I am inundated with complaints of racial discrimination at virtually every law enforcement, national security and intelligence agency of the U.S. government.

All of you, Mr. President, Gentlemen and Lady, are aware of the great services rendered to our country by whistleblowers during this period of crisis. Supervisory Special Agent, Coleen Rowley, of the Minneapolis FBI office, has properly been granted a full hearing on her charges concerning the now infamous search warrant on terrorist Zacarias Mousaoui's computer prior to 9/11.

Yet, you may not be aware that the Special Agent In-charge (SAC) of that same office has been formally charged with egregious Equal Employment Opportunity (EEO) racial discrimination claims since 1996, resulting in vast harm to the bureau's national security mission. Had the bureau followed its own EEO policies and guidelines with respect to that SAC, history might have been written, differently.

Patriots of color are blowing whistles all across this nation. Do you hear them?

I am very familiar with racism within the U.S. Marshal Service (USMS), having won a

Exhibit U
3 of 4

landmark discrimination case in the US District Court for the District of Columbia, Fogg v. Reno 94-2814, in 1998. A federal jury found the entire USMS nationwide to be a Racial Hostile Environment. The USMS now faces a class action suit by many African American Marshals who have been subjected to this same hostile environment and curtailed career opportunities.

Mr. President, your own Secret Service is the subject of legal action by African American agents. National security is clearly at stake in this issue.

The US Customs, US Capital police, Immigration & Naturalization, Border Patrol and the CIA, all have some form of race discrimination complaints pending. Black FBI agents recently announced a settlement in their race discrimination Class Action complaint, but many of them have since told me that a racially hostile environment still exists in their offices.

The bottom line is that security and intelligence agencies of the U.S. are rife with race discrimination. Whistleblowers, who are truly America's unsung heroes and seek only to strengthen the effectiveness of these agencies, are being abused or ignored. For this reason, it is imperative that racial bias be treated as a serious threat to national security, and that your offices directly and forcefully address this matter *before* the U.S. Congress acts to create a new Department of Homeland Security.

Unless discrimination is immediately treated as a national security priority, this new department will find itself hopelessly infested with all of the bias practices of its 22 component organizations. I fear the problem will be compounded beyond all possible solution, further damaging our national security.

Do not allow the prevailing patterns of racial bias at these agencies to be stacked on top of one another and commingled into an impenetrable mass, thereby bequeathing the nation a $37.5 billion, 170,000-member edifice of discrimination. I implore you to act now to solve these problems before they disappear into a giant, bureaucratic jumble, only to resurface later in even more dangerous form.

Mr. President, on June 6, you promised that the Department of Homeland Security would "bring together our best scientists to develop technologies that detect biological, chemical and nuclear weapons."

But current employment practices at Redstone Arsenal and elsewhere tell us that African American scientists will not be full participants in this effort.

In the same speech, the President asked all Americans to, "Add your eyes and ears to the protection of our homeland. In protecting our country we depend on the skill of our people."

Yet we know that at Redstone and other federal workplace facilities, Black skills are marginalized and rejected. African Americans are derided as Tar Baby.

We ignore this crisis at our nation's peril.


Respectfully,

Matthew F. Fogg
Executive Director
Redstone Area Minority Employees Association
P.O. Box 22214
Huntsville, AL 35814-2214


cc: Kweisi Mfume, Executive Director NAACP
Gerald Reed, National President of Blacks In Government (BIG)
Maurice Foster, Executive Director - National Organization of Black Law Enforcement
Executives (NOBLE)

Exhibit 4
4 of 4

# Black Agents Sue Secret Service

By Bill Miller
Washington Post Staff Writer
Wednesday, May 3, 2000; Page A21

For more than 26 years, black Secret Service agents have complained internally about the agency's hiring and promotional practices. Today they intend to strike back with a federal class action lawsuit seeking millions of dollars in damages and a court order that would require the Secret Service to initiate employment reforms.

The suit is a follow-up to a complaint filed in February with the Equal Employment Opportunity Commission. Attorneys for the agents said they have come up with new evidence since then, and that they believe they will get quicker results by moving to U.S. District Court.

David J. Shaffer, one of the plaintiffs' attorneys, said he and co-counsel John P. Relman have assembled a trail of correspondence documenting complaints from black agents through the 1970s, 1980s and 1990s. "It runs the gamut," Shaffer said, contending that the Secret Service failed to correct the problem. "They had a lot of responses, none meaningful."

Ten current and former agents are joining in the federal suit, including three agents who were part of the earlier EEOC complaint. They charge they were denied promotions, given dead-end assignments, unfairly disciplined, and subjected to repeated racial slurs in what they called a long-standing hostile work environment.

The Secret Service, responsible for protecting the president and vice president, among other duties, has more than 2,500 agents, including roughly 220 African Americans. Shaffer said he hopes to get court approval to cover all black agents who have worked for the Secret Service since 1974. He said that would include nearly every black agent who ever worked there.

The Secret Service is the latest major federal law enforcement agency to face a racial discrimination claim in the courts. The FBI and the Bureau of Alcohol, Tobacco and Firearms settled similar class action discrimination cases during the 1990s.

Jim Mackin, a Secret Service spokesman, said he would not comment on pending litigation. But he defended the agency's record, saying two of seven assistant directors are black, along with the heads of four of the agency's 11 largest field offices.

"The Secret Service in the past has taken matters of discrimination and equity very seriously, and we continue to do so," Mackin said. He said officials are determined to ensure that the hiring and promotions process is conducted fairly.

According to the lawsuit, job-related difficulties date back at least to 1974, when 35 black agents sent a memorandum to then-director H.S. Knight. The memorandum complained about recruitment, assignment and promotions, and said that black agents felt they were "not included in the mainstream" of the Secret Service.

Similar concerns were repeated to other top officials over the years, Shaffer said, sometimes generating promises that changes would be forthcoming. But black agents continue to hit a wall when they reach the GS-13 pay rank, the notch just below the supervisory jobs, he said. For example, nearly 11 percent

http://members.aol.com/rnbrown725/secsv00b.htm

10/11/2004

Exhibit V
108 2

of the GS-13 jobs are held by African Americans, but they have only 4.2 percent of the GS-14 jobs, he said.

Shaffer attributed the problem to employment practices that are too subjective and foster a "good-old-boy network." The lawsuit will ask the court to strike down the agency's system of awarding promotions and making performance evaluations.

According to Shaffer, the Secret Service missed a deadline in responding to the EEOC complaint, clearing the way for him to shift the case into federal court. He said the plaintiffs include men and women with a wide variety of experience, including agents who served on presidential and vice presidential details. But even after getting those choice assignments, he said, they got transferred laterally instead of being moved up.

John E. Turner, an agent with the Washington field office, said he ran into that problem after working on Vice President Gore's detail. He hoped the duties would be a gateway to advancement. Instead, he said, white agents with less experience got the promotions he sought. Turner said he had a score of 98.1 out of a possible 100 points in the Secret Service's promotional system, but the rules permitted officials to promote candidates with lower scores.

"Our frustration level is so high we have to do something," Turner said yesterday.

Jennell Walker Clark, one of the new plaintiffs in the case, left the Secret Service in 1996 after six years. Clark said she routinely missed out on assignments that would permit her to compete for promotions and she endured occasional racial slurs. Now she's an agent with the inspector general's office for the Small Business Administration.

"The Secret Service cannot just say it was one office or a personality thing," Clark said. "We were in different offices with different supervisors. It's pretty pervasive."

© 2000 The Washington Post Company

10/11/2004

Exhibit V
2 of 2

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO                0021
CONNECTION TEL          15712271901
SUB-ADDRESS
CONNECTION ID
ST. TIME                02/24 00:43
USAGE T                 04'12
PGS.                    30
RESULT                  OK
```

1319 F Street, NW, Washington, DC 20004
Fax: 202-318-2287
Telephone: 202-955-6968 ex. 11

**Robert C. Seldon &
Associates, P.C.**

# Fax

| **To:** | Tamara L. Miller, Esq. | **From:** | Molly E. Buie, Esq. |
|---|---|---|---|
| **Fax:** | 571-227-1901 | **Pages:** | 30 |
| **Phone:** | 571-227-1917 | **Date:** | 2/24/2004 |
| **Re:** | Complaint No. TSA 04-0099 | **CC:** | |

☐ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

Following is the Formal Complaint for Linda Cruz-Packer, No. TSA 04-0099. The original will follow by mail.

Exhibit W
1 of 30

# FORMAL COMPLAINT OF DISCRIMINATION IN THE FEDERAL GOVERNMENT

Department of Homeland Security

(FOR AGENCY USE)

## PRIVACY ACT STATEMENT (USC 552a)

**AUTHORITY:** Public law 92-261.

**Principle Purpose:** Formal filing of allegation of discrimination because of race, color, religion, sex, national origin age, handicap, reprisal, or sexual orientation.

**Routine Uses:** This form and the information on this form may be used (a) as a data source for complaint information for production of summary descriptive statistics and analytical studies of complaints processing and resolution efforts and may also be used to respond to general requests for information under the Freedom of Information Act, (b) to respond to requests from legitimate outside individuals or agencies (e.g., Members of Congress, the White House, and the Equal Employment Opportunity Commission (EEOC)) regarding the status of the complaint or appeal; and (c) to adjudicate complaint or appeal.

**Disclosure:** Voluntary, however, failure to complete all appropriate portions of this form may lead to rejection of complaint on the basis of inadequate data on which to determine if complaint is acceptable.

---

**1. NAME OF COMPLAINANT** (*Last, First, Middle Initial*)
CRUZ-PACKER, Linda Y.

**2. SSN**
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

**4. ADDRESS** (*Include City, State and ZIP Code*)
4800 MEGAN DRIVE
Clinton, Md 20735

**3a. HOME TELEPHONE NO.**
301 234-0097

**3b. WORK TELEPHONE NO**
571-227-1681

**5. ARE YOU BEING REPRESENTED?**
a. YES (*complete 5c*)   b. NO (*Skip to item 6a*)

**5c. IF YES, NAME, TELEPHONE AND ADDRESS OF REPRESENTATIVE.** Robert C. Seldon + Assoc, PC
Attorneys-At-Law
1319 F St, NW, Suite 305
Wash, DC 20004
202 995-4968

**6a. NAME OF DHS ADMINISTRATION YOU BELIEVE DISCRIMINATED AGAINST YOU**
HECTOR SANTANA

**7. DATE ON WHICH MOST RECENT ALLEGED DISCRIMINATION OCCURRED**
2/11/04

**6b. ADDRESS OF ALLEGED DISCRIMINATION ORGANIZATION** (*Include City, State and ZIP Code*)
TSA
601 SOUTH 12th STREET
Arlington, VA 22202-4220

**8. ARE YOU WORKING FOR THE FEDERAL GOVERNMENT?**
a. YES (*Complete items 9, 10 and 11*)
b. NO (*Skip to item 12*)

**9. NAME OF AGENCY WHERE YOU ARE CURRENTLY EMPLOYED**
TSA, OFFICE OF Internal Affairs + Program Review   3rd Floor

**10. ADDRESS OF YOUR CURRENT EMPLOYER** (*Include City, State and ZIP Code*)
601 South 12th Street
Arlington, VA 22202-4220

**11a. TITLE OF YOUR CURRENT POSITION**
Special Agent

**11b. GRADE/SERIES OR PAY BAND.**
14 / 1811   J BAND

**12. REASON YOU BELIEVE YOU WERE DISCRIMINATED AGAINST** (*Check below*)

| | | | | | |
|---|---|---|---|---|---|
| X | A. RACE (*Specify*) → | African American | X | F. SEX (*Specify*) → | Female |
| X | B. COLOR (*Specify*) → | Black | X | G. DISABILITY (*Specify*) | Perceived disab. due to weight |
| | C. RELIGION (*Specify*) | | | H. SEXUAL ORIENTATION | |
| | D. NATIONAL ORIGIN (*Specify*) | | X | I. REPRISAL (*Specify protected activity*) | |
| | E. AGE (*Specify Date of Birth mm/dd/yyyy*) → | | X | | SEE Attached |

| 13. I HAVE DISCUSSED MY COMPLAINT WITH AN EEO COUNSELOR | 13c. IF YES, NAME OF EEO COUNSELOR | 14. DATE OF FINAL INTERVIEW |
|---|---|---|
| (a.) YES (Complete 13c)   b. NO | Janet White | 2/4/04 |

15. EXPLAIN SPECIFICALLY HOW YOU WERE DISCRIMINATED AGAINST (*That is, treated differently from other employees or applicants, because of your race, color, religion, sex national origin, age mental or physical handicap, or reprisal*). (*If your complaint involves more than one basis for your dissatisfaction list and number each such allegation separately and furnish specific, factual information in support of each*). (*Use additional sheet(s), if necessary*).
**Allegation No. 1:**

SEE Attached

16. LIST IN ITEM 19 THE NAMES OF YOUR WITNESSES AND WHAT FACTUAL INFORMATION EACH WILL BE EXPECTED TO CONTRIBUTE THROUGH HIS/HER TESTIMONY TO THE INVESTIGATON OF YOUR COMPLAINT

17. WHAT SPECIFIC CORRECTIVE ACTION DO YOU WANT TAKEN ON YOUR COMPLAINT? (*If more than one allegation state overall corrective action desired and the specific corrective action desired for each separate allegation*).

SEE Attached

18. HAVE THE MATTERS LISTED IN ITEM 15 BEEN APPEALED TO THE MERIT SYSTEMS PROTECTION BOARD?
   a.  YES (*Explain in number item 19*)   (b.) No

19. REMARKS

SEE ATTACHMENT LABELED WITNESSES

| 20. SIGNATURE OF COMPLAINANT | 21. DATE SIGNED (*MM/DD/YYYY*) |
|---|---|
| Linda Cruz-Packer | 2/15/04 |

INFORMATION CONCERNING THE PROCESSING OF YOUR COMPLAINT OF DISCRIMINATION

This form will be used only if you, as a TSA employee or as an applicant for Federal employment, believe you have been treated unfairly because of your race, color, religion, sex, national origin ,age, mental or physical disability, reprisal or sexual orientation. If you have questions concerning the completion of this form, you may call the TSA Civil Rights Office at (571) 227-2349.

Your written, formal complaint must be filed within 15 calendar days of the date of your final interview with the EEO counselor. This time may be extended if you can give a good reason for not submitting the complaint within the 15 calendar day limit.

If the matter has not been resolved to your satisfaction within 30 calendar days of your first interview with the EEO counselor and the final counseling interview has not been completed within that time, you have the right to file a formal complaint at any time thereafter up to 15 days after the final interview.

 Your written formal complaint must be signed, dated and filed in person by you or your attorney or sent by mail to the: **Transportation Security Administration, Office of Civil Rights, TSA Headquarters, West Tower, 2nd Floor, TSA-6, 601 South 12th Street, Arlington, Virginia 22202-4220, Attention: Tamara L. Miller, Esq., Director.**

You may have a  representative at all stages of the processing of your complaint.

## FORMAL EEO COMPLAINT OF LINDA CRUZ-PACKER

Ms. Cruz-Packer asserts that the following actions were discriminatory and retaliatory, and created a hostile work environment for her based on her race (African American) and her sex (female), her perceived disability (weight), her prior participation in the EEO administrative complaints process against Volunteers of America, her former employer, and her current EEO activity against TSA. Some of the following are also actionable independent of a hostile work environment.

**1.)    Unwarranted 5 Day Suspension:** On May 2, 2003, Ms. Cruz-Packer was called to a meeting with her supervisor, Mr. Santana, and Deputy Director Widawski, and given a memorandum instructing her to explain in writing charges on her government-issued credit card for three cash advances and several car rentals. She was not allowed to respond verbally to the charges at that time or any other time. On May 5, 2003, she timely delivered her written response to her Director, John Rooney, explaining that she had not misused her government credit card. Five weeks later, she was suspended for 5 days without pay, beginning on June 16, 2003. Her suspension was unwarranted, and was disproportionately severe relative to the discipline administered to similarly situated white male agents. The suspension was motivated by discrimination on the basis of Ms. Cruz-Packer's race and sex and her prior participation in the EEO administrative complaints process.

On October 8, 2003, Ms. Cruz-Packer reported to SA Robert Boswell, that she had filed a police report with Prince George's Police Department, and notified Citibank that someone had fraudulently misused her credit card as well as several other credit cards that belonged to her. She was later informed by Mr. Widawski that he would not investigate the matter because it was "personal" in nature. Since that time, Citibank has conducted an investigation and resorted $500 due to a third party's fraudulent misuse of Ms. Cruz-Packer's government credit card.

**2.)    Unwarranted Placement on Administrative Leave:** From June 23, 2003 through the present, Ms. Cruz-Packer was placed on Administrative Leave with pay supposedly because unspecified "issues" had surfaced during her background investigation. TSA refused to provide Ms. Cruz-Packer with any further information about the reasons she was placed on administrative leave. The period of forced administrative leave was imposed shortly after she confronted Mr. Santana about his disparity in treatment between herself and white male agents when he inappropriately brought agents to her house, posted her picture, and refused to meet with her about the alleged misuse of her government card.

**3.)    Work assignment:** On December 29, 2002, Ms. Cruz-Packer was assigned to TSA's Office of Program Reviews and Special Operation and Hector Santana became her immediate supervisor. As the only minority member of the team except for one other black female, she was treated as an outsider by Mr. Santana. Mr. Santana rarely spoke to her, and when he did, he always had the Deputy Director, Lou Widawski in the room. In contrast with the treatment given to white male agents, she was not given her choice of work assignments (cities) to work. She picked at least six cities besides Chicago, which is the assignment that she was eventually given.

Cruz-Packer
Formal EEO Complaint
TSA No. 04-0099
Page 2 of 4

**4.)   Firearms Requalification:**  On January 28 and 29, 2003, Ms. Cruz-Packer attended firearms training and qualified with a score of 240, the qualifying score was 210. Three months later, on April 18, 2003, Mr. Santana required Ms. Cruz-Packer to requalify, supposedly for "safety reasons." According to Mr. Santana, her requalification was requested by the firearms instructors who had been present when she originally qualified. When she was at firearms training, however, those instructors did not mention to Ms. Cruz-Packer any problems regarding her performance, nor did they relay any concerns to the acting firearms agent in charge of our office, Special Agent Robert Boswell. At the time of her original qualification, she had never fired a Sigarm Automatic weapon, which was the weapon used for the training. No white male agents, even those who displayed the same unfamiliarity with the weapon, were required to requalify. The firearm requalification requirement was a pretext for Mr. Santana to discriminate and retaliate against Ms. Cruz-Packer on the basis of her race, sex, perceived disability, and her prior participation in protected EEO activity.

**5.)   Accusing Ms. Cruz-Packer of "Stealing Time":**  Mr. Santana repeatedly accused Ms. Cruz-Packer of falsifying her work hours because he supposedly observed her not being at her desk on a few occasions. Eventually, on April 16, 2003, she changed her core hours from 8:30- 4:30 to 9:30 to 5:30 to stop Mr. Santana's constant harassment and accusations against her. No white male agents were accused of falsifying their hours by Mr. Santana.

**6.)   Forcing Ms. Cruz-Packer To Work on Mother's Day:** On May 10, 2003, Mr. Santana required Ms. Cruz-Packer to work on Mother's Day against her protest that this would be the first time since her husband died that she wouldn't be home with her children. There was no emergency or other reason for her to work that day, and she was not normally required to work on weekends. Mr. Santana did not schedule the team, which was primarily white males, to work on Father's Day.

**7.)   Humiliating Ms. Cruz-Packer In Front of Co-Workers:** In June of 2003, Mr. Santana humiliated Ms. Cruz-Packer when he unnecessarily informed agents in her office that he had taken Ms. Cruz-Packer off of a work assignment because of her suspension. He also brought agents who had no reason to know of her suspension to her home on June 16, 2003 on the pretext of picking up TSA property, in order to further insult and embarrass her.

**8.)   Posting Her Picture:**  From June 16 through June 17, during her 5 day suspension, Mr. Santana directed that Ms. Cruz-Packer's picture be posted at the entrance to the TSA building and parking lot. The implication was that she was a "wanted fugitive". The incident was humiliating to Ms. Cruz-Packer. To her knowledge, no other agent has been subjected to such degrading treatment – the only time people have had their pictures similarly posted is when they have been fired, or when they are perceived as a threat to the agency.

**9.)   Removal of Items from Desk:** On October 28, 2003, Ms. Cruz-Packer received permission to obtain personal belonging from her work area. After reviewing her work area, she discovered certain items missing from her desk and file cabinet area, including her copy of her SF-86 and duplicate copies that she had used as working drafts to complete the final submitted

## WITNESSES

1. **Otis Cox** – (telephone: 202 366-2119) Mr. Cox is the Assistant Administrator with NHTSA, Department of Transportation, Washington, DC. Mr. Cox was the only person who could have authorized Ms. Cruz-Packer's termination from the West Virginia Department of Corrections, and he will attest that he did not make any such authorization. He has knowledge of the circumstances of Ms. Cruz-Packer's departure from that position. Mr. Cox can also attest to the fact that he was never contacted by TSA or OPM in connection with Ms. Cruz-Packer's background investigation prior to TSA's proposed removal of her.

2. **Hector Santana** * (Hispanic male) – Mr. Santana is Ms. Cruz-Packer's first-line supervisor and the primary manager who has discriminated and retaliated against her. Mr. Santana has knowledge of all aspects of this case.

3. **Lou Widawski** * (white male)- Mr. Widawski is the Deputy Director of Program Reviews and Special Operations and is Ms. Cruz-Packer's second line supervisor. He has knowledge relevant to many of the claims raised by Ms. Cruz-Packer, and was present when she discovered items missing from my desk. He can attest to his refusal to investigate the misuse of Ms. Cruz-Packer's government credit card as reported by her in October of 2003.

4. **Allan Cahill** * –(white male) can provide the details of how Ms. Cruz-Packer's picture came to be posted at the building entrances. Mr. Cahill was the Agent who provided the picture.

5. **Robert Boswell** * – (African American) has knowledge of Ms. Cruz-Packer's performance in the firearms training in January of 2003, and the need for her to requalify; specifically he can attest to the actions taken by the instructors after she initially qualified. Mr. Boswell can also provide information on the denial of follow-up after Ms. Cruz-Packer reported the misuse of her government credit card in October of 2003.

6. **Alonzo Webb** * – (African American) can provide information regarding the firearms qualifying. Can also provide information regarding Ms. Cruz-Packer attempting to place a theft report when Ms. Cruz-Packer discovered items missing from her desk. Also has knowledge of Ms. Cruz-Packer's picture being posted at the building entrances.

7. **Steve Iannucci** * – (white male) Can provide information regarding Ms. Cruz-Packer's attempts to place a theft report when she discovered items missing from her desk. Mr. Iannucci was also Ms. Cruz-Packer's first Supervisor when she came on board with TSA.

Cruz-Packer
Witness List
Page 2 of 2

8. **Lon Warfield *** – (white male) Mr. Santana brought Mr. Warfield to Ms. Cruz-Packer's home, supposedly to pick up TSA property, while Ms. Cruz-Packer was on suspension. He has knowledge of that event.

9. **Rochelle Graves *** (African American female) – Can attest to the fact that Ms. Cruz-Packer's picture was posted by the building entrances during the time she was suspended.

10. **Karen Wycke *** (white female) Can attest to the issues described as safety issues regarding Ms. Cruz-Packer's firearms qualification. She and SA Plavick were present at the range that day, and qualified alongside Ms. Cruz-Packer.

11. **Janice Plavick *** (white female) Can attest to the issues described as safety issues regarding Ms. Cruz-Packer's firearms qualification. She was present at the range that day and qualified alongside Ms. Cruz-Packer. She can also provide information regarding Ms. Cruz-Packer's photo being posted in TSA's entrances.

12. **John Rooney *** (white male) Director of Program Reviews and Special Operations and Mr. Santana's second line supervisor, can attest to Ms. Cruz-Packer's concerns regarding discrimination actions against her by Mr. Santana. (met with him twice regarding Mr. Santana's biased actions).

**\* Indicates** an agency employee

**ATTACHMENT A**

Linda Cruz-Packer
4800 Megan Drive
Clinton, MD  20735
(301) 234-0097

November 5, 2003

Janet White
Office of Civil Rights
EEO Counselor
TSA Hq., West  Tower
601  South12th Street
Arlington, VA.  22202-4220

Re: TSA-04-0099
Linda Cruz-Packer

Dear Ms. White:

This letter is written to summarize our telephone conversation on
Tuesday, October 21, 2003, which initiated the administrative
discrimination and retaliation complaints process on behalf of myself,
Linda Cruz-Packer.  My first contact with your office to (Ravleen) was
on October 13, 2003.  The bases for my complaint are discrimination
based on my race, sex, and handicap, as well as retaliation for filing
EEO complaints against a previous employer (Volunteers of America)and
initiating the informal complaints process at TSA.

I am presently employed as a Special Agent Band J, in TSA's Office of
Internal Affairs and Program Review, where I have worked for the past 18
months. I am also a veteran and served in the United States Army.  The
specific matters which give rise to this complaint were the proposal to
terminate me from my position, dated October 24, 2003, and my placement
on administrative leave, which began on June 13, 2003.

On December 29, 2002, I was assigned to TSA's Office of Program Reviews
and Special Operations   I was treated as an outsider on a team that
contained Agents who had worked together previously and knew each other
prior to working at TSA.  Outside of my immediate supervisor, Hector
Santana, the entire team was white except for one other Black female.

Mr. Santana treated me differently from the rest of the team.  He very
seldom spoke to me and whenever he did he almost always met with me in
the presence of Deputy Director Lou Widawski.  Uniformly, Mr. Santana
would repeat whatever information he wanted to convey to me numerous
time, so many times that the Deputy would interrupt Santana to inform
him that I understood what he was saying.  I was not given my choice
ofassignments or preferred assignments meaning (cities) as were team
members who were not black or female. Even though I recall picking at
least six cities beside the lone choice of Chicago, that I was granted.

Mr. Santana harassed me by accusing me of stealing time, in that he
accused me of leaving  leaving early from work and not doing my required
10 hours a day.  Eventually, on April 16, 2003, he changed my core
hours.  I do not believe that this was done to any nonminority agents.

Mr. Santana allowed the male, white members of our team to take leave on
Father's Day.  However, he required me to work on Mothers Day (May 10,
2003).  On that occasion, Mr. Santana assigned me to work out of town,
away from my two children.

Page two
November 5, 2003
TSA-04-0099

On January 28 and 29, 2003, I attended Firearms training and qualified with a score of over 240. The cut-off score was 210. However, Mr. Santana directed me to take the test again and re-qualify some 3 months later on April 18, 2003, reportedly for safety reasons. This was not done for any other agent.

On April 11, 2003, I continued to be harassed by management in that they required me to write a letter about my fitness for duty and directed me to return my handicapped license plates to the state of Maryland. For the record, I am perfectly fit for duty; the handicap plates were for my late husband's disabilities, which do not interfere with my work.

On May 2, 2003, I was called to a meeting with Mr. Santana and Mr. Widawski, and given a memo instructing me to respond back in written form before May 6, 2003, regarding Travel Card Charges on my government credit card, for three advance charges of $500 each, and several rental car useage. I was not allowed to respond to the memo verbally at that time. On May 5, 2003, I hand delivered my written response to my Director John Rooney. Mr. Santana and Mr. Widawski were not in the office that day.

My witten response demonstrated that I had not misused my government credit card. Specifically, at that time it made clear that I had inadvertly missused the credit card, mistaking it for my personal Citibank credit card which was similar in color.

For the record, on October 8, 2003, I reported to SA Robert Boswell, Office of Internal Affairs, that I had filed a police report with Prince George's Police Department, and notified Citibank that someone had fraudulently misused my government credit card as well as several other credit cards that belonged to me. I also made Mr. Widawski aware of this matter. Sometime during that same week Mr. Widawski called me to inform me he would not be investigating this matter due to the fact he felt it was a personal matter, and I had reported it to the Prince George's County Police Department.

On June 13, 2003, after more than five weeks, around 5 pm, once again I was called into a meeting with Mr. Santana and Mr. Widawski, and advised I was going to be placed on a 5 day suspension, beginning on June 16, 2003. No other nonminority agent has been suspended on such grounds; nor do I believe that any have been suspended for any administrative-related matter, without first being certain that they had been adequately briefed on the policies and procedures in question, and signed a document indicating such.

Supposedly on account of this suspension, Mr. Santana arranged for my picture to be posted in the front lobby and garage guard gate of our building. The implication was that I was a wanted fugitive. Mr. Santana also volunteered to other agents in my office that he had to pull me off of my current work assignment because of this suspension.

On June 16, 2003, Mr. Santana continue discrimination and harassment by visiting my home to secure TSA property. There was no reason to do so.

Page three
November 5, 2003
TSA-04-0099

Without warning, on June 23, 2003, I was placed on Administrative Leave
with pay. I was advised that this action had been taken due to
unspecified "issues that surfaced in New York regarding my back ground
check". I was given no specifics even though I inquired several times.

My placement on Administrative Leave for a matter that occurred in New
York could only have been due to an EEO complaint I filed against my
previous employer, Volunteers of America. Essentially, I was terminated
by Volunteers of America after reporting that a white manager had
physically assaulted a black employee. I filed a discrimination
complaint over my termination and prevailed via a settlement.

For the record, on October 8, 2003, I reported to SA Robert Boswell that
I had filed a police report with Prince George's Police Department, and
notified Citibank that someone had fraudulently misused my government
credit cards as well as several other credit cards that belonged to me.
I also made Mr. Widawski aware of this matter. Sometime during that
same week Mr. Widawski called me to inform me he would not be
investigating this matter due to the fact that he felt it was a personal
matter, and I had reported it to Prince George's County Police.

On October 10, 2003, I called Mr. Widawski to inform him I was going to
the International Association of Chief of Police conference in
Philadelphia, PA for two days October 23 and 24, 2003. He informed me
that I would have to put in a leave slip. I advise him that I wanted to
check with personnel prior to doing so. After checking I called him
back and told him I had spoken to a Charles Robertson, who was acting
in Janet Cammarota's absence, who advised me that I didn't have to take
leave. Mr. Widawski informed me to have him call him and that he still
wanted me to take leave. At this time I once again asked Mr. Widawski if
he had any further information regarding my administrative leave status
and he said he wasn't at liberty to discuss the matter, however he did
state he believed I would be hearing something in the next couple of
weeks.

On October 14, 2003, I attempted to call Ms. Cammarota and did not reach
her until October 17, 2003. When questioned if I had to take leave,
even though I was on administrative leave through no fault of my own,
she informed me that she would check and get back with me. I received a
voice mail from her on October 21, 2003, informing me that I did have to
take leave contrary to what Mr. Anderson had told me.

On October 25, 2003, I received a Notice of Proposed Removal from the
Office of Personnel Security and Credentialing Program Office to remove
me from my position as a Special Agent based on the results of my
background investigation. Once again I was not asked any questions about
the allegations found nor was there any other interviews conducted that
showed an unbiased observation.

On Tuesday October 28, 2003, I received permission to obtain personal
belonging from my work area at TSA. After reviewing my work area, I
discovered certain items missing from my desk and file cabinet,
including my copy of the SF 86 which I submitted in connection with my
background investigation. I reported this to my Deputy who was present
at the time, subsequently, I attempted to place a theft report with both

Page four
November 5, 2003
TSA-04-0099

TSA security and also reported it to the Director of Investigations Mr.
Iannuci. On October 30, 2003 Mr. Widawski called me back and told me he
would arrange for me to make a report and provided me a telephone number
(571) 227-2103 and name (Brian Williams) to call. I called the number
twice and left my name and number and as of this date I have been unable
to place a theft report. I wish to add these issues to my original
complaint.

I believe I was discriminated against because of my race, sex, handicap
status, and prior use of the administrative complaints process and
because I voiced to my immediate supervisor, Mr. Santana his
discriminatory handling of my suspension.

Sincerely,

Linda Cruz-Packer
Special Agent
Internal Affairs and Program Review

**ATTACHMENT B**

# *Robert C. Seldon & Associates, P.C.*

*Attorneys-At-Law*
*1319 F Street, N.W., Suite 305*
*Washington, DC 20004*
*202-955-6968 · fax: 202-318-2287*

January 27, 2004

<u>VIA FACSIMILE & FIRST CLASS MAIL</u>
Mr. Gary Krizanovic, Deputy Director
Personnel Security & Credentialing Program Office
TSA Headquarters – East Building
TSA-19 8th Floor
601 S.12th Street
Arlington, VA  22202-4220

RE:    <u>Reply to Notice of Proposed Removal by Linda Cruz-Packer</u>

Dear Mr. Krizanovic,

On October 24, 2003, our client, Linda Cruz-Packer, received a Notice of Proposed Removal from Mr. Robert J. Scanlon, Assistant Director of the Personnel Security and Credentialing Program Office (Att. C). The Notice did not contain the full record upon which Ms. Cruz-Packer's proposed termination was based, nor the background "investigation" conducted by the U.S. Office of Personnel Management. On behalf of Ms. Cruz-Packer, on October 31, 2003, we requested an extension to respond to the proposed removal in order to obtain the record underlying the Notice, garner necessary evidence, and obtain copies of other materials relating to her proposed removal. We also requested the foregoing materials.

We received a response from you on January 8, 2004. In addition to receiving copies of one or more critical documents not provided earlier, we also learned for the first time that TSA had not been in possession of the results of Ms. Cruz-Packer's background investigation when it proposed to terminate her. Consequently, we have filed a Freedom of Information Act request with OPM. This written reply is being filed on the schedule set in your letter of January 16, 2004. We hereby request the right to appear in person and present an oral reply.

The Notice of Proposed Removal sets out two grounds for terminating Ms. Cruz-Packer: 1) that she was terminated from her employment with the West Virginia Department of Corrections, Charlestown Work Release Program ("CWRP") in 1998 for misconduct; and 2) that she failed to disclose this termination on her application to TSA. The documentary record we have been able to assemble at this point demonstrates irrefutably that Ms. Cruz-Packer was <u>not</u> terminated from the CWRP, as confirmed by Otis Cox, the former Secretary for Public Safety for West Virginia whose authorization would have been required to terminate her (Att. B). Further, Ms. Cruz-Packer did disclose that she left the CWRP upon mutual agreement between herself

and Mr. Cox in response to Questions 12 and 16 on the Declaration of Federal Employment which was submitted as part of her SF-86 on March 24, 2003 (Att. A. at ¶¶11-17; Att. E).

Given the state of the evidence at present, we must register our vigorous objection to the agency proceeding any farther unless and until OPM releases its background "investigation," supporting documentation, and any related materials, as per our FOIA request. The simple truth, as demonstrated by Mr. Cox's Declaration, is that Ms. Cruz-Packer was not removed and could not have been removed from the CWRP without his concurrence, which "was neither sought nor given" (Att. B at ¶8). In short, this very disturbing affair is entirely the product of OPM's failure to conduct a proper and documented background investigation, and Mr. Scanlon's rush to act before a full record was available to him.

Returning to the specifics of the Notice of Proposed Removal, Ms. Cruz-Packer fully disclosed all information regarding her employment history, and in fact, exercised an abundance of caution by listing her voluntary departure from the CWRP on her Declaration of Federal Employment (Att. E, Question 12, 16). The OPM Report of Investigation, on which Mr. Scanlon relied to support the proposal to remove Ms. Cruz-Packer, did not contain the records of Ms. Cruz-Packer's supposed termination; include an interview with Mr. Cox, the only official who could have authorized Ms. Cruz Packer's supposed termination from the CWRP, or acknowledge that Ms. Cruz-Packer had disclosed her departure from the CWRP on her Declaration of Federal Employment (Att. C). TSA's proposed grounds for removing Ms. Cruz-Packer, as well as OPM's Report of Investigation, are inaccurate, unsubstantiated, and directly contradicted by the evidence (Att. A-C, E). [1]   Accordingly, Ms. Cruz-Packer requests that TSA withdraw the proposal to remove her, expunge all reference to it from her personnel file, and return her to active duty status. [2]

## Ms. Cruz-Packer Was Not Terminated From The Department of Corrections in 1998

Ms. Cruz-Packer moved to West Virginia in January of 1998 to spearhead that state's efforts to create a Capitol Police Department (Att. A at ¶3) for Governor Cecil Underwood. After Ms. Cruz-Packer accepted the position, however, the state determined that it could not afford to create the Police Department at that time due to budgetary constraints, and Ms. Cruz-Packer was given a political appointment as Program Manager in the Charlestown Work Release Program ("CWRP") with the Department of Corrections until a more suitable position could be found for her (Id.). She was the third in command at the CWRP under Donald Ervin, her first-line supervisor, and Manford Holland, her second-line supervisor (Id.).

---

[1]    Ms. Cruz-Packer filed a complaint in November of 2003 with OPM's Investigative Services regarding the unfair and incomplete background investigation that was conducted by OPM. That complaint is currently being investigated (Att. A at ¶2).

[2]    In selecting the penalty of removal, the Notice of Proposed Removal discusses Ms. Cruz-Packer's alleged misuse of her government credit card, which she has and continues to deny. Those allegations are only relevant to determining the severity of the discipline proposed to be taken. They were not asserted in the proposal as independent grounds for removal, and do not merit termination as evidenced by the fact that Ms. Cruz-Packer only received a five day suspension in connection with those charges in June of 2003. For present purposes, they are a closed matter which will not be discussed further here.

2

Ms. Cruz-Packer experienced resentment from Mr. Ervin, Mr. Holland, and her co-workers at the CWRP from her first day on the job (Att. A at ¶4-7). She was not told what her job duties were, denied training, excluded from staff meetings, and her efforts to improve conditions for the prisoners were met with hostility from the other managers (Id.). Ms. Cruz-Packer was outspoken about her disagreement with the manner in which Mr. Ervin and Mr. Holland ran the CWRP, especially the discrimination exhibited towards the inmates and herself (Id. at ¶7). She was an outsider in a closed West Virginia community and openly treated with contempt (Id.).

Despite the overt lack of support for her at CWRP, Ms. Cruz-Packer managed to begin a program to provide training for jobs for prisoners. These jobs entailed positions such as hairdressers, body shop work, upholstery positions, clerical work at fast food restaurants, cook position, and an apprentice librarian position (Att. A at ¶5). She also started a community-based program for prisoners, one which became so popular that prisoners relinquished passes to participate in it (Id. at ¶¶5-6). Local newspapers covered these new programs (Id. at ¶6). Mr. Ervin's response to Ms. Cruz-Packer was limited to telling her that this abused prisoner's furlough privileges (Id.).

In May of 1998, Mr. Ervin alleged that Ms. Cruz-Packer had engaged in misconduct; charges that were completely unfounded and untrue (Att. A at ¶¶8-10). Ms. Cruz-Packer immediately contacted Secretary Cox, to dispute the allegations. At that time, Ms. Cruz-Packer was in the process of adopting two children from the State of New York, and her husband had just been diagnosed with a terminal illness that necessitated her immediate return to New York to care for him (Id. at ¶8). Despite her desire to remain in West Virginia to formally contest the charges made by CWRP management, Ms. Cruz-Packer voluntarily resigned in order to return to New York to attend to her husband and children (Id.). Ms. Cruz-Packer was not terminated (Id. at ¶¶8-10; Att. B at ¶¶6-7).

When OPM investigated Ms. Cruz-Packer's employment at the West Virginia Division of Corrections, it reportedly discovered that she was "dismissed on 5/21/1998" (Att. D at 1). According to the ROI, Mr. Manford Holland, Ms. Cruz-Packer's second-line supervisor, officially terminated her employment (Id. at 4). As confirmed by Mr. Cox, Mr. Holland did not and could not have terminated Ms. Cruz-Packer, who was a political appointee (Att. B at ¶¶6-8). The only official who could have done so was the Commissioner of Corrections, and only with Mr. Cox's approval and written concurrence. (Id.). Mr. Cox's approval was neither sought nor given. (Id. at ¶8). Therefore, the CWRP personnel records cited in OPM's report, which supposedly reflect that Ms. Cruz-Packer was "dismissed" from that position, are inaccurate and unauthorized (Att. D at 2).

## Ms. Cruz-Packer Reported Her Departure
## From the CWRP On Her Security Clearance Form

Even though she was not terminated from the West Virginia Division of Corrections position, Ms. Cruz-Packer did notify TSA of her departure from that job on her Declaration of Federal Employment at Questions 12 and 16 (Att. E). She explicitly stated that she resigned on the basis of a "mutual agreement between the Director of Public Safety (Otis Cox) and [herself]."

3

(Att. E, Question 16). That form was signed by Ms. Cruz-Packer the same day she signed her SF-86 and was attached to the SF-86 (Att. A at ¶¶11-12, Att. C, E).

Ms. Cruz-Packer did not deliberately omit the West Virginia job in her response to Question 22 on the SF-86 (Att. A at ¶¶13-17). She inadvertently listed the events in chronological order, rather than reverse order, as she had on other sections of the form (e.g. Att. C, Question 10), and did not have space to list the 1998 CWRP position underneath the 1997 Volunteers of America position (Id. at Question 22). Instead, she listed her departure from the CWRP position in the "Continuation Space" portion of the Declaration of Federal Employment, at Question 16, which was attached to the SF-86 (Att. E, Att. A at ¶¶11-12, 15-16).

Ms. Cruz-Packer's SF-86 and Declaration of Federal Employment were signed on the same date, stapled together, and submitted as one document (Att. A at ¶¶11-12). Ms. Cruz-Packer disclosed her 1998 departure from the CWRP at the same time she provided notice of her 1997 termination from Volunteers of America (Id.). [3] TSA was therefore fully informed of Ms. Cruz-Packer's employment history, and its allegation that she failed to disclose that information is groundless.

As explained above, Ms. Cruz-Packer was not terminated from her position at the West Virginia Department of Corrections, rather she voluntarily resigned for family emergency reasons and returned to New York so that she could attend to the adoption mediation for her children, and her husband who was terminally ill. Ms. Cruz-Packer did provide information about her voluntary departure from that position to TSA in an attachment to her SF-86, which was signed and submitted to TSA on March 24, 2003, but which was inexplicably not included as an exhibit to TSA's Proposal to Remove (Att. C, E). Additionally, the OPM report on which the agency relied is inaccurate, and directly controverted by the official whose authorization would have been required to terminate Ms. Cruz-Packer (Att. A at ¶¶ 4, 10; Att. B at ¶¶6-8). The evidence provided by Ms. Cruz-Packer supports her account of the events, and demonstrates that she more than complied with her obligations to disclose her employment history to TSA. The agency has no grounds for finding Ms. Cruz-Packer unsuitable for federal service; accordingly, Ms. Cruz-Packer requests that the agency withdraw and expunge the notice of proposed removal and restore her to active duty status.

Very truly yours,

Robert C. Seldon, Esq.
Molly E. Buie, Esq.

cc:    Linda Cruz-Packer
       Martina Griggs Johnson

---

[3]    The Declaration of Federal Employment was not attached as an exhibit to the Proposal to Remove. Ms. Cruz-Packer obtained the attached copy (Att. E) through a document request to TSA.

4

**ATTACHMENT C**

# *Robert C. Seldon & Associates, P.C.*

*Attorneys-At-Law*
*1319 F Street, N.W., Suite 305*
*Washington, DC 20004*
*202-955-6968 · fax: 202-318-2287*

February 11, 2004

**VIA FACSIMILE & FIRST CLASS MAIL**
Mr. Gary Krizanovic, Deputy Director
Personnel Security & Credentialing Program Office
TSA Headquarters – East Building
TSA-19 8th Floor
601 S.12[th] Street
Arlington, VA  22202-4220

RE:    **OPM Investigation of Linda Cruz-Packer**

Dear Mr. Krizanovic,

On October 24, 2003, the agency issued a Notice of Proposed Removal to terminate our client, Ms. Cruz-Packer, from the federal service. The sole support for the issuance of this Notice was the allegedly unfavorable results of OPM's background investigation of Ms. Cruz-Packer, which supposedly revealed that Ms. Cruz-Packer was unsuitable for federal employment because she had been terminated from a previous job, and failed to fully disclose that information on her SF-86. Because the Notice of Proposed Removal only contained a portion of OPM's investigative report, Ms. Cruz-Packer submitted a Freedom of Information Act request to OPM on January 21, 2004 in order to obtain the complete record of investigation.

We just received OPM's response to our FOIA request, dated February 9, 2003 (Att. A). In it, OPM notified Ms. Cruz-Packer that her FOIA request could not be processed because the investigation is still in progress. Since the OPM investigation – is admittedly incomplete, there is no basis whatsoever for continuing Ms. Cruz-Packer in administrative leave capacity, much less requiring her to have taken annual leave to submit a reply to the proposed termination.

OPM's letter confirms our position exactly: Ms. Cruz-Packer's proposed termination was the product of OPM's inadequate and incomplete background investigation, and Mr. Scanlon's rush to act before a full record was available to him. As Ms. Cruz-Packer stated in her Reply to the Notice of Proposed Removal, the statements of Donald Ervin and Sharon Spurlock were untruthful, and easily could have been refuted by Otis Cox, had he been interviewed by OPM. Mr. Cox confirmed in a sworn affidavit that was attached to Ms. Cruz-Packer's Reply that he was the only official who could have authorized Ms. Cruz Packer's termination from the

Department of Corrections, and he did not do so. Further, Ms. Cruz-Packer provided evidence that she did report her departure upon mutual agreement from the West Virginia Department of Corrections on her Declaration of Federal Employment, which was attached to her SF-86.

Rather than wait for OPM to complete its investigation, however, TSA moved to terminate Ms. Cruz-Packer based on the fabricated statements of two witnesses who had ill motives for making them. At the same time, it ignored Ms. Cruz-Packer's truthful answers to questions 12 and 16 on the Declaration of Federal Employment which was in the agency's possession. The evidence cited in TSA's Notice of Proposed Removal, including OPM's deficient and <u>unfinished</u> investigation, <u>cannot</u> support the agency's proposed termination of Ms. Cruz-Packer. Accordingly, we request that TSA immediately reinstate Ms. Cruz-Packer, and withdraw the Notice of Proposed Termination unless and until it can provide complete, accurate, and properly documented evidence to support its charges.

We will await the agency's response at your earliest opportunity. If we do not hear from you before the week is out, we will advise Ms. Cruz-Packer to contact her EEO counselor about the agency's failure to restore her to active duty and to require her to take annual leave to submit her Reply.

Very truly yours,

Robert C. Seldon, Esq.
Molly E. Buie, Esq.

cc:    Linda Cruz-Packer

2

**ATTACHMENT D**

# Declaration for Federal Employment

Form Approved
OMB No. 3206-0182

## Instructions

The information collected on this form is used to determine your acceptability for Federal and Federal contract employment and your enrollment status in the Government's Life Insurance program. You may be asked to complete this form at any time during the hiring process. Follow instructions that the agency provides. If you are selected, before you are appointed you will be asked to update your responses on this form and on other materials submitted during the application process and then to recertify that your answers are true.

All your answers must be truthful and complete. A false statement on any part of this declaration or attached forms or sheets may be grounds for not hiring you, or for firing you after you begin work. Also, you may be punished by a fine or imprisonment (U.S. Code, title 18, section 1001).

Either type your responses on this form or print clearly in dark ink. If you need additional space, attach letter-size sheets (8.5" X 11"). Include your name, Social Security Number, and item number on each sheet. We recommend that you keep a photocopy of your completed form for your records.

## Privacy Act Statement

The Office of Personnel Management is authorized to request this information under sections 1302, 3301, 3304, 3328, and 8716 of title 5, U. S. Code. Section 1104 of title 5 allows the Office of Personnel Management to delegate personnel management functions to other Federal agencies. If necessary, and usually in conjunction with another form or forms, this form may be used in conducting an investigation to determine your suitability or your ability to hold a security clearance, and it may be disclosed to authorized officials making similar, subsequent determinations.

Your Social Security Number (SSN) is needed to keep our records accurate, because other people may have the same name and birth date. Public Law 104-134 (April 26, 1996) asks Federal agencies to use this number to help identify individuals in agency records. Giving us your SSN or any other information is voluntary. However, if you do not give us your SSN or any other information requested, we cannot process your application. Incomplete addresses and ZIP Codes may also slow processing.

ROUTINE USES: Any disclosure of this record or information in this record is in accordance with routine uses found in System Notice OPM/GOVT-1, General Personnel Records. This system allows disclosure of information to: training facilities; organizations deciding claims for retirement, insurance, unemployment, or health benefits; officials in litigation or administrative proceedings where the Government is a party; law enforcement agencies concerning a violation of law or regulation; Federal agencies for statistical reports and studies; officials of labor organizations recognized by law in connection with representation of employees; Federal agencies or other sources requesting information for Federal agencies in connection with hiring or retaining, security clearance, security or suitability investigations, classifying jobs, contracting, or issuing licenses, grants, or other benefits; public and private organizations, including news media, which grant or publicize employee recognitions and awards; the Merit Systems Protection Board, the Office of Special Counsel, the Equal Employment Opportunity Commission, the Federal Labor Relations Authority, the National Archives and Records Administration, and Congressional offices in connection with their official functions; prospective non-Federal employers concerning tenure of employment, civil service status, length of service, and the date and nature of action for separation as shown on the SF 50 (or authorized exception) of a specifically identified individual; requesting organizations or individuals concerning the home address and other relevant information on those who might have contracted an illness or been exposed to a health hazard; authorized Federal and non-Federal agencies for use in computer matching; spouses or dependent children asking whether the employee has changed from a self-and-family to a self-only health benefits enrollment; individuals working on a contract, service, grant, cooperative agreement, or job for the Federal government; non-agency members of an agency's performance or other panel; and agency-appointed representatives of employees concerning information issued to the employees about fitness-for-duty or agency-filed disability retirement procedures.

## Public Burden Statement

Public burden reporting for this collection of information is estimated to vary from 5 to 30 minutes with an average of 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of the collection of information, including suggestions for reducing this burden, to the U.S. Office of Personnel Management, Reports and Forms Manager (3206-0182), Washington, DC 20415-7900. The OMB number, 3206-0182, is valid. OPM may not collect this information, and you are not required to respond, unless this number is displayed.

03008433

# Declaration for Federal Employment

Form Approved
OMB No. 3206-0182

## GENERAL INFORMATION

1. **FULL NAME** *(First, middle, last)*

   ◆ Linda Yuetta Cruz-Packer

2. **SOCIAL SECURITY NUMBER**

   ◆ 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

3. **PLACE OF BIRTH** *(Include city and state or country)*

   ◆ Clarksville, Tenn

4. **DATE OF BIRTH** *(MM/DD/YYYY)*

   ◆ 05-20-1951

5. **OTHER NAMES EVER USED** *(For example, maiden name, nickname, etc)*

   ◆ Wakefield (maiden)

   ◆ Pippen (married

6. **PHONE NUMBERS** *(Include area codes)*

   Day ◆ (571) 227-1681

   Night ◆ (301) 234-0097

## Selective Service Registration

If you are a male born after December 31, 1959, and are at least 18 years of age, civil service employment law (5 U.S.C. 3328) requires that you must register with the Selective Service System, unless you meet certain exemptions.

7a. Are you a male born after December 31, 1959? ☐ YES ☑ NO *If "NO" skip 7b and 7c. If "YES" go to 7b.*

7b. Have you registered with the Selective Service System? ☐ YES ☑ NO *If "NO" go to 7c.*

7c. If "NO," describe your reason(s) in item #16.

## Military Service

8. Have you ever served in the United States military? ☑ YES *Provide information below* ☐ NO

   *If you answered "YES," list the branch, dates, and type of discharge for all active duty.*

   *If your only active duty was training in the Reserves or National Guard, answer "NO."*

| Branch | From MM/DD/YY | To MM/DD/YY | Type of Discharge |
|--------|---------------|-------------|-------------------|
| Army | 1/3/72 | 7/373 | Honorable |
| | | | |
| | | | |

## Background Information

For all questions, provide all additional requested information under item 16 or on attached sheets. The circumstances of each event you list will be considered. However, in most cases you can still be considered for Federal jobs.

For questions 9,10, and 11, your answers should include convictions resulting from a plea of *nolo contendere* (no contest), but omit (1) traffic fines of $300 or less, (2) any violation of law committed before your 16th birthday, (3) any violation of law committed before your 18th birthday if finally decided in juvenile court or under a Youth Offender law, (4) any conviction set aside under the Federal Youth Corrections Act or similar state law, and (5) any conviction for which the record was expunged under Federal or state law.

| | | YES | NO |
|---|---|---|---|
| 9. | During the last 10 years, have you been convicted, been imprisoned, been on probation, or been on parole? (Includes felonies, firearms or explosives violations, misdemeanors, and all other offenses.) *If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the police department or court involved.* | ☐ | ☒ |
| 10. | Have you been convicted by a military court-martial in the past 10 years? *(If no military service, answer "NO.")* If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the military authority or court involved. | ☐ | ☒ |
| 11. | Are you now under charges for any violation of law? *If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the police department or court involved.* | ☐ | ☒ |
| 12. | During the last 5 years, have you been fired from any job for any reason, did you quit after being told that you would be fired, did you leave any job by mutual agreement because of specific problems, or were you debarred from Federal employment by the Office of Personnel Management or any other Federal agency? *If "YES," use item 16 to provide the date, an explanation of the problem, reason for leaving, and the employer's name and address.* | ☐ | ☐ |
| 13. | Are you delinquent on any Federal debt? (Includes delinquencies arising from Federal taxes, loans, overpayment of benefits, and other debts to the U.S. Government, plus defaults of Federally guaranteed or insured loans such as student and home mortgage loans.) *If "YES," use item 16 to provide the type, length, and amount of the delinquency or default, and steps that you are taking to correct the error or repay the debt.* | ☒ | ☐ |

U.S. Office of Personnel Management
5 U.S.C. 1302, 3301, 3304, 3328 & 8716

NSN 7540-01-368-7775

Optional Form 306
Revised January 2001
Previous editions obsolete and unusable



03008433

Declaration for ..... eral Employment

Form Approved
OMB No. 3206-0182

## Additional Questions

14. Do any of your relatives work for the agency or government organization to which you are submitting this form? (Include: father, mother, husband, wife, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother, and half sister.) If "YES," use item 16 to provide the relative's name, relationship, and the department, agency, or branch of the Armed Forces for which your relative works.

YES ☐  NO ☒

15. Do you receive, or have you ever applied for, retirement pay, pension, or other retired pay based on military, Federal civilian, or District of Columbia Government service?

YES ☐  NO ☒

## Continuation Space / Agency Optional Questions

16. Provide details requested in items 7 through 15 and 18c in the space below or on attached sheets. Be sure to identify attached sheets with your name, Social Security Number, and item number, and to include ZIP Codes in all addresses. If any questions are printed below please answer as instructed (these questions are specific to your position and your agency is authorized to ask them).

Division of Correction  (6/98)          This job is on the borderline of
112 California Ave, Bldg 4 RM30          being 5 years -
Charleston, WV 25301
Job promised could not be granted. Due to start up cost. Couple with Fam.
stress, Relocation: mutual agreement between Director of Public Safety (Otis Cox)
+ myself to leave

## Certifications / Additional Questions

APPLICANT: If you are applying for a position and have not yet been selected, carefully review your answers on this form and any attached sheets. When this form and all attached materials are accurate, read item 17, and complete 17a.

APPOINTEE: If you are being appointed, carefully review your answers on this form and any attached sheets, including any other application materials that your agency has attached to this form. If any information requires correction to be accurate as of the date you are signing, make changes on this form or the attachments and/or provide updated information on additional sheets, initialing and dating all changes and additions. When this form and all attached materials are accurate, read item 17, complete 17b, read 18, and answer 18a, 18b, and 18c as appropriate.

17. I certify that, to the best of my knowledge and belief, all of the information on and attached to this Declaration for Federal Employment, including any attached application materials, is true, correct, complete, and made in good faith. I understand that a false or fraudulent answer to any question or item on any part of this declaration or its attachments may be grounds for not hiring me, or for firing me after I begin work, and may be punishable by fine or imprisonment. I understand that any information I give may be investigate for purposes of determining eligibility for Federal employment as allowed by law or Presidential order. I consent to the release of information about my ability and fitness for Federal employment by employers, schools, law enforcement agencies, and other individuals and organizations to investigators, personnel specialists, and other authorized employees or representatives of the Federal Government I understand that for financial or lending institutions, medical institutions, hospitals, health care professionals, and some other sources of information, a separate specific release may be needed, and I may be contacted for such a release at a later date.

17a. Applicant's Signature: *Linda Cruz-Packer*   Date  3/24/03
(Sign in ink)

Appointing Officer:
Enter Date of Appointment or Conversion
MM / DD / YYYY

17b. Appointee's Signature: _____  Date _____
(Sign in ink)

18. Appointee (Only respond if you have been employed by the Federal Government before): Your elections of life insurance during previous Federal employment may affect your eligibility for life insurance during your new appointment. These questions are asked to help your personnel office make a correct determination.

18a. When did you leave your last Federal job?   DATE: __MM / DD / YYYY__

18b. When you worked for the Federal Government the last time, did you waive Basic Life Insurance or any type of optional life insurance?

YES ☐  NO ☐  Do Not Kn ☐

18c. If you answered "YES" to item 18b, did you later cancel the waiver(s)? If your answer to item 18c is "NO," use item 16 to identify the type(s) of insurance for which waivers were not canceled.

YES ☐  NO ☐  Do Not Kn ☐

U.S. Office of Personnel Management
5 U.S.C. 1302, 3301, 3304, 3328 & 8716

NSN 7540-01-368-7775

Optional Form
Revised January
Previous editions obsolete and unus

**ATTACHMENT E**

Subj:     **Formal complaint of discrimination**
Date:     3/15/2005 5:36:31 PM Eastern Standard Time
From:     cagfisher@comcast.net
To:       Llycpacker@aol.com

Linda:

Attached are the supplemental pages to your complaint of discrimination and a cover letter to Tamara Miller, establishing that we received your Notice of Right to File on 3/1/05 via facsimile.

I know we discussed your veteran status, with respect to this complaint, it is not relevant, as EEO law does not contain special provisions as to veterans (that is a MSPB issue). Also, you will note that I set forth your complaint in more general terms, since so much of your specifics were set forth in your previous complaints ( which I referenced). Keep in mind that we need only to set forth sufficient facts to put the Agency on notice as to how you believe you were discriminated against at this stage of the matter.

Let me know your feedback and we can discuss how to proceed from here.

CAF

Crystal A.G. Fisher, Esquire
CAROLYN C. EAGLIN & ASSOCIATES
431 N. Lee Street
Alexandria, Virginia 22314
(703) 549-9041 (P)
(703) 549-9043 (F)
In Maryland:
(301) 843-4019 (P)
(301) 843-4017 (F)

15.   Ms. Cruz Packer alleges the following:

(a) **That the termination of her employment was a continuation of the disparate treatment she experienced due to her race, color, sex and age.**

As described in Ms. Cruz-Packer's prior complaint with the TSA Office of Civil Rights, No. TSA-04-00999, Ms. Cruz-Packer has and continues to allege that she was subject to disparate treatment by TSA officials during her employment. Specifically, she contends that she was treated differently than her White male counterparts by her supervisors with respect to actions taken related to alleged credit card misuse, scheduling, firearm qualification, and the investigation of Ms. Cruz-Packer's background. As to the security investigation, Ms. Cruz-Packer further contends that she was treated differently as to the manner in which the investigation was conducted by the Agency; the timing, nature and basis of opportunity with she was provided to respond to adverse information arising out of said investigation, and; the severity of action (i.e., indefinite suspension and termination) taken by the Agency in light of the adverse information upon which such actions were based.

(b) **That the termination of her employment represented a continuation of the hostile work environment she experienced due to her race, color, sex and age.**

Ms. Cruz-Packer contends that the same conduct and behavior by her supervisors as described above created and maintained a hostile work environment to which she was subjected, which ultimately led to and included the termination of her employment on November 18, 2004.

(c)   **That the termination of her employment represented retaliation based upon her prior EEO activity.**

Ms. Cruz Packer also alleges that the termination action was done in reprisal for her prior EEO activity, i.e., the filing of a complaint of discrimination with the TSA Office of Civil Rights, No. TSA-04-0099, on or about October 21, 2003. Ms. Cruz-Packer further contends that she made informal complaints about discrimination to Assistant Secretary David M. Stone and other TSA officials, both as an individual and as a member of the National Organization of Black Law Enforcement Executives (NOBLE), in that her involvement with said organization was known and acknowledged at the Agency.

## 19. Remarks and Explanations

*i.   Proposed Witnesses (Ms. Cruz-Packer refers to the Witness List provided in Complaint No. TSA-04-0099 in addition to those listed below):*

(a) **Hector Santana**:  Mr. Santana was Ms. Cruz-Packer's first-line supervisor and the one of the alleged discriminating officials.  Mr. Santana was involved in much of the conduct complained of herein.

(b) **Lou Widawski,** Deputy Director of Program Reviews and Special Operations: Was the official who proposed Ms. Cruz-Packer's indefinite suspension, and has knowledge of the background investigation performed on Ms. Cruz-Packer, as well as conduct by Santana complained of herein.

(c) **John Rooney,** Director of Program Reviews and Special Operations: Was the deciding official with respect to the proposed indefinite suspension and has knowledge of Ms. Cruz-Packer's prior complaints about Santana.

(d) **Gary Krizanovic,** Deputy Director of the Credentialing Program Office: Has knowledge regarding Ms. Cruz-Packer's background investigation and the information received from OPM, and the further investigation done by TSA concerning her background.

(e) **Robert Scanlon,** Assistant Director, Personnel Security & Credentialing Program Office: Was the official who proposed Ms. Cruz-Packer's removal. Has knowledge regarding Ms. Cruz-Packer's background investigation and the information received from OPM, and the further investigation done by TSA concerning her background.

(f) **Joy S. Fairtile,** Deputy Director, Office of Transportation Vetting and Credentialing: Was the deciding official as to Ms. Cruz-Packer's removal from federal service.

(g) **Otis Cox**: Served as the Secretary of Public Safety for the State of West Virginia during Ms. Cruz-Packer's employment with the Divisions of Corrections and has knowledge of the circumstances of Ms. Cruz-Packer's employment and departure from that position, as it relates to the actions taken against her by TSA with respect to the security background investigation.

ii.     *Appeals to the Merit Systems Protection Board (Question 18):*

Ms. Cruz-Packer appealed the indefinite suspension action to the Board on October 21, 2004 . The matter was dismissed, without prejudice, due to Ms. Cruz-Packer's removal from federal service on November 18, 2004. See Initial Decision, Cruz-Packer v. Dep't of Homeland Security, Docket No. DC-0752-04-0640-I-2, dated January 14, 2005, attached hereto.

2

# TRANSPORTATION SECURITY ADMINISTRATION

## MEMORANDUM OF INTERVIEW

**Subject Interviewed:**
ARMSTRONG, WAYNE
Director of Human Resources
Division of Corrections
State of West Virginia
Charleston, West Virginia
(304) 558-8045/8049

**Date and Time:**
4/20/04, 1:00 PM

**Details of Interview:**
ARMSTRONG was interviewed regarding an allegation developed during a background investigation that LINDA CRUZ-PACKER, Special Agent, Internal Affairs Division, DHS, TSA, Arlington, VA may have made false written statements on Office of Personnel Management (OPM) Standard Form (SF) 86, Questionnaire for National Security Positions, and OPM Optional Form (OF) 306, Declaration for Federal Employment. Specifically, CRUZ-PACKER did not list her termination from the West Virginia Division of Corrections on her SF 86. In addition, CRUZ-PACKER stated on her OF 306 that she left her position with the (West Virginia) Division of Corrections as a result of a "mutual agreement" between her and the Director of Public Safety, OTIS COX. This information is contrary to information obtained in the course of CRUZ-PACKER's background investigation that indicated she had been dismissed/fired from the West Virginia Division of Corrections. The interview was conducted at 607 Leon Sullivan Way, Charleston, WV. Prior to interviewing ARMSTRONG he was placed under oath.

ARMSTRONG essentially stated the following:

He has been the Director of Human Resources since April 2001. He was not involved in any of CRUZ-PACKER's personnel matters, but he knew that she had been dismissed/terminated from her employment with the Division of Corrections. CRUZ-PACKER had been a "160-day Temporary Employee". The Commissioner of the Division of Corrections (WILLIAM DAVIS) would have signature authority (the ability to sign documents on behalf of his superior) to dismiss/terminate Correction Division employees. The Commissioner would have given signature authority to his Deputy Commissioner (MANFRED HOLLAND). Therefore, HOLLAND would have had the authority to dismiss/terminate CRUZ-PACKER. Before an employee of the Division of Corrections can be fired, he should be consulted, but this does not always

Exhibit X
1 of 2

happen. COX could have only hired and fired those employees that worked directly for him and were physically located in his office. CRUZ-PACKER could not have been appointed by COX, but rather COX could recommend her to be hired. If CRUZ-PACKER was an "at-will" employee (political appointee) she would have no rights of employment.

The Personnel Action Form (WV11) is used to document employee personnel matters to include when an employee is fired. If CRUZ-PACKER was fired by the Deputy Commissioner of Corrections, the WV11 would be routed through COX's office, as well as the Division of Personnel for the State of West Virginia. BARBARA WIMER used to work as the Executive Secretary for COX, and COX may have given her signature authority.

His office does not have any hard-copy documentation regarding CRUZ-PACKER. He requested a search of CRUZ-PACKER's personnel file through the West Virginia State archives, but no records were found.

<u>Steve Geary, Special Agent</u>
 **TSA CPO Case Agent**

Exhibit V
2 of 2

## WITNESSES

1. **Otis Cox** – (telephone: 202 366-2119) Mr. Cox is the Assistant Administrator with NHTSA, Department of Transportation, Washington, DC. Mr. Cox was the only person who could have authorized Ms. Cruz-Packer's termination from the West Virginia Department of Corrections, and he will attest that he did not make any such authorization. He has knowledge of the circumstances of Ms. Cruz-Packer's departure from that position. Mr. Cox can also attest to the fact that he was never contacted by TSA or OPM in connection with Ms. Cruz-Packer's background investigation prior to TSA's proposed removal of her.

2. **Hector Santana** * (Hispanic male) – Mr. Santana is Ms. Cruz-Packer's first-line supervisor and the primary manager who has discriminated and retaliated against her. Mr. Santana has knowledge of all aspects of this case.

3. **Lou Widawski** * (white male)- Mr. Widawski is the Deputy Director of Program Reviews and Special Operations and is Ms. Cruz-Packer's second line supervisor. He has knowledge relevant to many of the claims raised by Ms. Cruz-Packer, and was present when she discovered items missing from my desk. He can attest to his refusal to investigate the misuse of Ms. Cruz-Packer's government credit card as reported by her in October of 2003.

4. **Allan Cahill** * –(white male) can provide the details of how Ms. Cruz-Packer's picture came to be posted at the building entrances. Mr. Cahill was the Agent who provided the picture.

5. **Robert Boswell** * – (African American) has knowledge of Ms. Cruz-Packer's performance in the firearms training in January of 2003, and the need for her to requalify; specifically he can attest to the actions taken by the instructors after she initially qualified. Mr. Boswell can also provide information on the denial of follow-up after Ms. Cruz-Packer reported the misuse of her government credit card in October of 2003.

6. **Alonzo Webb** * – (African American) can provide information regarding the firearms qualifying. Can also provide information regarding Ms. Cruz-Packer attempting to place a theft report when Ms. Cruz-Packer discovered items missing from her desk. Also has knowledge of Ms. Cruz-Packer's picture being posted at the building entrances.

7. **Steve Iannucci** * – (white male) Can provide information regarding Ms. Cruz-Packer's attempts to place a theft report when she discovered items missing from her desk. Mr. Iannucci was also Ms. Cruz-Packer's first Supervisor when she came on board with TSA.

8. **Lon Warfield \*** – (white male) Mr. Santana brought Mr. Warfield to Ms. Cruz-Packer's home, supposedly to pick up TSA property, while Ms. Cruz-Packer was on suspension. He has knowledge of that event.

9. **Rochelle Graves \*** (African American female) – Can attest to the fact that Ms. Cruz-Packer's picture was posted by the building entrances during the time she was suspended.

10. **Karen Wycke \*** (white female) Can attest to the issues described as safety issues regarding Ms. Cruz-Packer's firearms qualification. She and SA Plavick were present at the range that day, and qualified alongside Ms. Cruz-Packer.

11. **Janice Plavick \*** (white female) Can attest to the issues described as safety issues regarding Ms. Cruz-Packer's firearms qualification. She was present at the range that day and qualified alongside Ms. Cruz-Packer. She can also provide information regarding Ms. Cruz-Packer's photo being posted in TSA's entrances.

12. **John Rooney \*** (white male) Director of Program Reviews and Special Operations and Mr. Santana's second line supervisor, can attest to Ms. Cruz-Packer's concerns regarding discrimination actions against her by Mr. Santana. (met with him twice regarding Mr. Santana's biased actions).

**\* Indicates** an agency employee

**ATTACHMENT A**

Linda Cruz-Packer
4800 Megan Drive
Clinton, MD  20735
(301) 234-0097

November 5, 2003

Janet White
Office of Civil Rights
EEO Counselor
TSA Hq., West  Tower
601  South12th Street
Arlington, VA.  22202-4220

Re: TSA-04-0099
Linda Cruz-Packer

Dear Ms. White:

This letter is written to summarize our telephone conversation on
Tuesday, October 21, 2003, which initiated the administrative
discrimination and retaliation complaints process on behalf of myself,
Linda Cruz-Packer.  My first contact with your office on (Ravleen) was
on October 13, 2003.  The bases for my complaint are discrimination
based on my race, sex, and handicap, as well as retaliation for filing
EEO complaints against a previous employer (Volunteers of America) and
initiating the informal complaints process at TSA.

I am presently employed as a Special Agent Band J, in TSA's Office of
Internal Affairs and Program Review, where I have worked for the past 18
months. I am also a veteran and served in the United States Army.  The
specific matters which give rise to this complaint were the proposal to
terminate me from my position, dated October 24, 2003, and my placement
on administrative leave, which began on June 13, 2003.

On December 29, 2002, I was assigned to TSA's Office of Program Reviews
and Special Operations  I was treated as an outsider on a team that
contained Agents who had worked together previously and knew each other
prior to working at TSA.  Outside of my immediate supervisor, Hector
Santana, the entire team was white except for one other Black female.

Mr. Santana treated me differently from the rest of the team.  He very
seldom spoke to me and whenever he did he almost always met with me in
the presence of Deputy Director Lou Widawski. Uniformly, Mr. Santana
would repeat whatever information he wanted to convey to me numerous
time, so many times that the Deputy would interrupt Santana to inform
him that I understood what he was saying.  I was not given my choice
of assignments or preferred assignments meaning (cities) as were team
members who were not black or female. Even though I recall picking at
least six cities beside the lone choice of Chicago, that I was granted.

Mr. Santana harassed me by accusing me of stealing time, in that he
accused me of leaving  leaving early from work and not doing my required
10 hours a day.  Eventually, on April 16, 2003, he changed my core
hours.  I do not believe that this was done to any nonminority agents.

Mr. Santana allowed the male, white members of our team to take leave on
Father's Day.  However, he required me to work on Mothers Day (May 10,
2003).  On that occasion, Mr. Santana assigned me to work out of town,
away from my two children.

Page two
November 5, 2003
TSA-04-0099

On January 28 and 29, 2003, I attended Firearms training and qualified with a score of over 240. The cut-off score was 210. However, Mr. Santana directed me to take the test again and re-qualify some 3 months later on April 18, 2003, reportedly for safety reasons. This was not done for any other agent.

On April 11, 2003, I continued to be harassed by management in that they required me to write a letter about my fitness for duty and directed me to return my handicapped license plates to the state of Maryland. For the record, I am perfectly fit for duty; the handicap plates were for my late husband's disabilities, which do not interfere with my work.

On May 2, 2003, I was called to a meeting with Mr. Santana and Mr. Widawski, and given a memo instructing me to respond back in written form before May 6, 2003, regarding Travel Card Charges on my government credit card, for three advance charges of $500 each, and several rental car useage. I was not allowed to respond to the memo verbally at that time. On May 5, 2003, I hand delivered my written response to my Director John Rooney. Mr. Santana and Mr. Widawski were not in the office that day.

My witten response demonstrated that I had not misused my government credit card. Specifically, at that time it made clear that I had inadvertly missused the credit card, mistaking it for my personal Citibank credit card which was similar in color.

For the record, on October 8, 2003, I reported to SA Robert Boswell, Office of Internal Affairs, that I had filed a police report with Prince George's Police Department, and notified Citibank that someone had fraudulently misused my government credit card as well as several other credit cards that belonged to me. I also made Mr. Widawski aware of this matter. Sometime during that same week Mr. Widawski called me to inform me he would not be investigating this matter due to the fact he felt it was a personal matter, and I had reported it to the Prince George's County Police Department.

On June 13, 2003, after more than five weeks, around 5 pm, once again I was called into a meeting with Mr. Santana and Mr. Widawski, and advised I was going to be placed on a 5 day suspension, beginning on June 16, 2003. No other nonminority agent has been suspended on such grounds; nor do I believe that any have been suspended for any administrative-related matter, without first being certain that they had been adequately briefed on the policies and procedures in question, and signed a document indicating such.

Supposedly on account of this suspension, Mr. Santana arranged for my picture to be posted in the front lobby and garage guard gate of our building. The implication was that I was a wanted fugitive. Mr. Santana also volunteered to other agents in my office that he had to pull me off of my current work assignment because of this suspension.

On June 16, 2003, Mr. Santana continue discrimination and harassment by visiting my home to secure TSA property. There was no reason to do so.

Page three
November 5, 2003
TSA-04-0099

Without warning, on June 23, 2003, I was placed on Administrative Leave with pay. I was advised that this action had been taken due to unspecified "issues that surfaced in New York regarding my back ground check". I was given no specifics even though I inquired several times.

My placement on Administrative Leave for a matter that occurred in New York could only have been due to an EEO complaint I filed against my previous employer, Volunteers of America. Essentially, I was terminated by Volunteers of America after reporting that a white manager had physically assaulted a black employee. I filed a discrimination complaint over my termination and prevailed via a settlement.

For the record, on October 8, 2003, I reported to SA Robert Boswell that I had filed a police report with Prince George's Police Department, and notified Citibank that someone had fraudulently misused my government credit cards as well as several other credit cards that belonged to me. I also made Mr. Widawski aware of this matter. Sometime during that same week Mr. Widawski called me to inform me he would not be investigating this matter due to the fact that he felt it was a personal matter, and I had reported it to Prince George's County Police.

On October 10, 2003, I called Mr. Widawski to inform him I was going to the International Association of Chief of Police conference in Philadelphia, PA for two days October 23 and 24, 2003. He informed me that I would have to put in a leave slip. I advise him that I wanted to check with personnel prior to doing so. After checking I called him back and told him I had spoken to a Charles Robertson, who was acting in Janet Cammarota's absence, who advised me that I didn't have to take leave. Mr. Widawski informed me to have him call him and that he still wanted me to take leave. At this time I once again asked Mr. Widawski if he had any further information regarding my administrative leave status and he said he wasn't at liberty to discuss the matter, however he did state he believed I would be hearing something in the next couple of weeks.

On October 14, 2003, I attempted to call Ms. Cammarota and did not reach her until October 17, 2003. When questioned if I had to take leave, even though I was on administrative leave through no fault of my own, she informed me that she would check and get back with me. I received a voice mail from her on October 21, 2003, informing me that I did have to take leave contrary to what Mr. Anderson had told me.

On October 25, 2003, I received a Notice of Proposed Removal from the Office of Personnel Security and Credentialing Program Office to remove me from my position as a Special Agent based on the results of my background investigation. Once again I was not asked any questions about the allegations found nor was there any other interviews conducted that showed an unbiased observation.

On Tuesday October 28, 2003, I received permission to obtain personal belonging from my work area at TSA. After reviewing my work area, I discovered certain items missing from my desk and file cabinet, including my copy of the SF 86 which I submitted in connection with my background investigation. I reported this to my Deputy who was present at the time, subsequently, I attempted to place a theft report with both

Page four
November 5, 2003
TSA-04-0099

TSA security and also reported it to the Director of Investigations Mr. Iannuci. On October 30, 2003 Mr. Widawski called me back and told me he would arrange for me to make a report and provided me a telephone number (571) 227-2103 and name (Brian Williams) to call. I called the number twice and left my name and number and as of this date I have been unable to place a theft report. I wish to add these issues to my original complaint.

I believe I was discriminated against because of my race, sex, handicap status, and prior use of the administrative complaints process and because I voiced to my immediate supervisor, Mr. Santana his discriminatory handling of my suspension.

Sincerely,

Linda Cruz-Packer
Special Agent
Internal Affairs and Program Review

**ATTACHMENT B**

# *Robert C. Seldon & Associates, P.C.*

*Attorneys-At-Law*
*1319 F Street, N.W., Suite 305*
*Washington, DC 20004*
*202-955-6968 · fax: 202-318-2287*

January 27, 2004

**VIA FACSIMILE & FIRST CLASS MAIL**
Mr. Gary Krizanovic, Deputy Director
Personnel Security & Credentialing Program Office
TSA Headquarters – East Building
TSA-19 8th Floor
601 S.12th Street
Arlington, VA  22202-4220

RE:    **Reply to Notice of Proposed Removal by Linda Cruz-Packer**

Dear Mr. Krizanovic,

On October 24, 2003, our client, Linda Cruz-Packer, received a Notice of Proposed Removal from Mr. Robert J. Scanlon, Assistant Director of the Personnel Security and Credentialing Program Office (Att. C). The Notice did not contain the full record upon which Ms. Cruz-Packer's proposed termination was based, nor the background "investigation" conducted by the U.S. Office of Personnel Management. On behalf of Ms. Cruz-Packer, on October 31, 2003, we requested an extension to respond to the proposed removal in order to obtain the record underlying the Notice, garner necessary evidence, and obtain copies of other materials relating to her proposed removal. We also requested the foregoing materials.

We received a response from you on January 8, 2004. In addition to receiving copies of one or more critical documents not provided earlier, we also learned for the first time that TSA had not been in possession of the results of Ms. Cruz-Packer's background investigation when it proposed to terminate her. Consequently, we have filed a Freedom of Information Act request with OPM. This written reply is being filed on the schedule set in your letter of January 16, 2004. We hereby request the right to appear in person and present an oral reply.

The Notice of Proposed Removal sets out two grounds for terminating Ms. Cruz-Packer: 1) that she was terminated from her employment with the West Virginia Department of Corrections, Charlestown Work Release Program ("CWRP") in 1998 for misconduct; and 2) that she failed to disclose this termination on her application to TSA. The documentary record we have been able to assemble at this point demonstrates irrefutably that Ms. Cruz-Packer was <u>not</u> terminated from the CWRP, as confirmed by Otis Cox, the former Secretary for Public Safety for West Virginia whose authorization would have been required to terminate her (Att. B). Further, Ms. Cruz-Packer did disclose that she left the CWRP upon mutual agreement between herself

and Mr. Cox in response to Questions 12 and 16 on the Declaration of Federal Employment which was submitted as part of her SF-86 on March 24, 2003 (Att. A. at ¶¶11-17; Att. E).

Given the state of the evidence at present, we must register our vigorous objection to the agency proceeding any farther unless and until OPM releases its background "investigation," supporting documentation, and any related materials, as per our FOIA request. The simple truth, as demonstrated by Mr. Cox's Declaration, is that Ms. Cruz-Packer was not removed and could not have been removed from the CWRP without his concurrence, which "was neither sought nor given" (Att. B at ¶8). In short, this very disturbing affair is entirely the product of OPM's failure to conduct a proper and documented background investigation, and Mr. Scanlon's rush to act before a full record was available to him.

Returning to the specifics of the Notice of Proposed Removal, Ms. Cruz-Packer fully disclosed all information regarding her employment history, and in fact, exercised an abundance of caution by listing her voluntary departure from the CWRP on her Declaration of Federal Employment (Att. E, Question 12, 16). The OPM Report of Investigation, on which Mr. Scanlon relied to support the proposal to remove Ms. Cruz-Packer, did not contain the records of Ms. Cruz-Packer's supposed termination; include an interview with Mr. Cox, the only official who could have authorized Ms. Cruz Packer's supposed termination from the CWRP, or acknowledge that Ms. Cruz-Packer had disclosed her departure from the CWRP on her Declaration of Federal Employment (Att. C). TSA's proposed grounds for removing Ms. Cruz-Packer, as well as OPM's Report of Investigation, are inaccurate, unsubstantiated, and directly contradicted by the evidence (Att. A-C, E). [1]  Accordingly, Ms. Cruz-Packer requests that TSA withdraw the proposal to remove her, expunge all reference to it from her personnel file, and return her to active duty status. [2]

## Ms. Cruz-Packer Was Not Terminated From The Department of Corrections in 1998

Ms. Cruz-Packer moved to West Virginia in January of 1998 to spearhead that state's efforts to create a Capitol Police Department (Att. A at ¶3) for Governor Cecil Underwood. After Ms. Cruz-Packer accepted the position, however, the state determined that it could not afford to create the Police Department at that time due to budgetary constraints, and Ms. Cruz-Packer was given a political appointment as Program Manager in the Charlestown Work Release Program ("CWRP") with the Department of Corrections until a more suitable position could be found for her (Id.). She was the third in command at the CWRP under Donald Ervin, her first-line supervisor, and Manford Holland, her second-line supervisor (Id.).

---

[1]     Ms. Cruz-Packer filed a complaint in November of 2003 with OPM's Investigative Services regarding the unfair and incomplete background investigation that was conducted by OPM. That complaint is currently being investigated (Att. A at ¶2).

[2]     In selecting the penalty of removal, the Notice of Proposed Removal discusses Ms. Cruz-Packer's alleged misuse of her government credit card, which she has and continues to deny. Those allegations are only relevant to determining the severity of the discipline proposed to be taken. They were not asserted in the proposal as independent grounds for removal, and do not merit termination as evidenced by the fact that Ms. Cruz-Packer only received a five day suspension in connection with those charges in June of 2003. For present purposes, they are a closed matter which will not be discussed further here.

2

Ms. Cruz-Packer experienced resentment from Mr. Ervin, Mr. Holland, and her co-workers at the CWRP from her first day on the job (Att. A at ¶4-7). She was not told what her job duties were, denied training, excluded from staff meetings, and her efforts to improve conditions for the prisoners were met with hostility from the other managers (Id.). Ms. Cruz-Packer was outspoken about her disagreement with the manner in which Mr. Ervin and Mr. Holland ran the CWRP, especially the discrimination exhibited towards the inmates and herself (Id. at ¶7). She was an outsider in a closed West Virginia community and openly treated with contempt (Id.).

Despite the overt lack of support for her at CWRP, Ms. Cruz-Packer managed to begin a program to provide training for jobs for prisoners. These jobs entailed positions such as hairdressers, body shop work, upholstery positions, clerical work at fast food restaurants, cook position, and an apprentice librarian position (Att. A at ¶5). She also started a community-based program for prisoners, one which became so popular that prisoners relinquished passes to participate in it (Id. at ¶¶5-6). Local newspapers covered these new programs (Id. at ¶6). Mr. Ervin's response to Ms. Cruz-Packer was limited to telling her that this abused prisoner's furlough privileges (Id.).

In May of 1998, Mr. Ervin alleged that Ms. Cruz-Packer had engaged in misconduct; charges that were completely unfounded and untrue (Att. A at ¶¶8-10). Ms. Cruz-Packer immediately contacted Secretary Cox, to dispute the allegations. At that time, Ms. Cruz-Packer was in the process of adopting two children from the State of New York, and her husband had just been diagnosed with a terminal illness that necessitated her immediate return to New York to care for him (Id. at ¶8). Despite her desire to remain in West Virginia to formally contest the charges made by CWRP management, Ms. Cruz-Packer voluntarily resigned in order to return to New York to attend to her husband and children (Id.). Ms. Cruz-Packer was not terminated (Id. at ¶¶8-10; Att. B at ¶¶6-7).

When OPM investigated Ms. Cruz-Packer's employment at the West Virginia Division of Corrections, it reportedly discovered that she was "dismissed on 5/21/1998" (Att. D at 1). According to the ROI, Mr. Manford Holland, Ms. Cruz-Packer's second-line supervisor, officially terminated her employment (Id. at 4). As confirmed by Mr. Cox, Mr. Holland did not and could not have terminated Ms. Cruz-Packer, who was a political appointee (Att. B at ¶¶6-8). The only official who could have done so was the Commissioner of Corrections, and only with Mr. Cox's approval and written concurrence. (Id.). Mr. Cox's approval was neither sought nor given. (Id. at ¶8). Therefore, the CWRP personnel records cited in OPM's report, which supposedly reflect that Ms. Cruz-Packer was "dismissed" from that position, are inaccurate and unauthorized (Att. D at 2).

## Ms. Cruz-Packer Reported Her Departure
### From the CWRP On Her Security Clearance Form

Even though she was not terminated from the West Virginia Division of Corrections position, Ms. Cruz-Packer did notify TSA of her departure from that job on her Declaration of Federal Employment at Questions 12 and 16 (Att. E). She explicitly stated that she resigned on the basis of a "mutual agreement between the Director of Public Safety (Otis Cox) and [herself]."

3

(Att. E, Question 16). That form was signed by Ms. Cruz-Packer the same day she signed her SF-86 and was attached to the SF-86 (Att. A at ¶¶11-12, Att. C, E).

Ms. Cruz-Packer did not deliberately omit the West Virginia job in her response to Question 22 on the SF-86 (Att. A at ¶¶13-17). She inadvertently listed the events in chronological order, rather than reverse order, as she had on other sections of the form (e.g. Att. C, Question 10), and did not have space to list the 1998 CWRP position underneath the 1997 Volunteers of America position (Id. at Question 22). Instead, she listed her departure from the CWRP position in the "Continuation Space" portion of the Declaration of Federal Employment, at Question 16, which was attached to the SF-86 (Att. E, Att. A at ¶¶11-12, 15-16).

Ms. Cruz-Packer's SF-86 and Declaration of Federal Employment were signed on the same date, stapled together, and submitted as one document (Att. A at ¶¶11-12). Ms. Cruz-Packer disclosed her 1998 departure from the CWRP at the same time she provided notice of her 1997 termination from Volunteers of America (Id.). [3] TSA was therefore fully informed of Ms. Cruz-Packer's employment history, and its allegation that she failed to disclose that information is groundless.

As explained above, Ms. Cruz-Packer was not terminated from her position at the West Virginia Department of Corrections, rather she voluntarily resigned for family emergency reasons and returned to New York so that she could attend to the adoption mediation for her children, and her husband who was terminally ill. Ms. Cruz-Packer did provide information about her voluntary departure from that position to TSA in an attachment to her SF-86, which was signed and submitted to TSA on March 24, 2003, but which was inexplicably not included as an exhibit to TSA's Proposal to Remove (Att. C, E). Additionally, the OPM report on which the agency relied is inaccurate, and directly controverted by the official whose authorization would have been required to terminate Ms. Cruz-Packer (Att. A at ¶¶ 4, 10; Att. B at ¶¶6-8). The evidence provided by Ms. Cruz-Packer supports her account of the events, and demonstrates that she more than complied with her obligations to disclose her employment history to TSA. The agency has no grounds for finding Ms. Cruz-Packer unsuitable for federal service; accordingly, Ms. Cruz-Packer requests that the agency withdraw and expunge the notice of proposed removal and restore her to active duty status.

Very truly yours,

Robert C. Seldon, Esq.
Molly E. Buie, Esq.

cc:    Linda Cruz-Packer
        Martina Griggs Johnson

---

[3]    The Declaration of Federal Employment was not attached as an exhibit to the Proposal to Remove. Ms. Cruz-Packer obtained the attached copy (Att. E) through a document request to TSA.

4

**ATTACHMENT C**

Department of Corrections, and he did not do so. Further, Ms. Cruz-Packer provided evidence that she did report her departure upon mutual agreement from the West Virginia Department of Corrections on her Declaration of Federal Employment, which was attached to her SF-86.

Rather than wait for OPM to complete its investigation, however, TSA moved to terminate Ms. Cruz-Packer based on the fabricated statements of two witnesses who had ill motives for making them. At the same time, it ignored Ms. Cruz-Packer's truthful answers to questions 12 and 16 on the Declaration of Federal Employment which was in the agency's possession. The evidence cited in TSA's Notice of Proposed Removal, including OPM's deficient and <u>unfinished</u> investigation, <u>cannot</u> support the agency's proposed termination of Ms. Cruz-Packer. Accordingly, we request that TSA immediately reinstate Ms. Cruz-Packer, and withdraw the Notice of Proposed Termination unless and until it can provide complete, accurate, and properly documented evidence to support its charges.

We will await the agency's response at your earliest opportunity. If we do not hear from you before the week is out, we will advise Ms. Cruz-Packer to contact her EEO counselor about the agency's failure to restore her to active duty and to require her to take annual leave to submit her Reply.

Very truly yours,

Robert C. Seldon, Esq.
Molly E. Buie, Esq.

cc:    Linda Cruz-Packer

2

**ATTACHMENT D**

# Declaration for Federal Employment

Form Approved
OMB No. 3206-0182

## Instructions

The information collected on this form is used to determine your acceptability for Federal and Federal contract employment and your enrollment status in the Government's Life Insurance program. You may be asked to complete this form at any time during the hiring process. Follow instructions that the agency provides. If you are selected, before you are appointed you will be asked to update your responses on this form and on other materials submitted during the application process and then to recertify that your answers are true.

All your answers must be truthful and complete. A false statement on any part of this declaration or attached forms or sheets may be grounds for not hiring you, or for firing you after you begin work. Also, you may be punished by a fine or imprisonment (U.S. Code, title 18, section 1001).

Either type your responses on this form or print clearly in dark ink. If you need additional space, attach letter-size sheets (8.5" X 11"). Include your name, Social Security Number, and item number on each sheet. We recommend that you keep a photocopy of your completed form for your records.

## Privacy Act Statement

The Office of Personnel Management is authorized to request this information under sections 1302, 3301, 3304, 3328, and 8716 of title 5, U. S. Code. Section 1104 of title 5 allows the Office of Personnel Management to delegate personnel management functions to other Federal agencies. If necessary, and usually in conjunction with another form or forms, this form may be used in conducting an investigation to determine your suitability or your ability to hold a security clearance, and it may be disclosed to authorized officials making similar, subsequent determinations.

Your Social Security Number (SSN) is needed to keep our records accurate, because other people may have the same name and birth date. Public Law 104-134 (April 26, 1996) asks Federal agencies to use this number to help identify individuals in agency records. Giving us your SSN or any other information is voluntary. However, if you do not give us your SSN or any other information requested, we cannot process your application. Incomplete addresses and ZIP Codes may also slow processing.

ROUTINE USES: Any disclosure of this record or information in this record is in accordance with routine uses found in System Notice OPM/GOVT-1, General Personnel Records. This system allows disclosure of information to: training facilities; organizations deciding claims for retirement, insurance, unemployment, or health benefits; officials in litigation or administrative proceedings where the Government is a party; law enforcement agencies concerning a violation of law or regulation; Federal agencies for statistical reports and studies; officials of labor organizations recognized by law in connection with representation of employees; Federal agencies or other sources requesting information for Federal agencies in connection with hiring or retaining, security clearance, security or suitability investigations, classifying jobs, contracting, or issuing licenses, grants, or other benefits; public and private organizations, including news media, which grant or publicize employee recognitions and awards; the Merit Systems Protection Board, the Office of Special Counsel, the Equal Employment Opportunity Commission, the Federal Labor Relations Authority, the National Archives and Records Administration, and Congressional offices in connection with their official functions; prospective non-Federal employers concerning tenure of employment, civil service status, length of service, and the date and nature of action for separation as shown on the SF 50 (or authorized exception) of a specifically identified individual; requesting organizations or individuals concerning the home address and other relevant information on those who might have contracted an illness or been exposed to a health hazard; authorized Federal and non-Federal agencies for use in computer matching; spouses or dependent children asking whether the employee has changed from a self-and-family to a self-only health benefits enrollment; individuals working on a contract, service, grant, cooperative agreement, or job for the Federal government; non-agency members of an agency's performance or other panel; and agency-appointed representatives of employees concerning information issued to the employees about fitness-for-duty or agency-filed disability retirement procedures.

## Public Burden Statement

Public burden reporting for this collection of information is estimated to vary from 5 to 30 minutes with an average of 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of the collection of information, including suggestions for reducing this burden, to the U.S. Office of Personnel Management, Reports and Forms Manager (3206-0182), Washington, DC 20415-7900. The OMB number, 3206-0182, is valid. OPM may not collect this information, and you are not required to respond, unless this number is displayed.

U.S. Office of Personnel Management
5 U.S.C. 1302, 3301, 3304, 3328 & 8716

NSN 7540-01-368-7775

Optional Form 306
Revised January 2001
Previous editions obsolete and unusable

03008433

# Declaration for Federal Employment

Form Approved
OMB No. 3206-0182

## GENERAL INFORMATION

**1. FULL NAME** *(First, middle, last)*

Linda Yvetta Cruz-Packer

**2. SOCIAL SECURITY NUMBER**

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

**3. PLACE OF BIRTH** *(Include city and state or country)*

Clarksville, Tenn

**4. DATE OF BIRTH** *(MM/DD/YYYY)*

05-20-1951

**5. OTHER NAMES EVER USED** *(For example, maiden name, nickname, etc)*

- Wakefield (maiden)
- Pippen (married

**6. PHONE NUMBERS** *(Include area codes)*

Day (571) 227-1681

Night (301) 234-0097

## Selective Service Registration

If you are a male born after December 31, 1959, and are at least 18 years of age, civil service employment law (5 U.S.C. 3328) requires that you must register with the Selective Service System, unless you meet certain exemptions.

| | | | |
|---|---|---|---|
| 7a. | Are you a male born after December 31, 1959? | ☐ YES ☒ NO | *If "NO" skip 7b and 7c. If "YES" go to 7b.* |
| 7b. | Have you registered with the Selective Service System? | ☐ YES ☒ NO | *If "NO" go to 7c.* |
| 7c. | If "NO," describe your reason(s) in item #16. | | |

## Military Service

**8.** Have you ever served in the United States military? ☒ YES *Provide information below*  ☐ NO

*If you answered "YES," list the branch, dates, and type of discharge for all active duty.*

*If your only active duty was training in the Reserves or National Guard, answer "NO."*

| Branch | From MM/DD/YYYY | To MM/DD/YYYY | Type of Discharge |
|---|---|---|---|
| Army | 1/3/72 | 7/373 | Honorable |

## Background Information

For all questions, provide all additional requested information under item 16 or on attached sheets. The circumstances of each event you list will be considered. However, in most cases you can still be considered for Federal jobs.

For questions 9,10, and 11, your answers should include convictions resulting from a plea of *nolo contendere* (no contest), but omit (1) traffic fines of $300 or less, (2) any violation of law committed before your 16th birthday, (3) any violation of law committed before your 18th birthday if finally decided in juvenile court or under a Youth Offender law, (4) any conviction set aside under the Federal Youth Corrections Act or similar state law, and (5) any conviction for which the record was expunged under Federal or state law.

| | | YES | NO |
|---|---|---|---|
| 9. | During the last 10 years, have you been convicted, been imprisoned, been on probation, or been on parole? (Includes felonies, firearms or explosives violations, misdemeanors, and all other offenses.) *If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the police department or court involved.* | ☐ | ☒ |
| 10. | Have you been convicted by a military court-martial in the past 10 years? *(If no military service, answer "NO.")* If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the military authority or court involved. | ☐ | ☒ |
| 11. | Are you now under charges for any violation of law? If "YES," use item 16 to provide the date, explanation of the violation, place of occurrence, and the name and address of the police department or court involved. | ☐ | ☒ |
| 12. | During the last 5 years, have you been fired from any job for any reason, did you quit after being told that you would be fired, did you leave any job by mutual agreement because of specific problems, or were you debarred from Federal employment by the Office of Personnel Management or any other Federal agency? If "YES," use item 16 to provide the date, an explanation of the problem, reason for leaving, and the employer's name and address. | ☐ | ☐ |
| 13. | Are you delinquent on any Federal debt? (Includes delinquencies arising from Federal taxes, loans, overpayment of benefits, and other debts to the U.S. Government, plus defaults of Federally guaranteed or insured loans such as student and home mortgage loans.) If "YES," use item 16 to provide the type, length, and amount of the delinquency or default, and steps that you are taking to correct the error or repay the debt. | ☒ | ☐ |

U.S. Office of Personnel Management

5 U.S.C. 1302, 3301, 3304, 3328 & 8716

NSN 7540-01-368-7775

Optional Form 306
Revised January 2001
Previous editions obsolete and unusable

03008433

## Declaration for ... eral Employment

Form Approved
OMB No. 3206-0182

### Additional Questions

14.  Do any of your relatives work for the agency or government organization to which you are submitting this form? (Include: father, mother, husband, wife, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother, and half sister.) If "YES," use item 16 to provide the relative's name, relationship, and the department, agency, or branch of the Armed Forces for which your relative works.

YES ☐  NO ☒

15.  Do you receive, or have you ever applied for, retirement pay, pension, or other retired pay based on military, Federal civilian, or District of Columbia Government service?

YES ☐  NO ☒

### Continuation Space / Agency Optional Questions

16.  Provide details requested in items 7 through 15 and 18c in the space below or on attached sheets. Be sure to identify attached sheets with your name, Social Security Number, and item number, and to include ZIP Codes in all addresses. If any questions are printed below please answer as instructed (these questions are specific to your position and your agency is authorized to ask them).

Division of Correction (6|98)
112 California Ave, Bldg 4 RM30
Charleston, WV 25301

This job is on the borderline of being 5 years -

Job promised could not be granted. Due to start up cost. Couple with famr stress, Relocation: mutual agreement between Director of Public Safety (Otis Cox) + myself to leave

### Certifications / Additional Questions

APPLICANT: If you are applying for a position and have not yet been selected, carefully review your answers on this form and any attached sheets. When this form and all attached materials are accurate, read item 17, and complete 17a.

APPOINTEE: If you are being appointed, carefully review your answers on this form and any attached sheets, including any other application materials that your agency has attached to this form. If any information requires correction to be accurate as of the date you are signing, make changes on this form or the attachments and/or provide updated information on additional sheets, initialing and dating all changes and additions. When this form and all attached materials are accurate, read item 17, complete 17b, read item 18, and answer 18a, 18b, and 18c as appropriate.

17.  I certify that, to the best of my knowledge and belief, all of the information on and attached to this Declaration for Federal Employment, including any attached application materials, is true, correct, complete, and made in good faith. I understand that a false or fraudulent answer to any question or item on any part of this declaration or its attachments may be grounds for not hiring me, or for firing me after I begin work, and may be punishable by fine or imprisonment. I understand that any information I give may be investigate for purposes of determining eligibility for Federal employment as allowed by law or Presidential order. I consent to the release of information about my ability and fitness for Federal employment by employers, schools, law enforcement agencies, and other individual: and organizations to investigators, personnel specialists, and other authorized employees or representatives of the Federal Government. I understand that for financial or lending institutions, medical institutions, hospitals, health care professionals, and some other sources of information, a separate specific release may be needed, and I may be contacted for such a release at a later date.

17a.  Applicant's Signature: *Linda Crig-Packer*  Date  3/24/03

(Sign in ink)

Appointing Officer:
Enter Date of Appointment or Conversion
MM / DD / YYYY

17b.  Appointee's Signature: _____  Date _____

(Sign in ink)

18.  Appointee (Only respond if you have been employed by the Federal Government before): Your elections of life insurance during previous Federal employment may affect your eligibility for life insurance during your new appointment. These questions are asked to help your personnel office make a correct determination.

18a.  When did you leave your last Federal job?  DATE: ____ MM / DD / YYYY

18b.  When you worked for the Federal Government the last time, did you waive Basic Life Insurance or any type of optional life insurance?

YES ☐  NO ☐  Do Not Kn ☐

18c.  If you answered "YES" to item 18b, did you later cancel the waiver(s)? If your answer to item 18c is "NO," use item 16 to identify the type(s) of insurance for which waivers were not canceled.

YES ☐  NO ☐  Do Not Kn ☐

U.S. Office of Personnel Management
5 U.G.C. 1302, 3301, 3304, 3328 & 8716

NSN 7540-01-368-7775

Optional Form
Revised January
Previous editions obsolete and unus

**ATTACHMENT E**

Subj:      **Formal complaint of discrimination**
Date:      3/15/2005 5:36:31 PM Eastern Standard Time
From:      cagfisher@comcast.net
To:        Llycpacker@aol.com

Linda:

Attached are the supplemental pages to your complaint of discrimination and a cover letter to Tamara Miller, establishing that we received your Notice of Right to File on 3/1/05 via facsimile.

I know we discussed your veteran status, with respect to this complaint, it is not relevant, as EEO law does not contain special provisions as to veterans (that is a MSPB issue).  Also, you will note that I set forth your complaint in more general terms, since so much of your specifics were set forth in your previous complaints ( which I referenced).  Keep in mind that we need only to set forth sufficient facts to put the Agency on notice as to how you believe you were discriminated against at this stage of the matter.

Let me know your feedback and we can discuss how to proceed from here.

CAF

Crystal A.G. Fisher, Esquire
CAROLYN C. EAGLIN & ASSOCIATES
431 N. Lee Street
Alexandria, Virginia 22314
(703) 549-9041 (P)
(703) 549-9043 (F)
In Maryland:
(301) 843-4019 (P)
(301) 843-4017 (F)

Tuesday, March 15, 2005 America Online: Guest

# *Robert C. Seldon & Associates, P.C.*

*Attorneys-At-Law*
*1319 F Street, N.W., Suite 305*
*Washington, DC 20004*
*202-955-6968 · fax: 202-318-2287*

February 11, 2004

**VIA FACSIMILE & FIRST CLASS MAIL**
Mr. Gary Krizanovic, Deputy Director
Personnel Security & Credentialing Program Office
TSA Headquarters – East Building
TSA-19 8th Floor
601 S.12th Street
Arlington, VA 22202-4220

RE:    **OPM Investigation of Linda Cruz-Packer**

Dear Mr. Krizanovic,

On October 24, 2003, the agency issued a Notice of Proposed Removal to terminate our client, Ms. Cruz-Packer, from the federal service. The sole support for the issuance of this Notice was the allegedly unfavorable results of OPM's background investigation of Ms. Cruz-Packer, which supposedly revealed that Ms. Cruz-Packer was unsuitable for federal employment because she had been terminated from a previous job, and failed to fully disclose that information on her SF-86. Because the Notice of Proposed Removal only contained a portion of OPM's investigative report, Ms. Cruz-Packer submitted a Freedom of Information Act request to OPM on January 21, 2004 in order to obtain the complete record of investigation.

We just received OPM's response to our FOIA request, dated February 9, 2003 (Att. A). In it, OPM notified Ms. Cruz-Packer that her FOIA request could not be processed because the investigation is still in progress. Since the OPM investigation – which provided the sole basis for TSA's action – is admittedly incomplete, there is no basis whatsoever for continuing Ms. Cruz-Packer in administrative leave capacity, much less requiring her to have taken annual leave to submit a reply to the proposed termination.

OPM's letter confirms our position exactly: Ms. Cruz-Packer's proposed termination was the product of OPM's inadequate and incomplete background investigation, and Mr. Scanlon's rush to act before a full record was available to him. As Ms. Cruz-Packer stated in her Reply to the Notice of Proposed Removal, the statements of Donald Ervin and Sharon Spurlock were untruthful, and easily could have been refuted by Otis Cox, had he been interviewed by OPM. Mr. Cox confirmed in a sworn affidavit that was attached to Ms. Cruz-Packer's Reply that he was the only official who could have authorized Ms. Cruz Packer's termination from the

(Att. E, Question 16). That form was signed by Ms. Cruz-Packer the same day she signed her SF-86 and was attached to the SF-86 (Att. A at ¶¶11-12, Att. C, E).

Ms. Cruz-Packer did not deliberately omit the West Virginia job in her response to Question 22 on the SF-86 (Att. A at ¶¶13-17). She inadvertently listed the events in chronological order, rather than reverse order, as she had on other sections of the form (e.g. Att. C, Question 10), and did not have space to list the 1998 CWRP position underneath the 1997 Volunteers of America position (Id. at Question 22). Instead, she listed her departure from the CWRP position in the "Continuation Space" portion of the Declaration of Federal Employment, at Question 16, which was attached to the SF-86 (Att. E, Att. A at ¶¶11-12, 15-16).

Ms. Cruz-Packer's SF-86 and Declaration of Federal Employment were signed on the same date, stapled together, and submitted as one document (Att. A at ¶¶11-12). Ms. Cruz-Packer disclosed her 1998 departure from the CWRP at the same time she provided notice of her 1997 termination from Volunteers of America (Id.). [3] TSA was therefore fully informed of Ms. Cruz-Packer's employment history, and its allegation that she failed to disclose that information is groundless.

As explained above, Ms. Cruz-Packer was not terminated from her position at the West Virginia Department of Corrections, rather she voluntarily resigned for family emergency reasons and returned to New York so that she could attend to the adoption mediation for her children, and her husband who was terminally ill. Ms. Cruz-Packer did provide information about her voluntary departure from that position to TSA in an attachment to her SF-86, which was signed and submitted to TSA on March 24, 2003, but which was inexplicably not included as an exhibit to TSA's Proposal to Remove (Att. C, E). Additionally, the OPM report on which the agency relied is inaccurate, and directly controverted by the official whose authorization would have been required to terminate Ms. Cruz-Packer (Att. A at ¶¶ 4, 10; Att. B at ¶¶6-8). The evidence provided by Ms. Cruz-Packer supports her account of the events, and demonstrates that she more than complied with her obligations to disclose her employment history to TSA. The agency has no grounds for finding Ms. Cruz-Packer unsuitable for federal service; accordingly, Ms. Cruz-Packer requests that the agency withdraw and expunge the notice of proposed removal and restore her to active duty status.

Very truly yours,

Robert C. Seldon, Esq.
Molly E. Buie, Esq.

cc:    Linda Cruz-Packer
       Martina Griggs Johnson

---

[3]    The Declaration of Federal Employment was not attached as an exhibit to the Proposal to Remove. Ms. Cruz-Packer obtained the attached copy (Att. E) through a document request to TSA.

4

15.    Ms. Cruz Packer alleges the following:

(a) **That the termination of her employment was a continuation of the disparate treatment she experienced due to her race, color, sex and age.**

As described in Ms. Cruz-Packer's prior complaint with the TSA Office of Civil Rights, No. TSA-04-00999, Ms. Cruz-Packer has and continues to allege that she was subject to disparate treatment by TSA officials during her employment. Specifically, she contends that she was treated differently than her White male counterparts by her supervisors with respect to actions taken related to alleged credit card misuse, scheduling, firearm qualification, and the investigation of Ms. Cruz-Packer's background. As to the security investigation, Ms. Cruz-Packer further contends that she was treated differently as to the manner in which the investigation was conducted by the Agency; the timing, nature and basis of opportunity with she was provided to respond to adverse information arising out of said investigation, and; the severity of action (i.e., indefinite suspension and termination) taken by the Agency in light of the adverse information upon which such actions were based.

(b) **That the termination of her employment represented a continuation of the hostile work environment she experienced due to her race, color, sex and age.**

Ms. Cruz-Packer contends that the same conduct and behavior by her supervisors as described above created and maintained a hostile work environment to which she was subjected, which ultimately led to and included the termination of her employment on November 18, 2004.

(c)    **That the termination of her employment represented retaliation based upon her prior EEO activity.**

Ms. Cruz Packer also alleges that the termination action was done in reprisal for her prior EEO activity, i.e., the filing of a complaint of discrimination with the TSA Office of Civil Rights, No. TSA-04-0099, on or about October 21, 2003. Ms. Cruz-Packer further contends that she made informal complaints about discrimination to Assistant Secretary David M. Stone and other TSA officials, both as an individual and as a member of the National Organization of Black Law Enforcement Executives (NOBLE), in that her involvement with said organization was known and acknowledged at the Agency.

## 19. Remarks and Explanations

*i.  Proposed Witnesses (Ms. Cruz-Packer refers to the Witness List provided in Complaint No. TSA-04-0099 in addition to those listed below):*

(a) **Hector Santana**:  Mr. Santana was Ms. Cruz-Packer's first-line supervisor and the one of the alleged discriminating officials. Mr. Santana was involved in much of the conduct complained of herein.

1

(b) **Lou Widawski,** Deputy Director of Program Reviews and Special Operations: Was the official who proposed Ms. Cruz-Packer's indefinite suspension, and has knowledge of the background investigation performed on Ms. Cruz-Packer, as well as conduct by Santana complained of herein.

(c) **John Rooney,** Director of Program Reviews and Special Operations: Was the deciding official with respect to the proposed indefinite suspension and has knowledge of Ms. Cruz-Packer's prior complaints about Santana.

(d) **Gary Krizanovic,** Deputy Director of the Credentialing Program Office: Has knowledge regarding Ms. Cruz-Packer's background investigation and the information received from OPM, and the further investigation done by TSA concerning her background.

(e) **Robert Scanlon,** Assistant Director, Personnel Security & Credentialing Program Office: Was the official who proposed Ms. Cruz-Packer's removal. Has knowledge regarding Ms. Cruz-Packer's background investigation and the information received from OPM, and the further investigation done by TSA concerning her background.

(f) **Joy S. Fairtile,** Deputy Director, Office of Transportation Vetting and Credentialing: Was the deciding official as to Ms. Cruz-Packer's removal from federal service.

(g) **Otis Cox**: Served as the Secretary of Public Safety for the State of West Virginia during Ms. Cruz-Packer's employment with the Divisions of Corrections and has knowledge of the circumstances of Ms. Cruz-Packer's employment and departure from that position, as it relates to the actions taken against her by TSA with respect to the security background investigation.

ii.    *Appeals to the Merit Systems Protection Board (Question 18):*

Ms. Cruz-Packer appealed the indefinite suspension action to the Board on October 21, 2004 . The matter was dismissed, without prejudice, due to Ms. Cruz-Packer's removal from federal service on November 18, 2004. See Initial Decision, <u>Cruz-Packer v. Dep't of Homeland Security,</u> Docket No. DC-0752-04-0640-I-2, dated January 14, 2005, attached hereto.

# TRANSPORTATION SECURITY ADMINISTRATION

## MEMORANDUM OF INTERVIEW

**Subject Interviewed:**
ARMSTRONG, WAYNE
Director of Human Resources
Division of Corrections
State of West Virginia
Charleston, West Virginia
(304) 558-8045/8049

**Date and Time:**
4/20/04, 1:00 PM

**Details of Interview:**
ARMSTRONG was interviewed regarding an allegation developed during a background investigation that LINDA CRUZ-PACKER, Special Agent, Internal Affairs Division, DHS, TSA, Arlington, VA may have made false written statements on Office of Personnel Management (OPM) Standard Form (SF) 86, Questionnaire for National Security Positions, and OPM Optional Form (OF) 306, Declaration for Federal Employment. Specifically, CRUZ-PACKER did not list her termination from the West Virginia Division of Corrections on her SF 86. In addition, CRUZ-PACKER stated on her OF 306 that she left her position with the (West Virginia) Division of Corrections as a result of a "mutual agreement" between her and the Director of Public Safety, OTIS COX. This information is contrary to information obtained in the course of CRUZ-PACKER's background investigation that indicated she had been dismissed/fired from the West Virginia Division of Corrections. The interview was conducted at 607 Leon Sullivan Way, Charleston, WV. Prior to interviewing ARMSTRONG he was placed under oath.

ARMSTRONG essentially stated the following:

He has been the Director of Human Resources since April 2001. He was not involved in any of CRUZ-PACKER's personnel matters, but he knew that she had been dismissed/terminated from her employment with the Division of Corrections. CRUZ-PACKER had been a "160-day Temporary Employee". The Commissioner of the Division of Corrections (WILLIAM DAVIS) would have signature authority (the ability to sign documents on behalf of his superior) to dismiss/terminate Correction Division employees. The Commissioner would have given signature authority to his Deputy Commissioner (MANFRED HOLLAND). Therefore, HOLLAND would have had the authority to dismiss/terminate CRUZ-PACKER. Before an employee of the Division of Corrections can be fired, he should be consulted, but this does not always

Exhibit X
1 of 2

happen.  COX could have only hired and fired those employees that worked directly for him and were physically located in his office.  CRUZ-PACKER could not have been appointed by COX, but rather COX could recommend her to be hired.  If CRUZ-PACKER was an "at-will" employee (political appointee) she would have no rights of employment.

The Personnel Action Form (WV11) is used to document employee personnel matters to include when an employee is fired.  If CRUZ-PACKER was fired by the Deputy Commissioner of Corrections, the WV11 would be routed through COX's office, as well as the Division of Personnel for the State of West Virginia.  BARBARA WIMER used to work as the Executive Secretary for COX, and COX may have given her signature authority.

His office does not have any hard-copy documentation regarding CRUZ-PACKER.  He requested a search of CRUZ-PACKER's personnel file through the West Virginia State archives, but no records were found.


<u>Steve Geary, Special Agent</u>
**TSA CPO Case Agent**

Exhibit V
2 of 2